**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THOMAS U. KENNEY, on Behalf of Himself and a Class of Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>STATE STREET CORPORATION; NORTH AMERICA REGIONAL BENEFITS COMMITTEE OF STATE STREET CORPORATION; ALISON QUIRK; PAMELA GORMLEY; ROSS MCLELLAN; DAVID O'LEARY; SKIP CURTRELL; JAYNE DONAHUE; DAVID GUTSCHENRITTER; JAMES MALERBA; STATE STREET CORPORATION INVESTMENT COMMITTEE; and JOHN DOES 1-10<br><br>Defendants. | 1:09-cv-10750<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF ERISA DISCLOSURE REQUIREMENTS<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Thomas U. Kenney ("Plaintiff"), on behalf of himself and on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of the State Street Salary Savings Program (hereinafter referred to as the "Plan"), by his attorneys, alleges the following for his Amended Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiff, which are based upon personal knowledge. Plaintiff may, after discovery and/or disclosure proceedings in this case, seek leave to further amend this Complaint to add new parties or claims.

## NATURE OF ACTION

1. Plaintiff, who was a Participant in the Plan during time periods relevant to this Complaint, brings this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of common stock of State Street Corporation (hereinafter "State Street" or the "Company") at any time from January 3, 2008 to January 20, 2009 (the period from January 3, 2008 to January 20, 2009 being hereinafter referred to as the "Class Period"). Plaintiff brings this action on behalf of the Plan and the Class pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3). As more fully set forth below, Defendants breached their fiduciary duties to the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550. Defendants breached their fiduciary duties to the Participants in various ways, including, but not limited to, (i) misrepresenting and failing to disclose material facts to the Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Participants solely in the interests of the Participants for the

exclusive purpose of providing benefits to Participants and their beneficiaries; (iii) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify adequately the investments in the Plan so as to minimize the risk of large losses; and (v) permitting the Participants to continue to elect to invest their retirement monies in State Street common stock when the State Street had made materially misrepresentations about State Street's financial condition or omitted to disclose material facts about State Street's financial condition when it was imprudent to do so, and when the Participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty and or the damages recognized by law so that the Plan receives from the Defendants the difference between the performance of State Street stock held by the Plan during the Class Period and the value which that investment would have had if it had been prudently invested. In addition, under § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)), Plaintiff seeks other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, restitution, and other monetary relief. Insofar as any Defendant is sued alternatively as a knowing participant in a breach of fiduciary duty for equitable relief, Plaintiff intends to proceed pursuant to § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)).

## JURISDICTION AND VENUE

2. Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

3. This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plan was administered, where breaches of fiduciary duty took place and/or where one or more Defendants reside or may be found.

**THE PARTIES**

5. Plaintiff Thomas U. Kenney is a resident of the Commonwealth of Massachusetts. Plaintiff was employed by State Street (or a subsidiary or division of State Street) for several years until approximately December 4, 2008, and maintained an investment in State Street common stock in his individual account in the Plan during the Class Period.

6. Defendant State Street is a financial holding company. The Company, through its subsidiaries, including its banking subsidiary, State Street Bank and Trust Company and State Street Corporation, provides a range of products and services for institutional investors globally. The Company operates in three lines of business: Investment Management, Investment Research and Trading, and Investment Servicing. The business provide services to support institutional investors, including custody, daily pricing and administration, brokerage and other trading services, deposit and short-term investment facilities, loan and lease financing, investment manager and hedge fund manager operations outsourcing, performance, risk and compliance analytics, investment research and investment management, including passive and active United States and non-United States equity and fixed income strategies. The Company is incorporated in Massachusetts and maintains its principal place of business at One Lincoln Street, Boston, MA 02111. State Street has a significant presence in this District in that it maintains at least six offices in this District (see http://www.statestreet.com/geographic_markets/contact_us/us_ny.html).

7. Summary Plan Descriptions which were provided annually to Participants state that State Street was one of the Plan fiduciaries (along with the Benefits Committee and the Investment

Committee identified below) and that State Street had "Plan Fiduciary Responsibility." The 2007 SPD stated that the Executive Committee of the Board of Directors of State Street may appoint and remove members of the Benefits Committee and the Investment Committee. Under the governing Plan document, State Street was the "Plan Sponsor" (Plan, Section 2.35), and State Street designated the committee(s) which was or were to manage and administer the Plan on a day-to-day basis. Plan, Section 2.10. State Street also shared with the Benefits Committee, identified below, the power to select the investment options in which Participants could invest their retirement savings in the Plan. Section 5.4 of the Plan states that Participant accounts "shall be invested . . . as the Participants . . . direct from among such investment options as the Committee *or* Plan Sponsor may make available from time to time." (Emphasis added) Indeed, the Summary Plan Descriptions which were made available to Participants on an annual basis specifically advised that "[t]he Company may add or delete funds or other investment alternatives at any time." The SPD defines "the Company" as State Street. The Plan Administrator is also defined (in Section 2.34 of the Plan) as "State Street acting through the Committee(s)." State Street is thus liable herein because of its own conduct and inaction as Plan Sponsor and because of its authority over Plan investment options, as well as under the doctrine of *respondeat superior* (because the Benefits Committee, identified below, was made up of State Street employees), and also because State Street agreed to indemnify the members of the Benefits Committee, by virtue of Section 10.10 of the Plan or otherwise.

