UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
THOMAS U. KENNEY, on Behalf of  )
Himself and a Class of Persons  )
Similarly Situated,             )
                                )
            Plaintiff,          )
                                )
        v.                      )      CIVIL ACTION NO.
                                )      09-CV-10750-PBS
STATE STREET CORPORATION; NORTH )
AMERICA REGIONAL BENEFITS       )
COMMITTEE OF STATE STREET       )
CORPORATION; ALISON QUIRK;      )
PAMELA GORMLEY; ROSS MCLELLAN;  )
DAVID O'LEARY; SKIP CURTRELL;   )
JAYNE DONAHUE; DAVID            )
GUTSCHENRITTER; JAMES MALERBA   )
STATE STREET CORPORATION        )
INVESTMENT COMMITTEE; and JOHN  )
DOES 1-10,                      )
                                )
            Defendants.         )
_____)
```

**MEMORANDUM AND ORDER**

March 15, 2010

Saris, U.S.D.J.

**I.  INTRODUCTION**

Plaintiff Thomas U. Kenney ("Kenney"), a former State Street

employee, brings this action for breach of fiduciary duty under

Section 502(a) of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. §§ 1001-1461, on behalf of himself and a

class of similarly situated participants in the State Street

Salary Savings Plan ("the Plan") who chose to invest their

retirement savings in State Street's Employee Stock Ownership Plan ("ESOP").

Plaintiff alleges that State Street Corporation, the Benefits and Investment Committees of its Board of Directors, and the individual members thereof (collectively, "Defendants" or "State Street") negligently misrepresented and failed to disclose critical aspects of State Street's financial condition during a class period running from January 3, 2008, to January 20, 2009. During that time, defendants allegedly exposed the company to over $9 billion in potential losses through high-risk assets held in its investment portfolio and four asset-backed commercial paper conduits, which led to a massive decline in State Street's stock value.  Plaintiff claims that defendants mismanaged Plan assets and breached their ERISA duties of prudence and loyalty by continuing to invest Plan funds in State Street stock. Additionally, Plaintiff alleges that the individual defendants breached their duty of loyalty by failing to act solely in the Plan participants' interests and that State Street failed to appoint, monitor, and inform the committees and their members so as to ensure adequate management of the Plan.

Defendants have moved to dismiss on the grounds that they made full and truthful disclosures regarding the status of the company and the riskiness of its assets and that plaintiff has failed to rebut the "presumption of prudence" afforded ESOPs

under ERISA caselaw.  After hearing, the Court **ALLOWS** in part and **DENIES** in part defendants' Motion to Dismiss.

## II.  BACKGROUND

The following facts are drawn principally from plaintiff's Amended Complaint, with all reasonable inferences drawn in his favor.  The Court also takes judicial notice of documents on which the Amended Complaint depends, including the Summary Plan Descriptions and SEC filings incorporated therein.  (Am. Compl. ¶ 61.)  Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) (documents on which a complaint depends and to which it refers "merge[] into the pleadings and the trial court can review [them] in deciding [a Rule 12(b)(6)] motion"); Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994) (noting that court may take notice on motion to dismiss of facts present in publicly available government documents).  Neither party objects to consideration of State Street's SEC filings.

## A.  **ESOP's Fable**

The Plan's purpose is to enable and encourage State Street employees to save for retirement.[1]  Participants may invest their contributions across an array of twenty fund options, including the ESOP, which allows employees to allocate up to twenty-five

---

[1] The Plan is a defined contribution 401(k) plan with employee and employer contribution features.  It was designed as an individual account plan pursuant to Section 404(c) of ERISA. See 29 U.S.C. § 1104(c).

percent of their accounts to State Street's common stock.  As of December 31, 2007, approximately 28.2% of total Plan assets were invested in State Street common stock; this percentage dropped to 17% on December 31, 2008, representing an aggregate loss of approximately $200 million in the value of participants' shares.

