# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS U. KENNEY, on Behalf of Himself and a Class of Persons Similarly Situated, | X<br>:<br>:<br>: |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| STATE STREET CORPORATION; NORTH AMERICA REGIONAL BENEFITS COMMITTEE OF STATE STREET CORPORATION; ALISON QUIRK; PAMELA GORMLEY; ROSS MCLELLAN; DAVID O'LEARY; SKIP CURTRELL; JAYNE DONAHUE; DAVID GUTSCHENRITTER; JAMES MALERBA; STATE STREET CORPORATION INVESTMENT COMMITTEE; and JOHN DOES 1-10 | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| | : |
| Defendants. | : |
| | X |

1:09-cv-10750 (PBS)(JGD)

## DECLARATION OF MARK LEVINE IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEFENDANTS TO PRODUCE DOCUMENTS RESPONSIVSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS <u>WITH RESPECT TO THE APPROPRIATE RELEVANT TIME PERIOD</u>

I, Mark Levine, hereby declare:

1.      I am an attorney at the law firm of Stull, Stull & Brody, co-counsel for Plaintiff in this action.  I am admitted *pro hac vice* to the bar of this Court for purposes of this action and submit this Declaration in support of the motion of the Thomas U. Kenney ("Plaintiff") to Compel Defendants to Produce Documents Responsive to Plaintiff's First Request for Production of Documents With Respect to the Appropriate Relevant Time Period.

2.      Attached hereto as Exhibit A is a true and correct copy of Plaintiff's First Request for Production of Documents Directed to All Defendants.

3.      Attached hereto as Exhibit B is a true and correct copy of Defendants' Response to Plaintiff's First Request for Production of Documents.

4.      Attached hereto as Exhibit C is Plaintiff's April 9, 2010 letter to Defendants' counsel.

5.      Attached hereto as Exhibit D is a true and correct copy of State Street Corporation's May 22, 2009 Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC").

6.      Attached hereto as Exhibit E is a true and correct copy of State Street Corporation's May 18, 2009 Form 8-K filed with the SEC.

7.      Attached hereto as Exhibit F is a true and correct copy of State Street Corporation's July 21, 2009 press release filed with the SEC.

Signed under penalty of perjury this 18th day of June, 2010.

/s/  Mark Levine_____
          Mark Levine

CERTIFICATE OF SERVICE

I, Mark Levine, hereby certify that a copy of the foregoing document, filed through the ECF system on June 18, 2010, was sent electronically on that date to the registered participants as identified in the Notice of Electronic Filing.


Dated June 18, 2010

/s/ Mark Levine_____

# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THOMAS U. KENNEY, on Behalf of Himself and a Class of Persons Similarly Situated,<br><br>             Plaintiff,<br><br>    v.<br><br>STATE STREET CORPORATION; NORTH AMERICA REGIONAL BENEFITS COMMITTEE OF STATE STREET CORPORATION; ALISON QUIRK; PAMELA GORMLEY; ROSS MCLELLAN; DAVID O'LEARY; SKIP CURTRELL; JAYNE DONAHUE; DAVID GUTSCHENRITTER; JAMES MALERBA; STATE STREET CORPORATION INVESTMENT COMMITTEE; AND JOHN DOES 1-10<br><br>             Defendants. | Civil Action No. 09-CV-10750 (PBS) |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO ALL DEFENDANTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of this Court, plaintiff Thomas U. Kenney propound this First Request for Production of Documents upon all Defendants and requests that Defendants produce for inspection and copying the following documents and materials in accordance with the "Definitions" and "Instructions" set forth below at the offices of Stull, Stull & Brody, 6 East 45th Street, New York, N.Y. 10017, or such other place as counsel may agree within thirty days following receipt hereof.

## DEFINITIONS

1.      The term "State Street" or "Company" means State Street Corporation, its predecessors, successors, parents, subsidiaries, divisions, affiliates, or anyone acting or purporting to act on its behalf, including any of its respective directors, officers, managing agents, agents, employees, attorneys, accountants, or other representatives

2.      The term "Board" means the board of directors of State Street.

3.      The term "communications" refers to any oral, written, or electronic utterance, notation, or statement of any nature whatsoever, draft or final, potential or actual, by and to whomever made or attempted to be made, including, but not limited to, correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, electronic messages (including electronic-mail, text messages, instant messages, and Company intranet, electronic bulletin board or Internet site posting) and other understandings between two or more Persons.  The term "communications" specifically includes, but is not limited to, any exchange of information by any means of transmission, including, but not limited to, face-to-face conversations, mail, electronic mail, telegram, overnight delivery, telephone, facsimile or telex.

4.      The term "Plan" refers to the State Street Salary Savings Program.

5.      The term "Conduit" has the same meaning as the term "conduit" in Note 12 of State Street's Form 10-K for the year ended December 30, 2008.

6.      The term "Conduit Program" means the same as the term "conduit program" appearing in a Form 8-K filed by State Street on October 15, 2008.

7.      The term "concerning" means regarding, relating to, pertaining to, referring to, describing, evidencing, constituting, reflecting, showing, comprising, considering, discussing, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.  Requests for documents "concerning" any subject matter include documents concerning communications regarding that subject matter.

8.     The term "Defendants" refers to State Street and all of the Individual Defendants both individually and collectively.

9.     The term "documents" means documents whether fixed in tangible medium or electronically stored on disk or tape. The word "documents" shall include, by way of example and not by way of limitation, all of the following: papers, correspondence, trade letters, envelopes, memoranda, telegrams, cables, notes, messages, electronic-mails ("e-mails"), text messages, instant electronic messages, reports, studies, press releases, comparison, books, accounts, checks, audio and video recordings, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, newspapers, calendars, desk calendars, pocket calendars, lists, logs, publications, notices, diagrams, instructions, diaries, minutes of meetings, corporate minutes, orders, resolutions, agendas, memorials or notes of oral communications, whether by telephone or face-to-face, contracts, agreements, drafts of or proposed contracts or agreements, memoranda of understanding, letters of intent, deal memoranda, transcriptions of audio or video recordings, computer tapes, computer diskettes or disks, or any other tangible thing on which any handwriting, typing, printing, photostatic, electronic or other form of communication or information is recorded or reproduced, together with all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions of drafts thereof, whether used or not.

10.     The term "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.,* as amended.

11.     The term "Individual Defendants" refers to Alison Quirk, Pamela Gormley, Ross McLellan, David O'Leary, Skip Curtell, Jayne Donahue, David Gutschenritter and James Melerba, both individually and collectively, as well as to each of their agents, representatives and attorneys.

12.    The term "meeting" means, without limitation, any assembly, convocation, encounter or contemporaneous presence of two or more persons for any purpose, whether planned, arranged, scheduled or not.

13.    The term "or" should be construed as disjunctive and conjunctive, and "any" and "all" as used herein shall include "each" and "every." Similarly, the singular includes the plural, and vice versa.

14.    The term "Participant" refers to any employee or former employee of State Street who is a participant in or beneficiary of the Plan, as well as any person designated by a Participant, or by the terms of the Plan, who is or may become entitled to receive a benefit under the Plan.

15.    The term "person" means any individual, corporation, partnership, firm, association, government agency or other organization recognizable at law, and its agents and employees.

16.    The term "SEC" means the United States Securities and Exchange Commission.

17.    The pronouns "You" or "Your" refer to the named Defendants and their officers, directors, agents, employees, members, representatives, and attorneys.

## INSTRUCTIONS

1.    Please refer to Federal Rule of Civil Procedure 34 and consider it part of these instructions. All documents produced for inspection shall be produced as they are kept in the usual course of business, or shall be organized and labeled to correspond to the categories in the particular Documents Requests, as required by Federal Rule of Civil Procedure 34(b). Documents attached to one another shall not be separated for production, the sequence of the documents shall not be disturbed from the condition in which they are normally kept and all folders and containers for the documents shall be produced as well as the documents in the folders and containers.

2.     You are requested to produce all documents within your possession, custody, or control, including without limitation documents in storage or in the possession of your professional or business advisors, such as your attorneys, investigators, brokers, investment advisors, and accountants, or in the possession of your or their agents, employees, or representatives.

3.     Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

4.     Any alteration of a requested document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications and other versions of a final document. is a separate and distinct document and it should be produced.

5.     If you object to any of the definitions or instructions, state your objection(s) in your response and indicate whether you are complying with the direction or instruction in spite of your objection.  If your objection goes to only part of a request, produce all documents which do not fall within the scope of your objection.

6.     If a document responsive to these requests was at any time in State Street possession, custody or control but now is no longer available for production, as to each such document state the following information:

> Whether the document is missing or lost;
>
> Whether it has been destroyed;
>
> Whether the document has been transferred or delivered to another person or entity and, if so, at whose request;
>
> Whether the document has been otherwise disposed of; and

The circumstances surrounding the disposition of the document and the date of the document's disposition.

7.      The documents produced in response to these requests should be segregated and clearly marked or labeled as to the specific request to which such documents are responsive and being produced.  Otherwise, such documents shall be produced as they are kept in the usual course of business, including a production of the files from which such documents are taken, along with all other documents residing in those files.

8.      Documents not otherwise responsive to these discovery requests shall be produced if such documents mention, discuss, refer to or explain the documents which are called for by these requests, or if such documents are attached to documents called for by these requests and constitute routing slips, transmittal memoranda, letters, comments, evaluations or similar materials.

9.      Without in any way limiting the definition of "document" contained in the Federal Rules of Civil Procedure or herein, you are specifically instructed to search all document management systems, computer archives, and/or backup tapes or disks for documents responsive to the following requests, and production of such documents should be made regardless of whether such documents exist in tangible or "hard" copy form.  Production is also sought regardless of whether the user purported to "delete" the document, if such document is capable of being retrieved from archives and/or backup tapes or disks.

10.     With respect to any documents called for by these Requests but withheld due to a claim of privilege or for any other reason, each such document should be preserved and identified by stating the following:

    a.      generic description (e.g., "letter," "memo," "note," etc.);

    b.      general subject matter;

    c.      date;

    d.      author;

e.  person or persons for whom it was prepared and to whom it was sent; and

f.  the nature and basis of the privilege or other reason given for withholding such document.

11.  For documents that have originated in paper format, the following specifications should be used for their production: Images should be produced as single page TIFF group IV format imaged at 300dpi.

a.  Each filename must be unique and match the Bates number of the page. The filename should not contain any blank spaces and should be zero padded (for example ABC00000001).

b.  Media may be delivered on CDs, DVDs or External USB hard drives. Each media volume should have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001).

c.  Each delivery should be accompanied by an IPRO image cross reference file (.lfp) that contains document breaks.

d.  A delimited text file that contains available fielded data should also be included, and at a minimum include Beginning Bates Number, Ending Bates Number and Number of Pages. The delimiters for that file should be:

Field Separator: "|"

Quote Character: "~" Multi-Entry Delimiter: ";"

e.  To the extent that documents have been run through an Optical Character Recognition (OCR) Software in the course of reviewing the documents for production, full text should also be delivered for each document. Text should be delivered on a document level in an appropriately formatted text file (.txt) that is named to match the first bates number of the document.

f.  A Summation text cross reference load file (.lst) should also be included with the production delivery.

12.  Electronic documents should be produced in such fashion as to identify the location (i.e., the network file folder, hard drive, back-up tape or other location) where the documents are stored and, where applicable, the natural person in whose possession they were found (or on whose hardware device they reside or are stored). If the storage location was a file share or work group folder, that should be specified as well. Attachments, enclosures, and/or

exhibits to any parent documents should also be produced and proximately linked to the respective parent documents containing the attachments, enclosures, and/or exhibits.

13.    This document request is deemed to be continuing in nature and any documents that should come into your possession, custody or control after your initial production are hereby requested and should be produced without the need to supplement this request.

## RELEVANT TIME PERIOD

Unless otherwise indicated or stated, the Relevant Time Period covered by these Document Requests is January 1, 2008 through and including March 30, 2009. You should produce all documents created, received by you, reviewed or read by you, or dated during the Relevant Time Period, or which refer to any date, transaction, or event within the Relevant Time Period. The Relevant Time Period shall include reference to all occurrences and documents created prior to the Relevant Time Period that relate to, are effective during, or concern events, agreements, communications, investigations, reports, notes or any other matters during the Relevant Time Period.

## DOCUMENTS REQUESTED

**Document Request No. 1:**

All written instruments (as defined in ERISA §402(a), 29 U.S.C. §1102(a)) of the Plan, including but not limited to the operative Plan documents, Plan restatements, Trust Agreements, Investment Policy Statements and Investment Management Contracts, in effect during the Relevant Time Period, including any and all amendments, exhibits, or appendices thereto.

**Document Request No. 2:**

All prospectuses of the Plan, including any prospectuses issued under the Securities Act of 1933, in effect at any time during the Relevant Time Period, including all exhibits, schedules and attachments thereto.

**Document Request No. 3:**

Annual reports of the Plan created during the Relevant Time Period, regardless of the person or entity creating the report; this request includes reports by Plan consultant advisors, investment managers or consultants and advisors retained by the Company, or any fiduciary or party in interest, to review or comment upon the Plan.

**Document Request No. 4:**

All Company governmental filings, including, but not limited to, 11-K, 10-K, 10-KA, 10-Q, and 8-K Forms, filed with the SEC, and all related exhibits, schedules, attachments thereto, public releases, statements, minutes/transcripts of analyst meetings, or prepared statements by State Street directors, officers or other Company spokesperson(s) related to or discussing, the Plan, and/or State Street's financial or operational results during the Relevant Time Period.

**Document Request No. 5:**

All minutes of meetings of the Board and/or Benefits or Investments Committees which mention or pertain in any way to the Plan, including, but not limited to: (1) any minutes concerning the Plan Committee, including, without limitation, minutes discussing adding or removing Plan Committee members or monitoring or referencing the asset quality of State Street's investment portfolio and conduit programs

**Document Request No. 6:**

All documents relating to the asset quality of the Conduit Program and State Street's investment portfolio.

**Document Request No. 7:**

All documents relating to the margin between the rate of return on the Conduit Program's longer-term assets and the short-term cost of funding the Conduits Program.

**Document Request No. 8:**

All documents relating to any disruptions in the liquidity of the Conduit Program's short-

term debt or asset-backed securities.

**Document Request No. 9:**

All documents relating to the cost of short-term borrowings exceeding the Conduit Program's rate of return on their investment pools or purchased assets.

**Document Request No. 10:**

All documents relating to any contractual back-up liquidity State Street provided to the Conduit Program.

**Document Request No. 11:**

All documents relating to the level of demand for the Conduit Program's commercial paper financing.

**Document Request No. 12:**

All documents relating to the credit ratings of the underlying the assets of the Conduit Program and State Street's investment portfolio.

**Document Request No. 13:**

Documents concerning the asset backed commercial paper conduits that State Street sponsored, including without limitation, documents concerning asset quality, application of accounting rules, profit/loss models, and unrealized conduit losses.

**Document Request No. 14:**

Documents concerning State Street's investment portfolio, including without limitation documents concerning asset quality, the application of accounting rules, and the assessment and analysis of portfolio marks.

**Document Request No. 15:**

Documents relating to the factual basis for State Street's Form 8-K filed with the SEC on or about October 15, 2008.

**Document Request No. 16:**

All documents relating to the value of the Conduit Program and its underlying assets and State Street's investment portfolio.

**Document Request No. 17:**

All documents relating to the contractual arrangements between State Street and the Conduits in effect during the Relevant Period and any communications regarding any consideration of modifying those arrangements.

**Document Request No. 18:**

All communications between Ernst & Young LLP and State Street regarding the level of risk of the Conduit Program and State Street's investment portfolio.

**Document Request No. 19:**

With respect to Plaintiff:

> all documents concerning his Plan enrollment, elections and investment option selections;
>
> all documents evidencing Plan communications or other materials distributed to him;
>
> all documents concerning or evidencing the Plan investments held in his individual Plan account during the Relevant Time Period, including, but not limited to, individual account statements;
>
> all documents concerning or evidencing the number of shares and value of Company Stock Fund held in his individual Plan account during the Relevant Time Period; and
>
> the employment contract of other documentation of the terms of his employment, performance and disciplinary reviews or any severance agreement(s).

**Document Request No. 20:**

Documents sufficient to identify:

the daily purchases, sales and holdings of the Company stock by the Plan during the Relevant Time Period;

the quantity and dollar value of units of the Company stock owned by the Plan on an aggregate basis, and as allocated to each individual Participant's Plan account during the Relevant Time Period;

the allocation of any interest in Company stock units to or from each individual Participant's Plan account during the Relevant Time Period;

the closing market price of other indicator of value of each investment option under the Plan during the Relevant Time Period.

**Document Request No. 21:**

All documents and communications related to performance reviews of each individual investment alternative provided under the Plan.

**Document Request No. 22:**

All documents disseminated to Participants that constitute, set forth, discuss, refer, or relate, in whole or in part, to any analysis/review/evaluation of the Plan's investment options during the Relevant Time Period, including all drafts thereof, including but not limited to, any performance reviews of each individual investment alternative provided under the Plan.

**Document Request No. 23:**

Documents sufficient to show: (1) the number and identity of all persons who hold, or have held, an account in the Plan; and (2) the number and identity of each person whose account invested in the Company stock fund during the Relevant Time Period.

**Document Request No. 24:**

All documents concerning insurance policies in effect during the relevant time period that reflect the terms under which any Defendant may be insured or indemnified against liability relating to the administration of the Plan, the management of the Plan's assets, or the action/inaction of Plan's Fiduciaries.

**Document Request No. 25:**

Any sharing agreement(s) between State Street and any person or entity by which such

person or entity may be liable for any judgment on any of the claims alleged in this Action.

**Document Request No. 26:**

All documents that set forth, discuss, describe or concern State Street document destruction, retention policies, electronic mail backup system(s) or procedures during the Relevant Time Period, any document retention or destruction policy with respect to electronic communications (including e-mail, text messages, instant messages, computer records, disk files and/or other electronic records), and any actual, suggested or contemplated policy, program, procedure, instruction, direction or request concerning the destruction, alteration, removal, concealment, non-disclosure, secrecy or confidentiality of any of the documents requested herein.

March 18, 2010

**TODD & WELD, LLP**
Kevin T. Peters
28 State Street
Boston, MA  02109
Tel: (617) 720-2626
Fax: (617) 227-5777

**STULL, STULL & BRODY**

Edwin J. Mills
Mark Levine
6 East 45th Street
New York, NY  10017
Tel: (212) 687-7230
Fax: (212) 490-2022

**MAJOR KHAN, LLC**
Major Khan
20 Bellevue Street
Weehawken, NJ  07086
Tel: (646) 546-5664
Fax: (646) 546-5755

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THOMAS U. KENNEY, on Behalf of Himself and a Class of Persons Similarly Situated, |  |
| Plaintiff, |  |
| v. | Civil Action No. 1:09-CV-10750 (PBS) |
| STATE STREET CORPORATION; NORTH AMERICA REGIONAL BENEFITS COMMITTEE OF STATE STREET CORPORATION; ALISON QUIRK; PAMELA GORMLEY; ROSS MCLELLAN; DAVID O'LEARY; SKIP CURTRELL; JAYNE DONAHUE; DAVID GUTSCHENRITTER; JAMES MALERBA; STATE STREET CORPORATION INVESTMENT COMMITTEE; AND JOHN DOES 1-10 |  |
| Defendants. |  |

## CERTIFICATE OF SERVICE

I, Mark Levine, hereby certify that I caused a copy of Plaintiff's First Request For Production Of Documents Directed To All Defendants to be sent by e-mail and first class mail to the following Defendants' counsel this 18th day of March 2010:

