# EXHIBIT A

1  A. Cold calls.

2  Q. And what was the business of Netpiaucs?

3  A. I was employed in the Office Depot
4  division.

5  Q. And what did you do in the Office Depot
6  division?

7  A. I attempted to establish new accounts by
8  calling on businesses to purchase their office
9  supplies through Office Depot.

10  Q. Okay, so how long did you last at the
11  insurance company?

12      MR. LEVINE: Objection to the form.

13  A. Approximately maybe a little more, maybe a
14  little less.

15  Q. Did you quit or were you terminated?

16  A. I quit.

17      MR. LEVINE: Objection. Excuse me.
18  Wait for him to ask the question, and then give me
19  time to object, and then you can answer the
20  question. So I objected to the form of that
21  question.

22  Q. So you quit the insurance company; correct?

23      MR. LEVINE: Objection to the form.

24  A. Yes.

25

1  Q. Then you went to Netpiaucs.
2     MR. LEVINE: Objection to the form.
3  A. Yes.
4  Q. And how long did you last at Netpiaucs?
5     MR. LEVINE: Objection to the form.
6  A. Approximately three to four months.
7  Q. And did you quit Netpiaucs?
8  A. Yes.
9  Q. You weren't fired.
10 A. No.
11 Q. And now you're at the lumber company;
12 correct?
13 A. Correct.
14 Q. Now, at some point, sir, did you work for
15 State Street?
16 A. Yes.
17 Q. When did you first go to work for State
18 Street?
19 A. I want to say it was June of 2000.
20 Q. And what did you do when you first went to
21 work for State Street?
22 A. I was an account manager.
23 Q. What is the State Street entity for which
24 you worked, if you please, the name?
25

Page 11

1  A.  State Street Corporation.

2  Q.  State Street Corporation. And you were an
3  account manager; right?

4  A.  Correct.

5  Q.  Did you manage the daily operations of the
6  fund group?

7  A.  Yes.

8  Q.  What fund group was that?

9  A.  It was -- at the time it was UBS
10 PaineWebber.

11 Q.  And what did you do to manage the
12 operations of the fund group?

13 A.  Basically had four people working for me,
14 one senior -- one senior and four fund accountants,
15 and we would basically, you know, process all -- do
16 all the processing that occurs during the day and
17 basically strike the NAVs at the end of the day.

18 Q.  Strike the NAVs. Meaning net asset values?

19 A.  Correct.

20 Q.  So when you were an account manager at
21 State Street, you had four people working for you?

22      MR. LEVINE: Objection to the form.

23 A.  Yes.

24 Q.  Reporting to you?

25

Page 12

1   A. Correct.

2   Q. Do you currently have anybody working for
3   you or reporting to you at the lumber company?

4   A. No.

5   Q. Did you have anybody reporting to you or
6   working for you at Netpiaucs?

7   A. No.

8   Q. And at the insurance company did you have
9   any people reporting to you?

10   A. No.

11   Q. How long were you an account manager for at
12   State Street?

13   A. Approximately five to six years.

14   Q. So we're now up to about the year 2005 or
15   2006?

16   A. Correct.

17   Q. Did you get a promotion?

18   A. I don't know whether it was a promotion or
19   a lateral movement.

20   Q. Did you become an auditing manager?

21   A. I did.

22   Q. Now, what do you do -- what did you do as
23   an auditing manager?

24   A. As an auditing manager I basically took the

25

1  month-end statements of -- it was approximately 30
2  funds and checked that -- checked the daily work and
3  made sure everything tied out.
4      Q.   And did you have people reporting to you
5  when you were an auditing manager?
6      A.   Not -- no.
7      Q.   At some point, sir, did you become a senior
8  purchasing officer?
9      A.   I did.
10     Q.   All right.  How long were you an auditing
11 manager for, please?
12     A.   Probably less than two years.
13     Q.   Fair enough.  So you became a senior
14 purchasing officer in or about what year?  2007?
15          MR. LEVINE:  Objection to the form.
16     A.   As far as I can remember, I believe it was
17 February 2007.
18     Q.   February 2007.  And what did you do as a
19 senior purchasing officer?
20     A.   I basically assisted the assistant
21 vice-president in procuring goods and services for
22 State Street.
23     Q.   Give an example of the kind of good or
24 service you would procure?
25

Page 14

```
 1    A.   Office supplies.
 2    Q.   So you would call, say, Staples and say, "I
 3  want 300,000 legal pads"?
 4         MR. LEVINE:  Objection to the form.
 5    Q.   Just give me a concrete example, so I
 6  understand.
 7    A.   I actually maintained the purchasing
 8  contracts with the different companies or different
 9  services that were provided.
10    Q.   Did you negotiate the contracts?
11    A.   Some contracts I have, yes.
12    Q.   And other contracts you simply oversaw?
13    A.   Correct.
14         MR. LEVINE:  Objection to the form.
15    Q.   In December of 2007 did you leave State
16  Street?
17    A.   I don't believe it was in December of 2007.
18    Q.   Okay.  At any point in 2007 did you leave
19  State Street?
20    A.   I was laid off in, I believe it was May of
21  2007.
22    Q.   You were laid off in May of 2007.  Do you
23  know why you were laid off?
24    A.   It had to do with the pending purchase of
25
```

Page 15

1  IBT.

2  Q. What was the relationship between your

3  being laid off and the pending purchase of IBT?