8. At all times relevant to this Complaint, Defendant North America Regional Benefits Committee (the "Benefits Committee") managed and administered the Plan and the assets of the Plan on a day-to-day basis and acted as a fiduciary with respect to the Plan. The Report of Independent Registered Public Accounting Firm (Ernst & Young LLP) included in the Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2007, which was filed with the SEC on or about June

27, 2008 (the "2008 11-K") was addressed in part to "The North America Regional Benefits Committee." The Benefits Committee is the Committee, identified in Section 2.10 of the governing Plan document, which has been designated by the Plan Sponsor (State Street) to manage and administer the Plan on a day-to-day basis. Indeed, the Benefits Committee is described in the Plan documents as "the fiduciary identified to furnish the information to Participants and Beneficiaries described in the ERISA 404(c) regulations ...", Plan, Section 5.4., and as the entity "responsible. . . for complying with the reporting and disclosure requirements of ERISA." Plan, Section 10.8. The Benefits Committee shared, with State Street, the authority to select the investment options to be made available to Plan Participants, since as noted above, Section 5.4 of the Plan states that Participants accounts shall be invested as the Participants direct "from among such investment options as the Committee or Plan sponsor may make available from time to time." The Benefits Committee had "full discretionary power and authority to administer the Plan in all of its details." Plan, Section 10.2. The March 27, 2008 Investment Policy Statement of the Plan similarly states that "State Street . . . gives the . . . Benefits Committee all of the authority of the Company to manage the assets of the Plan."

9. At all times relevant to this Complaint Defendant Allison Quirk was a member of the Benefits Committee and was a fiduciary of the Plan. Defendant Quirk was Chair of the Benefits Committee as of June 2008.

10. At all times relevant to this Complaint Defendant Pamela Gormley was a member of the Benefits Committee and was a fiduciary of the Plan.

11. At all times relevant to this Complaint Defendant Ross McLellan was a member of the Benefits Committee and was a fiduciary of the Plan.

12. At all times relevant to this Complaint Defendant David O'Leary was a member of the Benefits Committee and was a fiduciary of the Plan. Defendant O'Leary, as State Street's Executive Vice President of Global Human Resources was a standing member of the Benefits Committee.

13. At all times relevant to this Complaint Defendant Skip Curtrell was a member of the Benefits Committee and was a fiduciary of the Plan.

14. At all times relevant to this Complaint Defendant Jayne Donahue was a member of the Benefits Committee and was a fiduciary of the Plan.

15. At all times relevant to this Complaint Defendant David Gutschenritter was a member of the Benefits Committee and was a fiduciary of the Plan.

16. At all times relevant to this Complaint Defendant James Malerba was a member of the Benefits Committee and was a fiduciary of the Plan.

17. At all times relevant to this Complaint, Defendant State Street Corporation Investment Committee (the "Investment Committee") assisted in the management and administration of the Plan and the assets of the Plan and acted as a fiduciary with respect to the Plan.

18. John Does 1-30 were the individual members of the Investment Committee. The identity of the members of the Investment Committee, and of any other committee(s) which was or were responsible for carrying out the provisions of the Plan, is currently not known. Plaintiff has requested that a Plan representative provide the names of the Investment Committee members but the Plan representative has so far declined to provide such information.

## CLASS ACTION ALLEGATIONS

19. Plaintiff brings this action on his own behalf and as a class action pursuant to Rules 23(a), (b)(1)(B) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting

of all current and former Participants in the Plan for whose individual accounts the Plan held shares of State Street common stock (including in the form of units of the State Street Corporation ESOP Fund) at any time from January 3, 2008 to January 20, 2009 (the "Class").

20. The members of the Class are so numerous that joinder of all members is impracticable. According to the 2008 11-K, the Plan was available to All State Street employees and employees of certain related companies. At December 31, 2007, the Plan had assets of $1,465,758,975. State Street's web page describes State Street as a company with "more than 27,500 talented and dedicated employees in our offices all over the world." Thus, it can be fairly assumed that there are at least thousands of class members, clearly satisfying the numerosity requirement.

21. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants were fiduciaries;

(b) Whether Defendants breached their fiduciary duties;

(c) Whether the Plan and the Participants were injured by such breaches; and

(d) Whether the Class is entitled to damages and/or injunctive or other equitable relief.

22. Plaintiff's claims are typical of the claims of the other members of the Class, as the Plaintiff and all other members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

23. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action ERISA litigation. The

interests of Plaintiff are coincident with and not antagonistic to the interests of the other class members.

24. Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

25. The claims herein are under ERISA and related principles of federal common law cannot be asserted by the Plaintiff in derivative actions against the company or in class actions under securities laws.

26. Under and as required by ERISA, Defendants carry insurance for claims asserted herein that may not be available to the defendants in any other actions.

## DESCRIPTION OF THE PLAN

27. At all times relevant to this Complaint, the Plan was an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

28. At all times relevant to this Complaint, the Plan was a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts..

29. The purpose of the Plan was to enable and encourage Participants to save for their retirements. As stated in the Summary Plan Descriptions which were distributed annually to

Participants, the Plan "helps you accumulate savings for retirement." According to the 2007 SPD, the Plan "[l]ets you save for retirement or meet short-term needs." The Plan document itself similarly states that "[t]he Plan is being maintained for the purpose of providing benefits to Participants upon retirement . . ." Plan, Section 1.3, entitled "Purpose of Plan." The March 27, 2008 Investment Policy Statement of the Plan concurs. ("The primary purpose of the Plan is to provide a benefit to employees which encourages eligible participants to save for retirement . . .").

30. At all times relevant to this Complaint, the Plan provided a number of different options for investment of the Plan's assets, including State Street common stock.

31. At all times relevant to this Complaint, Participants were allowed to direct the Plan to purchase investments from among the investment options available under the Plan and allocate them to their individual accounts. While the fiduciaries of the Plan did, in fact, offer State Street stock as a Plan investment option throughout the Class Period (albeit imposing a 25% cap), there was no requirement in the Plan or ERISA that the fiduciaries offer State Street stock. Indeed, the governing Plan document, including at Sections 5.4 and 10.2(d), make clear that both the Benefits Committee and State Street had complete discretion over what investment options would be made available to Participants.