Described by the <u>Boston Globe</u> as the "world's biggest money manager for institutions," State Street does not make loans, offer credit cards, or engage in other traditional consumer banking activities, but rather acts as a securities custodian. (Am. Compl. ¶ 49.)  During the class period, State Street promoted its "reputation for stability and safety," causing the market to perceive it as less vulnerable to market losses than broad-based commercial and investment banks.  (<u>Id.</u> ¶ 52.) Despite this reputation, State Street in fact held "high risk investment securities and conduits," which represented a "ticking time bomb" for the company's balance sheet.  (<u>Id.</u> ¶¶ 42, 43.)  In plaintiff's view, State Street common stock was no longer a prudent investment for the Plan participants during the class period, and the fiduciaries failed to make full and timely disclosure of State Street's true financial and operating condition to them.

## B.   **State Street's Statements**

State Street made various statements in press releases and accompanying Form 8-Ks over the course of the class period that

4

allegedly failed to disclose its high risk investments.   On
January 3, 2008, the start of the class period, State Street
issued a press release announcing the establishment of a reserve
to address "customer concerns" relating to its investment
management arm.   (Id. ¶ 44.)   Plaintiff claims that Chief
Executive Officer Ronald E. Logue said that State Street's
business "continues to be very strong," that customer complaints
were without merit, and that "we will continue to defend
ourselves vigorously against inappropriate claims."   (Id.)

On April 15, 2008, State Street issued a Form 8-K with a
press release related to the first quarter of 2008, which ended
March 31.   Logue stated, "I am extremely pleased with this record
revenue performance, particularly in today's challenging
environment."   (Id. ¶ 46.)   Similarly, on July 15, 2008, in
another Form 8-K, Logue highlighted State Street's "strong
performance in the second quarter."   (Id. ¶ 48.)   Two days later,
the Boston Globe reported that State Street was "forecasting no
write-downs tied to the collapse of the subprime mortgage
market."   (Id. ¶ 49.)

On October 1, 2008, the Globe reported, "Investors were
concerned that the mounting credit crisis would cause increased
losses in their bond holdings and off-balance funds called
conduits – a problem that State Street has stressed it is not
facing."   (Id. ¶ 51.)   On October 15, 2008, State Street issued a

Form 8-K and press release addressing the third quarter, which ended September 30.  Among other things, Logue stated:

> Due to the unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market[2] losses at quarter end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion. However, as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high.

(Id. ¶ 52.)  Describing the "strong performance" in the first nine months of 2008, he confirmed earlier predictions for expected growth in operating earnings per share approaching the high end of the ten to fifteen percent range.  (Id.)

C.   **"Ticking Time Bomb"**

On January 16, 2009, at the end of the class period, State Street filed a Form 8-K updating its risk factor disclosures and warning of approximately $9 billion in potential unrealized losses in its investment portfolio and conduits, almost double the figure cited by Logue in October 2008.  (Id. ¶ 53.)  The statement indicated that, as "2008 progressed, rating agencies imposed an increasing number of downgrades and credit watches on the securities in our investment portfolio, which contributed to the decline in market values."  (Id.)  The announcement included a lengthy discussion of risks with respect to the conduits:

---

[2] As defendant explains, mark-to-market accounting refers to the required practice of assigning a current fair market value to each security held by an entity, even if the securities are intended to be held to maturity.

> Our asset-backed commercial paper conduit program experienced significantly reduced demand for its commercial paper financing beginning in the third quarter of 2007.  As the disruption in the credit markets continued through 2008, our liquidity management of the conduits resulted in our purchasing historically high levels of commercial paper from the conduits.  During 2008, the amount of commercial paper issued by the conduits on our consolidated balance sheet increased from approximately $2 million as of December 31, 2007 to approximately $292 million as of March 31, 2008, approximately $212 million as of June 30, 2008, and approximately $7.82 billion as of September 30, 2008 . . . .

(Id.)  At its peak during the fourth quarter of 2008, State Street's overnight holdings of the conduits' commercial paper totaled $8.9 billion.  State Street also disclosed:

> Purchase of the assets of the conduits pursuant to the contractual agreements described above could affect the size of our consolidated balance sheet and related funding requirements, our capital ratios, and if conduit assets include unrealized losses, could require us to recognize those losses.  As of December 31, 2008, there were $3.6 billion of after tax net unrealized losses associated with portfolio holdings of the conduits.  Because of our contractual agreements to purchase assets from the conduits under specified conditions, we are exposed to the credit risks in the conduits' portfolios.[3]

(Id.)