**John Butts, Esq.**
**Wilmer Cutler Pickering Hale & Dorr LLP**
**60 State Street**
**Boston, Massachusetts 02109**

Dated: March 18, 2010

_____
Mark Levine

# Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                            )
THOMAS U. KENNEY, on Behalf of Himself and  )
a Class of Persons Similarly Situated       )
                                            )
              Plaintiff,                     )
                                            )          Civil Action
        v.                                   )          No. 09-10750-PBS
                                            )
STATE STREET CORPORATION, et al.            )
                                            )
              Defendants.                    )
_____     )
```

## DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S
## FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Defendants, State Street Corporation ("State Street"), North American Regional Benefits

Committee of State Street Corporation (the "NARBC"), Alison Quirk, Pamela Gormley, Ross

McLellan, David O'Leary, Charles Cutrell, Jayne Donahue, David Gutschenritter, James

Malerba, and State Street Corporation Investment Committee (collectively, the "Defendants"),

by and through their undersigned counsel, hereby respond and object to Plaintiff's First Request

For Production of Documents Directed to All Defendants ("Request For Production").

## GENERAL OBJECTIONS

Each of the Defendants' responses is subject to and incorporates the following general

objections.  The assertion of the same, similar, or additional objections, or a partial response to

any individual Document Request does not waive any of Defendants' general objections.

1.      Defendants object to the Request for Production to the extent that it seeks

documents and information that are not relevant to the sole surviving claim of the Amended

Complaint following the Court's March 15, 2010 Memorandum and Order, *i.e.,* plaintiff's

negligent misrepresentation claim concerning an October 15, 2008 statement by Mr. Logue contained in a Form 8-K ("the Sole Surviving Claim"), or the defenses thereto, or not reasonably calculated to lead to the discovery of admissible evidence concerning that claim.  Unless otherwise expressly stated, Defendants will produce documents only with respect to the Sole Surviving Claim.

2.      Defendants object to time period specified in the Request For Production, which is overbroad, and calls for documents which would be unduly burdensome to collect, and calls for documents which are not relevant to the parties claims or defenses with respect to the Sole Surviving Claim, or reasonably calculated to lead to the discovery of admissible evidence concerning that claim.  Unless otherwise expressly stated, Defendants define the "Relevant Period" to be October 1, 2008 through January 20, 2009, and will not produce documents created outside of that period.

3.      Defendants object to the Request for Production to the extent that it seeks documents and information that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other privilege or protection.  Any inadvertent disclosure of such information is not intended and should not be construed or deemed to constitute a waiver, either generally or specifically, in whole or in part, with respect to such material or the subject matter thereof.

4.      Defendants object to the Request for Production to the extent that it exceeds the scope of permissible discovery under, and/or seeks to impose obligations upon Defendants that are different from or in addition to those imposed by, and/or exceeding the scope of permissible discovery under the Federal Rules of Civil Procedure of the Local Rules of the United States District Court for the District of Massachusetts.

5.      Defendants object to the Request for Production to the extent that it purports to impose a burden on Defendants to provide information that is publicly available and/or already in the plaintiff's possession, custody, or control, and is therefore equally available to the plaintiff.

6.      Defendants object to the Request for Production to the extent that the discovery sought is duplicative, overly broad, unduly burdensome, oppressive, harassing, ambiguous, vague or requires unreasonable investigation by Defendants.

7.      Defendants object to the Request for Production to the extent that it purports to impose a burden on Defendants of ascertaining information and collecting documents that are not within Defendants' possession, custody, or control.  Defendants will only provide information and documents that are within their possession, custody, or control.

8.      Defendants object to the Request for Production to the extent that it seeks the production of documents or the disclosure of information that constitute or contain confidential information.  Defendants will only produce such documents, or disclose such information, subject to a mutually acceptable confidentiality agreement.

9.      Defendants object to the Request for Production to the extent that it purports to impose a duty on Defendants to seek information or documents through something other than a reasonable search of their files where potentially responsive materials or information reasonably would be expected to be found.  Defendants' representation that they will produce responsive documents means that they will make a diligent, good faith effort to locate responsive documents and that they will produce any non-privileged, responsive documents that are found.  It does not mean that any such documents exist, or that any existing documents can be collected through reasonable efforts.

10.     Defendants object to the definitions of "State Street" and "Company" on the grounds that they are overly broad, unduly burdensome, vague, and capture individuals, entities, and organizations that are not relevant to the Sole Surviving Claim or the defenses thereto. Defendants will interpret those terms to mean State Street Corporation.

11.     Defendants object to the definition of "Individual Defendants" on the grounds that it is overly broad, unduly burdensome, vague, and captures individuals, entities, and organizations that are not relevant to the Sole Surviving Claim or the defenses thereto. Defendants will interpret those terms to mean Alison Quirk, Pamela Gormley, Ross McLellan, David O'Leary, Skip Cutrell, Jayne Donahue, David Gutschenritter and James Malerba.

12.     Defendants object to the definitions of "communications," "concerning," and "documents" on the grounds that they are overly broad, unduly burdensome, and vague. Defendants will interpret those terms in accordance with the definitions set forth in Local Rule 26.5(C).

13.     Defendants object to the definition of "meeting" on the grounds that it is vague and ambiguous, especially limited insofar as the definition purports to include any "encounter" or "contemporaneous presence of two or more persons for any purpose," which phrases are vague and ambiguous.

14.     Defendants object to the definition of "Participant" on the grounds that it is overly broad, unduly burdensome, and vague.  Defendants interpret that term to mean an individual who (a) was a participant of the Plan during the Relevant Period, and (b) who allocated some of their Plan investments into the State Street Corporation ESOP Fund (the "State Street ESOP").

15.     Defendants object to the definition of the terms "you" and "your" on the grounds that they are overly broad, unduly burdensome, vague, and capture individuals, entities, and

organizations that are not relevant to the Sole Surviving Claim or the defenses thereto.

Defendants will interpret these terms to include the named Defendants only.

16.     None of Defendants' responses herein shall constitute a waiver of any and all

defenses, protections or rights accorded to them.  In addition, none of these responses, including

but not limited to any statement that certain information will be provided or a document will be

produced, is an admission relative to the existence of any such information or documents, to the

relevance or admissibility of any information or documents, or to the truth or accuracy of any

statement or characterization contained in the Request for Production.  Defendants retain the

right to object, on the grounds of competency, privilege, relevance, materiality, or otherwise, to

the use of the information or documents that they produce, in whole or in part, in this or in any

other action.

17.     Defendants object to Instruction Numbers Nine, Eleven, and Twelve, and object

generally to the production of documents stored in electronic form, on the grounds that such

instructions and requests are unduly burdensome, overly broad, harassing and oppressive,

especially insofar as they relate to electronic documents that are stored in archived media (*e.g.*,

backup tapes), individual hard drives, or any portable media.  Any statement below that

Defendants will produce specified documents does not include electronic documents.

Defendants are willing to separately discuss with plaintiff a protocol for the searching of

electronically stored information (including among other things, the identification of custodians,

key word search terms, and sources of information to be collected and searched) as well as the

format of any production.

18.     Defendants object to any request that purports to require them to produce multiple copies of the same document.  Unless otherwise indicated, Defendants will only produce non-identical copies of any documents they agree to produce.

19.     Defendants object to Instruction Number Two on the grounds that it is vague, ambiguous, unduly burdensome, and calls for materials that are protected by the attorney-client privilege, the attorney work product doctrine and/or any other privilege or protection, insofar as it purports to require production of documents "in storage or in the possession of your professional and business advisors, such as your attorneys, investigators, brokers, investment advisors, and accountants, or in the possession of your or their agents, employees, or representatives."  Defendants will produce only documents within their possession, custody, or control.

20.     Defendants object to Instruction Number Three on the grounds that it is overly broad, unduly burdensome, harassing, and oppressive.  Where a document is redacted, Defendants will identify in summary terms the reason for the redaction.

21.     Defendants object to Instruction Number Six on the grounds that it is overly broad, unduly burdensome, harassing, oppressive, and seeks information that is neither relevant to the parties claims or defenses, nor reasonably calculated to lead to the discovery of admissible evidence.

22.     Defendants object to Instruction Number Seven on the grounds that it is overly broad, unduly burdensome, harassing, oppressive, and exceeds the boundaries of the Federal Rules of Civil Procedure and the Local Rules of this Court.

23.     Defendants object to Instruction Number Eight on the grounds that it is overly broad, unduly burdensome, and vague.

24.     Defendants object to Instruction Number Ten on the grounds that it is overly broad, unduly burdensome, harassing, oppressive, and exceeds the boundaries of the Federal Rules of Civil Procedure and the Local Rules of this Court.  For any documents that Defendants withhold on the basis of a privilege, Defendants will provide a log containing sufficient information to enable plaintiff to assess the basis for Defendants' assertion of a privilege.

25.     Defendants object to Instruction Number Thirteen to the extent that it exceeds the boundaries of the Federal Rules of Civil Procedure and the Local Rules of this Court.

26.     All of these responses are without prejudice to Defendants' using or relying on at trial subsequently discovered documents or information, including any such documents or information that are omitted from these responses as a result of good faith oversight, error, or mistake.

27.     The responses herein are made solely for the purpose of this action.  Each response is subject to all objections as to competency, relevancy, materiality, propriety, and admissibility, and any and all other objections on any grounds which would require the exclusion from evidence of any statement herein if any production of document were asked for, or any statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are expressly reserved and may be interposed at trial.

28.     Defendants' investigation is ongoing.  These responses therefore are made on the basis of Defendants' investigation to date and upon information currently available to and located by them after reasonable inquiry.  Defendants reserve the right to amend, supplement, or modify its responses, as further information becomes available and known and such information is analyzed.

29.     Defendants agree to produce non-privileged responsive documents as expressly identified below, if any, in accordance with a schedule to be determined by the Court.  Unless otherwise expressly indicated, Defendants will not produce any documents encompassed by the foregoing objections.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

Subject to and without waiving the foregoing general objections, Defendants respond to each request as follows:

### Document Request No. 1:

All written instruments (as defined in ERISA §402(a), 29 U.S.C. §1102(a)) of the Plan, including but not limited to the operative Plan documents, Plan restatements, Trust Agreements, Investment Policy Statements and Investment Management Contracts, in effect during the Relevant Time Period, including any and all amendments, exhibits, or appendices thereto.

### Response to Request No. 1:

Defendants object to this request on the ground that the terms "operative Plan documents, Plan restatements, Trust Agreements, Investment Policy Statements and Investment Management Contracts" are vague and ambiguous, and call for documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object to this request on the ground that it calls for documents that have already been produced to the plaintiff, including, among other things, the Plan document, Trust Agreement, Summary Plan Descriptions which pertain to the Plan during the Relevant Period set forth above.  To the extent that any other documents that might be responsive to this request exist, Defendants object to production insofar as they are neither relevant to the parties' claims or defenses with respect to the Sole Surviving Claim, nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim.

**Document Request No. 2:**

All prospectuses of the Plan, including any prospectuses issued under the Securities Act of 1933, in effect at any time during the Relevant Time Period, including all exhibits, schedules and attachments thereto.

**Response to Request No. 2**

Defendants object to this request on the ground that it calls for publicly available documents, which are available to the plaintiff with equal burden. Defendants also object on the grounds that any such documents are neither relevant to the parties' claims or defenses with respect to the Sole Surviving Claim, nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim.

**Document Request No. 3:**

Annual reports of the Plan created during the Relevant Time Period, regardless of the person or entity creating the report; this request includes reports by Plan consultant advisors, investment managers or consultants and advisors retained by the Company, or any fiduciary or party in interest, to review or comment upon the Plan.

**Response to Request No. 3**

Defendants object to this request to the extent that it calls for publicly available documents which are equally available to plaintiff. Defendants further object to this request on the ground that the terms "Plan consultant advisors, investment managers or consultants and advisors retained by the Company, or any fiduciary or party in interest" are vague and ambiguous. Defendants also object on the grounds that any such documents are neither relevant to the parties' claims or defenses with respect to the Sole Surviving Claim, nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim.

**Document Request No. 4:**

All Company governmental filings, including, but not limited to, 11-K, 10-K, 10-KA, 10-Q, and 8-K Forms, filed with the SEC, and all related exhibits, schedules, attachments thereto, public releases, statements, minutes/transcripts of analyst meetings, or prepared statements by State Street directors, officers or other Company spokesperson(s) related to or

discussing, the Plan, and/or State Street's financial or operational results during the Relevant Time Period.

**Response to Request No. 4**

Defendants object to this request on the ground, to the extent it calls for the production of SEC filings, this request is overly burdensome insofar as those documents are publicly available and can be collected by the plaintiff with equal burden. Defendants object to the remainder of this request on the grounds that it is overly broad, unduly burdensome, vague, and that it calls for the production of documents and information that are neither relevant to the parties' claims or defenses with respect to the Sole Surviving Claim, nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim.

**Document Request No. 5:**

All minutes of meetings of the Board and/or Benefits or Investments Committees which mention or pertain in any way to the Plan, including, but not limited to: (1) any minutes concerning the Plan Committee, including, without limitation, minutes discussing adding or removing Plan Committee members or monitoring or referencing the asset quality of State Street's investment portfolio and conduit programs.

**Response to Request No. 5**

Defendants object to this request on the ground that it calls for documents that are neither relevant to the parties' claims or defenses with regard to the Sole Surviving Claim nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim. Defendants further object to this request as vague insofar as the terms "Benefits" and "Investments Committees" are undefined. Defendants' further object to the term "asset quality" as vague and ambiguous, and will interpret that term (in this and all other requests) as addressing credit ratings performed internally or through an outside agency such as Standard & Poor's or Moody's.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce minutes of meetings of the Board or the NARBC that took place in the Relevant Period, as specified above, and concern the quality of the assets in State Street's investment portfolio and/or the conduits State Street sponsored.

**Document Request No. 6:**

All documents relating to the asset quality of the Conduit Program and State Street's investment portfolio.

**Response to Request No. 6**

Defendants object to this request on the ground that it calls for documents that are neither relevant to the parties' claims or defenses with regard to the Sole Surviving Claim, nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim. Defendants further object on the grounds that the request for "all documents . . . relating to" this subject matter is overly broad and unduly burdensome. Defendants also object on the grounds that this request is duplicative of Request Number Five. Defendants further object that the term "asset quality" is vague and ambiguous.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce documents that can be located through a reasonable search that were created during the Relevant Period set forth above, which concern the quality of the assets in State Street's investment portfolio and/or the conduits State Street sponsored.

**Document Request No. 7:**

All documents relating to the margin between the rate of return on the Conduit Program's longer-term assets and the short-term cost of funding the Conduits Program.

**Response to Request No. 7**

Defendants object to this request on the grounds that it calls for documents that are neither relevant to the parties claims or defenses with regard to the Sole Surviving Claim nor

reasonably calculated to lead to the discovery of admissible evidence concerning that claim. Defendants also object to this request on the ground that the terms "margin," "rate of return," and "cost of funding" are vague and ambiguous.

**Document Request No. 8:**

All documents relating to any disruptions in the liquidity of the Conduit Program's short-term debt or asset-backed securities.

**Response to Request No. 8**

Defendants object to this request on the ground that the phrase "disruptions in the liquidity" is vague and ambiguous, and this request is therefore unintelligible. Defendants also object insofar as this request is duplicative of Request No. 6.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce documents they have agreed to produce in response to Request Number 6.

**Document Request No. 9:**

All documents relating to the cost of short-term borrowings exceeding the Conduit Program's rate of return on their investment pools or purchased assets.

**Response to Request No. 9**

Defendants further object to this request on the grounds that it calls for documents that are neither relevant to the parties claims or defenses with regard to the Sole Surviving Claim nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim. Defendants object to this request on the ground that it is vague and ambiguous, and unduly burdensome.

**Document Request No. 10:**

All documents relating to any contractual back-up liquidity State Street provided to the Conduit Program.

**Response to Request No. 10**

Defendants object to this request on the grounds that the request for "all documents relating to" this subject is overly broad and unduly burdensome.  Subject to and without waiving the foregoing general and specific objections, Defendants will produce documents responsive to this request that were created during the Relevant Period as set forth above which can be collected through a reasonable search.

**Document Request No. 11;**

All documents relating to the level of demand for the Conduit Program's commercial paper financing.

**Response to Request No. 11**

Defendants object to this request on the ground that the entire request is vague and ambiguous, and unduly burdensome.  Defendants object to this request on the grounds that the request for "all documents relating to" this subject is overly broad and unduly burdensome.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce documents sufficient to show the quantity of purchases of commercial paper from the Conduit Program during the Relevant Period as set forth above.

**Document Request No. 12:**

All documents relating to the credit ratings of the underlying the assets of the Conduit Program and State Street's investment portfolio.

**Response to Request No. 12**

Defendants object to this request on the grounds that it is duplicative of Request Number 6.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce documents they have agreed to produce in response to Request Number 6.

- 13 -

**Document Request No. 13:**

Documents concerning the asset backed commercial paper conduits that State Street sponsored, including without limitation, documents concerning asset quality, application of accounting rules, profit/loss models, and unrealized conduit losses.

**Response to Request No. 13**

Defendants object to this request on the grounds that it is duplicative of multiple requests, including Request Numbers 6 and 12. Defendants further object to the phase "application of accounting rules" on the grounds that it is vague and ambiguous and unduly burdensome.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce: (a) the documents they agreed to produce in response to Request Number 6; (b) the conduit's profits/loss models that were created during the Relevant Period, set forth above; and (c) documents that can be collected with reasonable efforts that concern State Street's interactions with its outside auditor during the Relevant Period set forth above which concern the calculation of unrealized losses.

**Document Request No. 14:**

Documents concerning State Street's investment portfolio, including without limitation documents concerning asset quality, the application of accounting rules, and the assessment and analysis of portfolio marks.

**Response to Request No. 14**

Defendants object to this request on the grounds that it is duplicative of multiple requests, including Request Number 6. Defendants further object to the phrases "application of accounting rules" and "assessment and analysis" on the grounds that they are vague and ambiguous and unduly burdensome. Defendants also object to this request on the grounds that the implicit request for all "documents concerning" this subject area is overly broad and unduly burdensome.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce:  (a) the documents they agreed to produce in response to Request Number 6; (b) documents that can be collected with reasonable efforts that concern the calculation of the portfolio marks during the Relevant Period set forth above; and (c) documents that can be collected with reasonable efforts that concern State Street's interactions with its outside auditor during the Relevant Period set forth above which concern the calculation of unrealized losses.

**Document Request No. 15:**

Documents relating to the factual basis for State Street's Form 8-K filed with the SEC on or about October 15, 2008.

**Response to Request No. 15**

Defendants further object to this request on the grounds that it calls for documents that are neither relevant to the parties' claims or defenses with regard to the Sole Surviving Claim nor reasonably calculated to lead to the discovery of admissible evidence concerning that claim. Defendants object to this request on the ground that the entire request is vague and ambiguous, and is overbroad and unduly burdensome.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce, to the extent they can be identified through reasonable efforts, any documents used as the factual basis for the single statement in State Street's Form 8-K filed with the SEC on or about October 15, 2008 that is at issue in the Sole Surviving Claim.

**Document Request No. 16:**

All documents relating to the value of the Conduit Program and its underlying assets and State Street's investment portfolio.

**Response to Request No. 16**

Defendants object to this request on the ground that the entire request is vague and

ambiguous, and is overbroad and unduly burdensome.  Defendants further object on the grounds

that this request is duplicative of numerous other requests.

**Document Request No. 17:**

All documents relating to the contractual arrangements between State Street and the
Conduits in effect during the Relevant Period and any communications regarding any
consideration of modifying those arrangements.

**Response to Request No. 17**

Defendants object to this request on the ground that it is duplicative of Request No. 10.

Defendants further object to this request on the grounds that the request for documents

concerning "any consideration of modifying those arrangements" is neither relevant to the

parties' claims or defenses with regard to the Sole Surviving Claim nor reasonably calculated to

lead to the discovery of admissible evidence concerning that claim.  Defendants further object on

the grounds that the request for "all documents relating to" these subjects is overly broad and

unduly burdensome.  Defendants also object to the extent this request seeks documents protected

from disclosure by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections, Defendants

will produce sufficient to show State Street's contractual obligations to the conduits during the

Relevant Period set forth above.

**Document Request No. 18:**

All communications between Ernst & Young LLP and State Street regarding the level of
risk of the Conduit Program and State Street's investment portfolio.

**Response to Request No. 18**

Defendants object to this request on the ground that the term "level of risk" is vague and

ambiguous.  Defendants also object to the extent this request is intended to capture documents

that are neither relevant to the parties' claims or defenses with respect to the Sole Surviving

Claim nor reasonably likely to lead to the discovery of admissible evidence concerning that

claim.

Subject to and without waiving the foregoing general and specific objections, Defendants

will produce their communications with Ernst & Young LLP during the Relevant Period set forth

above that concern (a) the quality of the assets in the conduits or State Street's investment

portfolio; (b) the calculation of unrealized losses in the conduits or State Street's investment

portfolio; or (c) the appropriate accounting treatment for the unrealized losses associated with the

conduits or State Street's investment portfolio.

**Document Request No. 19:**

With respect to Plaintiff:

all documents concerning his Plan enrollment, elections and investment option
selections;

all documents evidencing Plan communications or other materials distributed to
him;

all documents concerning or evidencing the Plan investments held in his
individual Plan account during the Relevant Time Period, including, but not
limited to, individual account statements;

all documents concerning or evidencing the number of shares and value of
Company Stock Fund held in his individual Plan account during the Relevant
Time Period; and

the employment contract or other documentation of the terms of his employment,
performance and disciplinary reviews or any severance agreement(s).

**Response to Request No. 19**

Defendants object to this request as unduly burdensome insofar as the majority of the

documents requested should also be in the possession of the plaintiff.  Defendants also object on

the grounds that documents concerning plaintiff's employment performance and disciplinary

reviews are neither relevant to the parties' claims or defenses with regard to the Sole Surviving

Claim nor reasonably calculated to lead to the discovery of admissible evidence concerning that

claim.

Subject to and without waiving the foregoing general and specific objections, Defendants