4  A. What I was told was that it was a

5  duplication of duties, and my job was being

6  eliminated.

7  Q. Do you have any reason to believe that what

8  you were told was not true?

9  A. No.

10 Q. So in May of 2007 you were laid off from

11 State Street.

12 A. Correct.

13 Q. Did you then go to work for anybody else?

14 A. At that point, I do not believe so.

15 Q. At any time in 2007 did you work for

16 anybody else?

17 A. I do not believe so.

18 Q. Do you have any memory of reapplying for a

19 job at State Street?

20 A. Yes.

21 Q. When was that, please?

22 A. I want to say it was February 2008.

23 Q. February of 2008. Is it a true statement

24 that between May of 2007 and February 2008 you

25


1  didn't work for anybody?
2     A.  That would be -- as far as I can remember,
3  I did not.
4     Q.  You were unemployed.
5     A.  Correct.
6     Q.  Now, you came back to State Street when,
7  please, sir?
8     A.  March 17th, 2008.
9     Q.  Do you still have that job?
10    A.  I do not.
11    Q.  When did you lose that job?
12        MR. LEVINE:  Objection to the form.  Go
13 ahead.
14    A.  I was laid off in December, I believe it
15 was December 8th, 2008.
16    Q.  Do you know why you were laid off?
17    A.  I have a pretty good idea; it's because
18 they had laid off within that month probably about
19 7,000 employees.  So I figured I was -- I was just
20 part of the paring.
21    Q.  Just part of a generalized reduction in
22 force.
23    A.  Yes.
24    Q.  When you came back to State Street, what
25

Westlaw Deposition Services          800.548.3668 Ext. 1

 Q. You withdrew from it?

 A. I just -- I -- to the best of my recollection, when I was rehired by State Street, I don't remember checking off that they take money out for the stock.

  MR. LEVINE: Excuse me, Jeff. We've been going for about an hour. Do you want to take a break?

  MR. RUDMAN: If you'll agree that you won't talk to the witness about his testimony during any break --

  MR. LEVINE: I don't have to make any agreements with you, Jeff.

  MR. RUDMAN: I think we'll keep going until we get through this subject matter, because I think you'd like to coach your witness.

  MR. LEVINE: I object to these statements.

  MR. RUDMAN: I don't really care.

  MR. LEVINE: I don't have to agree, come to an agreement with you.

  MR. RUDMAN: You're not supposed to coach a witness when he's on the stand.

  MR. LEVINE: I am not coaching any

1  witness.
2          MR. RUDMAN: Good. Just agree that you
3  won't. You've certainly been trying hard enough to
4  while we're on the record. God knows what you'll do
5  off the record.
6     Q. Now, sir -- let's keep going for a while.
7  Is it your testimony that you purchased State Street
8  stock with monthly -- with payments out of your
9  paycheck every month?
10    A. Is it my assumption?
11    Q. Is it your testimony?
12    A. Yes.
13    Q. Do you know roughly how much you spent per
14 month in 2008 buying State Street common stock?
15    A. I believe I purchased no State Street
16 common stock in 2008.
17    Q. All right. How about 2007?
18          MR. LEVINE: Objection to the form.
19    A. I don't have the figures in front of me, so
20 I can't be sure.
21    Q. How much State Street common stock did you
22 purchase after you heard Mr. Logue's words, "We've
23 got the conduits covered"?
24    A. Absolutely none.
25

Q. None. So after you heard from Mr. Logue, you never thereafter bought a share of State Street common stock, after this town hall meeting?

A. That's correct.

Q. So after listening to Mr. Logue, you ceased all purchases of State Street common stock?

MR. LEVINE: Objection. You have to give me time to object. Objection. You're mischaracterizing Mr. Kenney's testimony.

A. I believe I've already answered that question. It was -- at the point when Mr. Logue had that meeting, I wasn't purchasing stock.

Q. So as of the time of the town hall meeting, you were not purchasing State Street common stock.

A. Correct.

Q. Okay. So when did you last purchase State Street common stock prior to this town hall meeting?

A. It would have been in 2007.

Q. Okay. When did you cease buying State Street common stock?

A. When I was terminated the first time.

Q. I see. So you didn't --

When were you terminated the first time?

A. The termination -- official -- the official

Page 62