32. The 2008 11-K of the Plan states, among other things:

> **1. Description of the Plan**
>
> The description of the State Street Salary Savings Program (the Plan) is provided for general information purposes only. Employees should refer to the Summary Plan Description and Plan document for more complete information.
>
> **General**
>
> The Plan is a defined contribution plan. All State Street employees and certain related companies (collectively, the Company) are immediately eligible to participate in the Plan except for the following categories of employees:

- Non-resident aliens with no U.S. source income
- Student interns and co-op employees
- Union employees
- Leased employees and independent contractors
- Employees of a non-participating affiliated company.

**Plan Amendments and Other Changes**

During 2006, the following amendments and changes were made to the Plan:

Effective August 4, 2006 (close of business), the State Street Corporation Stock Fund (the non-ESOP Stock Fund) was discontinued. This non-ESOP stock fund had been used solely as a holding vehicle to receive new employee and employer contributions during a quarter before they were transferred to the ESOP Fund. Regulations changed and employee and company matching contributions could be posted directly into the ESOP Fund without first being posted to the non-ESOP fund.

Effective August 4, 2006 (close of business), the SSgA Conservative, Moderate, and Aggressive Asset Allocation Funds were discontinued as SSP investment options. Balances remaining in these funds as of the effective date were transferred automatically to the new Age-Based Fund associated with a participant's date of birth.

Effective August 7, 2006, nine SSgA Age-Based Funds were added to the SSP investment options. These nine funds are similar in composition to the Asset Allocation Funds and provide a single investment vehicle that provides diversification exposure across major global asset classes. The Age-Based Funds provide automatic rebalancing, moving from an aggressive mix to a conservative mix as retirement approaches.

Effective in 2007, the following changes were made to the Plan:

* * *

Restriction on ESOP Fund account balance to no more than 25% of participant's total account balance (existing ESOP balances grandfathered).

Investment in the ESOP Fund can be made only by means of a spot transfer from another core Plan fund or funds, subject to the 25%

restriction; direct investment into ESOP Fund, by means of payroll contributions or rollovers, is no longer permitted.

* * *

**Contributions**

Active participants may elect to make tax-deferred contributions and/or Roth after-tax contributions to the Plan equal to 1% to 50% (25% prior to January 1, 2007) of their compensation, subject to certain limitations. Participants may also contribute amounts representing rollover distributions from other qualified defined benefit or defined contribution plans.

Effective January 1, 2008, Matching Contributions to the Plan are made by the Company in amounts equal to 100% of the first 6% of the employee's tax-deferred contributions or Roth after-tax contributions. Prior to January 1, 2008, contributions to the Plan were made by the Company in amounts equal to 50% of the first 6% of the employee's contributions. Also, prior to January 1, 2008, all employees who had completed one year of employment during which they have worked at least 1,000 hours were eligible for corporate matching contributions and these contributions vested immediately.

All contributions to the Plan are paid to State Street Bank and Trust Company, as Plan Trustee. The Trustee holds contributions in trust exclusively for participants and their beneficiaries, invests the contributions as instructed by the participants, and makes benefit payments as they become due.

**Investment Options**

Participant contributions and matching contributions are allocated to investment funds at the participant's direction. A wide range of investment choices, including various common collective trust funds managed by State Street Bank and Trust Company, a company stock fund (ESOP) and a Self-Managed Brokerage Account (SMBA), are available to participants. Limitations and restrictions apply to direct contributions to the ESOP or the SMBA Funds.

In the event a participant does not make an investment election, and in the event of automatic enrollment, funds are invested in the Target Retirement Date Fund that corresponds to the participants assumed target retirement year based on the participant's date of birth.

* * *

> **Participant Accounts**
>
> Each participant's account is credited with the participant's contributions, Company contributions, and related earnings. The benefit to which a participant is entitled is the value of the participant's vested account balance, including earnings.

33. The Plan's 2008 11-K represents that approximately $413,880,785 of the Plan's total investments of $1,463,945,655, or approximately 28.2% of the assets of the Plan, were invested in State Street common stock as of December 31, 2007. According to the Plan's Form 11-K for the year ended December 31, 2008, which was signed by defendant Malerba on June 29, 2009 (2009 11-K), $194, 949, 882 of the Plan's total investments of $1,148,438,707, a reduction down to 17% of the assets of the Plan as of December 31, 2008, was invested in State Street common stock, despite the fact that the number of units of participation of State Street common stock had decreased only approximately 2% from 5,097,055 units to 4,956,774 units. Thus, Plan participants who had invested in State Street stock saw a reduction in the value of those shares being held of about $200 million over the course of 2008.

34. Throughout the Class Period, State Street common stock was not a prudent investment for the Participants' individual retirement accounts under the Plan. Further, Defendants had made full and timely disclosure to the Participants of State Street's true financial and operating condition, as described herein, the Participants would not have chosen State Street common stock as an investment option under the Plan to the extent that they did. Indeed, had the truth been disclosed to the Participants, State Street common stock would not have been chosen by many Participants as an investment option at all.

## ADMINISTRATION OF THE PLAN

35. Defendants, as fiduciaries of the Plan, were required by ERISA to furnish certain information to Participants. For example, ERISA Section 101 (29 U.S.C. § 1021) requires a plan's

Administrator to furnish a Summary Plan Description ("SPD") to Participants. ERISA Section 102 (29 U.S.C. § 1022) provides that an SPD must apprise Participants of their rights and obligations under the Plan. In addition, every person who held State Street stock in a Plan account received annually a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of State Street.