Following these announcements, shares of State Street shed more than half their value, falling from $36.35 on January 16, 2009, to $14.89 on January 20, 2009.  One analyst stated that State Street was a "paradox" because its daily operations were

---

[3] Form 10-Qs throughout the class period had made similar disclosures regarding the conduits, State Street's liquidity guarantees, and the possibility and significance of consolidation.

"respectable," "but the balance sheet, the unrealized losses in the investment portfolio are very, very substantial." (Id. ¶ 54.)  In addition, all three major ratings agencies downgraded the company's main ratings in response to the fourth quarter results. (Id. ¶ 56.)  On January 21, 2009, the Boston Globe reported that a banking analyst took Logue "to task for not having disclosed sooner that earnings were likely to be flat this year."[4]  (Id. ¶ 59.)  Plaintiff and other Plan participants suffered losses to their retirement accounts as a result of the dramatic decline in State Street's share price.

### III.  LEGAL STANDARD

In order to survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).  In considering a motion to dismiss for failure to state a claim upon which relief can be granted, courts must take as true the allegations in the plaintiff's pleadings and must make all reasonable inferences in favor of the plaintiff.  Rivera v. Rhode Island, 402 F.3d 27, 33 (1st Cir. 2005).  The Court may take into consideration the facts set out in public documents attached to the complaint or opposition, or expressly incorporated therein. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  Consideration

---

[4] The Amended Complaint mistakenly lists the date of this article as July 21, 2009.

of any documents not incorporated or attached to the complaint is
forbidden, unless the proceeding is properly converted into one
for summary judgment.  Id.

   "A pleading that offers labels and conclusions or a
formulaic recitation of the elements of a cause of action will
not do."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)
(internal quotations and citations omitted).  "The court need not
accept a plaintiff's assertion that a factual allegation
satisfies an element of a claim . . . nor must a court infer from
the assertion of a legal conclusion that factual allegations
could be made that would justify drawing such a conclusion."
Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 n.3
(1st Cir. 2006).

## IV.  DISCUSSION

### A.   Imprudence

   Plaintiff claims that defendants violated their fiduciary
duties by continuing to invest Plan funds imprudently in State
Street stock, knowing that they had exposed the company to
potentially billions in investment losses, which ultimately
caused the stock's value to drop precipitously.  Under the
widely-applied holding of Moench v. Robertson, 62 F.3d 553 (3d
Cir. 1995) ("Moench"), defendants argue that their decision to
keep ESOP funds invested in company stock is entitled to a

presumption of prudence, which can be overcome only by showing that their actions placed the company at risk of total collapse.

### 1.   Fiduciary Obligations Under ERISA

ERISA subjects fiduciaries to strict obligations, among them a duty of prudence requiring that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  In accordance with that duty, ERISA fiduciaries must "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  Id. § 1104(a)(1)(C).  The statute states explicitly, however, that eligible individual account plans do not violate the diversification requirement or the prudence requirement "to the extent that it requires diversification . . . by acquisition or holding of qualifying . . . . employer securities . . . ."  Id. § 1104(a)(2); see also id. §§ 1107(d)(3) (listing ESOPs among the exempt plans) and (d)(5)(A) (listing employer-issued stock as an eligible security).

These exceptions arise from the unique nature of ESOPs, which Congress intended to function as "both an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership."  Martin v. Feilen, 965

F.2d 660, 664 (8th Cir. 1992) (quoting 129 Cong. Rec. S16629, 16636 (daily ed. Nov. 7, 1983) (statement of Sen. Long)).  Since ESOPs generally invest in securities issued by the sponsoring company, they tend to "place[] employee retirement assets at a much greater risk than does the typical diversified ERISA plan." Id.  Aside from these exceptions, however, ESOP fiduciaries remain subject to ERISA's strict fiduciary duties.  See Donovan v. Cunningham, 716 F.2d 1455, 1466 (5th Cir. 1983) (comparing Congressional policies to "encourage the formation of ESOPs" with the "equally forceful" policy of "safeguarding the interests of participants . . . by vigorously enforcing standards of fiduciary responsibility"); In re Ford Motor Co. ERISA Litig., 590 F. Supp. 2d 883, 888 (E.D. Mich. 2008) ("Courts, therefore, are in the difficult position of attempting to pass on the 'prudence' of these sorts of funds without considering what would normally be regarded as their severe underdiversification.").