will produce documents sufficient to show (a) plaintiff's plan enrollment, elections and

investment option selections; (b) Plan communications or other materials concerning the State

Street ESOP that were distributed or made available to him; (c) plaintiff's individual account

statements; and (d) non-privileged documents from plaintiff's employment file.

**Document Request No. 20:**

Documents sufficient to identify:

the daily purchases, sales and holdings of the Company stock by the Plan during
the Relevant Time Period;

the quantity and dollar value of units of the Company stock owned by the Plan on
an aggregate basis, and as allocated to each individual Participant's Plan account
during the Relevant Time Period;

the allocation of any interest in Company stock units to or from each individual
Participant's Plan account during the Relevant Time Period;

the closing market price of other indicator of value of each investment option
under the Plan during the Relevant Time Period.

**Response to Request No. 20**

Defendants object to this request on the ground that it is unduly burdensome, and, to the

extent this request calls for documents concerning investment options other than the State Street

ESOP, it seeks documents that are neither relevant to the parties' claims or defenses with regard

to the Sole Surviving Claim nor reasonably calculated to lead to the discovery of admissible

evidence about that claim.  Defendants further object to the extent the request calls for publicly

available information pertaining to closing market prices.  Defendants further object to the extent

this request seeks personally identifiable information about the putative absent class members

which Defendants are prohibited from disclosing.

Subject to and without waiving the foregoing general and specific objections, Defendants

will meet and confer with plaintiff to discuss the first three subparts of this request and what

might be able to be provided through reasonable efforts and which relate to the Relevant Period

set forth above.

**Document Request No. 21:**

All documents and communications related to performance reviews of each individual
investment alternative provided under the Plan.

**Response to Request No. 21**

Defendants object to this request on the grounds that it is overly broad, unduly

burdensome, and that it seeks documents that are neither relevant to the parties' claims or

defenses with regard to the Sole Surviving Claim nor reasonably calculated to lead to the

discovery of admissible evidence about that claim.  Defendants also object on the ground that the

term "performance reviews" is vague and ambiguous.

**Document Request No. 22:**

All documents disseminated to Participants that constitute, set forth, discuss, refer, or
relate, in whole or in part, to any analysis/review/evaluation of the Plan's investment options
during the Relevant Time Period, including all drafts thereof, including but not limited to, any
performance reviews of each individual investment alternative provided under the Plan.

**Response to Request No. 22**

Defendants object to this request on the grounds that it is overly broad, unduly

burdensome, and that it seeks documents that are neither relevant to the parties' claims or

defenses with regard to the Sole Surviving Claim nor reasonably calculated to lead to the

discovery of admissible evidence about that claim.  Defendants also object on the ground that the

phrase "analysis/review/evaluation" is vague and ambiguous.

**Document Request No. 23:**

Documents sufficient to show: (1) the number and identity of all persons who hold, or have held, an account in the Plan; and (2) the number and identity of each person whose account invested in the Company stock fund during the Relevant Time Period.

**Response to Request No. 23**

Defendants object to this request on the grounds that it is overly broad, unduly

burdensome, and that it seeks documents that are neither relevant to the parties' claims or

defenses with regard to the Sole Surviving Claim nor reasonably calculated to lead to the

discovery of admissible evidence about that claim. Defendants further object on the grounds that

this request seeks personally identifiable information about the putative absent class members

which Defendants are prohibited from disclosing.

Subject to and without waiving the foregoing general and specific objections, Defendants

will meet and confer with plaintiff to discuss potential ways in which Defendants might be able

to provide some information concerning Participants who invested in the State Street ESOP

during the Relevant Period set forth above.

**Document Request No. 24:**

All documents concerning insurance policies in effect during the relevant time period that reflect the terms under which any Defendant may be insured or indemnified against liability relating to the administration of the Plan, the management of the Plan's assets, or the action/inaction of Plan's Fiduciaries.

**Response to Request No. 24**

Defendants object to this request on the grounds that it is overly broad, unduly

burdensome, and that it seeks documents that are neither relevant to the parties' claims or

defenses with regard to the Sole Surviving Claim nor reasonably calculated to lead to the

discovery of admissible evidence about that claim. Defendants also object to this request as

overly broad and unduly burdensome to the extent that it seeks "all documents concerning" the referenced subject matter.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce documents sufficient to show the amount of insurance coverage that may be available if plaintiff were to succeed on his claim.

**Document Request No. 25:**

Any sharing agreement(s) between State Street and any person or entity by which such person or entity may be liable for any judgment on any of the claims alleged in this Action.

**Response to Request No. 25**

Defendants object to this request on the ground that the term "sharing agreements" is vague and ambiguous. Defendants further object to the extent that this request is duplicative of Request No. 24.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce the documents they agreed to produce in response to Request No. 24.

**Document Request No. 26:**

All documents that set forth, discuss, describe or concern State Street document destruction, retention policies, electronic mail backup system(s) or procedures during the Relevant Time Period, any document retention or destruction policy with respect to electronic communications (including e-mail, text messages, instant messages, computer records, disk files and/or other electronic records), and any actual, suggested or contemplated policy, program, procedure, instruction, direction or request concerning the destruction, alteration, removal, concealment, non-disclosure, secrecy or confidentiality of any of the documents requested herein.

**Response to Request No. 26**

Defendants object to this request on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, calls for documents which are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and that it calls for documents protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections, Defendants will produce copies of written document retention policies in effect during the Relevant Period set forth above.


DEFENDANTS,

By their attorneys,


_/s/ Timothy Perla_____
Jeffrey B. Rudman (BBO No. 433380)
William H. Paine (BBO No. 550506)
John J. Butts (BBO No. 643201)
Timothy Perla (BBO No. 660447)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
Timothy.perla@wilmerhale.com


Date: April 21, 2010


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for the plaintiff in this action by electronic mail on this 21th day of April, 2010.


_/s/ Timothy Perla_____ _____
Timothy J. Perla

# Exhibit C

# STULL, STULL & BRODY
*COUNSELORS AT LAW*
*6 EAST 45th STREET*
*NEW YORK, N.Y. 10017*

TELEPHONE
212-687-7230

TELECOPIER
212-490-2022

**April 9, 2010**

**Via e-mail and First Class Mail**
**John J. Butts, Esq.**
**Wilmer Cutler Pickering Hale & Dorr LLP**
**60 State Street**
**Boston, Massachusetts 02109**

Re: Kenney v. State Street Corp.
Civil Action No. 09-CV-10750 (PBS) (D. Mass.)

Dear John:

In reviewing Plaintiff's First Request for Production of Documents Directed to All Defendants, which is now outstanding, I noticed that the Relevant Time Period in that request ended on March 30, 2009. We believe that it would have been more appropriate to end the relevant period on December 31, 2009 so accordingly, Defendants should consider this letter a modification to the document request to the extent that it extends the Relevant Time Period to December 31, 2009. We would be pleased to talk about a brief extension to Defendants' time to respond to the extent that this extension would cause an additional search for documents. In all other respects, the deadline should not be considered extended.

Thank you for your cooperation.

Very truly yours,

*Mark Levine*

Mark Levine

Encl.

cc: Kevin Peters, Esq. (via e-mail)
Major Khan, Esq. (via e-mail)
J. Henry Glavin, IV, Esq. (via e-mail)
Michael Klein, Esq. (via e-mail)

# Exhibit D

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): May 22, 2009**

---

# STATE STREET CORPORATION
### (Exact name of registrant as specified in its charter)

---

| **Massachusetts** | **001-07511** | **04-2456637** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**One Lincoln Street, Boston, Massachusetts**     **02111**
(Address of principal executive offices)     (Zip Code)

**617-786-3000**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2 below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events**

**Common Stock Offering**

On May 22, 2009, State Street Corporation, a Massachusetts corporation ("State Street"), issued and sold 58,974,358 shares of its common stock (the "Shares") in a public offering pursuant to a registration statement on Form S-3 (File No. 333-157882) and a related preliminary prospectus supplement and prospectus supplement, each as filed with the Securities and Exchange Commission. The sale of the Shares was made pursuant to the terms of an Underwriting Agreement (the "Common Stock Underwriting Agreement"), dated as of May 18, 2009, among State Street and Goldman, Sachs & Co. and Morgan Stanley & Co. Incorporated, as representatives of the several underwriters named in the Common Stock Underwriting Agreement. State Street received net proceeds from the offering of the Shares, after deducting expenses and underwriting discounts and commissions, of approximately $2.23 billion. The Common Stock Underwriting Agreement has been included as Exhibit 1.1 to State Street's Current Report on Form 8-K, filed on May 21, 2009.

**Senior Notes Offering**

On May 22, 2009, State Street issued $500 million aggregate principal amount of 4.30% Senior Notes Due 2014 (the "Notes") in a public offering pursuant to a registration statement on Form S-3 (File No. 333-157882) and a related preliminary prospectus supplement and prospectus supplement, each as filed with the Securities and Exchange Commission. The Notes were issued under an Indenture (the "Indenture"), dated as of March 11, 2009, between State Street and U.S. Bank National Association. The sale of the Notes was made pursuant to the terms of an Underwriting Agreement (the "Senior Notes Underwriting Agreement"), dated as of May 19, 2009, among State Street and Goldman, Sachs & Co. and Morgan Stanley & Co. Incorporated, as representatives of the several underwriters named in the Senior Notes Underwriting Agreement. The Notes are not guaranteed by the Federal Deposit Insurance Corporation under its Temporary Liquidity Guarantee Program. State Street received net proceeds from the offering of the Notes, after deducting expenses and underwriting discounts and commissions, of approximately $498 million. The form of 4.30% Senior Note due 2014 is filed as Exhibit 4.1 hereto. The Senior Notes Underwriting Agreement has been included as Exhibit 1.2 to State Street's Current Report on Form 8-K, filed on May 21, 2009, and the Indenture has been included as Exhibit 4.2 to State Street's Registration Statement on Form S-3, filed on March 12, 2009.

**Item 9.01. Financial Statements and Exhibits**

(d) Exhibits

4.1   Form of 4.30% Senior Note due 2014

Form 8-K

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

STATE STREET CORPORATION

Date: May 22, 2009

By:   /s/ David C. Phelan

Name:  David C. Phelan

Title:   Executive Vice President and General Counsel

Form 8-K

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Form of 4.30% Senior Note due 2014 |

# Exhibit E

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM 8-K

---

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

#### Date of Report (Date of earliest event reported): May 18, 2009

---

# State Street Corporation
##### (Exact name of registrant as specified in its charter)

---

| **Massachusetts** | **001-07511** | **04-2456637** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **One Lincoln Street, Boston, Massachusetts** | **02111** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

#### 617-786-3000
##### (Registrant's telephone number, including area code)

#### Not Applicable
##### (Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2 below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01.   Regulation FD Disclosure**

Attached hereto as Exhibit 99.1 are slides being presented to investors in connection with a registered public offering of our common stock.

The information in this Item 7.01, and the slide presentation in Exhibit 99.1 attached to this Form 8-K, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, nor shall this Item 7.01, such Exhibit 99.1, or any of the information contained therein be deemed incorporated by reference in any filing under the Securities Exchange Act of 1934 or the Securities Act of 1933, except as shall be expressly set forth by specific reference in such filing.

**Item 8.01.   Other Events**

We are also filing this Current Report on Form 8-K for the purpose of (1) updating risk factor disclosures, in particular to reflect the consolidation onto our consolidated balance sheet of all of the assets and liabilities of the four third-party-owned, special-purpose, multi-seller asset-backed commercial paper products that we administer, referred to as conduits, and to update the information in the other risk factors, (2) filing certain information regarding the consolidation of the conduits, and (3) filing certain information regarding the results of the "stress test" administered by the Federal Reserve under the Supervisory Capital Assessment Program.

Unless otherwise indicated or unless the context requires otherwise, all references in this Current Report on Form 8-K to "State Street," "we," "us," "our," or similar terms means State Street Corporation and its subsidiaries on a consolidated basis.

**Risk Factors**

This Form 8-K and other reports filed by us under the Securities Exchange Act of 1934 or registration statements under the Securities Act of 1933 contain statements that are considered "forward-looking statements" within the meaning of United States securities laws. In addition, State Street and its management may make other written or oral communications from time to time that contain forward-looking statements. Forward-looking statements, including statements about industry trends, management's future expectations and other matters that do not relate strictly to historical facts, are based on assumptions by management, and are often identified by such forward-looking terminology as "expect," "look," "believe," "anticipate," "estimate," "seek," "may," "will," "trend," "target" and "goal," or similar statements or variations of such terms. Forward-looking statements may include, among other things, statements about our confidence in our strategies and our expectations about financial performance, market growth, acquisitions and divestitures, new technologies, services and opportunities and earnings.

Forward-looking statements are subject to various risks and uncertainties, which change over time, are based on management's expectations and assumptions at the time the statements are made, and are not guarantees of future results. Management's expectations and assumptions, and the continued validity of the forward-looking statements, are subject to change due to a broad range of factors affecting the national and global economies, the equity, debt, currency and other financial markets, as well as factors specific to State Street and its subsidiaries, including State Street Bank. Factors that could cause changes in the expectations or assumptions on which forward-looking statements are based include, but are not limited to:

2

- global financial market disruptions and the current worldwide economic recession, and monetary and other governmental actions designed to address such disruptions and recession in the U.S. and internationally;

- the impact of our consolidation for financial reporting purposes, effective as of May 15, 2009, of the asset-backed commercial paper conduits that we administer, including the possible increase in the volatility of our net interest revenue, changes in the composition of the assets on our consolidated balance sheet and the possibility that we may be required to change the manner in which we fund those assets;

- the financial strength and continuing viability of the counterparties with which we or our clients do business and with which we have investment or financial exposure;

- the liquidity of the U.S. and international securities markets, particularly the markets for fixed income securities, and the liquidity requirements of our customers;

- the credit quality and credit agency ratings of the securities in our investment securities portfolio, a deterioration or downgrade of which could lead to other-than-temporary impairment of the respective securities and the recognition of an impairment loss;

- the maintenance of credit agency ratings for our debt obligations as well as the level of credibility of credit agency ratings;

- the possibility of our customers incurring substantial losses in investment pools where we act as agent, and the possibility of further general reductions in the valuation of assets;

- our ability to attract deposits and other low-cost, short-term funding;

- potential changes to the competitive environment, including changes due to the effects of consolidation, extensive and changing government regulation and perceptions of State Street as a suitable service provider or counterparty;

- the level and volatility of interest rates and the performance and volatility of securities, credit, currency and other markets in the U.S. and internationally;

- our ability to measure the fair value of the investment securities on our consolidated balance sheet;

- the results of litigation, government investigations and similar disputes and, in particular, the effect of current or potential proceedings concerning State Street Global Advisors', or SSgA's, active fixed-income strategies and other investment products, and the enactment of legislation and changes in regulation and enforcement that impact us and our customers;

- adverse publicity or other reputational harm;

3

- our ability to pursue acquisitions, strategic alliances and divestures, finance future business acquisitions and obtain regulatory approvals and consents for acquisitions;

- the performance and demand for the products and services we offer, including the level and timing of withdrawals from our collective investment products;

- our ability to continue to grow revenue, attract highly skilled people, control expenses and attract the capital necessary to achieve our business goals and comply with regulatory requirements;

- our ability to control operating risks, information technology systems risks and outsourcing risks, the possibility of errors in the quantitative models we use to manage our business and the possibility that our controls will fail or be circumvented;

- the potential for new products and services to impose additional costs on us and expose us to increased operational risk, and our ability to protect our intellectual property rights;

- changes in government regulation or new legislation, which may increase our costs, expose us to risk related to compliance or impact our customers;

- restrictions and limitations associated with our participation in the U.S. Treasury's Troubled Asset Relief Program, or TARP, capital purchase program and our ability to repurchase the preferred stock and warrants issued by us under that program;

- changes in accounting standards and practices; and

- changes in tax legislation and in the interpretation of existing tax laws by U.S. and non-U.S. tax authorities that impact the amount of taxes due.

Therefore, actual outcomes and results may differ materially from what is expressed in our forward-looking statements and from our historical financial results due to the factors discussed above, below and elsewhere in this Form 8-K or disclosed in our other Securities and Exchange Commission, or SEC, filings. Forward-looking statements should not be relied upon as representing our expectations or beliefs as of any date subsequent to the date of this Form 8-K. We undertake no obligation to revise the forward-looking statements contained in this Form 8-K to reflect events after the date it is filed with the SEC. The factors discussed above, below and elsewhere in this Form 8-K or disclosed in our other SEC filings are not intended to be a complete summary of all risks and uncertainties that may affect our businesses. We cannot anticipate all potential economic, operational and financial developments that may adversely impact our operations and our financial results.

Forward-looking statements should not be viewed as predictions and should not be the primary basis upon which investors evaluate State Street. Any investor in State Street should consider all risks and uncertainties disclosed in our SEC filings, including our filings under the Securities Exchange Act of 1934, including our reports on Form 10-K, Form 10-Q and Form 8-K, or registrations under the Securities Act of 1933, all of which are accessible on the SEC's website at *www.sec.gov* or on our website at *www.statestreet.com*.

The following is a discussion of risk factors applicable to State Street.

***Global financial market disruptions since mid-2007 have increased the uncertainty and unpredictability we face in managing our business, and continued or additional disruptions could have an adverse effect on our business, our results of operations and our financial condition.***

Since mid-2007, global credit and other financial markets have suffered substantial volatility, illiquidity and disruption. Beginning in 2008, these factors resulted in the bankruptcy or acquisition of, or significant government assistance to, a number of major domestic and international financial institutions, some of which were significant counterparties with us. These events, and the potential for increased and continuing disruptions, have significantly diminished overall confidence in the financial markets and in financial institutions, have further exacerbated liquidity and pricing issues within the fixed-income markets, have increased the uncertainty and unpredictability we face in managing our business and have had an adverse effect on our business, our results of operations and our financial condition. The continuation of current disruptions or the occurrence of additional disruptions in the global markets could have an adverse effect on our business, our results of operations and our financial condition.

***The current worldwide economic recession has adversely affected, and is likely to continue to adversely affect, our business and our results of operations.***

Our business is affected by global economic conditions, including regional and international rates of economic growth and the impact that such economic conditions have on the financial markets. The current downturn in the U.S. and global economies has led to an increased level of commercial and consumer delinquencies, lack of consumer confidence, decreased market valuations and liquidity, increased market volatility and a widespread reduction of business activity generally. The resulting economic pressure and lack of confidence in the financial markets has adversely affected our business, our financial condition and our results of operations, as well as the business of our customers. A worsening of economic conditions in the U.S. or globally would likely exacerbate the adverse effects of these difficult conditions on us and on the financial services industry in general.

***The consolidation for financial reporting purposes of our asset-backed commercial paper conduits may increase the volatility of our net interest income, changes the composition of the assets on our consolidated balance sheet and may require that we change the manner in which we fund those assets.***

Effective May 15, 2009, we elected to take action that resulted in the consolidation onto our consolidated balance sheet of all of the assets and liabilities of the conduits. Upon consolidation, the aggregate fair value of the conduit assets was established as their book value, resulting in a discount to par value. To the extent that the assets' cash flows exceed their book value, the discounts will accrete as interest revenue over the lives of the assets in accordance with GAAP. The timing and ultimate recognition of this accretion of revenue depends on factors including future credit conditions and the timing of underlying collateral prepayment. Because the rate of revenue recognition is dependent in part on the rate of prepayments, which is beyond our control, the volatility of our net interest revenue may increase.

5

Consolidating the conduits also altered the overall composition of the assets on our consolidated balance sheet. As of May 15, 2009, the percentage of the carrying value of our aggregate investment securities rated "AAA" was 69%, rated "AA" was 12%, rated "A" was 7% and rated "BBB" was 4% following consolidation, compared to 72%, 11%, 5% and 3%, respectively, immediately prior to consolidation. The percentage of the financial assets on our consolidated balance sheet that are classified as level 3 for purposes of SFAS No. 157 also increased as a result of the conduit consolidation. Although we anticipate that the actual economic loss on the assets consolidated from the conduits will be less than the after-tax extraordinary loss of approximately $3.7 billion that we recorded upon consolidation, we believe that the risk of economic loss associated with these assets is generally higher than the risk associated with the other securities on our consolidated balance sheet.

Going forward, we expect to fund the conduit assets through State Street Bank's normal funding sources, through the issuance by the conduits of asset-backed commercial paper or by drawing upon our other short-term liquidity sources. The amount and composition of this funding will vary depending on the availability and cost of the various funding sources. If the market for asset-backed commercial paper continues to be stressed, or if the conduits are unable to obtain third-party funding, we may be required to fund the conduits from State Street Bank's normal funding sources or our other liquidity sources. If conditions were to arise that strained our liquidity management, such increased reliance upon our balance sheet as a funding source would place additional pressure on our liquidity management.

### *The failure or instability of any of our significant counterparties, many of whom are financial institutions, could expose us to loss.*

The financial markets are characterized by extensive interconnections among financial institutions, including banks, broker/dealers, collective investment funds and insurance companies. As a result of these interconnections, we and many of our customers have concentrated counterparty exposure to other financial institutions. Although we have procedures for monitoring both individual and aggregate counterparty risk, like other large financial institutions the nature of our business is such that large individual and aggregate counterparty exposure is inherent. At any given time, it is typical that we will have one or more counterparties to which our exposure exceeds 10% of our total shareholders' equity exclusive of unrealized gains or losses. Concentration of counterparty exposure presents significant risks to us and to our customers because the failure or perceived weakness of any of our counterparties (or in some cases of our customers' counterparties) has the potential to expose us to risk of loss. The current instability of the financial markets has resulted in many financial institutions becoming significantly less creditworthy, and as a result we are exposed to increased counterparty risks, both as principal and in our capacity as agent for our customers. Changes in market perception of the financial strength of particular financial institutions can occur rapidly, is often based upon a variety of factors and is difficult to predict. In addition, as U.S. and non-U.S. governments have addressed the financial crisis in an evolving manner, the criteria for and manner of governmental support of financial institutions and other economically important sectors remain uncertain. If a significant individual counterparty defaults on an obligation to us, we could incur financial losses that materially adversely affect our business, our financial condition and our results of operations.

Although our entire business is subject to these interconnections, several of our lines of business are particularly sensitive to them, including our Treasury operations, currency and other trading, securities lending and investment management. Given the limited number of strong counterparties in the current market, we are not able to mitigate risks all of our and our customers' counterparty credit risk. The current consolidation of financial service firms that began in 2008, and which we believe is likely to continue in 2009, and the failures of other financial institutions have increased the concentration of our counterparty risk.