36. At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plan's assets allocated to their accounts.

37. At all times relevant to this Complaint, Defendants had a duty to review the Plan's investment policies and the selection and the performance of investment alternatives offered under the Plan. There was no requirement that any assets of the Plan be invested in Company stock or that Company stock be continued as an investment alternative.

38. At all times relevant to this Complaint, all fiduciaries of the Plan had a duty to obtain from the Company information necessary for the proper administration of the Plan.

39. At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

40. Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

41. During the Class Period, as a result of statements made by or on behalf of State Street, the Company was perceived by the market to be less vulnerable to market losses than broad-based

commercial and investment banks, mainly because State Street did not make loans, offer credit cards, or engage in consumer banking but, instead, acted as a securities custodian. However, this perception, which was fostered by State Street, was incorrect. In fact, during the Class Period: (1) State Street held highly risky investments; (2) State Street was overexposed to billions of dollars of off-balance sheet conduits, and (3) State Street risked losing significant custodial fees and other business, and State Street stock was exposed to a substantial diminution in value, by actions by State Street which jeopardized its reputation and stature.

**STATE STREET STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN**

42. During the Class Period, State Street held high risk investment securities and conduits, ignoring the devastating effects that these high risk investment securities and the conduits would have on the Company as the economy and stock market softened. These high risk investments have caused substantial damage for State Street, in terms of a substantial write-down of assets, as-yet unrealized losses, reputational harm and loss of business. These losses include the "$5.5 billion of after-tax net unrealized losses associated with our portfolio of investment securities available for sale and held to maturity" which would ultimately be reported by the Company on January 16, 2009, near the end of the Class Period.

43. In heavily investing in investment securities, State Street and the other Defendants knew or should have known that: (i) throughout the Class Period the Company was more exposed to stock fluctuations than it disclosed; and (ii) the Company's Class Period public and financial statements were materially false due to their failure to inform the market of the ticking time bomb in the Company's investment securities portfolio due to the deteriorating assets which caused State Street's portfolio to be impaired.

44. The Class Period begins on January 3, 2008. On that day State Street issued a press release announcing that it had established a reserve to address certain matters, including "customer concerns" relating to activities of the Company's investment management arm, State Street Global Advisors (SSgA). Notwithstanding the establishment of the reserve, State Street went out of its way in the January 3, 2008 press release to assure the market generally, as well as the Plan Participants, that any such customer concerns were without merit. The press release quoted State Street CEO Ronald E. Logue as stating that "[o]ur business continues to be very strong" and that "we will continue to defend ourselves vigorously against inappropriate claims."

45. In fact, as would ultimately be later revealed, State Street's business was not "very strong" at the beginning of 2008, customer concerns and complaints relating to activities of State Street's investment management arm were in large part meritorious and widespread, and State Street's portfolio was impaired in amounts exceeding the reserve established in January 2008.

46. Thereafter, on April 15, 2008, the Company issued a Form 8-K which contained a press announcing State Street's results of operations and related financial information for the first quarter of 2008 ended March 31, 2008: It stated in part as follows:

> *Ronald E. Logue, State Street's chairman and chief executive officer, said, "I am extremely pleased with this record revenue performance, particularly in today's challenging environment.* The momentum we have achieved over the past 12 months continues, despite the negative equity markets. The neutral earnings-per-share result for the acquired Investors Financial business demonstrates our success in consolidating this business. In the first quarter, we grew our revenue and operating earnings per share and generated operating return on equity above our financial goals. Compared to the year-ago quarter, we experienced growth in nearly all lines of our income statement and recorded positive operating leverage for the fourteenth consecutive quarter when measured on a year-over-year basis.
>
> Servicing fee revenue was up 34% and asset management fee revenue grew 7% from the prior year's first quarter. We won $600 billion of assets in new business in servicing and $69 billion of net new business in asset management. Growth outside the U.S. continues to provide momentum. Growth in revenue was particularly

> strong in our trading business and our securities finance business in this volatile business environment. Growth in net interest revenue is due to a favorable U.S. rate environment as well as the successful execution of our balance sheet strategy."
>
> Logue continued, "During the first quarter, we strengthened our regulatory capital position with strong net income of more than $500 million and the issuance of $500 million of tier-1 qualified regulatory capital."
>
> Logue concluded, "Given the continued unsettled economic environment, for now we continue to expect to achieve in the middle of the ranges we established for this year. Excluding the impact of the fourth-quarter 2007 charge and the impact of merger and integration costs in both 2007 and 2008, these ranges reflect an increase in operating earnings per share of between 10 and 15 percent; an increase in revenue of 14 to 17 percent; and operating return on equity of 14 to 17 percent." (Emphasis added)

47. In fact, the April 15, 2008 announcement, like the earlier January 3, 2008 announcement, portrayed State Street's business and prospects as being better than they were and improperly concealed from the market generally and the Participants in this case the impairment in State Street's portfolio and the fact that State Street held high risk investment securities and conduits during what even State Street admitted was an "unsettled economic environment."

48. State Street continued to portray its business and prospects as being better than they actually were in other public statements issued during the Class Period. On July 15, 2008, the Company issued a Form 8-K which contained a press announcing State Street's results of operations and related financial information for the second quarter of 2008 ended June 30, 2008: It stated as follows:

> Ronald E. Logue, State Street's chairman and chief executive officer, said, "Our strong performance in the second quarter following outstanding performance in the first quarter demonstrates our core business strength and our ability to sustain strong momentum globally. Additionally, the performance of the acquired Investors Financial business continues to meet or exceed the financial targets we established with more than 90% of the customer revenue now retained. Our year-over-year and sequential quarterly growth in servicing fees is fueled by new business wins and increased cross selling. On the investment management side, I am pleased with SSgA's financial performance amid market disruption."