> ### 2.   The *Moench* Presumption

In Moench, the Third Circuit held that "an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision.  However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities."  62 F.3d at 571. "In considering whether the presumption that an ESOP fiduciary

who has invested in employer securities has acted consistently
with ERISA has been rebutted, courts should be cognizant that as
the financial state of the company deteriorates, EPOS fiduciaries
who double as directors of the corporation often begin to serve
two masters." Id. at 572.  The Moench court held that a
precipitous decline in stock price and the fiduciaries' knowledge
of an impending collapse, together with their conflicted status,
may be sufficient to overcome the presumption.  Id.; see also
Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 255 (5th Cir.
2008) (dismissing claim where the company's stock had fallen
forty percent but its "viability as a going concern" was not
threatened and its "stock was [not] in danger of becoming
essentially worthless"); see generally Morrison v. Moneygram
Int'l, Inc., 607 F. Supp. 2d 1033, 1051-52 (D. Minn. 2009)
(concluding from a summary of the case law that "an employer on
the verge of collapse" is "always sufficient to overcome the
Moench presumption," but that "a drop in the price of an
employer's stock" is, by itself, "never sufficient").

Although other Circuits have adopted the Moench
presumption,[5] the First Circuit has expressly declined to do so.
In LaLonde v. Textron, Inc., 369 F.3d 1, 3 (1st Cir. 2004), it

_____

[5] See, e.g., Pugh v. Tribune Co., 521 F.3d 686, 701 (7th
Cir. 2008); Kirschbaum, 526 F.3d at 254; Kuper v. Iovenko, 66
F.3d 1447, 1459 (6th Cir. 1995).  But cf. In re Syncor ERISA
Litig., 516 F.3d 1095, 1102 (9th Cir. 2008) ("[T]his Circuit has
not yet adopted the Moench presumption, and we decline to do so
now.").

reversed a decision allowing a motion to dismiss an ERISA prudence challenge where fiduciaries whose company faced bleak future prospects had prohibited diversification of an ESOP.  In assessing alleged breaches of ERISA fiduciary duties, the court emphasized the following allegations:

> Textron's earnings per share declined by over 70%; Textron initiated a restructuring that was expected to culminate in the termination of over 10% of its workforce; Textron artificially inflated the price of its stock by concealing internal problems that led to its lost earnings and restructuring (malfeasance that was alleged to have been the subject of a federal securities lawsuit brought by Textron's shareholders); and Textron common stock significantly underperformed in comparison to the market as a whole (measured in terms of the Standard & Poor's 500) and Textron's peer group.  Despite this bleak scenario and in dereliction of their duties . . . defendants continued to fund the Textron stock fund and prohibited the class from diversifying its retirement accounts.

<u>Id.</u>

In dismissing the complaint, the district court had applied a presumption of prudence drawn from <u>Moench</u>.  <u>Id.</u> at 3-4.  The First Circuit expressed concern about applying such a presumption, particularly on a motion to dismiss, in an "important and complex area of law . . . [that] is neither mature nor uniform . . . ."  <u>Id.</u> at 6.  The court declined to adopt the presumption "based only on the statute's text and history, the sparse pleadings, and the few and discordant judicial decisions discussing the issue we face."  <u>Id.</u>  The holding rejected a "hard-and-fast rule" and emphasized the value of "further record

development" as "essential to a reasoned elaboration of that
which constitutes a breach of fiduciary duty in this context."
Id.

In Bunch v. W.R. Grace & Co., 555 F.3d 1, 4-5, 7-8 (1st Cir.
2009), the First Circuit affirmed a summary judgment ruling for
defendants accused of breaching their fiduciary duties by
terminating an ESOP in advance of a rising market, applying a
totality of the circumstances analysis.  More significantly, the
court rejected the plaintiffs' contention that the Moench
presumption operated against defendants who decided to sell
company stock:

> Appellants seek to induce us to . . . apply a
> presumption of prudence which is afforded fiduciaries
> when they decide to retain an employer's stock in
> falling markets, first articulated in Kuper v. Iovenko,
> 66 F.3d 1447, 1459 (6th Cir. 1995) and Moench, 62 F.3d
> at 571-72.  The presumption favoring retention in a
> "stock drop" case serves as a shield for a prudent
> fiduciary.  If applied verbatim in a case such as our
> own, the purpose of the presumption is controverted and
> the standard transforms into a sword to be used against
> the prudent fiduciary.  This presumption has not been
> so applied, and we decline to do so here, as it would
> effectively lead us to judge a fiduciary's actions in
> hindsight. . . . It is [defendants'] prudent
> assessment, and not a presumption of retention,
> applicable in another context entirely, which controls
> the disposition of this case.