***In the normal course of business we assume significant credit and counterparty risk, and even when we hold collateral against this risk, we may incur a loss in the event of a default.***

Our focus on large institutional investors and their businesses requires that we assume secured and unsecured credit and counterparty risk, both on and off-balance sheet, in a variety of forms. We may experience significant intra- and inter-day credit exposure through settlement-related or redemption-related extensions of credit. The degree of the demand for such overdraft credit tends to increase during periods of market turbulence. For example, investors in collective investment vehicles for which we act as custodian may engage in significant redemption activity due to adverse market or economic news that was not anticipated by the fund's manager. Our relationship with our customers, the nature of the settlement process and our systems may limit our ability to decline to extend short-term credit in such circumstances. For some types of customers, we provide credit to allow them to leverage their portfolios, which increases our potential loss if the customer experiences credit difficulties. From time to time, we may assume concentrated credit risk at the individual obligor, counterparty or guarantor level. In addition, we may from time to time be exposed to concentrated credit risk at the industry or country level, potentially exposing us to a single market or political event or a correlated set of events. We are also generally not able to net exposures across counterparties that are affiliated entities and may not be able in all instances to net exposures across multiple products to the same legal entity. As a consequence, we may incur a loss in relation to one entity or product even though our exposure to one of its affiliates or across product types is over-collateralized. Moreover, not all of our counterparty exposure is secured, and when our exposure is secured, the realizable market value of the collateral may be less at the time we exercise rights against that collateral than the value of the secured obligations. This risk may be particularly acute if we are required to sell the collateral into an illiquid or temporarily impaired market. See, for example, "—We are exposed to the risk of losses as a result of certain customer relationships with Lehman Brothers." In some cases, we have indemnified customers against a shortfall in the value of collateral that secures certain repurchase obligations of third parties to such customers.

In addition, our customers often purchase securities or other financial instruments from a broker/dealer under repurchase arrangements, frequently as a method of reinvesting the cash collateral they receive from lending their securities. Under these arrangements, the broker/dealer is obligated to repurchase these securities or financial instruments from the customer at the same price at some point in the future. The anticipated value of the collateral is intended to exceed the broker/dealer's repayment obligation. In certain cases, we agree to indemnify our customers from any loss that would arise upon a default by the counterparty if the proceeds from the disposition of the securities or other financial assets is less than the amount of the repayment obligation by the customer's counterparty. In those instances, we, rather than our customer, are exposed to the risks associated with counterparty default and collateral value.

Certain assets on our consolidated balance sheet are entitled to the benefit of guarantees from monoline insurance companies. Certain of these insurance companies have experienced significant deterioration in their financial condition, including one that has suspended all payments on its contractual obligations, and may not continue to perform their guarantee obligations. To the extent assets require credit support from the guarantors to be able to pay principal and interest in full and the guarantor does not or is not able to make payments required under the guarantee, we are exposed to risk of loss.

***We are exposed to the risk of losses as a result of certain customer relationships with Lehman Brothers.***

We had indemnification obligations with respect to customer repurchase agreements with Lehman. In the case of some of our customers that entered into repurchase agreements with a U.S.-based Lehman affiliate, we indemnified obligations totaling $1 billion and, following the bankruptcy of Lehman, paid this amount to our customers. Upon such payments, we took possession of the collateral, consisting of commercial real estate obligations, that was subject to our customers' repurchase agreements with Lehman. Based upon our assessment of the likely proceeds to be received from the disposition or maturity of this collateral in light of the then current market environment, during the third quarter of 2008, we established a reserve of $200 million to cover the

7

difference between the estimated fair value of the collateral at the time and the payment we made to our customers. As we do with our investment portfolio, we continue to evaluate the value of the collateral. In the first quarter of 2009, we recorded a provision for loan losses of $84 million in connection with this collateral. Upon further evaluation or changes in market conditions, we may incur additional charges if the value of the collateral deteriorates. In addition, upon disposition or maturity of the collateral, the loss incurred may be greater.

In addition to the foregoing repurchase agreements, certain customers had entered into repurchase agreements with Lehman's U.K. affiliate. We have repaid those customers and taken possession of the related collateral; however, we believe that the proceeds from the disposition or maturity of the collateral will be at least equal to the amount we paid to such customers and, consequently, have not established a reserve related to those agreements. It is possible that we will incur losses relating to these agreements in the future.

We appointed Lehman as sub-custodian or prime broker for some of our custody customers and some investment funds managed by SSgA. For custody customers, we made this appointment at their direction. In the case of investment funds managed by SSgA, we appointed Lehman in our capacity as manager of those funds. As of September 15, 2008, the date Lehman was placed in administration, our custody customers had claims against Lehman of approximately $325 million, and our investment funds had claims against Lehman of approximately $312 million, both in connection with Lehman's role as a sub-custodian or prime broker. Estimating the actual amount or timing of any recovery on our clients' and funds' claims against Lehman is currently not possible. While we believe that we acted appropriately in appointing Lehman as a sub-custodian and a prime-broker, some customers who invested in the funds managed by SSgA have commenced litigation against us seeking compensation for their losses. Resolution of these disputes could adversely affect our financial condition and results of operations.

***If all or a significant portion of the unrealized losses in investment securities on our consolidated balance sheet were determined to be other-than-temporarily impaired, we would recognize a material charge to our earnings and our capital ratios would be adversely impacted.***

The following table summarizes the amount of after-tax net unrealized losses associated with investment securities on our consolidated balance sheet, including the portfolio holdings of the asset-backed commercial paper conduits which we consolidated onto our consolidated balance sheet effective May 15, 2009. The securities reflected in the table under the column "Asset-Backed Commercial Paper Conduits" were consolidated onto our consolidated balance sheet at fair value at the date of consolidation, as a result of which we recorded a pre-tax extraordinary loss of approximately $6.1 billion (or approximately $3.7 billion after-tax):

|  | After-Tax Unrealized Losses on | | |
|---|---|---|---|
|  | Available-for-Sale Investment Securities On Consolidated Balance Sheet | Held-to-Maturity Investment Securities On Consolidated Balance | Asset-Backed Commercial Paper Conduits |
|  | | (dollars in billions) | |
| May 15, 2009 | $  3.2 | $  2.1 | (1) |
| March 31, 2009 | 3.6 | 2.3 | $  3.6 |
| December 31, 2008 | 4.1 | 2.3 | 3.6 |

(1) Because these assets were consolidated on our consolidated balance sheet as of May 15, 2009 and a related loss was recorded in our income statement, no unrealized losses are attributable to such assets as of May 15, 2009. In future periods, any unrealized losses on the conduit assets would be reflected in amounts disclosed with respect to our investment securities portfolio.

Generally, the fair value of such securities is based upon information supplied by third-party sources. Market values for the securities in our portfolio declined significantly during 2008 as liquidity and pricing generally in the capital markets was disrupted. When the fair value of a security declines, management must

assess whether that decline is "other-than-temporary." See "—We must apply significant judgment to assign fair values to our assets, and we may not be able to realize these values, or any value, if these assets were sold." When management reviews whether a decline in fair value is other than temporary, it considers numerous factors, many of which involve significant judgment. During 2008 and 2009, rating agencies imposed an increasing number of downgrades and credit watches on the securities in our investment portfolio, which contributed to the decline in market values. Any continued increase in downgrades and credit watches may contribute to a further decline in market values. More generally, market conditions continue to be volatile, and we can provide no assurance that the amount of the unrealized losses will not increase.

To the extent that any portion of the unrealized losses in these portfolios is determined to be other-than-temporarily impaired, we will recognize a charge to our earnings in the quarter during which such determination is made and our capital ratios will be adversely impacted. If any such charge is significant, a rating agency might downgrade our credit rating or put us on credit watch. Our credit rating was downgraded by each of the principal rating agencies during the first quarter of 2009. A further downgrade or a significant reduction in our capital ratios might adversely impact our ability to access the capital markets or might increase our cost of capital. Even if we do not determine that the unrealized losses associated with these portfolios require an impairment charge, increases in such unrealized losses adversely affect our tangible common equity ratio, which may adversely affect credit rating agency and investor sentiment toward us. Such negative perception also may adversely affect our ability to access the capital markets or might increase our cost of capital.

***Our business activities expose us to liquidity and interest-rate risk.***

In our business activities, we assume liquidity and interest-rate risk in our investment portfolio of longer-and intermediate-term assets, which is funded in large part by our customer deposit base. Similarly, after consolidation of our commercial paper conduits, we may fund the portfolio of intermediate term assets held by the conduits through our customer deposit base, by the conduits issuing commercial paper or by drawing upon other short-term liquidity sources. In addition, we may be exposed to liquidity or other risks in managing asset pools for third parties that are funded on a short-term basis, or where the customers participating in these products have a right to the return of cash or assets on limited notice. These business activities include, among others, securities finance collateral pools, money market and other short-term investment funds and liquidity facilities in connection with municipal bond programs.

***We must apply significant judgment to assign fair values to our assets, and we may not be able to realize these values, or any value, if these assets were sold.***

As of March 31, 2009, including the effect of master netting agreements, approximately 46% of our consolidated total assets and approximately 5% of our consolidated total liabilities were carried at fair value on a recurring basis. Current accounting standards require us to categorize these assets and liabilities according to a fair value valuation hierarchy. On the same basis, approximately 39% of our assets and approximately 5% of our liabilities were categorized in level 2 of the valuation hierarchy (meaning that their fair value was determined by reference to quoted prices for similar assets or liabilities or other observable inputs) or level 3 (meaning that their fair value was determined by reference to inputs that are unobservable in the market and therefore require a greater degree of management judgment). Effective May 15, 2009, as a result of the consolidation for financial reporting purposes onto our consolidated balance sheet of the conduits, the percentage of the assets on our consolidated balance sheet that are classified as level 3 for purposes of SFAS No. 157 has increased. See "—The consolidation for financial reporting purposes of our asset-backed commercial paper conduits may increase the volatility of our net interest income, changes the composition of the assets on our consolidated balance sheet and may require that we change the manner in which we fund those assets."

The determination of fair value for financial assets and liabilities categorized in level 2 or 3 involves significant judgment due to the complexity of factors contributing to the valuation, many of which are not readily observable in the market. The current market disruptions make valuation even more difficult and subjective. In addition, we have historically placed a high level of reliance on information obtained from third-party sources to

9

measure fair values. Third-party sources also use assumptions, judgments and estimates in determining securities values, and different third parties use different methodologies or provide different prices for securities.

In addition, the nature of the market participant that is valuing the securities at any given time could impact the valuation of the securities. For example, investment banks, such as the underwriters of our public offerings, may value our securities differently than securities pricing providers. Moreover, depending upon, among other things, the measurement date of the security, the subsequent sale price of the security may be different from its recorded fair value. These differences may be significant, especially if the security is sold during a period of illiquidity or market disruption or as part of a large block of securities under a forced transaction.

***Adverse conditions in the economy or financial markets may simultaneously trigger adverse events affecting multiple aspects of our business.***

Adverse economic or financial market conditions could simultaneously adversely affect several aspects of our business. For example, decreases in equity market valuations adversely impact the fee revenue we receive from both asset servicing and asset management, since both business lines employ fee structures that are determined in significant part by the percentage of assets under custody, administration or management. If multiple aspects of our business are simultaneously impacted by economic or financial market conditions or other events, the demands on our liquidity may exceed our resources.

***We may need to raise additional capital in the future, which may not be available to us or may only be available on unfavorable terms.***

As a result of continued disruption in the financial markets or other developments having an adverse effect on our capital ratios, we may need to raise additional capital in order to maintain our credit ratings or for other purposes. However, our ability to access the capital markets, if needed, will depend on a number of factors, including the state of the financial markets. Accordingly, we cannot assure you of our ability to raise additional capital, if needed, on terms acceptable to us.

***If our custody customers experience high levels of redemption requests from their investors, or if high volumes in the securities markets disrupt normal settlements, we may provide significant and unanticipated overdraft availability, exposing us to risk of loss.***

We provide custody and related services for mutual funds and other collective investment vehicles managed by unaffiliated managers. Generally, these affiliated and unaffiliated collective investment pools offer investors liquidity on a daily basis or with notice periods of a month or less. During periods of disruption in the financial markets, failures in the settlement process tend to increase, and investor demand for liquidity from these investment pools can be extremely high relative to normal cash levels maintained by those funds. In such circumstances, we may, but generally are not required to, provide short-term extensions of credit. For example, during the second half of 2008, we funded higher-than-normal levels of overdrafts by unaffiliated mutual funds and other collective investment vehicles, with particular liquidity requirements by money market funds. The provision of such overdraft availability may affect the size of our balance sheet, which, in the absence of additional capital, could adversely affect our capital ratios. In addition, if these overdrafts are substantial relative to the net assets of the investment pool, we may be subject to the risk that the investment pool is unable to liquidate assets to pay down the overdraft or that a decline in the value of the investment pool's assets may result in the fund not having sufficient assets to satisfy its obligation to repay the overdrafts, exposing us to risk of loss.

***Our reputation and business prospects may be damaged if our customers incur substantial losses in investment pools where we act as agent.***

Our management of collective investment pools on behalf of customers exposes us to reputational risk. The incurrence by our customers of substantial losses in these pools, particularly in money market funds (where there is a general market expectation that net asset value will not drop below $1.00 per share), in situations where we

10

make distributions in-kind to satisfy redemption requests or in circumstances where one of our investment strategies significantly underperforms the market or our competitors' products, could result in significant harm to our reputation and significantly and adversely affect the prospects of our associated business units. In some very limited circumstances, and consistent with applicable regulatory requirements, we may compensate investment pools for all or a portion of the pool's losses even though we are not statutorily or contractually obligated to do so. Because we often implement investment and operational decisions and actions over multiple investment pools to achieve scale, we face increased risk that losses, even small losses, may have a significant effect in the aggregate.

A failure or inability to provide support to investment pools could damage our reputation among current or prospective customers. For example, during the first and fourth quarters of 2008, we elected to provide support to stable value accounts managed by SSgA. These accounts, offered to retirement plans, allow participants to purchase and redeem units at a constant net asset value regardless of volatility in the underlying value of the assets held by the account. The accounts enter into contractual arrangements with third-party financial institutions that agree to make up any shortfall in the account if all the units are redeemed at the constant net asset value. These financial institutions have the right, under certain circumstances, to terminate this guarantee with respect to future investments in the account. During 2008, the liquidity and pricing issues in the fixed-income markets adversely impacted the market value of the securities in these accounts to the point that the third-party guarantors considered terminating their financial guarantees with the accounts.

During the first quarter of 2008, although we were not statutorily or contractually obligated to do so, we contributed $160 million to these accounts. In addition, during the fourth quarter of 2008, although we were not statutorily or contractually obligated to do so, we elected to purchase approximately $2.49 billion of debt securities from these accounts that had been identified as presenting increased risk in the current market environment, and to contribute an aggregate of $450 million to the accounts, to improve the ratio of the market value of the accounts' portfolio holdings to the book value of the accounts. This election to contribute $450 million to the accounts resulted in a fourth quarter 2008 charge of $450 million. Any future decision by us to provide financial support to our investment pools would potentially result in the recognition of significant losses and could in certain situations require us to consolidate the investment pools onto our balance sheet. A failure or inability to provide such support could damage our reputation among current and prospective customers. Any termination by a third-party guarantor of its guarantee could, if we were unable to replace the guarantee, adversely affect our business or result in litigation.

***We may be exposed to customer claims, financial loss, reputational damage and regulatory scrutiny as a result of transacting purchases and redemptions relating to the unregistered cash collateral pools underlying our securities lending program at a net asset value of $1.00 per unit rather than a lower net asset value based upon market value of the underlying portfolios.***

A portion of the cash collateral received by customers under our securities lending program is invested in cash collateral pools that we manage. Interests in these cash collateral pools are held by unaffiliated customers and by registered and unregistered investment funds that we manage. Our cash collateral pools that are money market funds registered under the Investment Company Act of 1940 are required to maintain, and have maintained, a constant net asset value of $1.00 per unit. The remainder of our cash collateral pools are bank collective investment funds that are not required to be registered under the Investment Company Act. These unregistered cash collateral pools seek, but are not required, to maintain, and transact purchases and redemptions at, a constant net asset value of $1.00 per unit. At March 31, 2009, December 31, 2008 and December 31, 2007, the aggregate net asset value of these unregistered cash collateral pools (based on a constant net asset value of $1.00) was approximately $122 billion, $122 billion and $194 billion, respectively.

Throughout 2008 and currently, these unregistered cash collateral pools have continued to transact purchases and redemptions at a constant net asset value of $1.00 per unit even though the market value of the unregistered cash collateral pools' portfolio holdings, determined using pricing from third-party pricing sources,

11

has been below $1.00 per unit. At March 31, 2009, the net asset value, based on the market value of our unregistered cash collateral pools, ranged from $0.904 to $1.00, with the weighted-average net asset value on that date equal to $0.947. A substantial portion of the decline in the market value of these assets occurred in the fourth quarter of 2008. We believe that our practice of continuing to effect purchases and redemptions at $1.00 per unit at the unregistered cash collateral pools, notwithstanding the underlying portfolios having a market value of less than $1.00 per unit, is consistent with the practices of other securities lending agents and in compliance with the terms of our unregistered cash collateral pools. We have continued this practice for a number of reasons, including the fact that none of the securities in the cash collateral pools is currently in default or considered to be impaired, and that there are restrictions on withdrawals from the collective investment funds. Currently, we require direct participants in the collateral pools who wish to redeem their interests in the pools, other than in connection with the operation of the securities lending program, to accept redemption proceeds in the form of in-kind distributions. Moreover, the cash collateral pools have adequate sources of liquidity, from normal lending activity under the securities lending program, in order not to be required for liquidity purposes to sell securities the values of which have been adversely impacted by the lack of liquidity in the fixed-income markets. If we continue to transact purchases and redemptions from the unregistered cash collateral pools based upon a constant $1.00 per unit net asset value and the liquid assets of these pools turn out to be insufficient to support redemption activity at such value or the pools suffer material credit losses on their underlying portfolio holdings, investors in the unregistered cash collateral pools may seek to hold us responsible for any shortfall due to prior redemptions at a value above the market value of the underlying portfolio or as a result of any such portfolio defaults.

Moreover, a broad range of unregistered collective investment pools that SSgA manages, referred to as lending funds, participate in our securities lending program and as a result hold interests in certain of the unregistered cash collateral pools described above. The lending funds continue to purchase and redeem units of the lending funds at prices that assign a $1.00 value to units of the collateral pools held by such funds. If it was determined that the historical or prospective transaction valuation for purchase or redemption of units of the lending funds should reflect a valuation of the collateral pools of less than $1.00, lending fund investors may claim that they overpaid for their investment, or that investors who redeemed their units at prices that reflect a valuation of units of the collateral pools of $1.00 were overcompensated, and seek to hold us responsible for their alleged investment loss. For financial reporting purposes, the lending funds' financial statements for the period ended December 31, 2008 reflected net asset values for the lending funds based upon a valuation of the units of the collateral pools at market value rather than at the $1.00 transaction value. If we continue to transact purchases and redemptions of units of the lending funds based upon the $1.00 transaction value of the collateral pools rather than their financial statement reported value, such potential exposure would likely increase over time. Since the percentage of a lending fund's assets on loan varies based on the fund's investment focus and with changes in market demand, the potential impact of this issue on the net asset value of the lending fund will vary significantly, but in some cases may be material.

In an effort to provide investors in the lending funds equal access to liquidity in the collateral pools and limit the need to sell portfolio securities into an illiquid market in order to meet redemption requests, in March 2009 we established restrictions on the percentage of an investor's interest in a lending fund that may be redeemed in any month. These restrictions, which do not apply to participant level activity in defined contribution plans, are more definitive and potentially more restrictive than those we initially implemented in October 2008. Investors in the lending funds have objected to, and may claim to have been harmed by, such limitations on liquidity of their investment, notwithstanding our right to implement such restrictions under the governing documents for such funds. As a result, our reputation as an asset manager and the marketability of these lending funds may be adversely affected and participants in our lending funds may seek to be compensated for any loss they incurred or allege to have incurred resulting from either the valuation of the units of the lending funds or restrictions on the liquidity of such units. An indirect participant in certain of the lending funds has commenced a putative class action on behalf of all investors in the lending funds that are benefit plans subject to the Employee Retirement Income Security Act. The class action claim alleges, among other things, failure to exercise prudence in the management of the collateral pools and seeks both damages and injunctive relief. Claims asserted in the purported class action or by other investors in the unregistered cash collateral pools or our

12

lending funds could have a material impact on our consolidated financial condition and results of operations and may result in regulatory scrutiny of our securities lending program.

***Our plan to reduce operating costs and support long-term growth may not achieve its intended objectives.***

During the fourth quarter of 2008, we recorded charges of $306 million in connection with a restructuring plan. The plan is intended to reduce our future operating costs, including through global workforce reductions that we substantially completed in the first quarter of 2009, in order to support our long-term growth while aligning the organization to meet the challenges and opportunities presented by the current market environment. Our restructuring plan and other workforce management issues may impair our ability to achieve anticipated operating cost reductions or may otherwise harm our business.

***If we are unable to continuously attract deposits and other short-term funding, our consolidated financial condition, including our capital ratios, our results of operations and our business prospects could be harmed.***

Liquidity management is critical to the management of our consolidated balance sheet and to our ability to service our customer base. We generally use our sources of funds to:

- extend credit to our customers in connection with our custody business;

- meet demands for return of funds on deposit by customers; and

- manage the pool of intermediate-and longer-term assets that are included in the investment securities on our consolidated balance sheet.

Because the demand for credit by our customers is difficult to forecast and control, and may be at its peak at times of disruption in the securities markets, and because the average maturity of our investment portfolio is significantly longer than the contractual maturity of our deposit base, we need to continuously attract, and are dependent upon, access to various sources of short-term funding.

In managing our liquidity, our primary source of short-term funding is customer deposits, which are predominantly transaction-based deposits by institutional investors. Our ability to continue to attract these deposits, and other short-term funding sources such as certificates of deposit and commercial paper, is subject to variability based upon a number of factors, including volume and volatility in the global securities markets, the relative interest rates that we are prepared to pay for these liabilities and the perception of safety of those deposits or short-term obligations relative to alternative short-term investments available to our customers, including in the capital markets. For example, the disruption in the global fixed-income securities markets, which began in the third quarter of 2007 and is continuing, had a substantially greater impact upon liquidity and valuations in those markets than has historically been experienced. In addition, liquidity in the inter-bank market, as well as the markets for commercial paper, certificates of deposit and other short-term instruments, significantly contracted starting in 2008. The availability and cost of credit in short-term markets is highly dependent upon the markets' perception of our liquidity and creditworthiness. Our efforts to monitor and manage liquidity risk may not be successful or sufficient to deal with dramatic or unanticipated changes in the global securities markets or other event-driven reductions in liquidity. In such events, our cost of funds may increase, thereby reducing our net interest revenue, or we may need to dispose of a portion of our investment portfolio, which, depending upon market conditions, could result in our realizing a loss.

***If we are unable to successfully invest customer deposits our business may be adversely affected.***

During the current market disruptions, we have experienced substantial inflows of liquid assets, particularly customer deposits, as short-term deposits with us became more attractive relative to other short-term investment options. However, the contraction in the number of counterparties for which we had a favorable credit assessment has made it difficult to invest, even on an overnight basis, all of our available liquidity, which has adversely impacted the rate of return that we earned on these assets. As a result of this contraction of

counterparties during the current market disruptions, we have frequently placed deposits with government central banks, resulting in a minimal rate of return. If we continue to face difficulty investing these assets, our ability to attract customer deposits may be harmed, which would in turn harm our business and our results of operations.

***Any downgrades in our credit ratings could adversely affect our borrowing costs, capital costs and liquidity and cause reputational harm.***

Various independent rating agencies publish credit ratings for our debt obligations based on their evaluation of a number of factors, some of which relate to our performance and other corporate developments, including financings, acquisitions and joint ventures, and some of which relate to general industry conditions. We anticipate that the rating agencies will review our ratings regularly based on our results of operations and developments in our business. We cannot assure you that we will continue to maintain our current ratings. The current market environment and exposure to other financial institution counterparties increases the risk that we may not maintain our current ratings. Downgrades in our credit ratings may adversely affect our borrowing costs, our capital costs and our ability to raise capital and, in turn, our liquidity. A failure to maintain an acceptable credit rating may also preclude us from being competitive in certain products, may be negatively perceived by our customers or counterparties or may have other adverse reputational effects.

***An actual or perceived reduction in our financial strength may cause others to reduce or cease doing business with us.***

Our counterparties, as well as our customers, rely upon our financial strength and stability and evaluate the risks of doing business with us. If we experience diminished financial strength or stability, actual or perceived, including due to market or regulatory developments, our announced or rumored business developments or results of operations, a decline in our stock price or a reduced credit rating, our counterparties may become less willing to enter into transactions, secured or unsecured, with us, our customers may reduce or place limits upon the level of services we provide them or seek other service providers and our prospective customers may select other service providers. The risk that we may be perceived as less creditworthy relative to other market participants is increased in the current market environment, where the consolidation of financial institutions, including major global financial institutions, is resulting in a smaller number of much larger counterparties and competitors. If our counterparties perceive us to be a less viable counterparty, our ability to enter into financial transactions on terms acceptable to us or our customers, on our or our customers' behalf, will be materially compromised. If our customers reduce their deposits with us or select other service providers for all or a portion of the services we provide them, our net interest revenue and fee revenue will decrease accordingly.

***Our businesses may be negatively affected by adverse publicity or other reputational harm.***

Our relationship with many of our customers is predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance. Adverse publicity, regulatory actions, litigation, operational failures, the failure to meet customer expectations and other issues could materially and adversely affect our reputation, our ability to attract and retain customers or our sources of funding. Preserving and enhancing our reputation also depends on maintaining systems and procedures that address known risks and regulatory requirements, as well as our ability to identify and mitigate additional risks that arise due to changes in our businesses and the marketplaces in which we operate, the regulatory environment and customer expectations. If any of these developments has a material effect on our reputation, our business will suffer.

***Governmental responses to current market disruptions may be inadequate, may have unintended consequences and may increase our costs.***

In response to current market disruptions, legislators and financial regulators have taken a number of steps to stabilize the financial markets. These steps included the Emergency Economic Stabilization Act of 2008, the American Recovery and Reinvestment Act of 2009, the provision of other direct and indirect assistance to

distressed financial institutions, assistance by the banking authorities in arranging acquisitions of weakened banks and broker/dealers, implementation of programs by the Federal Reserve to provide liquidity to the commercial paper markets and temporary prohibitions on short sales of certain financial institution securities. The overall effects of these and other legislative and regulatory efforts on the financial markets are uncertain, and may not have the intended stabilization effects. In addition to these actions in the U.S., other governments have taken regulatory and other steps to support financial institutions, to guarantee deposits and to seek to stabilize the financial markets. Should these or other legislative or regulatory initiatives fail to stabilize the financial markets, our business, financial condition, results of operations and prospects could be materially and adversely affected.

Political bodies have also increasingly scrutinized the financial services industry. Additional legislative and regulatory measures are under consideration that could substantially increase regulation of the financial services industry and impose restrictions on the operations and general ability of firms within the industry to conduct business consistent with historical practices, including with respect to compensation, interest rates and the impact of bankruptcy proceedings on consumer real property mortgages. In addition, state governmental authorities have also become increasingly active in conducting investigations on matters impacting the financial markets.

These measures may have unintended consequences on the global financial system or our businesses, including increasing competition, reducing our competitive position, increasing the general level of uncertainty in the markets or favoring or disfavoring certain lines of business, institutions or depositors. We may need to modify our strategies, businesses or operations, and we may incur increased capital requirements and constraints or additional costs in order to satisfy new regulatory requirements or to compete in a changed business environment.

***Our participation in the U.S. Treasury's TARP capital purchase program restricts our ability to increase dividends on our common stock, undertake stock repurchase programs and compensate our employees.***

In October 2008, the U.S. Treasury invested $2 billion in State Street pursuant to the TARP capital purchase program. The terms of the TARP capital purchase program require us to pay cumulative preferred dividends to Treasury and restrict our ability to increase dividends on our common stock, redeem Treasury's investment without receiving high-quality replacement capital, undertake common stock repurchase programs and compensate our employees. In February 2009, the American Recovery and Reinvestment Act, among other things, retroactively imposed additional compensation and governance restrictions on participants in the program. Additional restrictions may be imposed by Treasury or Congress on us at a later date, and these restrictions may also apply to us retroactively. These restrictions may have a material adverse effect on our operations, revenue and financial condition, on our ability to pay dividends or on our ability to retain or attract talented executives and other employees. The process and timing for the repayment of the U.S. Treasury's investment continues to be uncertain and may be subject to changing requirements imposed by our regulators.

***Government-imposed limitations on short sales and investor decisions to reduce short selling may harm our securities finance revenues.***

Government-imposed prohibitions and restrictions on short sales of securities, designed to address perceived market abuses, negatively impacted the value of securities on loan during 2008. Although many of these restrictions have expired, regulators are actively considering new restrictions on short sales, and continued

15

reductions in the overall volume of short sales likely would decrease our securities finance revenue. In addition, media and regulatory focus on short selling, and losses incurred in securities finance programs sponsored by other financial institutions, have caused some institutional investors to reduce or eliminate their securities finance programs. Continued investor avoidance of short sales or renewed regulatory prohibitions on short sales would affect our business model and the demand for our services, and both our revenue from securities finance operations and the liquidity and market value of the collateral pools in which our customers invest may be adversely affected.

***Because our fee income is based in part on the value of assets under custody or management, our business could be adversely affected by further declines in asset values.***

The significant declines in equity and other financial markets globally during 2008 and during portions of 2009 have adversely affected and are likely to continue to adversely affect our fee revenue, which is based in part upon the value of assets under custody, administration or management. The lower levels of equity indices during the first quarter of 2009 resulted in significant declines in our fee income in the first quarter of 2009 compared to the corresponding period of 2008, and to the extent equity market levels remain depressed during 2009, would continue to adversely impact our fee income. Further deterioration or a continuation of current market conditions is likely to lead to a continued decline in the value of assets under custody, administration or management, which would reduce our asset-based fee revenue and may adversely affect other transaction-based revenue, such as securities finance revenue, and the volume of transactions that we execute for our customers. Many of the costs of providing our services are relatively fixed. Therefore, any such decline in revenue would have a disproportionate effect on our earnings.

***The illiquidity and volatility of global fixed-income and equity markets has affected our ability to effectively and profitably manage our investment pools and may make our products less attractive to customers.***

We manage assets on behalf of customers in several forms, including in collective investment pools, including money market funds, securities finance collateral pools, cash collateral and other cash products and short-term investment funds. In addition to the impact on the market value of customer portfolios, the illiquidity and volatility of both the global fixed-income and equity markets have negatively affected our ability to manage customer inflows and outflows from our pooled investment vehicles. Within our asset management business, we manage investment pools, such as mutual funds and collective investment funds, that generally offer our customers the ability to withdraw their investments on short notice, generally daily or monthly. This feature requires that we manage those pools in a manner that takes into account both maximizing the long-term return on the investment pool and retaining sufficient liquidity to meet reasonably anticipated liquidity requirements of our customers.

During the current market disruptions, the liquidity in many asset classes, particularly short-and long-term fixed-income securities, has declined dramatically, and providing liquidity to meet all customer demands in these investment pools without adversely impacting the return to non-withdrawing customers has become more difficult. For customers that invest directly or indirectly in certain of the collateral pools and seek to terminate participation in lending programs, we have required, in accordance with the applicable customer arrangements, that these withdrawals from the collateral pools take the form of partial in-kind distributions of securities, and in the case of SSgA funds that engage in securities lending, we have implemented limitations on the portion of an investor's interest in such fund that may be withdrawn during any month, although such limitations do not apply to participant directed activity in defined contribution plans. If higher than normal demands for liquidity from our customers continue or increase, it could become more difficult to manage the liquidity requirements of our collective investment pools and, as a result, we may elect (or in some situations be required) to support the liquidity of these pools. If the liquidity in the fixed-income markets were to deteriorate further or remain disrupted for a prolonged period, our relationship with our customers may be adversely affected, levels of redemption activity could increase and our results of operations and business prospects could be adversely impacted.

16

In addition, if a money market fund that we manage were to have unexpected liquidity demands from investors in the fund that exceeded available liquidity, the fund could be required to sell assets to meet those redemption requirements, and it may then be difficult to sell the assets held by the fund at a reasonable price, if at all.

Alternatively, although we have no such arrangements currently in place, we have in the past, and may in the future, guaranteed liquidity to investors desiring to make withdrawals from a fund, and a significant amount of such guarantees could adversely affect our own liquidity and financial condition. Because of the size of the investment pools that we manage, we may not have the financial ability or regulatory authority to support the liquidity demands of our customers. The extreme volatility in the equity markets has led to potential for the return on passive and quantitative products deviating from their target return. The temporary closures of securities exchanges in certain markets, such as occurred in Brazil and Russia in the second half of 2008, or artificial floors such as the one implemented in Pakistan, create a risk that customer redemptions in pooled investment vehicles may result in significant tracking error and underperformance relative to stated benchmarks. Any failure of the pools to meet redemption requests or to underperform relative to similar products offered by our competitors could harm our business and our reputation.

### *We are subject to intense competition in all aspects of our business, which could negatively affect our ability to maintain or increase our profitability.*

The markets in which we operate across all facets of our business are both highly competitive and global. We have experienced, and anticipate that we will continue to experience, pricing pressure in many of our core businesses. Many of our businesses compete with other domestic and international banks and financial services companies, such as custody banks, investment advisors, broker-dealers, outsourcing companies and data processing companies. Ongoing consolidation within the financial services industry could pose challenges in the markets we serve, including potentially increased downward pricing pressure across our businesses. Many of our competitors, including our competitors in core services, have substantially greater capital resources than we do. In some of our businesses, we are service providers to significant competitors. These competitors are in some instances significant customers, and the retention of these customers involves additional risks, such as the avoidance of actual or perceived conflicts of interest and the maintenance of high levels of service quality. The ability of a competitor to offer comparable or improved products or services at a lower price would likely negatively affect our ability to maintain or increase our profitability. Many of our core services are subject to contracts that have relatively short terms or may be terminated by our customer after a short notice period. In addition, pricing pressures as a result of the activities of competitors, customer pricing reviews, and rebids, as well as the introduction of new products, may result in a reduction in the prices we can charge for our products and services.

### *If we fail to attract new customers and cross-sell additional products and services to our existing customers, our prospects for growth may be harmed.*

Our strategy for growth depends upon both attracting new customers and cross-selling additional products and services to our existing customer base. To the extent that we are not able to achieve these goals, we may not be able to meet our financial goals. In addition, our proactive cross-selling of multiple products and services to our customers can exacerbate the negative financial effects associated with the risk of loss of any one customer.

### *Development of new products and services may impose additional costs on us and may expose us to increased operational risk.*

Our financial performance depends, in part, on our ability to develop and market new and innovative services and to adopt or develop new technologies that differentiate our products or provide cost efficiencies, while avoiding increased related expenses. The introduction of new products and services can entail significant time and resources. Substantial risks and uncertainties are associated with the introduction of new products and services, including technical and control requirements that may need to be developed and implemented, rapid

17

technological change in the industry, our ability to access technical and other information from our customers and the significant and ongoing investments required to bring new products and services to market in a timely manner at competitive prices. Regulatory and internal control requirements, capital requirements, competitive alternatives and shifting market preferences may also determine if such initiatives can be brought to market in a manner that is timely and attractive to our customers. Failure to manage successfully these risks in the development and implementation of new products or services could have a material adverse effect on our business, as well as our results of operations and financial condition.

### *It may be difficult and costly to protect our intellectual property rights, and we may not be able to ensure their protection.*

We may be unable to protect our intellectual property and proprietary technology effectively, which may allow competitors to duplicate our technology and products and may adversely affect our ability to compete with them. To the extent that we are not able to protect our intellectual property effectively through patents or other means, employees with knowledge of our intellectual property may leave and seek to exploit our intellectual property for their own or others' advantage. In addition, we may infringe upon claims of third-party patents, and we may face intellectual property challenges from other parties. We may not be successful in defending against any such challenges or in obtaining licenses to avoid or resolve any intellectual property disputes. The intellectual property of an acquired business, such as that of Currenex, Inc., acquired in 2007, may be an important component of the value that we agree to pay for such a business. However, such acquisitions are subject to the risks that the acquired business may not own the intellectual property that we believe we are acquiring, that the intellectual property is dependent upon licenses from third parties, that the acquired business infringes upon the intellectual property rights of others, or that the technology does not have the acceptance in the marketplace that we anticipated.

### *We may be unable to increase the portion of our management fee revenue that is generated from enhanced index and actively managed products, and the investment performance of these products may result in a reduction in the fees that we earn.*

Over the past several years, we have sought to increase the portion of our management fee revenue generated from enhanced index and actively managed products, with respect to which we generally receive fees at higher rates compared to passive products. We may not be able to grow this segment of our business at a rate that is consistent with our business and financial goals. The amount of assets we are able to attract and retain in active strategies depends on the performance of such products relative to competitive products in the institutional marketplace. In addition, with respect to certain of our enhanced index and actively managed products, we have entered into performance fee arrangements, where the management fee revenue we earn is based on the performance of managed funds against specified benchmarks. The reliance on performance fees increases the potential volatility of our management fee revenue. If investment performance in our asset management business fails to meet either benchmarks or the performance of our competitors, we could experience a decline in assets under management and a reduction in the fees that we earn, irrespective of economic or market conditions.

### *Our business is subject to risks from foreign exchange movements.*

The degree of volatility in foreign exchange rates can affect our foreign exchange trading revenue. In general, increased currency volatility may increase our market risk, and our foreign exchange revenue, all other things being equal, is likely to decrease during times of decreased currency volatility. In addition, as our business grows globally, our exposure to changes in foreign currency exchange rates could affect our levels of revenue, expense and earnings, as well as the value of our investment in our non-U.S. operations.

18

*Our revenues and profits are sensitive to changes in interest rates.*

Our financial performance could be negatively affected by changes in interest rates as they impact our asset and liability management activities. The levels of interest rates in global markets, changes in the relationship between short- and long-term interest rates, the direction and speed of interest-rate changes, and the asset and liability spreads relative to the currency and geographic mix of our interest-earning assets and interest-bearing liabilities, affect our net interest revenue. Our ability to anticipate these changes or to hedge the related exposures on and off our consolidated balance sheet can significantly influence the success of our asset and liability management activities and the resulting level of our net interest revenue. The impact of changes in interest rates will depend on the relative durations of assets and liabilities in accordance with their relevant currencies. In general, sustained lower interest rates, a flat or inverted yield curve and narrow interest-rate spreads have a constraining effect on our net interest revenue.

*Acquisitions, strategic alliances and divestiture pose risks for our business.*

Acquisitions of complementary businesses and technologies, development of strategic alliances and divestiture of portions of our business, in addition to fostering organic growth opportunities, are an active part of our overall business strategy to remain competitive. The integration of acquisitions presents risks that differ from the risks associated with our ongoing operations. Our financial results would be significantly harmed by an inability to achieve the cost savings and other benefits that we anticipated in valuing an acquired business. We may not be able to effectively assimilate services, technologies, key personnel or businesses of acquired companies into our business or service offerings, alliances may not be successful, and we may not achieve related revenue growth or cost savings. We also face the risk of being unable to retain the customer bases of acquired companies or unable to cross-sell our products and services to its customers. Acquisitions of investment servicing businesses entail information technology systems conversions, which involve operational risks and may result in customer dissatisfaction and defection. Customers of asset servicing businesses that we have acquired may be competitors of our non-custody businesses. The loss of some of these customers or a significant reduction in revenues generated from them, for competitive or other reasons, would adversely affect the benefits that we expect to achieve from these acquisitions. In addition, we may not be able to successfully manage the divestiture of identified businesses on satisfactory terms, if at all, which would reduce any anticipated benefits to earnings.

With any acquisition, the integration of the operations and resources of the businesses could result in the loss of key employees, the disruption of our and the acquired company's ongoing businesses, or inconsistencies in standards, controls, procedures and policies that could adversely affect our ability to maintain relationships with customers and employees or to achieve the anticipated benefits of the acquisition. Integration efforts may also divert management attention and resources. The acquisition and combination of a business with our operations may also expose us to risks from unknown or contingent liabilities with respect to which we may have no recourse against the seller. Acquisition transactions are often competitive auctions in which we have limited time and access to information to evaluate the risks inherent in the business being acquired, and no or limited recourse against the seller if undisclosed liabilities are discovered after we enter into a definitive agreement.

We may not achieve the benefits we sought in an acquisition, or, if achieved, those benefits may be achieved later than we anticipated. Failure to achieve anticipated benefits from an acquisition could result in increased costs and lower revenues than expected of the combined company. In addition, if the financial performance associated with an acquisition falls short of expectations, impairment charges associated with the goodwill or other intangible assets recorded as part of the acquisition may result.

*Unavailability of financing may make future business acquisitions or dispositions difficult.*

Our ability to make acquisitions in order to achieve greater economies of scale or to expand our product offering is dependent upon our financial resources and our ability to access the capital markets. In addition, our ability to dispose of businesses that no longer fit our business model may be difficult if attractive financing is not

19

available to prospective buyers. Due to company-specific issues or lack of liquidity in the capital markets, our ability to expand through acquisitions or to dispose of businesses that no longer are strategic to us may be adversely affected.