> Logue added, "In these markets, we continue to experience strong year-over-year results in securities finance and trading, as well as net interest revenue. We are pleased to achieve positive operating leverage on both a quarter-to-quarter and on a year-over-year basis, the fifteenth consecutive quarter as measured on a year-over-year basis."
>
> Logue concluded, "Our strong results of the quarter, plus the benefit of the $2.8 billion in equity capital that we issued in early June, enhanced the Corporation's solid capital position. Given the strength of the first half of the year, we now expect both growth in operating earnings per share to approach the high end of the 10 to 15 percent range and achievement of operating return on equity to approach the high end of the 14 percent to 17 percent range in 2008. We are also increasing our outlook for growth in revenue, expecting to exceed the high end of the 14 percent to 17 percent range in 2008. We continue to be focused on achieving positive operating leverage on an annual basis."

49. On July 17, 2008, *The Boston Globe* reported in an articled entitled "Wall Street gives State Street a big embrace" that "Boston-based State Street Corp.'s shares barreled higher for a second straight day. On Tuesday, the world's biggest money manager for institutions rose after posting a 50 percent increase in second-quarter earnings *and forecasting no write-downs tied to the collapse of the subprime mortgage market.* State Street also raised its 2008 profit and sales forecasts." [Emphasis added]

50. As State Street's stock price "barreled higher for a second straight day" (indeed, rising from $55.70 on July 14, 2008 to $68.85 on July 17, 2008), Participants who purchased State Street's stock for their Plan accounts in this time frame were paying more than what they would have paid had State Street been revealing the truth about its business and prospects. Participants who purchased State Street's stock for their Plan accounts throughout the Class Period overpaid for essentially the same reason, that is, that throughout the Class Period State Street's public statements portrayed State Street's business and prospects as being better than they were and concealed the impairment of State Street's portfolio.

51. On October 1, 2008, *The Boston Globe* reported in an article entitled "After the big sell-off, State Street rebounds" that "State Street fell 27 percent. Investors were concerned that the mounting credit crisis would cause increased losses in their bond holdings and off-balance funds called *conduits - a problem that State Street has stressed it is not facing."* (Emphasis added)

52. State Street's overly optimistic statements to the public generally and to the Participants in this case continued. On October 15, 2008, the Company issued a Form 8-K which contained a press announcing State Street's results of operations and related financial information for the second quarter of 2008 ended September 30, 2008: It stated as follows:

> Ronald E. Logue, State Street's chairman and chief executive officer, said, *"We are pleased to be one of the nine financial institutions key to the infrastructure of the global financial markets,* selected by the U.S. Treasury to initiate the TARP Capital Purchase Program, a program aimed at addressing the financial turmoil and restoring confidence in the markets. Our selection demonstrates the important role that State Street plays for its customers and in the global markets and reflects our core financial strengths. Although we have always been and remain well capitalized, the program adds additional capital and affords us additional flexibility to continue our leadership role in meeting the challenges and opportunities in current markets. It's my belief that the companies that will emerge from this turmoil are those, like State Street, with the right mix of businesses, a focus on customer service, and a prudent plan for this environment. As part of this program, State Street will issue $2 billion of senior preferred shares to the U.S. Treasury along with warrants to purchase common stock with a total market price equal to about $300 million at the time of issuance, which we anticipate will be minimally dilutive to our shareholders."
>
> He continued, "In the third quarter, the volatility of both the equity and fixed-income markets resulted in increased business for State Street as customers sought us out because of our reputation for stability and safety. Market events drove growth in our balance sheet from $146 billion at June 30, 2008, to $286 billion at quarter end. Our normalized balance sheet has grown to $155 billion, excluding a temporary balance of $77 billion due to the AMLF and $54 billion in excess balances held at central banks, which we believe reflect current market conditions. We bear no risk or any capital assessment relative to the AMLF balances. We are pleased to be a significant participant and one of the first banks to be fully operational in the AMLF program of the Federal Reserve. We are also pleased to have been appointed by the U.S. Treasury to manage a portion of the assets for its mortgage-backed securities portfolio."

> Logue noted, "Due to the unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market losses at quarter end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion. *However, as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high."*
>
> Addressing the future outlook, Logue concluded, "Due to our strong performance in the first nine months of 2008, *we continue to confirm our earlier statements regarding our performance to our financial goals for 2008.* We continue to expect our growth in operating earnings per share to be approaching the high end of the 10 to 15 percent range; growth in operating revenue to be above the high end of the 14 to 17 percent range and our operating return on equity to approach the high end of the 14 to 17 percent range." (Emphasis added)

53. In January 2009, however, indications began to appear that State Street's business and prospects were not what the Company had previously represented. After the markets closed on Friday, January 16, 2009, State Street filed a Form 8-K Current Report with the SEC warning about $9 billion in potential investment losses that had not previously been disclosed and projections for a tougher 2009 that had not previously been disclosed. The filing stated, among other things, that:

> As of December 31, 2008, ***there were $5.5 billion of after-tax net unrealized losses associated with our portfolio of investment securities available for sale and held to maturity***. Generally, the fair value of such securities is based upon market values supplied by third-party sources. Market values for the securities in our portfolio declined significantly during 2008 as liquidity and pricing generally in the capital markets was disrupted. When the fair value of a security declines, management must assess whether that decline is "other-than-temporary." *See "We must apply significant judgment to assign fair values to our assets, and we may not be able to obtain these values, or any value, if these assets were sold."* When management reviews whether a decline in fair value is other-than-temporary, it considers numerous factors, many of which involve significant judgment. As 2008 progressed, rating agencies imposed an increasing number of downgrades and credit watches on the securities in our investment portfolio, which contributed to the decline in market values. Any continued increase in downgrades and credit watches may contribute to a further decline in market values. More generally, market conditions continue to be volatile, and we can provide no assurance that the amount of the unrealized losses will not increase.