Id. at 10.  The court reaffirmed LaLonde's proposition that
record development, not "hard-and-fast" rules, should govern
ERISA fiduciary duty cases.[6]  Id.

---

[6] Those courts that have adopted Moench have disagreed as to
the propriety of applying it at the pleadings stage.  Compare In

14

3.   **Plausibility**

As a backstop, State Street insists that the Amended

Complaint flunks the plausibility standard mandated by <u>Iqbal</u> and

<u>Twombly</u>.  Plaintiff has alleged that the plummeting stock value,

combined with high risk investments, would have led a reasonable

fiduciary to believe that continued investment in the company

stock was imprudent.  The Amended Complaint states repeatedly

that State Street's investment portfolio and conduits held low-

quality, "high risk" assets that rendered it "more exposed to

stock fluctuations than it disclosed."  (Am. Compl. ¶¶ 42, 43,

47, 63.)

Protesting that plaintiff is engaged in Monday-morning-

quarterbacking during a severe global recession, defendants argue

that allegations of imprudence are implausible in light of State

_____

re Hartford Fin. Servs., No. 08-CV-1708, 2010 WL 135186, at *1-2
(D. Conn. Jan. 13, 2010) (declining to apply the presumption on a
motion to dismiss), and In re Morgan Stanley ERISA Litig., No.
07-CV-11285, 2009 WL 5947139, at *10-11 (S.D.N.Y. Dec. 9, 2009)
("[D]istrict courts in the Second Circuit and elsewhere have
viewed the presumption of prudence inappropriate for resolution
on a motion to dismiss."), with In re Lehman Bros. Sec. & ERISA
Litig., No. 09-MD-2017, 2010 WL 354937, at *5-6 (S.D.N.Y. Feb. 2,
2010) (applying Moench on a motion to dismiss).  Although the
presumption of prudence arose in the summary judgment context,
following Twombly, it has been applied increasingly at the
pleadings stage.  See, e.g., In re Citigroup ERISA Litig., No.
07-CV-9790, 2009 WL 2762708, at *16 ("[F]ollowing the Supreme
Court's ruling in Twombly . . . courts have regularly applied
Moench at the motion-to-dismiss stage."); Morrison, 607 F. Supp.
2d at 1051 ("To say that the presumption of prudence applies at
the pleading stage is just another way of saying that plaintiffs
must allege facts to demonstrate that they have a non-speculative
claim . . . .").

Street's overall strong performance during 2008 in earnings, revenue, and return on equity.  They point out that the SEC filings indicate that approximately ninety percent of the investment portfolio's assets and seventy percent of the conduits' assets were AA or AAA rated in any given quarter.[7] (Perla Aff., Ex. L at 20, 35-41; Ex. M at 22, 45-52; Ex. N at 52-66; Ex. P at 77-89.)  Moreover, neither program saw any defaults on its securities.  (Perla Aff., Ex. L at 36, 38; Ex. M at 46, 49; Ex. N. at 55, 58, 68; Ex. P. at 54, 80, 83.)  In defendants' view, plaintiff pleads no facts plausibly suggesting that defendants knew or should have known that State Street common stock would be an imprudent investment during the class period. See Bunch, 555 F.3d at 10 ("Although hindsight is 20/20 . . . that is not the lens by which we view a fiduciary's actions under ERISA.").

However, State Street's use of "off-balance" conduits makes it particularly difficult for a court to determine whether plaintiff's claim of imprudence is viable.  The "conduits" are complex, non-transparent investment vehicles, and the "financial

---

[7] See Standard & Poors, Credit Ratings Definitions, *available at* http://www.standardandpoors.com/ratings/definitions-and-faqs/en/us (AAA and AA are the highest ratings, and connote an issuer that has at least a "very strong capacity to meet its financial commitments"); Self Regulatory Organizations, S.E.C. Release No. 34-36225, 1995 WL 555395, at *2 n.8 (Sept. 13, 1995) ("Debt rated 'AAA' has the highest rating assigned by S&P because the capacity to pay interest and repay principal is extremely strong").