***We face significant regulatory hurdles when planning business acquisitions.***

In connection with most acquisitions, before the acquisition can be completed, we must obtain various regulatory approvals or consents, which may include approvals of the Federal Reserve, the Massachusetts Commissioner of Banks and other domestic and foreign regulatory authorities. These regulatory authorities may impose conditions on the completion of the acquisition or require changes to its terms. Any such conditions, or any associated regulatory delays, could limit the benefits of the transaction.

***Competition for our employees is intense, and we may not be able to attract and retain the highly skilled people we need to support our business.***

Our success depends, in large part, on our ability to attract and retain key people. Competition for the best people in most activities in which we engage can be intense, and we may not be able to hire people or retain them, particularly in light of compensation restrictions applicable to us, as a participant in the TARP capital purchase program, under the Emergency Economic Recovery Act of 2008, as amended by the American Recovery and Reinvestment Act of 2009. The unexpected loss of services of one or more of our key personnel could have a material adverse impact on our business because of their skills, their knowledge of our markets, their years of industry experience and, in some cases, the difficulty of promptly finding qualified replacement personnel. Similarly, the loss of key employees, either individually or as a group, can adversely impact customer perception of our ability to continue to manage certain types of investment management mandates. In some of our businesses, we have experienced significant employee turnover, which increases costs, requires additional training and increases the potential for operational errors.

***Long-term fixed-price contracts expose us to pricing and performance risk.***

We enter into long-term fixed-price contracts to provide middle office or investment manager and hedge fund manager operations outsourcing services to customers, including services related but not limited to certain trading activities, cash reporting, settlement and reconciliation activities, collateral management and information technology development. The long-term contracts for these relationships require considerable up-front investment by us, including technology and conversion costs, and carry the risk that pricing for the products and services we provide might not prove adequate to generate expected operating margins over the term of the contracts. Profitability of these contracts is largely a function of our ability to accurately calculate pricing for our services and our ability to control our costs and maintain the relationship with the customer for an adequate period of time to recover our up-front investment. Our estimate of the profitability of these arrangements can be adversely impacted by declines in the assets under the customers' management, whether due to general declines in the securities markets or customer specific issues. In addition, the profitability of these arrangements may be based on our ability to cross sell additional services to these customers, and we may be unable to do so.

In addition, performance risk exists in each contract, given our dependence on successful conversion and implementation onto our own operating platforms of the service activities provided. Our failure to meet specified service levels may also adversely affect our revenue from such arrangements, or permit early termination of the contracts by the customer. If the current decline in overall market securities valuations persists or our customers are unable to grow their businesses, these relationships may not be successful. If the demand for these types of services were to decline, we could see a decline in revenue.

***We face significant risks developing and implementing our future business plans and strategies.***

In order to maintain and grow our business, we must continuously make strategic decisions about our future business plans, including plans for entering or exiting business lines or geographic markets, plans for acquiring or disposing of businesses and plans to build new systems and other infrastructure. Our business, our results of

operations and our financial position may be adversely affected by incorrect business and strategic decisions or improper implementation of our decisions. If the business decisions that we make prove erroneous, we may fail to be responsive to industry changes or customer demands. Moreover, the implementation of our decisions may involve significant capital outlays, often far in advance of when we expect to derive any related revenues, and therefore it may be difficult to alter or abandon plans without incurring significant loss.

***We are exposed to operational risk, which could adversely affect our results of operations.***

Operational risk is inherent in all of our activities. Our customers have a broad array of complex and specialized servicing, confidentiality and fiduciary requirements. We face the risk that the policies, procedures and systems we have established to comply with our operational requirements will fail, be inadequate or become outdated. We also face the potential for loss resulting from inadequate or failed internal processes, employee supervisory or monitoring mechanisms or other systems or controls, which could materially affect our future results of operations. Operational errors that result in us sending funds to a failing or bankrupt entity may be irreversible, and may subject us to losses. We may also be subject to disruptions from external events that are wholly or partially beyond our control, which could cause delays or disruptions to operational functions, including information processing and financial market settlement functions. In addition, our customers, vendors and counterparties could suffer from such events. Should these events affect us, or the customers, vendors or counterparties with which we conduct business, our results of operations could be negatively affected. When we record balance sheet reserves for probable loss contingencies from operational losses, we may be unable to accurately estimate our exposure, and any reserves we establish to cover operational losses may not be sufficient to cover our actual financial exposure, which may have a material impact on our consolidated financial condition or results of operations.

***We depend on information technology, and any failures of our information technology systems could result in significant costs and reputational damage.***

Our businesses depend on information technology infrastructure to record and process a large volume of increasingly complex transactions, in many currencies, on a daily basis, across numerous and diverse markets. Any interruptions, delays or breakdowns of this infrastructure could result in significant costs and reputational damage.

***Cost shifting to foreign jurisdictions may expose us to increased operational risk and reputational harm and may not result in expected cost savings.***

We actively strive to achieve cost savings by shifting certain business processes to lower-cost geographic locations, including by forming joint ventures and by establishing operations in lower cost areas, such as Poland, India and China, and outsourcing to vendors in various jurisdictions. This effort exposes us to the risk that we may not maintain service quality, control or effective management within these business operations. The increased elements of risk that arise from conducting certain operating processes in some jurisdictions could lead to an increase in reputational risk. During periods of transition, greater operational risk and customer concern exist regarding the continuity of a high level of service delivery. The extent and pace at which we are able to move functions to lower-cost locations may also be impacted by regulatory and customer acceptance issues. Such relocation of functions also entails costs, such as technology and real estate expenses, that may offset or exceed the expected financial benefits of the lower-cost locations.

***Any theft, loss or other misappropriation of the confidential information we possess could have an adverse impact on our business and could subject us to regulatory actions, litigation and other adverse effects.***

Our businesses and relationships with customers are dependent upon our ability to maintain the confidentiality of our and our customers' trade secrets and confidential information (including customer transactional data and personal data about our employees, our customers and our customers' customers). Unauthorized access to such information may occur, resulting in theft, loss or other misappropriation. Any theft,

21

loss or other misappropriation of confidential information could have a material adverse impact on our competitive positions, our relationships with our customers and our reputation and could subject us to regulatory inquiries and enforcement, civil litigation and possible financial liability or costs.

***Our businesses may be adversely affected by litigation.***

From time to time, our customers may make claims and take legal action relating to our performance of fiduciary or contractual responsibilities. We may also face employment lawsuits or other legal claims. In any such claims or actions, demands for substantial monetary damages may be asserted against us and may result in financial liability or an adverse effect on our reputation among investors or on customer demand for our products and services. We may be unable to accurately estimate our exposure to litigation risk when we record balance sheet reserves for probable loss contingencies. As a result, any reserves we establish to cover any settlements or judgments may not be sufficient to cover our actual financial exposure, which may have a material impact on our consolidated financial condition or results of operations.

In the ordinary course of our business, we are also subject to various regulatory, governmental and law enforcement inquiries, investigations and subpoenas. These may be directed generally to participants in the businesses in which we are involved or may be specifically directed at us. In regulatory enforcement matters, claims for disgorgement, the imposition of penalties and the imposition of other remedial sanctions are possible.

In view of the inherent difficulty of predicting the outcome of legal actions and regulatory matters, we cannot provide assurance as to the outcome of any pending matter or, if determined adversely to us, the costs associated with any such matter, particularly where the claimant seeks very large or indeterminate damages or where the matter presents novel legal theories, involves a large number of parties or is at a preliminary stage. The resolution of certain pending legal actions or regulatory matters, if unfavorable, could have a material adverse effect on our consolidated results of operations for the quarter in which such actions or matters are resolved.

***We face litigation risks in connection with SSgA's active fixed-income strategies.***

In connection with certain of SSgA's active fixed-income strategies, during the fourth quarter of 2007, we established a reserve of approximately $625 million to address legal exposure and related costs in connection with such strategies. Among other things, the portfolio managers for certain actively managed fixed-income strategies materially increased the exposure of these strategies to securities collateralized by sub-prime mortgages and shifted the weighting of these portfolios to more highly rated sub-prime instruments. During the third quarter of 2007, as the liquidity and valuations of these securities, including the more highly rated instruments, came under increased pressure, the performance of these strategies was adversely, and in some cases significantly, affected. The underperformance, which was greater than that typically associated with fixed-income funds, also caused a number of our customers to question whether the execution of these strategies was consistent with their investment intent. This questioning has resulted in several civil suits, including putative class action claims, applicable both to funds registered under the Investment Company Act of 1940 and to those that are exempt from such registration. These lawsuits allege, among other things, that we failed to comply with applicable investment limitations, disclosure obligations and our requisite standard of care in managing these active funds, including those where we act as a fiduciary under ERISA. We have also received, and are in the process of responding to, inquiries or subpoenas from federal and state regulatory authorities regarding SSgA's active fixed-income strategies, including the Securities and Exchange Commission, the Department of Labor and Massachusetts regulatory authorities. Given our desire to fully respond to customer concerns, in the fourth quarter of 2007, State Street undertook a further review of all the actively managed fixed-income strategies at SSgA that were exposed to sub-prime investments. Based on our review and ongoing discussions with customers who were invested in these strategies, we established a reserve to address our estimated legal exposure.

The reserve was established based upon our best judgment as to legal exposures and related costs associated with certain actively managed fixed-income investment strategies. As of March 31, 2009, we had made settlement and related payments totaling approximately $418 million. The amount of the original reserve was

22

based on certain assumptions. While we believe the reserve represents a reasonable estimate of our legal exposure and other costs associated with these issues, we do not believe that it is feasible to predict or determine the amount of such exposure with certainty. As such, it is possible that we have overestimated or underestimated our exposure. If the amount of our actual exposure is materially different from our reserve, there would be a material impact on our consolidated financial condition and results of operations. In addition, we cannot predict at this time whether any of the governmental authorities conducting investigations relating to our fixed income strategies will commence enforcement or other proceedings against us. Any such determination could have an adverse effect on our reputation, operations and financial results.

***We face extensive and changing government regulation, which may increase our costs and expose us to risks related to compliance.***

Most of our businesses are subject to extensive regulation by multiple regulatory bodies, and many of the customers to which we provide services are themselves subject to a broad range of regulatory requirements. These regulations may affect the manner and terms of delivery of our services. As a financial institution with substantial international operations, we are subject to extensive regulatory and supervisory oversight, both in the U.S. and outside the U.S. in connection with our global operations. The regulations affect, among other things, the scope of our activities and customer services, our capital structure and our ability to fund the operations of our subsidiaries, our lending practices, our dividend policy and the manner in which we market our services. Evolving regulations, such as the Basel II and other global regulatory capital frameworks, short-selling regulations and anti-money laundering regulations, may impose significant compliance costs on us. The disruption of the financial markets in 2008 and resulting governmental support of, and loss of confidence in, financial institutions is likely to result in demand for increased and more extensive regulation of our business both in the U.S and internationally. Different countries may respond to the market and economic environment in different and potentially conflicting manner, which could have the impact of increasing the cost of compliance for us. New or modified regulations and related regulatory guidance may have unforeseen or unintended adverse effects on the financial services industry.

If we do not comply with governmental regulations, we may be subject to fines, penalties, lawsuits or material restrictions on our businesses in the jurisdiction where the violation occurred, which may adversely affect our business operations and, in turn, our financial results. Similarly, many of our customers are subject to significant regulatory requirements, and retain our services in order for us to assist them in complying with those legal requirements. Changes in these regulations can significantly affect the services that we are asked to provide, as well as our costs. In addition, adverse publicity and damage to our reputation arising from the failure or perceived failure to comply with legal, regulatory or contractual requirements could affect our ability to attract and retain customers. If we cause customers to fail to comply with these regulatory requirements, we may be liable to them for losses and expenses that they incur. In recent years, regulatory oversight and enforcement have increased substantially, imposing additional costs and increasing the potential risks associated with our operations. If this regulatory trend continues, it could adversely affect our operations and, in turn, our financial results.

***Changes in accounting standards may be difficult to predict and may adversely affect our consolidated financial position and results of operations.***

New accounting standards, or changes in the interpretation of existing accounting standards, by the Financial Accounting Standards Board or the SEC, can potentially affect our consolidated financial condition and results of operations. These changes are difficult to predict, and can materially impact how we record and report our consolidated financial condition and results of operations and other financial information. In some cases, we could be required to apply a new or revised standard retroactively, resulting in the revised treatment of certain transactions or activities, and, in some cases, the restatement of prior period financial statements.

23

***Changes in tax laws or regulations, and challenges to our tax positions with respect to historical transactions, may adversely affect our net income, effective tax rate and our overall results of operations and financial condition.***

Our businesses can be affected by new tax legislation or the interpretation of existing tax laws worldwide. Changes in tax laws may affect our business directly or indirectly through their impact on the financial markets. In the normal course of business, we are subject to reviews by U.S. and non-U.S. tax authorities. These reviews may result in adjustments to the timing or amount of taxes due and the allocation of taxable income among tax jurisdictions. These adjustments could affect the attainment of our financial goals.

Prior to 2004, we entered into certain leveraged leases, known as sale-in, lease-out, or SILO, transactions. The Internal Revenue Service, or IRS, challenged our tax deductions arising from those transactions. During the second quarter of 2008, while we were engaged in settlement discussions with them, the IRS won a court victory in a SILO case involving other taxpayers. Shortly after that decision, the IRS suspended all SILO settlement discussions and, on August 5, 2008, issued a standard SILO settlement offer to most taxpayers that had such transactions. After reviewing the settlement offer carefully, we have decided not to accept it but to continue to pursue our appeal rights within the IRS.

In accordance with Statement of Financial Accounting Standards No. 13, Accounting for Leases, we originally recorded income and deferred tax liabilities with respect to our SILO transactions based on projected pre-tax and tax cash flows. In consideration of the terms of the settlement offer and the context in which it was issued, we revised our projections of the timing and amount of the tax cash flows and reflected those revisions in our leveraged lease accounting. During the third quarter of 2008 we substantially increased our reserve for tax-related interest expense that may be incurred upon resolution of this matter.

If we were to further revise our projection of the timing or amount of the tax cash flows from the leases, existing accounting standards would require us to again recalculate the rate of return and the recognition of income from the leases from inception. In addition to the recalculation, it is possible that we would increase our reserve for tax-related interest expense, which would be recorded as an increase to income tax expense.

***The quantitative models we use to manage our business may contain errors that result in imprecise risk assessments, inaccurate valuations or poor business decisions.***

We use quantitative models to help manage many different aspects of our business. As an input to our overall assessment of capital adequacy, we use models to measure the amount of credit risk, market risk, operational risk and business risk we face. During the preparation of our financial statements, we sometimes use models to value positions for which reliable market prices are not available. We also use models to support many different types of business decisions including trading activities, hedging, asset and liability management and whether to change business strategy. In all of these uses, errors in the underlying model could result in unanticipated and adverse consequences. Because of our widespread usage of models, potential errors in models pose an ongoing risk to us.

***Our controls and procedures may fail or be circumvented, and our risk management policies and procedures may be inadequate.***

We may fail to identify and manage risks related to a variety of aspects of our business, including, but not limited to, operational risk, interest-rate risk, trading risk, fiduciary risk, legal and compliance risk, liquidity risk and credit risk. We have adopted various controls, procedures, policies and systems to monitor and manage risk. We cannot provide assurance that those controls, procedures, policies and systems are adequate to identify and manage the risks inherent in our various businesses. In addition, our businesses and the markets in which we operate are continuously evolving. We may fail to fully understand the implications of changes in our business or the financial markets and fail to adequately or timely enhance our risk framework to address those changes. If our risk framework is ineffective, either because it fails to keep pace with changes in the financial markets or our business or for other reasons, we could incur losses.

***We may fail to accurately quantify the magnitude of the risks we face, which could subject us to losses.***

We may fail to accurately quantify the magnitude of the risks we face. Our measurement methodologies rely upon many assumptions and historical analyses and correlations. These assumptions may be incorrect, and the historical correlations we rely on may not continue to be relevant. Consequently, the measurements that we make for regulatory and economic capital may not adequately capture or express the true risk profiles of our businesses. Additionally, as businesses and markets evolve, our measurements may not accurately reflect those changes. While our risk measures may indicate sufficient capitalization, we may in fact have inadequate capital to conduct our businesses.

25

**Conduit Consolidation**

Effective May 15, 2009, we elected to take action that resulted in the consolidation onto our consolidated balance sheet of all of the assets and liabilities of the four third-party-owned, special-purpose, multi-seller asset-backed commercial paper programs that we administer, referred to as conduits. The consolidation of the conduits was completed pursuant to the provisions of Financial Accounting Standards Board Interpretation No. 46(R) following the voluntary redemption of the conduits' outstanding subordinated debt. We consolidated the conduits only for accounting purposes and have not legally acquired the conduits' assets and liabilities. The conduits remain separate and distinct legal entities, and their commercial paper programs continue to operate substantially in accordance with past practice.

In connection with the consolidation of the conduits, (1) we recorded a pre-tax extraordinary loss of approximately $6.1 billion, or approximately $3.7 billion after-tax, in our consolidated statement of income, (2) we added conduit assets, primarily mortgage- and asset-backed securities, which as of May 15, 2009 had an aggregate par value of approximately $22.7 billion and an aggregate fair value of approximately $16.6 billion, to our consolidated balance sheet and (3) we increased our third-party liabilities, primarily short-term commercial paper, on our consolidated balance sheet to a new total of $20.9 billion as of May 15, 2009. Upon consolidation, the aggregate fair value of the conduit assets was established as their book value, resulting in a discount to par value. To the extent that the assets' cash flows exceed their book value, the discounts will accrete as interest revenue over the lives of the assets in accordance with U.S. generally accepted accounting principles, or GAAP.

Following consolidation, our aggregate investment securities portfolio continues to be concentrated in securities with high credit quality, with approximately 81% of the carrying value of the portfolio rated "AAA" or "AA" as of May 15, 2009, compared to 83% for the investment securities portfolio immediately prior to consolidation. Because of our recognition upon consolidation of the unrealized loss on the conduit assets, the consolidation of the conduits did not affect the net unrealized loss on our investment portfolio. The net pre-tax unrealized loss on the investment portfolio as of May 15, 2009 was $8.6 billion, or $5.3 billion after-tax, compared to $9.5 billion, or $5.9 billion after-tax, at March 31, 2009.

**Results of Stress Test**

On May 7, 2009, the Board of Governors of the Federal Reserve System announced the results of its forward-looking capital assessment, referred to as the Supervisory Capital Assessment Program, or the SCAP, that was administered to the 19 largest U.S. bank holding

companies, including State Street. The Federal Reserve determined that, under the stress test administered under the SCAP, we did not need additional capital.

The SCAP's stress test methodology assumed two scenarios: a "baseline" scenario reflecting a current market outlook and a "more adverse" scenario. The Federal Reserve concluded that we had a sufficient capital buffer to withstand even the stress test's "more adverse" scenario, which was applied assuming consolidation of the conduits onto our consolidated balance sheet during 2009. The information used to apply the stress test was prepared in accordance with the assumptions and methodologies required by the SCAP. The information utilized does not reflect our outlook and is not intended to be a representation of our expected future performance or financial condition.

**Item 9.01.   Financial Statements and Exhibits**

   (d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Slide presentation (such Exhibit 99.1 is furnished and not filed). |

27

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

STATE STREET CORPORATION

By:    /s/ David C. Phelan
Name: David C. Phelan
Title:  Executive Vice President and General Counsel

Date: May 18, 2009

28

Form 8-K

Exhibit Index

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Side presentation (such Exhibit 99.1 is furnished and not filed). |

29

# Exhibit F

EX-99.1 2 a6010753ex991.htm EXHIBIT 99.1

**Exhibit 99.1**

**State Street Corporation Reports Second-Quarter 2009 Earnings Per Share of $0.79 before Extraordinary Loss Due to Conduit Consolidation, Which Includes Previously Disclosed Repayment of TARP CPP of $0.23 Per Share**

**Operating-Basis Earnings Per Share Are $1.04 in Second Quarter**

**Fee Revenue Increased 7% Compared to First Quarter and Continued Expense Control Drives Q2 2009 Positive Operating Leverage on an Operating Basis, Relative to Both Q2 2008 and Q1 2009**

BOSTON--(BUSINESS WIRE)--July 21, 2009--State Street Corporation today announced second-quarter results per common share of $(7.12), including an after-tax extraordinary loss of $(7.91) per share related to the effect of the previously disclosed consolidation of the State Street-administered asset-backed commercial paper (ABCP) conduits onto the Company's balance sheet, $(0.23) per share related to repayment of the U.S. Treasury's TARP CPP investment, and $(0.02) per share in merger and integration costs associated with the 2007 acquisition of Investors Financial Services Corp. ("Investors Financial") . Revenue of $2.122 billion in the second quarter of 2009 is down 20.6% from $2.672 billion in the year-ago second quarter. Total expenses in the second quarter of 2009 of $1.364 billion are down 25.9% compared to $1.841 billion in the year-ago second quarter. As reflected in the after-tax per share loss noted above, the Company recorded an extraordinary pre-tax loss in the second quarter of $(6.096) billion as a result of the previously reported consolidation of the ABCP conduits. For the second quarter of 2009, before the extraordinary loss and reflecting the effect of the equity issuances in 2008 and 2009, return on common shareholders' equity was 13.0%, down from 18.6% in the second quarter of 2008.

In addition to presenting State Street's financial results in conformity with US generally accepted accounting principles (GAAP), management also presents results on an "operating basis" in order to highlight comparable financial trends and other characteristics with respect to State Street's ongoing business operations from period to period. A full reconciliation of operating-basis results to GAAP results is included in the addendum at the end of this press release. Also see "Additional Information."

The following table reconciles GAAP-basis results to results presented on an operating basis:

**Reconciliation of Results - GAAP Basis to Operating Basis**
**For the Three Months Ended June 30, 2009**

| *(Dollars in millions)* | Net Income (Loss) | | EPS | ROE |
|---|---|---|---|---|
| **GAAP-basis net loss available to common shareholders** | $ | (3,314) | $ (7.12) | nm |