* * *

In connection with our administration of the asset-backed commercial paper conduits, we provide contractual back-up liquidity to the conduits. If the conduits cannot issue sufficient commercial paper to meet their ongoing liquidity needs, we are required by contract to, among other things, provide liquidity to the conduits by purchasing portfolio assets from them. If required, these portfolio assets are purchased at prices determined in accordance with contractual terms of the applicable liquidity asset purchase agreement, which may exceed their fair value. We may also provide liquidity to the conduits by purchasing commercial paper from them or by providing other extensions of credit to the conduits. Our asset-backed commercial paper conduit program experienced significantly reduced demand for its commercial paper financing beginning in the third quarter of 2007. As the disruption in the credit markets continued through 2008, our liquidity management of the conduits resulted in our purchasing historically high levels of commercial paper from the conduits. During 2008, the amount of commercial paper issued by the conduits on our consolidated balance sheet increased from approximately $2 million as of December 31, 2007 to approximately $292 million as of March 31, 2008, approximately $212 million as of June 30, 2008, and approximately $7.82 billion as of September 30, 2008 (including $1.6 billion under the AMLF program). On December 31, 2008, we held $230 million of commercial paper issued by the conduits on our consolidated balance sheet (which does not include $5.7 billion issued by the conduits under the Federal Reserve's Commercial Paper Funding Facility as of December 31, 2008). The highest total overnight position (including AMLF) in the conduits' commercial paper held by State Street during the three months ended December 31, 2008, was approximately $8.9 billion and during the fiscal year ended December 31, 2008, was approximately $ 8.9 billion. The average total overnight position (including AMLF) for the same periods was approximately $5.43 billion for the quarter ended December 31, 2008 and $2.3 billion for the fiscal year ended December 31, 2008. As noted above, as of December 31, 2008, the conduits had utilized the Federal Reserve's Commercial Paper Funding Facility to issue $5.7 billion of commercial paper. The Commercial Paper Funding Facility is currently scheduled to expire for new issuances on April 30, 2009. We may be required to provide additional back-up liquidity if the conduits are unable to place their commercial paper in the market after the Commercial Paper Funding Facility expires. Our contractual arrangements with the conduits also require us to purchase conduit portfolio assets under other circumstances, such as a downgrade of the credit rating of securities held by the conduits. Purchase of the assets of the conduits pursuant to the contractual agreements described above could affect the size of our consolidated balance sheet and related funding requirements, our capital ratios, and, if the conduit assets include unrealized losses, could require us to recognize those losses. ***As of December 31, 2008, there were $3.6 billion of after-tax net unrealized losses associated with portfolio holdings of the conduits.*** Because of our contractual agreements to purchase assets from the conduits under specified conditions, we are also exposed to the credit risks in the conduits' portfolios. [Emphasis added]

54. On January 21, 2009, reporting on the State Street Form 8-K, *The Boston Globe* reported that:

> *Shares of State Street Corp. shed more than half their value yesterday,* as investors digested the company's warning about $9 billion in potential investment losses and projections for a tougher 2009.
>
> *The stock of the Boston financial services company plunged $21.46, or 59 percent, to $14.89, a level not seen since 1996.* Although State Street reported 28 percent increases in revenue and earnings for last year, it said fourth-quarter earnings fell 71 percent from the year-ago period. And its chief executive, Ronald E. Logue, said revenue and earnings growth would be flat this year.
>
> "State Street is a paradox right now," said Gerard Cassidy, a bank analyst at RBC Capital Markets in Portland, Maine. "On the one hand, its daily operations, its day-to-day business, in this environment is respectable. *But the balance sheet, the unrealized losses in the investment portfolio are very, very substantial.*"
>
> State Street, which manages money for institutions and handles recordkeeping and accounting for large investment funds, revealed significant risks on the horizon in a regulatory filing after the markets closed Friday. In the filing, the company said it had $9.1 billion worth of troubled investments on its books, in investment securities and in its commercial paper program. The question is how many of those investments will recover in value; if they don't, the company will have to take losses on them. [Emphasis added]

55. Similarly, American Banker reported on January 21, 2009, in an article entitled "State St. CEO: No Need for Fresh Capital" that some "analysts were [] skeptical, saying that *State Street may face customer claims, financial losses, reputational damage, and regulatory scrutiny.*" (Emphasis added)

56. *On February* 10, 2009, in an article entitled "State Street Preferred's Ratings Trimmed", *American Banker* summarized the problems with State Street's financial position, reporting that:

> Fitch Inc. reduced State Street Corp.'s preferred stock rating but affirmed other key ratings, citing the "extremely high probability" the federal government would bail out the asset manager and securities custodian if necessary.

> State Street last month shocked analysts and investors by disclosing that unrealized losses had more than doubled in the fourth quarter, raising questions about its capital levels and ability to raise money if need be.
>
> All three major ratings agencies, including Fitch, downgraded the company's main ratings in response to the fourth-quarter results.
>
> On Monday, Fitch cut its rating on the preferred stock by two notches, to BBB, or two steps about junk grade, on the "somewhat higher risk" that dividends could be deferred or that "other undesirable outcomes" were possible.
>
> Still, the ratings firm called State Street's near-term plan to rebuild capital – announced last week – a positive and put a stable outlook on all State Street's ratings.
>
> The Boston company said last week it would slash its dividend to 1 cent a share, cut bonuses, and take other cost-cutting steps to boost its tangible common equity ratio.
>
> On Monday [February 9, 2008], State Street's shares closed up 0.13%, to $30.33. The company's shares are down roughly 60% since September.