models" used to determine when and whether to consolidate their assets and liabilities onto State Street's balance sheet are not well explained by the SEC filings.  It is unclear whether the continued off-balance sheet treatment of conduits is an overly aggressive accounting gimmick or a prudent investment strategy. Because the investments are opaque and highly complex, plaintiff must allege sufficient facts to demonstrate that it was imprudent to invest in State Street stock because of the riskiness of these portfolio and conduit assets during the class period.  Conclusory allegations of riskiness will not suffice.  The Court dismisses the imprudence claim without prejudice.

**B.    Negligent Misrepresentation and Non-disclosure Claims**

Plaintiff claims that State Street's SEC filings "were materially false and misleading in that they misrepresented the truth about the Company, and misleadingly concealed material adverse information," identifying in his Amended Complaint misstatements in four of State Street's dozens of class period filings.  (Am. Compl. ¶ 63.)

The Supreme Court has held that ERISA fiduciaries can be liable for statements made to participants in a fiduciary capacity.  See Varity Corp. v. Howe, 516 U.S. 489, 504-05 (1996). Courts rule frequently that the incorporation of SEC filings into ERISA plan documents "trigger[s] fiduciary responsibility for the contents of such filings."  In re Morgan Stanley, 2009 WL

17

5947139, at *14 (collecting cases); <u>see also</u> <u>In re Sprint Corp.</u>
<u>ERISA Litig.</u>, 388 F. Supp. 2d 1207, 1226-27 (D. Kan. 2004) ("SEC
filings were incorporated by reference into the SPDs and
prospectuses and . . . Defendants were therefore acting in their
ERISA fiduciary capacities when they made those
representations.").  <u>But see</u> <u>Gearren v. McGraw-Hill Cos.</u>, Nos.
08-CV-7890, 09-CV-5450, 2010 WL 532315, at *15 (S.D.N.Y. Feb. 10,
2010) ("Defendants who incorporated the SEC documents by
reference into the Summary Plan Descriptions did not
intentionally connect the content of those SEC filings to
statements about plan benefits."); <u>In re Bausch & Lomb Inc. ERISA</u>
<u>Litig.</u>, No. 06-CV-6297, 2008 WL 5234281, at *7-8 (W.D.N.Y. Dec.
12, 2008) (explaining that "the SPD's incorporation by reference
of B & L's SEC filings does not alter" its conclusion that the
alleged misstatements "were made in a corporate and not ERISA
fiduciary capacity").

    **1.**    **The January 3, 2008, Form 8-K and Press Release**

The first of State Street's alleged misstatements was a Form
8-K and press release issued on January 3, 2008, at the start of
the class period.  Notwithstanding the establishment of a $618
million reserve to address legal exposure and other costs
associated with the poor performance of various fixed-income
investments managed by its investment wing, State Street Global
Advisors ("SSgA"), plaintiff alleges that "State Street went out

of its way . . . to assure the market generally, as well as the Plan Participants, that any such customer concerns were without merit," when they were actually "in large part meritorious and widespread." (Am. Compl. ¶¶ 44, 45.) Plaintiff points particularly to the statement that State Street would "continue to defend [itself] against inappropriate claims." (<u>Id.</u> ¶ 44.) Plaintiff also claims that "as would ultimately be . . . revealed . . . State Street's portfolio was impaired in amounts exceeding the reserve established in January 2008," and notes defendant and State Street CEO Ronald E. Logue's statement that the company's business continued to be "very strong," when, according to plaintiff, it "was not 'very strong' at the beginning of 2008 . . . . ." (<u>Id.</u> ¶¶ 44, 45.)

The press release nowhere states that customer complaints were meritless. The declaration that State Street would resist "inappropriate claims" does not indicate that all or even most customer complaints were frivolous, particularly when immediately following Logue's statement that some customers "have raised concerns that we intend to address." (<u>Id.</u> ¶ 44.) Indeed, State Street established a $618 million reserve to address such complaints. Defendants point out that accounting rules do not even permit the establishment of such a reserve unless a loss is both probable and reasonably subject to estimation. (Def.'s Mem. in Supp. Mot. Dismiss at 13 n.23.)