| Extraordinary loss from conduit consolidation, net of tax | | (3,684) | (7.91) | |
| **GAAP-basis net income available to common shareholders before extraordinary loss** | $ | 370 | $ .79 | 13.0% |
| Repayment of TARP preferred stock investment [1] | | 106 | .23 | 3.8 |
| After-tax merger and integration costs | | 7 | .02 | 0.2 |
| **Operating-basis net income available to common shareholders before extraordinary loss** | $ | 483 | $ 1.04 | 17.0% |

| | | |
|---|---|---|
| Average diluted common shares outstanding (in thousands) | **465,814** | |

[1] Repayment of TARP preferred stock investment resulted in accretion against retained earnings of remaining preferred stock discount, reducing GAAP-basis net income available to common shareholders.
nm – not meaningful.

Operating-basis results in the second quarter of 2009 exclude the effects noted above of the TARP repayment, the consolidation of the ABCP conduits and $(12) million in pre-tax merger and integration costs associated with the Investors Financial acquisition. Operating-basis results for the second quarter of 2008 excluded merger and integration costs of $(32) million associated with the Investors Financial acquisition. Operating-basis results for the first quarter of 2009 excluded $(17) million in merger and integration costs associated with the Investors Financial acquisition and $7 million of net interest revenue associated with the Federal Reserve's AMLF. Operating-basis revenue for all periods is presented on a fully taxable-equivalent basis.

The table below provides a summary of selected financial information and key ratios for the indicated periods, presented on an operating basis where noted. The tier 1 capital and tier 1 leverage ratios are capital ratios used regularly by bank regulatory authorities to evaluate the Company's capital status. The tier 1 common ratio was used by the Federal Reserve in connection with its Supervisory Capital Assessment Program, or "SCAP." The TCE and TCE/risk-weighted assets ratios are other capital ratios management believes provide additional context for understanding and assessing the Company's capital status. See "Additional Information" for a further description of these ratios and the addendum at the end of this press release for reconciliations applicable to the TCE ratio.

| **Selected Financial Information and Key Ratios** *(Dollars in millions)* | Q2 2009 | | Q1 2009 | | Increase/(Decrease) | | Q2 2008 | | Increase/(Decrease) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total revenue[1] | $ | 2,153 | $ | 2,027 | $ | 126 | 6.2% | $ | 2,700 | $ (547) | (20.3%) |
| Total expenses[1] | | 1,352 | | 1,287 | | 65 | 5.1% | | 1,809 | (457) | (25.3%) |
| Total assets [2][3] | | 153,421 | | 142,144 | | 11,277 | 7.9% | | 146,221 | 7,200 | 4.9% |
| Unrealized loss on investment portfolio, after-tax[3] | | (4,747) | | (5,851) | | 1,104 | (18.9%) | | (2,012) | (2,735) | (135.9%) |
| **AUCM** *(dollars in billions):* | | | | | | | | | | |
| Assets under custody and administration[3][4] | $ | 16,394 | $ | 15,035 | $ | 1,359 | 9.0% | $ | 19,727 | $ (3,333) | (16.9%) |
| Assets under management[3] | | 1,557 | | 1,395 | | 162 | 11.6% | | 1,894 | (337) | (17.8%) |
| Earnings per common share[1] | $ | 1.04 | $ | 1.04 | $ | - | - | $ | 1.40 | $ (0.36) | (25.7%) |
| Return on common equity[1] | | 17.0% | | 15.9% | | 110 bps | | | 19.3% | (230) bps | |
| Tier 1 capital ratio | | 14.5% | | 19.1% | | (460) bps | | | 17.1% | (260) bps | |
| Tier 1 leverage ratio | | 7.3% | | 10.4% | | (310) bps | | | 8.3% | (100) bps | |
| Tier 1 common ratio | | 12.5% | | 14.8% | | (230) bps | | | 15.0% | (250) bps | |
| TCE ratio | | 5.0% | | 5.9% | | (90) bps | | | 5.8% | (80) bps | |
| TCE/RWA ratio | | 8.5% | | 8.2% | | 30 bps | | | 11.9% | (340) bps | |

[1] Presented on an operating basis.

[2] Increase for Q2 2009 compared to Q1 2009 primarily resulted from consolidation of the ABCP conduits.

[3] As of period end.

[4] Includes assets under custody of $12,337 billion, $11,337 billion and $15,257 billion, respectively.

Operating-basis earnings per common share in the second quarter of 2009 are $1.04, down 25.7% from $1.40 per share in the second quarter of 2008. Operating-basis revenue of $2.153 billion in the second quarter of 2009 is down 20.3% from $2.700 billion in the second quarter a year ago. Operating-basis expenses of $1.352 billion in the second quarter of 2009 are down 25.3% from $1.809 billion in the year-ago quarter. These second quarter 2009 revenue and expense results represent 500 basis points of positive operating leverage compared to the second quarter of 2008. For the second quarter of 2009, operating-basis return on common shareholders' equity is 17.0%, down from 19.3% for the second quarter of 2008.

The balance sheet is $153 billion at June 30, 2009, compared to $142 billion at March 31, 2009. Excluding $20 billion in excess deposits held at central banks at June 30, 2009, compared with $30 billion at March 31, 2009, the normalized balance sheet was $133 billion at June 30, 2009, compared to a normalized balance sheet of $112 billion at March 31, 2009. Our regulatory capital ratios continue to be strong as of June 30, 2009, with our tier 1 capital ratio at 14.5% and our leverage ratio at 7.3%. In addition, our tier 1 common ratio is 12.5%, our TCE to risk-weighted assets ratio is 8.5%, and our TCE ratio is 5.0%.

At June 30, 2009, the after-tax, unrealized mark-to-market losses in the consolidated investment portfolio are $4.75 billion, down from $5.85 billion after-tax at March 31, 2009 and down from $6.32 billion after-tax as of December 31, 2008.

Ronald E. Logue, State Street's chairman and chief executive officer, said, "While markets have remained challenging, we achieved a number of significant milestones during the second quarter. We strengthened our TCE ratio, passed the Federal Reserve's stress test, conducted a successful equity and debt issuance in mid-May, and re-paid the TARP CPP preferred stock investment in June. We also repurchased the TARP common stock warrant in early July. With these actions, our capital ratios are among the strongest in our industry, and we have performed well against the TCE Improvement Plan that we announced on February 5."

Logue continued, "Fee revenue in the second quarter increased 7% from the first quarter. This performance, combined with our continued focus on expense control, resulted in 500 basis points of positive operating leverage compared to the second quarter of 2008 and 110 basis points on a sequential-quarter basis, each on an operating basis. We remain focused on what we can control – servicing our customers, managing our expenses and investing for the future."

SECOND QUARTER 2009 RESULTS VS. YEAR-AGO SECOND QUARTER

Servicing fees are down 19% to $795 million from $977 million in last year's second quarter. The decrease is attributable primarily to the approximately 38% decline in daily average equity valuations. Total assets under custody and administration are $16.39 trillion at June 30, 2009, down 17%, compared with $19.73 trillion at June 30, 2008. Daily average values for the S&P 500 Index are down 35% from the second quarter of 2008; daily average values for the MSCI® EAFE Index$^{SM}$ are down 41% from the same period.

Investment management fees, generated by State Street Global Advisors, are $193 million, down 31% from $280 million in the year-ago quarter. The decline in management fees is attributable primarily to the approximately 36% decrease in average month-end equity valuations. Total assets under management at June 30, 2009, are $1.56 trillion, down 18%, compared to $1.89 trillion at June 30, 2008.

Trading services revenue, which includes foreign exchange trading revenue and brokerage and other fees, is $310 million for the second quarter of 2009, down 3% from $320 million the second quarter a year-ago. A 16% decrease in foreign exchange revenue is due to lower volumes, partially offset by higher volatility. Brokerage and other fees increased 29% due primarily to improved transition management business.

Securities finance revenue is $201 million in the quarter, down 43% from $352 million in the very strong year-ago second quarter. This significant decline is due primarily to lower volumes, offset partially by slightly higher spreads.

Processing fees and other is $17 million, down 78% from $77 million in the second quarter of 2008. The decline is primarily due to lower revenue from structured products, as well as the consolidation of the ABCP conduits onto our balance sheet. As a result of the consolidation, the fees earned from conduit activities after May 15 are reported as net interest revenue.

Net interest revenue on an operating basis is $611 million, a decrease of 11% from $685 million in the year-ago second quarter. The decline is due primarily to the decrease in customer deposit volumes and spreads, partially offset by $112 million of discount accretion on securities in the investment portfolio recorded following the consolidation of the ABCP conduits.

In the quarter, due to the improving markets, we recorded $26 million in net gains related to investment securities—$90 million from sales of securities, partially offset by $64 million in other-than-temporary impairment. In addition, we recorded a $14 million provision for loan losses in order to provide for expected losses related to the commercial mortgage loans held on our balance sheet that were acquired in the fourth quarter of 2008.

Operating-basis expenses decreased to $1.352 billion, down 25.3% from $1.809 billion a year ago, due primarily to a 34% reduction in salaries and benefits expense due to a lower level of accrual for incentive compensation as well as the benefit of the reduction in force. Other expenses also declined due to measures which we undertook that contributed to a 26% decrease.

The decrease in total expenses also includes lower transaction processing services, down 15% to $146 million from $172 million a year ago, due to lower volumes in the investment servicing business. Occupancy increased 5% to $121 million from $115 million. Other expenses were down 26% or $76 million to $222 million from $298 million due primarily to lower professional fees and lower securities processing costs, partially offset by a special assessment from the FDIC.

The effective tax rate in the second quarter of 2009 is 32.6%, down from 34.0% in the second quarter of 2008. It is expected to be 30.7% for full-year 2009.

SECOND-QUARTER 2009 RESULTS VS. FIRST QUARTER 2009

The GAAP loss per share of $(7.12) in the second quarter of 2009 on revenue of $2.122 billion, compares with earnings per share of $1.02 per share in the first quarter of 2009 on revenue of $2.002 billion. Expenses in the second quarter of 2009 are $1.364 billion, compared with $1.304 billion in the first quarter of 2009. Return on common shareholders' equity is 13.0% in the second quarter of 2009, which excludes the impact of the extraordinary loss, compared to 15.7% in the first quarter of 2009.

The following information is presented on an operating basis. Earnings per common share in the second quarter of 2009 of $1.04 are flat with the first quarter of 2009. Total revenue in the second quarter is $2.153 billion, up 6.2% versus $2.027 billion in the first quarter of 2009. Total expenses for the second quarter of 2009 are $1.352 billion, up 5.1% compared to $1.287 billion in the first quarter of 2009. Return on common shareholders' equity of 17.0% in the second quarter compares with 15.9% in the first quarter.

The table below provides the components of operating-basis revenue:

| **Operating-Basis Revenue** | | | | | Increase/(Decrease) | |
|---|---|---|---|---|---|---|
| *(Dollars in millions)* | **Q2 2009** | | **Q1 2009** | | **$** | **%** |
| Servicing fees | $ | 795 | $ | 766 | $ 29 | 3.8% |
| Investment management fees | | 193 | | 181 | 12 | 6.6 |
| Trading services revenue | | 310 | | 245 | 65 | 26.5 |
| Securities finance revenue | | 201 | | 181 | 20 | 11.0 |
| Processing fees and other revenue | | 17 | | 49 | (32) | (65.3) |
| Net interest revenue, fully-taxable equivalent basis | | 611 | | 589 | 22 | 3.7 |
| Gains (Losses) related to investment securities, net | | 26 | | 16 | 10 | 62.5 |
| **Total Operating-Basis Revenue** | $ | **2,153** | $ | **2,027** | $ **126** | **6.2%** |

Servicing fees are $795 million, up 4% from $766 million in the first quarter due primarily to the approximately 12% increase in daily average equity valuations, as well as new business. Management fees are $193 million, up 7% from $181 million primarily due to the greater than 16% increase in the average month-end equity valuations and net new business. Trading services revenue is $310 million, up 27% from $245 million primarily due to strength in brokerage and other fee revenue. Securities finance revenue is $201 million, up 11% from the prior quarter primarily due to higher spreads as well as higher volumes. Processing fees and other revenue declined 65% from $49 million to $17 million due to lower revenue from structured products. In addition, the fees earned from the ABCP conduit activities were reported as net interest revenue after consolidation of the conduits on May 15, 2009. Net interest revenue on an operating basis is $611 million, up 4% from $589 million, due primarily to the effect of $112 million of discount accretion recorded following the consolidation of the conduits, offset partially by the decline in Libor rates and narrower spreads both in the investment portfolio and on customer deposits.

The table below provides the components of operating-basis expenses:

| **Operating-Basis Expenses** | | | | | | | Increase/(Decrease) | |
| *(Dollars in millions)* | Q2 2009 | | Q1 2009 | | $ | | % | |
| Salaries and employee benefits | $ | 696 | $ | 731 | $ | (35) | (4.8%) | |
| Information systems and communications | | 167 | | 161 | | 6 | 3.7 | |
| Transaction processing services | | 146 | | 131 | | 15 | 11.5 | |
| Occupancy | | 121 | | 121 | | --- | --- | |
| Other | | 222 | | 143 | | 79 | 55.2 | |
| **Total Operating-Basis Expenses** | $ | 1,352 | $ | 1,287 | $ | 65 | 5.1% | |

Salaries and employee benefits expense decreased 5% to $696 million from $731 million primarily due to a lower level of 2009 incentive compensation. Information systems and communications increased 3.7% from $161 million to $167 million due to increases in investment servicing. Transaction processing expense is up 11% from $131 million to $146 million due to higher volumes in the asset servicing business. Other expenses are up 55% from $143 million to $222 million due to increases in FDIC fees, including a special assessment, professional fees and securities processing costs.

ADDITIONAL INFORMATION

All per share amounts represent fully diluted earnings per common share. Return on common shareholders' equity is determined by dividing annualized net income before extraordinary loss available to common shareholders by average common shareholders' equity for the period. Positive operating leverage is defined as the excess rate of growth of total revenue over the rate of growth of total expenses, each separately determined on a GAAP or an operating basis.

This press release includes financial information presented on a GAAP basis as well as on an operating basis. Management measures and compares certain financial information on an operating basis, as it believes that this presentation supports meaningful comparisons from period to period and the analysis of comparable financial trends with respect to State Street's normal ongoing business operations. Management believes that operating-basis financial information, which reports revenue from non-taxable sources on a fully taxable-equivalent basis and excludes the impact of revenue and expenses outside of the normal course of business, facilitates an investor's understanding and analysis of State Street's underlying financial performance and trends in addition to financial information prepared in accordance with GAAP. Non-GAAP financial measures should be considered in addition to, not as a substitute for or superior to, financial measures determined in accordance with GAAP. A full reconciliation of operating-basis results to GAAP results is included in the addendum at the end of this press release.

Management believes that the use of other non-GAAP financial measures in the calculation of identified capital ratios is useful to understanding State Street's capital position and of interest to investors. Below is a description of, and other information with respect to, the capital ratios referenced in this press release.

- **The tier 1 risk-based capital, or tier 1 capital, and tier 1 leverage ratios**, as applicable, are each calculated in accordance with applicable bank regulatory requirements and, as permitted, exclude the impact of commercial paper purchased under the Federal Reserve Bank of Boston's AMLF.

- **The tier 1 risk-based common, or tier 1 common, ratio** is calculated by dividing (a) tier 1 capital less non-common elements including qualifying perpetual preferred stock, qualifying minority interest in subsidiaries and qualifying trust preferred securities, by (b) risk-weighted assets, which assets are calculated in accordance with applicable bank regulatory requirements. The tier 1 common ratio is not required by GAAP or on a recurring basis by bank regulations. However, this ratio was used by the Federal Reserve in connection with its stress test administered to the 19 largest U.S. bank holding companies under the SCAP, the results of which were announced on May 7, 2009. Although we understand that the Federal Reserve does not intend to prospectively require calculation of the tier 1 common ratio, due to the recent timing of the SCAP, management is currently monitoring this ratio, along with the other capital ratios described in this press release, in evaluating State Street's capital levels and believes that, at this time, the ratio may be of interest to investors.

  Reconciliations with respect to unaudited tier 1 common capital as of June 30, 2009, March 31, 2009 and June 30, 2008 are provided in the addendum at the end of this press release.

- **The ratio of tangible common equity to adjusted tangible assets, or TCE ratio**, is calculated by dividing total common shareholders' equity by consolidated total assets, after reducing both amounts by goodwill and other intangible assets net of related deferred taxes. Total assets reflected in the TCE ratio also exclude commercial paper purchased under the AMLF and cash balances on deposit at the Federal Reserve Bank and other central banks in excess of required reserves. The TCE ratio is not required by GAAP or by bank regulations, but is a metric used by management to evaluate the adequacy of State Street's capital levels. Since there is no authoritative requirement to calculate the TCE ratio, our TCE ratio is not necessarily comparable to similar capital measures disclosed or used by other companies in the financial services industry. Tangible common equity and adjusted tangible assets are non-GAAP financial measures and should be considered in addition to, not as a substitute for or superior to, financial measures determined in accordance with GAAP. Reconciliations with respect to the calculation of the unaudited TCE ratio as of June 30, 2009, March 31, 2009 and June 30, 2008 are provided in the addendum at the end of this press release.

- **The ratio of tangible common equity to risk-weighted assets, or TCE/RWA ratio,** is calculated by dividing total common shareholders' equity (reduced by goodwill and other intangible assets net of related deferred taxes) by risk-weighted assets (determined in accordance with applicable bank regulatory requirements). As permitted by bank regulations, risk-weighted assets exclude commercial paper purchased under the AMLF. The TCE/RWA ratio is not required by GAAP or by bank regulations, but is a metric used by management to evaluate the adequacy of State Street's capital levels. Since there is no authoritative requirement to calculate the TCE/RWA ratio, our TCE/RWA ratio is not necessarily comparable to similar capital measures disclosed or used by other companies in the financial services industry. Tangible common equity is a non-GAAP financial measure and should be considered in addition to, not as a substitute for or superior to, financial measures determined in accordance with GAAP. Reconciliations with respect to the calculation of the unaudited TCE/RWA ratio as of June 30, 2009, March 31, 2009 and June 30, 2008 are included in the addendum at the end of this press release

INVESTOR CONFERENCE CALL

State Street will webcast an investor conference call today, Tuesday, July 21, 2009, at 9:30 a.m. EDT, available at www.statestreet.com/stockholder. The conference call will also be available via telephone, at +1 706/679-5594 or +1 888/391-4233 (Conference ID #13443176). Recorded replays of the conference call will be available on the web site, and by telephone at +1 706/645-9291 or +1 800/642-1687 (Conference ID#13443176) , beginning approximately two hours after the call's completion. The telephone replay will be available for two weeks following the conference call. This press release, presentation materials referred to on the conference call, and additional financial information are available on State Street's website, at www.statestreet.com/stockholder under "Investor Information--Latest News, Annual Reports and Financial Trends—Financial Trends," and "Investor Events and Presentations."

State Street Corporation (NYSE: STT) is the world's leading provider of financial services to institutional investors including investment servicing, investment management and investment research and trading. With $16.394 trillion in assets under custody and administration and $1.557 trillion in assets under management at June 30, 2009, State Street operates in 27 countries and more than 100 geographic markets and employs 26,950 worldwide. For more information, visit State Street's web site at www.statestreet.com or call +1 877/639-7788 [NEWS STT] toll-free in the United States and Canada, or +1 678/999-4577 outside those countries.

**FORWARD-LOOKING STATEMENTS**

This news announcement contains forward-looking statements as defined by United States securities laws, including statements about our goals and expectations regarding our business, financial condition, results of operations and strategies, the financial and market outlook, governmental and regulatory initiatives and developments, and the business environment. These statements are not guarantees of future performance, are inherently uncertain, are based on current assumptions that are difficult to predict and involve a number of risks and uncertainties. Therefore, actual outcomes and results may differ materially from what is expressed in those statements, and those statements should not be relied upon as representing our expectations or beliefs as of any date subsequent to the date of this release.

Important factors that may affect future results and outcomes include, but are not limited to:

- global financial market disruptions and the current worldwide economic recession, and monetary and other governmental actions designed to address such disruptions and recession in the U.S. and internationally;

- increases in the potential volatility of our net interest revenue, changes in the composition of the assets on our consolidated balance sheet and the possibility that we may be required to change the manner in which we fund those assets, all as a result of the May 15, 2009 consolidation for financial reporting purposes of the ABCP conduits that we administer;

- the financial strength and continuing viability of the counterparties with which we or our customers do business and with which we have investment, credit or financial exposure;

- the liquidity of the U.S. and international securities markets, particularly the markets for fixed- income securities, and the liquidity requirements of our customers;

- the credit quality and credit agency ratings of the securities in our investment securities portfolio, a deterioration or downgrade of which could lead to other-than-temporary impairment of the respective securities and the recognition of an impairment loss;

- the maintenance of credit agency ratings for our debt obligations as well as the level of credibility of credit agency ratings;

- the possibility of our customers incurring substantial losses in investment pools where we act as agent, and the possibility of further general reductions in the valuation of assets;

- our ability to attract deposits and other low-cost, short-term funding;

- potential changes to the competitive environment, including changes due to the effects of consolidation, extensive and changing government regulation and perceptions of State Street as a suitable service provider or counterparty;

- the level and volatility of interest rates and the performance and volatility of securities, credit, currency and other markets in the U.S. and internationally;

- our ability to measure the fair value of the investment securities on our consolidated balance sheet;

- the results of litigation, government investigations and similar disputes and, in particular, the effect of current or potential proceedings concerning State Street Global Advisors', or SSgA's, active fixed-income strategies and other investment products, in particular, the potential for monetary damages and negative consequences for our business arising from the previously reported "Wells" notice we received from the SEC;

- the enactment of legislation and changes in regulation and enforcement that impact us and our customers;

- adverse publicity or other reputational harm;

- our ability to pursue acquisitions, strategic alliances and divestures, finance future business acquisitions and obtain regulatory approvals and consents for acquisitions;

- the performance and demand for the products and services we offer, including the level and timing of withdrawals from our collective investment products;

- our ability to continue to grow revenue, attract highly skilled people, control expenses and attract the capital necessary to achieve our business goals and comply with regulatory requirements;

- our ability to control operating risks, information technology systems risks and outsourcing risks, the possibility of errors in the quantitative models we use to manage our business and the possibility that our controls will fail or be circumvented;

- the potential for new products and services to impose additional costs on us and expose us to increased operational risk, and our ability to protect our intellectual property rights;

- changes in government regulation or new legislation, which may increase our costs, expose us to risk related to compliance or impact our customers;

- changes in accounting standards and practices; and

- changes in tax legislation and in the interpretation of existing tax laws by U.S. and non-U.S. tax authorities that impact the amount of taxes due.

Other important factors that could cause actual results to differ materially from those indicated by any forward-looking statements are set forth in our 2008 Annual Report on Form 10-K, our Current Report on Form 8-K dated May 18, 2009, and our subsequent SEC filings. We encourage investors to read these filings, particularly the sections on Risk Factors, for additional information with respect to any forward-looking statements and prior to making any investment decision. The forward-looking statements contained in this press release speak only as of the date hereof, July 21, 2009, and we do not undertake efforts to revise those forward-looking statements to reflect events after this date.

**STATE STREET CORPORATION**
**Earnings Press Release Addendum**

**Consolidated Financial Highlights**
**June 30, 2009**

| | | Quarters Ended | | | % Change | |
|---|---|---|---|---|---|---|
| (Dollars in millions, except per share amounts or where otherwise noted) | | June 30, 2009 | March 31, 2009 | June 30, 2008 | Q2 2009 vs. Q1 2009 | Q2 2009 vs. Q2 2008 |
| Total Revenue | $ | **2,122** | $ 2,002 | $ 2,672 | 6 % | (21) % |
| Provision for Loan Losses | | **14** | 84 | - | | |
| Total Expenses: | | | | | | |
|     Expenses from operations | | **1,352** | 1,287 | 1,809 | 5 | (25) |
|     Merger and integration costs | | **12** | 17 | 32 | (29) | (63) |
| Net Income Before Extraordinary Loss | | **502** | 476 | 548 | 5 | (8) |
| Extraordinary Loss, Net of Tax | | **(3,684)** | - | - | | |
| Net Income (Loss) | | **(3,182)** | 476 | 548 | (768) | (681) |
| Net Income Before Extraordinary Loss Available to Common Shareholders | | **370** | 445 | 548 | (17) | (32) |
| Net Income (Loss) Available to Common Shareholders | | **(3,314)** | 445 | 548 | (845) | (705) |
| Diluted Earnings Per Common Share Before Extraordinary Loss | $ | **.79** | $ 1.02 | $ 1.35 | (23) | (41) |
| Diluted Earnings (Loss) Per Common Share | | **(7.12)** | 1.02 | 1.35 | (798) | (627) |
| Average Diluted Common Shares Outstanding (in thousands) | | **465,814** | 435,299 | 406,964 | | |
| Cash Dividends Declared Per Common Share | $ | **.01** | $ .01 | $ .24 | | |
| Closing Price Per Share of Common Stock (at quarter end) | | **47.20** | 30.78 | 63.99 | | |
| Ratios: | | | | | | |
|     Return on common equity before extraordinary loss | | **13.0** % | 15.7 % | 18.6 % | | |
|     Net interest margin, fully taxable-equivalent basis | | **1.93** | 2.01 | 2.31 | | |
|     Tier 1 risk-based capital | | **14.5** | 19.1 | 17.1 | | |
|     Total risk-based capital | | **15.8** | 20.5 | 18.4 | | |
|     Tier 1 leverage | | **7.3** | 10.4 | 8.3 | | |
| At Quarter End: | | | | | | |
|     Assets Under Custody and Administration[1] (AUA) (in trillions) | $ | **16.39** | $ 15.04 | $ 19.73 | | |
|     Assets Under Management (AUM) (in trillions) | | **1.56** | 1.40 | 1.89 | | |

[1] Includes assets uncer custody of $12.34 trillion, $11.34 trillion, and $15.26 trillion, respectively.

| | | Six Months Ended | | % Change | |
|---|---|---|---|---|---|
| (Dollars in millions, except per share amounts) | | June 30, 2009 | June 30, 2008 | 2009 vs. 2008 | |
| Total Revenue | $ | **4,124** | $ 5,249 | (21) % | |