57. All told, State Street's stock price dropped precipitously from January 16, 2009 ($36.35) to January 20, 2009 ($14.89), as the market digested the shocking news about the depth of State Street's business and questions about its future. The enormous decline in the market price of State Street's common stock from January 16, 2009 to January 20, 2009 and, indeed, throughout the Class Period corresponds directly with diminished retirement savings of Participants who held State Street stock in the Plan accounts.

58. On April 21, 2009, State Street issued a Form 8-K which contained a press release providing and discussing State Street's financial results for the quarter ended March31, 2009. The press release contained in the Form 8-K confirmed the deterioration of State Street financial condition which had first been disclosed in January, 2009 but which went back to at least January 2008. The April 21, 2009 press release indicated that State Street's first quarter 2009 earning per share had declined to $1.02 per share from $1.35 per share for the quarter ended March 31, 2008.

Moreover, the revenue reported for the first quarter of 2009 of $2.002 billion was a decline of 22.5% from revenue of $2.577 billion reported for the first quarter ended March 31, 2008.

59. On July 21, 2009, The Boston Globe reported that following the announcement of $9 billion in potential losses and a plunge of 59% in market price, "Nancy Bush, a banking analyst and founder of NAB Research during the [conference] call [with State Street CEO Logue] took Logue to task for not having disclosed sooner that earnings were likely to be flat this year."

60. The Company's reputational harm already suffered will likely further cause the Company to lose customers and management and consulting fees, thereby decreasing its future income and cash flows.

**BREACHES OF FIDUCIARY DUTY**

61. As required by ERISA, Defendants issued one or more SPDs, each of which either referred to or incorporated by reference the documents filed by State Street with the SEC under the federal securities laws. For example, State Street published an SPD for the Plan on September 21, 2007 for the program in effect on January 1, 2007. It includes a Plan Prospectus, dated March 13, 2007. In a section of the 2007 SPD entitled "Incorporation of Certain Documents by Reference", the SPD states:

> . . . The information incorporated by reference is considered to be part of this Prospectus, and the information that the Company will file later with the SEC will automatically update and supersede this information. On July 11, 2006, the Company filed a registration statement in accordance with SEC Form S-8, Part II with respect to shares of Company stock deliverable under the Plan, which incorporated certain documents by reference. The Company incorporates those documents by reference in this Prospectus as well. In addition, all documents filed by us under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this Prospectus and prior to the end of this offering are deemed incorporated in this Prospectus from the date of their filing.

The SPD published by State Street on June 10, 2008 for the program in effect on January 1,

2008 contains substantially similar language.

62. These incorporated filings, however, contained numerous material misrepresentations and omitted to state material facts which were necessary to make the statements which were made not misleading.

63. In particular, State Street's SEC filings during the Class Period, including its proxy statements and Form 10-K for the years ended December 31, 2007 and Forms 10-Q for the quarters ended March 31, 2008, June 30, 2008 and September 30, 2008 which were incorporated into the SPDs, were materially false and misleading in that they misrepresented the truth about the Company, and misleadingly concealed material adverse information, including, *inter alia*, the fact that:

a. the Company was risking literally billions of dollars on speculative, investment securities that it held; including the $5.5 billion of after-tax net unrealized losses associated with State Street's portfolio of investment securities available for sale ultimately announced on January 16, 2009;

b. the Company was risking literally billions of dollars on conduits which it held;

c. the Company was risking its future income stream for asset management and consulting;

d. the Company lacked qualified management in its investment and conduit units;

e. the customer complaints against SSgA were largely meritorious and widespread, and the Company's consistent public statements which diminished and disparaged the customer complaints against SSgA as either without merit or immaterial were incorrect;

f. the Company had no basis to make the public financial forecasts that it did due to at least one substantial write-down that would need to be taken;

g. contrary to representations by the Company, the asset quality of State Street's investment portfolio and the conduit program did not remain high;

h. as a result of the above, the Company's projected financial results for the Class Period were grossly inflated.

i. the Company lacked required internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts; and

j. the Company lacked the necessary personnel to issue accurate financial reports and projections

64. Defendants were not obligated by ERISA or by the Plans to discharge their duty to provide information to Participants through the mechanism of incorporation of SEC filings. Defendants could have fulfilled this duty by setting forth sufficient and accurate information in the SPDs themselves, and updating such information as appropriate. Defendants chose, however, to adopt the mechanism of incorporation of SEC filings into the SPDs, and the SEC filings contained materially false and misleading information which caused loss to the Plans and the Participants as set forth above.

65. At all relevant times, Defendants should have known of the material misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs.

66. State Street stock traded at $85.37 on January 3, 2008. As a result of the above, State Street stock closed at $14.89 per share on January 20, 2009, a decrease of over 80%, thereby greatly

diminishing the retirement benefits of Plaintiff and the Participants. State Street's highly speculative investments and conduits, its inability to properly the value same, and its attempts to conceal the truth about the severity of its problems from the investing public, regulators, securities analysts and the Participants have resulted in significant Plan and Participant losses.