The First Circuit and other courts have held in similar

19

contexts that "vague and loosely optimistic statements [are] . . . nonactionable as a matter of law." Gross v. Summa Four, Inc., 93 F.3d 987, 995 (1st Cir. 1996), superseded in part on other grounds, 15 U.S.C. 78u-4(b)(2); see also In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 54 (D. Mass. 1998) ("The rule covers loose optimism about both an issuers current state of affairs and its future prospects." (emphasis original)). Logue's statement that State Street's business was "very strong" is precisely the sort of corporate macro statement that courts have deemed nonactionable. Greebel v. FTP Software, Inc., 194 F.3d 185, 189, 207 (1st Cir. 1999) (dismissing claims about statement that "[s]ales continue to be strong"); In re Parametric Tech. Corp. Sec. Litig., 300 F. Supp. 2d 206, 217 (D. Mass. 2001) (dismissing claim regarding statement that company was in "strong competitive position").

Furthermore, based on the SEC filings incorporated into the SPD, defendants point out that Logue's statement, which referenced the company's growing revenues, earnings per share, and return on equity, was true. State Street's 2008 Form 10-K did report record revenue, record assets, and increases in earnings per share and return on equity ratios over the prior year. There is no countervailing allegation that State Street should have known that it would suffer large unrealized losses from the conduits and investment portfolio when the press release was issued on January 3, 2008.

2.    **The April and July Form 8-Ks and Press Releases**

Plaintiff challenges another statement by Logue in a Form 8-K and press release dated April 15, 2008, declaring, "I am extremely pleased with this record revenue performance, particularly in today's challenging environment." (Am. Compl. ¶ 46 (internal quotations omitted).) Logue also noted the development of substantial new revenues, the strengthening of State Street's regulatory capital position, and pointed out that the company's general revenue, returns, and earnings per share were in the middle of the ranges that it had predicted for the fiscal year. (Id.) Plaintiff claims:

> In fact, the April 15, 2008 announcement, like the earlier January 3, 2008 announcement, portrayed State Street's business and prospects as being better than they were and improperly concealed from the market generally and the Participants in this case the impairment in State Street's portfolio and the fact that State Street held high risk investment securities and conduits during what even State Street admitted was an "unsettled economic environment."

(Id. ¶ 47.)

Plaintiff does not challenge the specific figures cited in the press release relating to State Street's financial performance in the preceding quarter. Rather, he takes issue again with Logue's optimistic characterization. Logue's statement, however, was one of subjective satisfaction. See, e.g., Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 300-01 (D. Mass. 2004) (dismissing similar subjective opinions "that

the [plaintiffs] could not specifically prove or disprove" as
nonactionable corporate puffery); In re Peritus Software Servs.,
Inc. Sec. Litig., 52 F. Supp. 2d 211, 220 (D. Mass. 1999) (same).

Plaintiff challenges another optimistic statement by Logue
in a July 15, 2008, Form 8-K and press release as "portray[ing
the company's] business and prospects as being better than they
actually were . . . ." (Am. Compl. ¶ 48.) In that instance,
Logue explained, "Our strong performance in the second quarter
following outstanding performance in the first quarter
demonstrates our core business strength and our ability to
sustain strong momentum globally." (Id. (internal quotations
omitted).) Logue also said, "I am pleased with SSgA's financial
performance amid market disruption," predicting growth in
operating earnings per share, revenue, and return on equity in
the higher range of the company's initial predictions for 2008.
(Id.) As a result of these statements, plaintiff alleges that
State Street's share price rose significantly - from $55.70 on
July 14, 2008, to $68.85 on July 17, 2008 - causing Plan
participants to pay more for their stock than they would have had
the company's true condition been revealed. (Id. ¶¶ 49, 50.)

As before, Logue's subjective statement that he was pleased
with SSgA's performance is not actionable. See, e.g., Orton, 344
F. Supp. 2d at 300-01; Peritus, 52 F. Supp. at 220. Likewise,
his enthusiastic reference to State Street's "strong performance
in the second quarter following outstanding performance in the

first quarter" is not actionable in light of State Street's actual strong performance in those quarters, indicated in its SEC filings.  Logue's projections regarding State Street's return on equity and growth in revenue were also met.  See Mear v. Sun Life Assur. Co. of Can. (U.S.)/Keyport Life Ins. Co., No. 06-CV-12143, 2008 WL 245217, at *6-7 (D. Mass. Jan. 24, 2008) (dismissing misrepresentation claim where record refuted claims of falsity).