| Provision for Loan Losses | | **98** | - | | |
| Total Expenses: | | | | | |
|     Expenses from operations | | **2,639** | 3,557 | (26) | |
|     Merger and integration costs | | **29** | 58 | (50) | |
| Net Income Before Extraordinary Loss | | **978** | 1,078 | (9) | |
| Extraordinary Loss, Net of Tax | | **(3,684)** | - | | |
| Net Income (Loss) | | **(2,706)** | 1,078 | (351) | |
| Net Income Before Extraordinary Loss Available to Common Shareholders | | **815** | 1,078 | (24) | |
| Net Income (Loss) Available to Common Shareholders | | **(2,869)** | 1,078 | (366) | |
| Diluted Earnings Per Common Share Before Extraordinary Loss | $ | **1.81** | $ 2.70 | (33) | |
| Diluted Earnings (Loss) Per Common Share | | **(6.37)** | 2.70 | (336) | |
| Average Diluted Common Shares Outstanding (in thousands): | | **450,483** | 399,684 | | |
| Cash Dividends Declared Per Common Share | $ | **.02** | $ .47 | (96) | |
| Return on Common Equity Before Extraordinary Loss | | **14.4** % | 18.6 % | | |

Net interest margin, fully taxable-equivalent basis                    **1.96**          2.26

**STATE STREET CORPORATION**
Earnings Press Release Addendum

**SELECTED CONSOLIDATED FINANCIAL INFORMATION**
Quarters and Six Months Ended June 30, 2009 and June 30, 2008

| (Dollars in millions, except per share amounts) | June 30, 2009 | | June 30, 2008 | | % Change | | June 30, 2009 | | June 30, 2008 | | % Change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Quarters Ended | | | | | | Six Months Ended | | | | | |
| **Fee Revenue:** | | | | | | | | | | | | |
| Servicing fees | $ | **795** | $ | 977 | (19) | % | $ | **1,561** | $ | 1,937 | (19) | % |
| Management fees | | **193** | | 280 | (31) | | | **374** | | 558 | (33) | |
| Trading services | | **310** | | 320 | (3) | | | **555** | | 686 | (19) | |
| Securities finance | | **201** | | 352 | (43) | | | **382** | | 655 | (42) | |
| Processing fees and other | | **17** | | 77 | (78) | | | **66** | | 131 | (50) | |
| Total fee revenue | | **1,516** | | 2,006 | (24) | | | **2,938** | | 3,967 | (26) | |
| **Net Interest Revenue:** | | | | | | | | | | | | |
| Interest revenue | | **773** | | 1,137 | (32) | | | **1,511** | | 2,425 | (38) | |
| Interest expense | | **193** | | 480 | (60) | | | **367** | | 1,143 | (68) | |
| Net interest revenue [(1)] | | **580** | | 657 | (12) | | | **1,144** | | 1,282 | (11) | |
| **Gains (Losses) related to investment securities, net:** | | | | | | | | | | | | |
| Net gains from sales of available-for-sale securities | | **90** | | 9 | | | | **119** | | 15 | | |
| Losses from other-than-temporary impairment | | **(167)** | | - | | | | **(180)** | | (15) | | |
| Losses not related to credit | | **103** | | - | | | | **103** | | - | | |
| Gains (Losses) related to investment securities, net | | **26** | | 9 | | | | **42** | | - | | |
| Total revenue | | **2,122** | | 2,672 | (20.6) | | | **4,124** | | 5,249 | (21.4) | |
| Provision for loan losses | | **14** | | - | | | | **98** | | - | | |
| **Expenses:** | | | | | | | | | | | | |
| Salaries and employee benefits | | **696** | | 1,060 | (34) | | | **1,427** | | 2,122 | (33) | |
| Information systems and communications | | **167** | | 164 | 2 | | | **328** | | 319 | 3 | |
| Transaction processing services | | **146** | | 172 | (15) | | | **277** | | 334 | (17) | |
| Occupancy | | **121** | | 115 | 5 | | | **242** | | 225 | 8 | |
| Merger and integration costs | | **12** | | 32 | (63) | | | **29** | | 58 | (50) | |
| Other | | **222** | | 298 | (26) | | | **365** | | 557 | (34) | |
| Total expenses | | **1,364** | | 1,841 | (25.9) | | | **2,668** | | 3,615 | (26.2) | |
| Income before income tax expense and extraordinary loss | | **744** | | 831 | (10) | | | **1,358** | | 1,634 | (17) | |
| Income tax expense | | **242** | | 283 | | | | **380** | | 556 | | |
| Income before extraordinary loss | | **502** | | 548 | (8) | | | **978** | | 1,078 | (9) | |
| Extraordinary loss, net of tax | | **(3,684)** | | - | | | | **(3,684)** | | - | | |
| **Net income (loss)** | $ | **(3,182)** | $ | 548 | (681) | | $ | **(2,706)** | $ | 1,078 | (351) | |
| **Adjustments to net income (loss):** | | | | | | | | | | | | |
| Prepayment of preferred stock discount | $ | **(106)** | | - | | | $ | **(106)** | | - | | |
| Dividend on preferred stock | | **(21)** | | - | | | | **(46)** | | - | | |
| Accretion of preferred stock discount | | **(5)** | | - | | | | **(11)** | | - | | |
| | | **(132)** | | - | | | | **(163)** | | - | | |
| **Net income before extraordinary loss available to common shareholders** | $ | **370** | $ | 548 | (32) | | $ | **815** | $ | 1,078 | (24) | |
| **Net income (loss) available to common shareholders** | $ | **(3,314)** | $ | 548 | (705) | | $ | **(2,869)** | $ | 1,078 | (366) | |
| **Earnings Per Common Share Before Extraordinary Loss:** | | | | | | | | | | | | |
| Basic [(2)] | $ | **.80** | $ | 1.36 | (41) | | $ | **1.82** | $ | 2.72 | (33) | |
| Diluted | | **.79** | | 1.35 | (41) | | | **1.81** | | 2.70 | (33) | |
| **Earnings (Loss) Per Common Share:** | | | | | | | | | | | | |
| Basic [(3)] | $ | **(7.16)** | $ | 1.36 | (626) | | $ | **(6.40)** | $ | 2.72 | (335) | |

| Diluted | **(7.12)** | 1.35 | (627) | **(6.37)** | 2.70 | (336) |

**Average Common Shares Outstanding (in thousands):**

| | | | | | | |
|---|---|---|---|---|---|---|
| Basic | **462,399** | 402,482 | | **447,370** | 395,212 | |
| Diluted | **465,814** | 406,964 | | **450,483** | 399,684 | |

Selected consolidated financial information presented above was prepared in accordance with accounting principles generally accepted in the United States.

(1) Net interest revenue on a fully taxable-equivalent basis was $611 million and $685 million for the quarters ended June 30, 2009 and 2008, respectively, and $1.21 billion and $1.33 billion for the six months ended June 30, 2009 and 2008, respectively. These amounts include taxable-equivalent adjustments of $31 million and $28 million for the quarters ended June 30, 2009 and 2008, respectively, and $63 million and $51 million for the six months ended June 30, 2009 and 2008, respectively.

(2) Basic earnings per common share before extraordinary loss on distributed earnings were $.01 and $.23 for the quarters ended June 30, 2009 and 2008, respectively, and $.25 and $.46 for the six months ended June 30, 2009 and 2008, respectively. Basic earnings per common share before extraordinary loss on undistributed earnings were $.79 and $1.13 for the quarters ended June 30, 2009 and 2008, respectively, and $1.57 and $2.26 for the six months ended June 30, 2009 and 2008, respectively.

(3) Basic earnings per common share on distributed earnings were $.01 and $.23 for the quarters ended June 30, 2009 and 2008, respectively, and $.25 and $.46 for the six months ended June 30, 2009 and 2008, respectively. Basic earnings per common share on undistributed earnings were $(7.17) and $1.13 for the quarters ended June 30, 2009 and 2008, respectively, and $(6.65) and $2.26 for the six months ended June 30, 2009 and 2008, respectively.

**STATE STREET CORPORATION**
Earnings Press Release Addendum

**SELECTED CONSOLIDATED FINANCIAL INFORMATION**
Quarters Ended June 30, 2009 and March 31, 2009

| | | Quarters Ended | | |
|---|---|---|---|---|
| (Dollars in millions, except per share amounts) | | June 30, 2009 | March 31, 2009 | % Change |
| **Fee Revenue:** | | | | |
| Servicing fees | $ | 795 | $ 766 | 4 % |
| Management fees | | 193 | 181 | 7 |
| Trading services | | 310 | 245 | 27 |
| Securities finance | | 201 | 181 | 11 |
| Processing fees and other | | 17 | 49 | (65) |
| Total fee revenue | | 1,516 | 1,422 | 7 |
| **Net Interest Revenue:** | | | | |
| Interest revenue | | 773 | 738 | 5 |
| Interest expense | | 193 | 174 | 11 |
| Net interest revenue [1] | | 580 | 564 | 3 |
| **Gains (Losses) related to investment securities, net:** | | | | |
| Net gains from sales of available-for-sale securities | | 90 | 29 | |
| Losses from other-than-temporary impairment | | (167) | (13) | |
| Losses not related to credit | | 103 | - | |
| Gains (Losses) related to investment securities, net | | 26 | 16 | |
| Total revenue | | 2,122 | 2,002 | 6.0 |
| Provision for loan losses | | 14 | 84 | |
| **Expenses:** | | | | |
| Salaries and employee benefits | | 696 | 731 | (5) |
| Information systems and communications | | 167 | 161 | 4 |
| Transaction processing services | | 146 | 131 | 11 |
| Occupancy | | 121 | 121 | - |
| Merger and integration costs | | 12 | 17 | (29) |
| Other | | 222 | 143 | 55 |
| Total expenses | | 1,364 | 1,304 | 4.6 |
| Income before income tax expense and extraordinary loss | | 744 | 614 | 21 |
| Income tax expense | | 242 | 138 | |
| Income before extraordinary loss | | 502 | 476 | 5 |
| Extraordinary loss, net of tax | | (3,684) | - | |
| **Net income (loss)** | $ | (3,182) | $ 476 | (768) |
| **Adjustments to net income (loss):** | | | | |
| Prepayment of preferred stock discount | $ | (106) | | |
| Dividend on preferred stock | | (21) | $ (25) | |
| Accretion of preferred stock discount | | (5) | (6) | |
| | | (132) | (31) | |
| **Net income before extraordinary loss available to common shareholders** | $ | 370 | $ 445 | (17) |
| **Net income (loss) available to common shareholders** | $ | (3,314) | $ 445 | (845) |
| **Earnings Per Common Share Before Extraordinary Loss:** | | | | |
| Basic [2] | $ | .80 | $ 1.03 | (22) |
| Diluted | | .79 | 1.02 | (23) |
| **Earnings (Loss) Per Common Share:** | | | | |
| Basic [3] | $ | (7.16) | $ 1.03 | (795) |
| Diluted | | (7.12) | 1.02 | (798) |
| **Average Common Shares Outstanding (in thousands):** | | | | |
| Basic | | 462,399 | 432,179 | |

| Diluted | **465,814** | 435,299 |

Selected consolidated financial Information presented above was prepared in accordance with accounting principles generally accepted in the United States.

[1] Net interest revenue on a fully taxable-equivalent basis was $611 million and $596 million for the quarters ended June 30, 2009 and March 31, 2009, respectively. These amounts include taxable-equivalent adjustments of $31 million and $32 million for the quarters ended June 30, 2009 and March 31, 2009, respectively.

[2] Basic earnings per common share before extraordinary loss on distributed earnings were $.01 and $.24 for the quarters ended June 30, 2009 and March 31, 2009, respectively, and on undistributed earnings were $.79 for each of the quarters ended June 30, 2009 and March 31, 2009.

[3] Basic earnings per common share on distributed earnings were $.01 and $.24 for the quarters ended June 30, 2009 and March 31, 2009, respectively, and on undistributed earnings were $(7.17) and $.79 for the quarters ended June 30, 2009 and March 31, 2009, respectively.

**STATE STREET CORPORATION**
Earnings Press Release Addendum

**SELECTED CONSOLIDATED OPERATING-BASIS FINANCIAL INFORMATION**
Quarters and Six Months Ended June 30, 2009 and June 30, 2008

| (Dollars in millions, except per share amounts) | Quarters Ended [1] | | | Six Months Ended [1] | | |
|---|---|---|---|---|---|---|
| | June 30, 2009 | June 30, 2008 | % Change | June 30, 2009 | June 30, 2008 | % Change |
| **Fee Revenue:** | | | | | | |
| Servicing fees | $ 795 | $ 977 | (19) % | $ 1,561 | $ 1,937 | (19) % |
| Management fees | 193 | 280 | (31) | 374 | 558 | (33) |
| Trading services | 310 | 320 | (3) | 555 | 686 | (19) |
| Securities finance | 201 | 352 | (43) | 382 | 655 | (42) |
| Processing fees and other | 17 | 77 | (78) | 66 | 131 | (50) |
| Total fee revenue | 1,516 | 2,006 | (24) | 2,938 | 3,967 | (26) |
| **Net Interest Revenue:** | | | | | | |
| Interest revenue, operating basis | 804 | 1,165 | (31) | 1,550 | 2,476 | (37) |
| Interest expense | 193 | 480 | (60) | 350 | 1,143 | (69) |
| Net interest revenue, operating basis | 611 | 685 | (11) | 1,200 | 1,333 | (10) |
| Gains (Losses) related to investment securities, net | 26 | 9 | | 42 | - | |
| Total revenue, operating basis [2] | 2,153 | 2,700 | (20.3) | 4,180 | 5,300 | (21.1) |
| Provision for loan losses | 14 | - | | 98 | - | |
| **Expenses:** | | | | | | |
| Salaries and employee benefits | 696 | 1,060 | (34) | 1,427 | 2,122 | (33) |
| Information systems and communications | 167 | 164 | 2 | 328 | 319 | 3 |
| Transaction processing services | 146 | 172 | (15) | 277 | 334 | (17) |
| Occupancy | 121 | 115 | 5 | 242 | 225 | 8 |
| Other | 222 | 298 | (26) | 365 | 557 | (34) |
| Total expenses, operating basis [2] | 1,352 | 1,809 | (25.3) | 2,639 | 3,557 | (25.8) |
| Income before income tax expense, operating basis | 787 | 891 | (12) | 1,443 | 1,743 | (17) |
| Income tax expense, operating basis | 247 | 293 | | 389 | 575 | |
| Tax-equivalent adjustment | 31 | 28 | | 63 | 51 | |
| **Net income, operating basis** | $ 509 | $ 570 | (11) | $ 991 | $ 1,117 | (11) |
| **Net income available to common shareholders, operating basis** | $ 483 | $ 570 | (15) | $ 934 | $ 1,117 | (16) |
| **Diluted earnings per common share, operating basis** | $ 1.04 | $ 1.40 | (26) | $ 2.07 | $ 2.79 | (26) |
| **Average diluted common shares outstanding (in thousands)** | 465,814 | 406,964 | | 450,483 | 399,684 | |
| **Return on common equity, operating basis** | 17.0% | 19.3 % | | 16.4% | 19.3 % | |

[1] Refer to the accompanying reconciliation of reported results to operating-basis results.

[2] For the quarter ended June 30, 2009, positive operating leverage in the year-over-year comparison was 500 basis points, based on a decline in total operating-basis revenue of 20.3% and a decline in total operating-basis expenses of 25.3%. For the six months ended June 30, 2009, positive operating leverage in the year-over-year comparison was 470 basis points, based on a decline in total operating-basis revenue of 21.1% and a decline in total operating-basis expenses of 25.8%

**STATE STREET CORPORATION**
**Earnings Press Release Addendum**

**SELECTED CONSOLIDATED OPERATING-BASIS FINANCIAL INFORMATION**
**Quarters Ended June 30, 2009 and March 31, 2009**

| (Dollars in millions, except per share amounts) | June 30, 2009 | | March 31, 2009 | | % Change | |
|---|---|---|---|---|---|---|
| **Fee Revenue:** | | | | | | |
| Servicing fees | $ | **795** | $ | 766 | 4 | % |
| Management fees | | **193** | | 181 | 7 | |
| Trading services | | **310** | | 245 | 27 | |
| Securities finance | | **201** | | 181 | 11 | |
| Processing fees and other | | **17** | | 49 | (65) | |
| Total fee revenue | | **1,516** | | 1,422 | 7 | |
| | | | | | | |
| **Net Interest Revenue:** | | | | | | |
| Interest revenue, operating basis | | **804** | | 746 | 8 | |
| Interest expense | | **193** | | 157 | 23 | |
| Net interest revenue, operating basis | | **611** | | 589 | 4 | |
| | | | | | | |
| Gains (Losses) related to investment securities, net | | **26** | | 16 | | |
| Total revenue, operating basis [2] | | **2,153** | | 2,027 | 6.2 | |
| | | | | | | |
| Provision for loan losses | | **14** | | 84 | | |
| | | | | | | |
| **Expenses:** | | | | | | |
| Salaries and employee benefits | | **696** | | 731 | (5) | |
| Information systems and communications | | **167** | | 161 | 4 | |
| Transaction processing services | | **146** | | 131 | 11 | |
| Occupancy | | **121** | | 121 | - | |
| Other | | **222** | | 143 | 55 | |
| Total expenses, operating basis [2] | | **1,352** | | 1,287 | 5.1 | |
| Income before income tax expense, operating basis | | **787** | | 656 | 20 | |
| Income tax expense | | **247** | | 142 | | |
| Tax-equivalent adjustment | | **31** | | 32 | | |
| **Net income, operating basis** | $ | **509** | $ | 482 | 6 | |
| | | | | | | |
| **Net income available to common shareholders, operating basis** | $ | **483** | $ | 451 | 7 | |
| | | | | | | |
| **Diluted earnings per common share, operating basis** | $ | **1.04** | $ | 1.04 | - | |
| | | | | | | |
| **Average diluted common shares outstanding (in thousands)** | | **465,814** | | 435,299 | | |
| | | | | | | |
| **Return on common equity, operating basis** | | **17.0** % | | 15.9 % | | |

[1] Refer to the accompanying reconciliation of reported results to operating-basis results.

[2] For the quarter ended June 30, 2009, positive operating leverage in the quarter-over-quarter comparison was 110 basis points, based on an increase in total operating-basis revenue of 6.2% and an increase in total operating-basis expenses of 5.1%.

**STATE STREET CORPORATION**
Earnings Press Release Addendum

**RECONCILIATION OF REPORTED RESULTS TO OPERATING-BASIS RESULTS**
Quarter and Six Months Ended June 30, 2009

| (Dollars in millions, except per share amounts) | Quarter Ended June 30, 2009 | | | Six Months Ended June 30, 2009 | | |
|---|---|---|---|---|---|---|
| | Reported Results | Adjustments | Operating Results | Reported Results | Adjustments | Operating Results |
| **Fee Revenue:** | | | | | | |
| Servicing fees | $ 795 | | $ 795 | $ 1,561 | | $ 1,561 |
| Management fees | 193 | | 193 | 374 | | 374 |
| Trading services | 310 | | 310 | 555 | | 555 |
| Securities finance | 201 | | 201 | 382 | | 382 |
| Processing fees and other | 17 | | 17 | 66 | | 66 |
| Total fee revenue | 1,516 | | 1,516 | 2,938 | | 2,938 |
| **Net Interest Revenue:** | | | | | | |
| Interest revenue | 773 | $ 31 [(1)] | 804 | 1,511 | $ 39 [(6)] | 1,550 |
| Interest expense | 193 | - | 193 | 367 | (17) [(7)] | 350 |
| Net interest revenue | 580 | 31 | 611 | 1,144 | 56 | 1,200 |
| Gains (Losses) related to investment securities, net: | 26 | - | 26 | 42 | - | 42 |
| **Total revenue** | 2,122 | 31 | 2,153 | 4,124 | 56 | 4,180 |
| Provision for loan losses | 14 | - | 14 | 98 | - | 98 |
| **Expenses:** | | | | | | |
| Salaries and employee benefits | 696 | - | 696 | 1,427 | - | 1,427 |
| Information systems and communications | 167 | - | 167 | 328 | - | 328 |
| Transaction processing services | 146 | - | 146 | 277 | - | 277 |
| Occupancy | 121 | - | 121 | 242 | - | 242 |
| Merger and integration costs | 12 | (12) [(2)] | - | 29 | (29) [(2)] | - |
| Other | 222 | - | 222 | 365 | - | 365 |
| Total expenses | 1,364 | (12) | 1,352 | 2,668 | (29) | 2,639 |
| Income before income tax expense and extraordinary loss | 744 | 43 | 787 | 1,358 | 85 | 1,443 |
| Income tax expense | 242 | 5 [(3)] | 247 | 380 | 9 [(8)] | 389 |
| Tax-equivalent adjustment | - | 31 [(1)] | 31 | - | 63 [(1)] | 63 |
| Income before extraordinary loss | 502 | 7 | 509 | 978 | 13 | 991 |
| Extraordinary loss, net of tax | (3,684) | 3,684 [(4)] | - | (3,684) | 3,684 [(4)] | - |
| **Net income (loss)** | $ (3,182) | $ 3,691 | $ 509 | $ (2,706) | $ 3,697 | $ 991 |
| **Adjustments to net income (loss):** | | | | | | |
| Prepayment of preferred stock discount | $ (106) | $ 106 [(5)] | $ - | $ (106) | $ 106 [(5)] | $ - |
| Dividend on preferred stock | (21) | - | (21) | (46) | - | (46) |
| Accretion of preferred stock discount | (5) | - | (5) | (11) | - | (11) |
| | (132) | 106 | (26) | (163) | 106 | (57) |
| **Net income before extraordinary loss available to common shareholders** | $ 370 | $ 113 | $ 483 | $ 815 | $ 119 | $ 934 |
| **Net income (loss) available to common shareholders** | $ (3,314) | $ 3,797 | $ 483 | $ (2,869) | $ 3,803 | $ 934 |
| **Diluted earnings per common share before extraordinary loss** | $ 0.79 | $ .25 | $ 1.04 | $ 1.81 | $ .26 | $ 2.07 |
| **Diluted earnings (loss) per common share** | (7.12) | 8.16 | 1.04 | (6.37) | 8.44 | 2.07 |
| **Average diluted common shares outstanding (in thousands)** | 465,814 | 465,814 | 465,814 | 450,483 | 450,483 | 450,483 |
| **Return on common equity before extraordinary loss** | 13.0 % | 4.0 % | 17.0 % | 14.4 % | 2.0 % | 16.4 % |

[1] Represents tax-equivalent adjustment of $31 million, which is not included in reported results.

[2] Represents merger and integration costs recorded in connection with the July 2007 acquisition of Investors Financial.

[3] Represents income tax benefit related to merger and integration costs.

[4] Represents extraordinary loss related to the consolidation of the asset-backed commercial paper conduits on May 15, 2009 onto State Street's balance sheet.

[5] Represents prepayment of the preferred stock discount in connection with repayment of the U.S.Treasury's preferred stock investment under the TARP Capital Purchase Program.

[6] Represents $63 million tax-equivalent adjustment, which is not included in reported results, net of $24 million of revenue related to the Boston Federal Reserve Bank's Asset-Backed Commercial Paper Money Market Liquidity Facility (AMLF).

[7] Represents interest expense related to the AMLF.

[8] Represents $3 million of income tax expense related to the AMLF net of $12 million of income tax benefit related to merger and integration costs.

**STATE STREET CORPORATION**
Earnings Press Release Addendum

**RECONCILIATION OF REPORTED RESULTS TO OPERATING-BASIS RESULTS**
Quarter and Six Months Ended June 30, 2008

| (Dollars in millions, except per share amounts) | Quarter Ended June 30, 2008 | | | Six Months Ended June 30, 2008 | | |
|---|---|---|---|---|---|---|
| | Reported Results | Adjustments | Operating Results | Reported Results | Adjustments | Operating Results |
| **Fee Revenue:** | | | | | | |
| Servicing fees | $    977 | | $    977 | $  1,937 | | $  1,937 |
| Management fees | 280 | | 280 | 558 | | 558 |
| Trading services | 320 | | 320 | 686 | | 686 |
| Securities finance | 352 | | 352 | 655 | | 655 |
| Processing fees and other | 77 | | 77 | 131 | | 131 |
| Total fee revenue | 2,006 | | 2,006 | 3,967 | | 3,967 |
| **Net Interest Revenue:** | | | | | | |
| Interest revenue | 1,137 | $    28 [(1)] | 1,165 | 2,425 | $    51 [(1)] | 2,476 |
| Interest expense | 480 | - | 480 | 1,143 | - | 1,143 |
| Net interest revenue | 657 | 28 | 685 | 1,282 | 51 | 1,333 |
| Gains (Losses) related to investment securities, net: | 9 | - | 9 | - | - | - |
| **Total revenue** | 2,672 | 28 | 2,700 | 5,249 | 51 | 5,300 |
| Provision for loan losses | - | - | - | - | - | - |
| **Expenses:** | | | | | | |
| Salaries and employee benefits | 1,060 | - | 1,060 | 2,122 | - | 2,122 |
| Information systems and communications | 164 | - | 164 | 319 | - | 319 |
| Transaction processing services | 172 | - | 172 | 334 | - | 334 |
| Occupancy | 115 | - | 115 | 225 | - | 225 |
| Merger and integration costs | 32 | (32) [(2)] | - | 58 | (58) [(2)] | - |
| Other | 298 | - | 298 | 557 | - | 557 |
| Total expenses | 1,841 | (32) | 1,809 | 3,615 | (58) | 3,557 |
| Income before income taxes | 831 | 60 | 891 | 1,634 | 109 | 1,743 |
| Income tax expense | 283 | 10 | 293 | 556 | 19 | 575 |
| Tax-equivalent adjustment | - | 28 [(1)] | 28 | - | 51 [(1)] | 51 |
| **Net income** | $    548 | $    22 | $    570 | $  1,078 | $    39 | $  1,117 |
| **Net income available to common shareholders** | $    548 | $    22 | $    570 | $  1,078 | $    39 | $  1,117 |
| **Diluted earnings per common share** | $   1.35 | $   .05 | $   1.40 | $   2.70 | $   .09 | $   2.79 |
| **Average diluted common shares outstanding (in thousands)** | 406,964 | 406,964 | 406,964 | 399,684 | 399,684 | 399,684 |
| **Return on common equity** | 18.6% | 0.7 % | 19.3% | 18.6% | 0.7 % | 19.3% |

[(1)] Represents taxable-equivalent adjustment, which is not included in reported results.

[(2)] Represents merger and integration costs recorded in connection with the July 2007 acquisition of Investors Financial.

**STATE STREET CORPORATION**
Earnings Press Release Addendum

**RECONCILIATION OF REPORTED RESULTS TO OPERATING-BASIS RESULTS**
Quarter Ended March 31, 2009

| (Dollars in millions, except per share amounts) | Quarter Ended March 31, 2009 | | |
|---|---|---|---|
| | Reported Results | Adjustments | Operating Results |
| **Fee Revenue:** | | | |
| Servicing fees | $ 766 | | $ 766 |
| Management fees | 181 | | 181 |
| Trading services | 245 | | 245 |
| Securities finance | 181 | | 181 |
| Processing fees and other | 49 | | 49 |
| Total fee revenue | 1,422 | | 1,422 |
| **Net Interest Revenue:** | | | |
| Interest revenue | 738 | $ 8 [1] | 746 |
| Interest expense | 174 | (17) [2] | 157 |
| Net interest revenue | 564 | 25 | 589 |
| Gains (Losses) related to investment securities, net | 16 | - | 16 |
| **Total revenue** | 2,002 | 25 | 2,027 |
| Provision for loan losses | 84 | - | 84 |
| **Expenses:** | | | |
| Salaries and employee benefits | 731 | - | 731 |
| Information systems and communications | 161 | - | 161 |
| Transaction processing services | 131 | - | 131 |
| Occupancy | 121 | - | 121 |
| Merger and integration costs | 17 | (17) [3] | - |
| Other | 143 | - | 143 |
| Total expenses | 1,304 | (17) | 1,287 |
| Income before income taxes | 614 | 42 | 656 |
| Income tax expense | 138 | 4 [4] | 142 |
| Tax-equivalent adjustment | - | 32 [5] | 32 |
| **Net income** | $ 476 | $ 6 | $ 482 |
| **Net income available to common shareholders** | $ 445 | $ 6 | $ 451 |
| **Diluted earnings per common share** | $ 1.02 | $ .02 | $ 1.04 |
| **Average diluted common shares outstanding (in thousands)** | 435,299 | 435,299 | 435,299 |
| **Return on common equity** | 15.7 % | 0.2 % | 15.9 % |

[1] Represents tax-equivalent adjustment of $32 million, which is not included in reported results, net of $24 million of revenue related to the AMLF.

[2] Represents interest expense related to the AMLF.

[3] Represents merger and integration costs recorded in connection with the July 2007 acquisition of Investors Financial.

[4] Represents $3 million of income tax expense related to the AMLF net of $7 million of income tax benefit related to merger and integration costs.

[5] Represents tax-equivalent adjustment, which is not included in reported results.

**STATE STREET CORPORATION**
**Press Release Addendum**

**CONSOLIDATED STATEMENT OF CONDITION**

| (Dollars in millions, except per share amounts) | June 30, 2009 | | December 31, 2008 | | June 30, 2008 | |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and due from banks | $ | **4,044** | $ | 3,181 | $ | 4,587 |
| Interest-bearing deposits with banks | | **26,346** | | 55,733 | | 20,636 |
| Securities purchased under resale agreements | | **5,277** | | 1,635 | | 10,697 |
| Federal funds sold | | **-** | | - | | 5,024 |
| Trading account assets | | **127** | | 815 | | 311 |
| Investment securities available for sale | | **58,308** | | 54,163 | | 67,607 |
| Investment securities held to maturity purchased under money market liquidity facility | | **300** | | 6,087 | | - |
| Investment securities held to maturity | | **22,093** | | 15,767 | | 4,103 |
| Loans and leases (net of allowance of $108, $18 and $18) | | **12,554** | | 9,113 | | 14,666 |
| Premises and equipment | | **2,114** | | 2,011 | | 1,992 |
| Accrued income receivable | | **1,549** | | 1,738 | | 2,076 |
| Goodwill | | **4,547** | | 4,527 | | 4,549 |
| Other intangible assets | | **1,790** | | 1,851 | | 1,941 |
| Other assets | | **14,372** | | 17,010 | | 8,032 |
| Total assets | $ | **153,421** | $ | 173,631 | $ | 146,221 |
| **Liabilities** | | | | | | |
| Deposits: | | | | | | |
| Noninterest-bearing | $ | **14,539** | $ | 32,785 | $ | 14,896 |
| Interest-bearing -- U.S. | | **6,323** | | 4,558 | | 9,670 |
| Interest-bearing -- Non-U.S. | | **64,715** | | 74,882 | | 72,681 |
| Total deposits | | **85,577** | | 112,225 | | 97,247 |
| Securities sold under repurchase agreements | | **12,899** | | 11,154 | | 15,266 |
| Federal funds purchased | | **4,032** | | 1,082 | | 1,809 |
| Short-term borrowings under money market liquidity facility | | **300** | | 6,042 | | - |
| Other short-term borrowings | | **19,935** | | 11,555 | | 4,306 |
| Accrued taxes and other liabilities | | **9,595** | | 14,380 | | 9,427 |
| Long-term debt | | **8,980** | | 4,419 | | 4,127 |
| Total liabilities | | **141,318** | | 160,857 | | 132,182 |
| **Shareholders' Equity** | | | | | | |
| Preferred stock, no par: authorized 3,500,000; 20,000 shares issued and outstanding | | **-** | | 1,883 | | - |
| Common stock, $1 par: authorized 750,000,000 shares; 494,434,216, 431,976,032 and 431,677,761 shares issued | | **494** | | 432 | | 432 |
| Surplus | | **9,202** | | 6,992 | | 6,712 |
| Retained earnings | | **6,255** | | 9,135 | | 8,629 |
| Accumulated other comprehensive loss | | **(3,828)** | | (5,650) | | (1,716) |
| Treasury stock (at cost 462,514, 418,354 and 406,218 shares) | | **(20)** | | (18) | | (18) |
| Total shareholders' equity | | **12,103** | | 12,774 | | 14,039 |
| Total liabilities and shareholders' equity | $ | **153,421** | $ | 173,631 | $ | 146,221 |

**STATE STREET CORPORATION**
**Tangible Common Equity and Tier 1 Common Ratios**
**As of Period End**

The table set forth below presents the calculations of State Street's ratios of tangible common equity to total tangible assets and to total risk-weighted assets, and its ratios of tier 1 common capital to total risk-weighted assets.

| (Dollars in millions) | | June 30, 2009 | March 31, 2009 | June 30, 2008 |
|---|---|---|---|---|
| | | For the periods ended | | |
| **Consolidated Total Assets** | | $ 153,421 | $ 142,144 | $ 146,221 |
| Less: | | | | |
| Goodwill | | 4,547 | 4,493 | 4,549 |
| Other intangible assets | | 1,790 | 1,809 | 1,941 |
| AMLF investment securities | | 300 | 740 | - |
| Excess reserves held at central banks | | 20,449 | 29,963 | - |
| Adjusted assets | | 126,335 | 105,139 | 139,731 |
| Plus: | | | | |
| Deferred tax liability | | 532 | 540 | 512 |
| Total tangible assets | A | $ 126,867 | $ 105,679 | $ 140,243 |
| | | | | |
| **Consolidated Total Common Shareholders' Equity** | | $ 12,103 | $ 11,969 | $ 14,039 |
| Less: | | | | |
| Goodwill | | 4,547 | 4,493 | 4,549 |
| Intangible assets | | 1,790 | 1,809 | 1,941 |
| Adjusted equity | | 5,766 | 5,667 | 7,549 |
| Plus deferred tax liability | | 532 | 540 | 512 |
| Total tangible common equity | B | $ 6,298 | $ 6,207 | $ 8,061 |
| | | | | |
| Tangible common equity ratio | B/A | 4.96 % | 5.87 % | 5.75 % |
| | | | | |
| Ratio of tangible common equity to total risk-weighted assets | B/D | 8.50 % | 8.15 % | 11.86 % |
| **Tier 1 capital** | | $ 10,740 | $ 14,567 | $ 11,645 |
| Less: | | | | |
| TARP preferred stock | | - | 1,889 | - |
| Trust preferred securities | | 1,450 | 1,450 | 1,450 |
| Tier 1 common capital | C | $ 9,290 | $ 11,228 | $ 10,195 |
| | | | | |
| **Total risk-weighted assets** | D | $ 74,103 | $ 76,138 | $ 67,973 |
| | | | | |
| Ratio of tier 1 common capital to total risk-weighted assets | C/D | 12.54 % | 14.75 % | 15.00 % |

CONTACT:
State Street Corporation
Edward J. Resch, +1 617-664-1110
or
Investors:
Kelley MacDonald, +1 617-664-3477
or
Media:
Hannah Grove, +1 617-664-3377