67. State Street's breach of fiduciary duty with respect to the proposed Class in this action is just one example of a pattern of Defendants' breaching their fiduciary duty with respect to persons who have entrusted pension funds to their custody. For example in *In re State Street Bank and Trust Co. ERISA Litigation*, 07 civ. 8488 (RJH) (D. Mass.), defendants are charged by trustees of several pension plans acting in reckless disregard of the best interests of investors in conservative bond funds managed by State Street in violation of ERISA. Rather than investing in conservative bonds as per the profile of the bond funds involved, those funds were in fact investing in high risk and/or highly leveraged financial instruments tied to, among other things, mortgage backed securities. In *Sisters of Charity of the Blessed Virgin Mary, Dubuque, Iowa v. State Street Bank and Trust Company*, 1:09-CV-3487-RJH (S.D.N.Y.), State Street is alleged to have violated its obligations as a trustee and fiduciary to Plaintiffs' investment funds by enticing plaintiffs investment through advertisement in "Enhanced Dow Jones-AIG Commodities Future Strategy" which purported consistently exceeded benchmark returns without incurring unnecessary investment risk but in fact exposed plaintiffs assets to investment in subprime mortgages and took highly leveraged positions in mortgage-related financial derivative creating an inappropriate level of risk that materially departed from the stated investment objectives and resulting in a radical negative departure from its benchmark indices. In *Fishman Haygood Phelps Walmsley Willis & Swanson, L.L.P. v. State Street Corporation*, 1:2009cv 10533 (D. Mass), plaintiff alleged that it and a class of participants in a retirement plan suffered losses as a result of breach of fiduciary duty of State street

in violation of ERISA by recklessly engaging in a practice known as "securities lending" for its own benefit in a manner that involved imprudent and unreasonable risk of loss to the Plans.

## MISMANAGEMENT OF PLAN ASSETS

68. Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

69. Defendants breached their fiduciary duties in that they should have known the facts alleged above and should have known that the Plan should not have invested in State Street common stock during the Class Period.

## FIRST CLAIM: INVESTMENT IN STATE STREET COMMON STOCK (AGAINST ALL DEFENDANTS)

70. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

71. Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

72. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants. Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties. By their continuing

to offer State Street common stock as an investment under the Plan, when State Street's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

73. As a consequence of Defendants' breaches, the Plan suffered losses and was damaged in that investments in the Plan with respect to State Street stock suffered inferior returns to returns that would have been available if the same funds had been prudently invested.

74. Defendants are individually liable to make good to the Plan any damages to the Plan resulting from such breach.

75. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**SECOND CLAIM: NEGLIGENT MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

76. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

77. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

78. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

79. Defendants breached these fiduciary duties in that they made material misrepresentations , identified above, which boosted and artificially inflated the market price of State

Street stock and caused participants to pay more than they would have paid and more than they should have had to pay for State Street stock had the truth been told.

80. The Participants relied upon, and are presumed to have relied upon, Defendants' material misrepresentations to their detriment.

81. As a consequence of Defendants' material misrepresentations, the Plan suffered losses.

82. Defendants are individually liable to make good to the Plan any losses or damages to the Plan resulting from each breach.

83. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**THIRD CLAIM: NONDISCLOSURE**
**(AGAINST ALL DEFENDANTS)**

84. Plaintiff realleges and incorporates herein by reference the allegations set forth above in paragraphs through.

85. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

86. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

87. Defendants breached these fiduciaries in that they concealed and failed to disclose material information about State Street's impaired portfolio and other material information identified above.

88. As a consequence of Defendants' misleading omissions, the Plan suffered losses.

89. Defendants are individually liable to make good to the Plan any losses or damages to the Plan resulting from each breach.

90. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**FOURTH CLAIM: DIVIDED LOYALTY**
**(AGAINST THE INDIVIDUAL DEFENDANTS ONLY)**

91. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

92. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

93. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

94. Defendants breached their fiduciary obligations when they acted in their own interests or in their employer's (State Street's) interests rather than solely in the interests of the Participants and Beneficiaries.

95. As a consequence of these breaches, the Plan suffered losses and Plaintiff and the other members of the Class were damaged.

96. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

97. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**FIFTH CLAIM: MISMANAGEMENT OF PLAN ASSETS**
**(AGAINST ALL DEFENDANTS)**

98. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

99. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

100. Pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), the Defendants were required to discharge their duties with respect to the Plan solely in the interests of the Participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

101. Defendants breached these duties in that the Plan invested in State Street common stock despite the fact that State Street had made materially misleading statements and/or omitted material information, and the Plan permitted an over allocation of assets into State Street common stock, thereby failing to diversify assets so as to minimize the risk of large losses.

102. As a consequence of these breaches, the Plan suffered losses and damages as recognized by law in that the value of the portfolio invested in State Street stock underperformed an

investment of the same value prudently invested.

103. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach and for all legally recognized damages.

104. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## SIXTH CLAIM: BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR AND INFORM THE COMMITTEE AND MEMBERS OF THE COMMITTEE (AGAINST STATE STREET ONLY)

105. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

106. State Street had the duty and responsibility to properly appoint, monitor and inform the members of the Benefits and Investment Committees and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and their assets.

107. State Street failed to properly appoint, monitor and inform such persons in that the State Street failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the State Street did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by State Street during the Class Period identified herein) but nonetheless continued to allow such persons to offer State Street common stock as an investment option under the Plan even though State Street common stock was not a prudent investment for Participants' retirement accounts under the Plan.

108. As a consequence of these breaches, the Plan suffered losses and damages recognized by law in that the value of the portfolio invested in State Street stock underperformed an investment of the same value prudently invested.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A. Actual damages in the amount the difference between the value of the plan if it had been prudently invested during the class period and the actual value of the plan, with such damages to be allocated among the Participants' individual accounts in proportion to the accounts' losses, as well as damages calculated on an individual account basis;

B. Appropriate equitable relief, including in the form of restitution;

C. Costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

D. Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and,

E. Such other relief as the Court may deem equitable and just.

**JURY TRIAL DEMAND**

Plaintiff demands trial by jury of all issues so triable.

Dated: July 20, 2009

**TODD & WELD, LLP**

By: s/ Kevin T. Peters
Kevin T. Peters
28 State Street
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777

**STULL, STULL & BRODY**
Edwin J. Mills
Mark Levine
Michael J. Klein
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
Major Khan

**MAJOR KHAN, LLC**
20 Bellevue Street
Weehawken, NJ 07086
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

***Counsel for Plaintiff***