### 3.   The October 15, 2008, Form 8-K and Press Release

The closest question involves the following passage in State Street's October 15, 2008, press release:

> Due to the unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market losses at quarter end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion. However, as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high.

(Perla Aff., Ex. N at 27 (emphasis added); see also Am. Compl. ¶ 52 (highlighting this passage).)  Plaintiff claims that the description of the asset quality of the investment portfolio and conduit program "remains high" was a misrepresentation.

State Street responds that the assets in those programs did in fact remain highly rated throughout the class period and that it provided adequate warnings in the SEC filings about the downsides of the investment.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 658 F. Supp. 2d 299, 305-07 (D. Mass. 2009) (dismissing misrepresentation claim

23

where loan documents "'abound with warnings' of the potential perils"); In re the First Marblehead Sec. Litig., 639 F. Supp. 2d 145, 155 & n.73 (D. Mass. 2009) (noting that a plaintiff fails to plead a non-disclosure claim when SEC filings show disclosure of that which was supposedly concealed).  The Form 10-Qs identified the volatility presented by external factors and warned that falling market prices could lead to substantial unrealized losses.  (See, e.g., Perla Aff., Ex. G at 63-64.)  Similarly, they stated that State Street might be forced to consolidate the conduits' assets and liabilities onto its balance sheet, and acknowledged that "we would recognize an extraordinary loss on the date of consolidation if the fair value of the conduits' liabilities exceeded the fair value of the conduits' assets, as they do currently."  (Perla Aff., Ex. I at 45 (emphasis added); see also Perla Aff., Ex. D at 35, 46-48; Ex. F. at 34-35; Ex. G at 34-35; Ex. H at 34-35, 37-38.)  In light of these disclosures, State Street argues that the statement that the assets continued to have high quality could not possibly have been misleading.

It is true that in some contexts descriptions of assets as "high quality" have been held to be mere puffery.  See, e.g., In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008).  Here, however, the sanguine statement that the asset quality "remained high" turned out to be misleading. Within months, in the fourth quarter of 2008, the net unrealized

losses of the investment portfolio and conduits increased from an aggregate $5.4 billion to an eye-popping $9.1 billion!  State Street's overnight holdings of the conduits' commercial paper peaked at $8.9 billion in that quarter.  This information prompted a massive decline in State Street's stock in January 2009 and criticism from an experienced banking analyst that State Street had not been more forthcoming.

While there were lengthy, turgid disclosures in the SEC filings, they did not clearly explain the risks posed by "first loss" notes, "monoline insurance," the "financial models," or the "off balance sheet" assets.  A Plan beneficiary could reasonably have read Logue's statement to be a pat-on-the-back assurance that, despite the unrealized losses in the third quarter, no further significant losses were foreseeable and there was no reason not to continue investing in the stock.  While State Street insists the assets' quality did remain high and the unrealized losses were just an analytical accounting requirement that reflected no true loss in value, this record does not allow the Court to resolve that disputed fact.  As such, with all reasonable inferences drawn in plaintiff's favor, he has stated a claim that State Street negligently misrepresented the quality and riskiness of its conduits and investment portfolio assets in the October 15 statement.

C.   **Remaining Issues**

Because the remaining claims for mismanagement of Plan assets, divided loyalty, and failure of State Street properly to appoint, monitor, and inform the remaining defendants contain conclusory claims and derive substantially from plaintiff's imprudence claim, the Court dismisses them without prejudice.

Defendants argue that State Street and the Benefits and Investment Committees are not proper defendants.  That is a fact-bound inquiry and should be resolved on summary judgment.  <u>See, e.g.</u>, <u>In re Cardinal Health, Inc. ERISA Litig.</u>, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) (gathering cases).


**ORDER**

Defendants' Motion to Dismiss [Docket No. 17], is **<u>DENIED</u>** with respect to the October 15 press release, and **<u>ALLOWED</u>** without prejudice with respect to the remaining claims.


      /s/ PATTI B. SARIS
      PATTI B. SARIS
      United States District Judge