# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | X | |
| THOMAS U. KENNEY, on Behalf of Himself and a Class of Persons Similarly Situated, | : : : | |
| | : | 1:09-cv-10750 |
| Plaintiff, | : | |
| v. | : : | CLASS ACTION |
| STATE STREET CORPORATION; NORTH AMERICA REGIONAL BENEFITS COMMITTEE OF STATE STREET CORPORATION; ALISON QUIRK; PAMELA GORMLEY; ROSS MCLELLAN; DAVID O'LEARY; SKIP CURTRELL; JAYNE DONAHUE; DAVID GUTSCHENRITTER; JAMES MALERBA; STATE STREET CORPORATION INVESTMENT COMMITTEE; and JOHN DOES 1-10 | : : : : : : : : : : : : | PROPOSED SECOND AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF ERISA DISCLOSURE REQUIREMENTS  JURY TRIAL DEMANDED |
| Defendants. | : | |
| | X | |

Plaintiff Thomas U. Kenney ("Plaintiff"), on behalf of State Street Salary Savings Program (hereinafter referred to as the "Plan") to indirectly benefit himself as a Participant in the Plan during the Class Period (as defined below), and similarly situated participants and beneficiaries (the "Participants") as Participants in the Plan consisting of a class as defined below, by his attorneys, alleges the following for his Second Amended Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiff, which are based upon personal knowledge. Plaintiff may, after further discovery and/or disclosure proceedings in this case, seek leave to further amend this complaint to add new allegations, parties or claims.

### OVERVIEW OF THE CASE

1.       This is an action brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, on behalf of the Plan seeking redress for Defendants' failure to manage the Plan in a prudent way and in making materially misleading statements and/or omitting to disclose material facts.  During the Class Period, State Street administered "conduits" as discussed below.  These conduits were not initially reflected on State Street's financial statements so they may have appeared to have been a strategy that could legitimately avoid reporting losses while taking in significant fees in connection with the administration of the conduits and thus boost State Street's profits.  In fact, because the conduits were not adequately backed by equity, their profitability was very sensitive to relatively small swings in their earnings or principal losses on its financial statements, thus making the potential of incurring massive losses great and thereby significantly increasing the risk of State Street having to honor its support agreements and consolidate the conduits and their losses on its financial statements, thus causing State Street to fail to meet a minimally acceptable Tangible Common Equity ("TCE") ratio.  Although administering the conduits may have on the surface appeared to have been a reasonable strategy, permitting Plan participants to have invested in State Street common stock while State Street stock was so risky due to State Street's concentrated activities in administering the conduits in press releases and filings with the Security Exchange Commission ("SEC"), it was not prudent for a pension plan administrator to permit participants to continue to maintain shares of State Street stock and/or continue to invest in State Street stock.  In addition, although State Street regularly issued statements about the conduits in SEC filings, the form of these statements was cryptic and convoluted and did not fully disclose the risk inherent in this type of investment or this particular investment in the context of the particular features of the relationship between the conduits and State Street.  That is, even an

experienced, cynical, fraud-oriented analyst would have had to piece together information scattered throughout at State Street's various SEC disclosures and combine it with other market observations to discover the actual high level of risk. Although other conduit sponsors had faced or were faced with significant losses in 2007 and 2008, it was not until January 2009, when the price of State Street stock declined almost 60% in one trading session that the market and Plan Participants were able to grasp the level of risk in investing in State Street stock and thus truly begin to understand the fact that an investment in State Street stock was not prudent.

## NATURE OF ACTION

2.      Plaintiff, who was a Participant in the Plan during time period relevant to this Complaint, brings this civil enforcement action under Section 502(a) of ERISA, 29 U.S.C. § 1132(a), for plan-wide relief on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of common stock of State Street Corporation (hereinafter "State Street" or the "Company") at any time from August 28, 2007 to January 20, 2009 (the period from August 28, 2007 to January 20, 2009 being hereinafter referred to as the "Class Period"). Plaintiff brings this action on behalf of the Plan, for distribution from the Plan to the Plan accounts of class members pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3). Recovery in this action, would be paid to the Plan, and only then to the accounts of Participants, who are members of the Class, as defined below, in accordance with the legally cognizable damages of their interests in the Plan.

3.      As more fully set forth below, Defendants breached their fiduciary duties to the Plan and its Participants including Plaintiff and the other members of the Class, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550. Defendants breached their fiduciary duties to the Plan and its Participants in

various ways, also including, but not limited to, (i) misrepresenting and failing to disclose material facts to the Plan and its Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Plan and its Participants solely in the interests of the Plan and its Participants for the exclusive purpose of providing benefits to Plan and it Participants and their beneficiaries; (iii) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify adequately the investments in the Plan so as to minimize the risk of large losses; (v) permitting the Plan and its Participants to continue to elect to maintain and/or invest their retirement monies in State Street common stock when it was not prudent to do so and when State Street had made material misrepresentations regarding State Street's financial condition and/or omitted to disclose material facts about State Street's financial condition; and (vi) failing to provide the Plan and its Participants with timely, accurate and complete information concerning the Company as required by applicable law.

4.      As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good directly to the Plan and, indirectly to Participants who are Class Members, for losses resulting from each such breach of fiduciary duty and/or the damages recognized by law so that the Plan directly and Plaintiff and the other Class Members, indirectly, as Participants receive from the Defendants the difference between the performance of State Street stock held by the Plan during the Class Period and the value which that investment would have had if it had been prudently invested or such other formula for calculating damages that may be directed by the Court

5.      During the Class Period, State Street stock declined significantly more than available alternative prudent investments.  In addition, under § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)),

Plaintiff, on behalf of the Plan directly, and Plan Participants indirectly, seeks other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, restitution, and other monetary relief. Insofar as any Defendant is sued alternatively as a knowing participant in a breach of fiduciary duty for equitable relief, Plaintiff intends to proceed pursuant to § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3))

6.     Plaintiff, on behalf of the Plan directly, and Plan Participants indirectly, also seeks damages resulting from any material misrepresentations or omissions made by Defendants in their capacities as fiduciaries.

## JURISDICTION AND VENUE

7.     The Plan's claims, which are being pursued by Plaintiff on behalf of the Plan directly, and the Plan's Participants, indirectly, arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.9. This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because this is a District where the Plan was administered, where breaches of fiduciary duty took place and/or where one or more Defendants reside or may be found.

## THE PARTIES

9.     Plaintiff Thomas U. Kenney is a resident of the Commonwealth of Massachusetts. Plaintiff was employed by State Street (or a subsidiary or division of State Street) for several years starting in 2000 until he was laid off in 2007 and rehired by State Street in March 2008 where he worked until approximately December 4, 2008 when he was terminated as part of a State Street job reduction plan. He maintained an investment in State Street common stock in his individual account

5

in the Plan during the Class Period.[1]

10.     Defendant State Street is a financial holding company.  The Company, through its subsidiaries, including its banking subsidiary, State Street Bank and Trust Company, provides a range of products and services for institutional investors globally (the term "State Street" hereinafter refers to State Street Corporation and State Street Bank and Trust Company unless otherwise stated). According to State Street's Form 10-K for the year ended December 31, 2007 ("2007 Form 10-K"), State Street conducts two lines of business: Investment Servicing and Investment Management. According to the 2007 Form 10-K, these lines of business provide a full range of products and services for State Street's customers, which include mutual funds and other collective investment funds, corporate and public retirement plans, insurance companies, foundations, endowments and other investment pools, and investment managers.  Investment Servicing provided services to support institutional investors, such as custody, product- and participant-level accounting, daily pricing and administration; master trust and master custody; recordkeeping; shareholder services, including mutual fund and collective investment fund shareholder accounting; foreign exchange, brokerage and other trading services; securities finance; deposit and short-term investment facilities; loans and lease financing; investment manager and hedge fund manager operations outsourcing; and performance, risk and compliance analytics.  Investment Management provided a broad array of services for managing financial assets, such as investment research services and investment management, including passive and active U.S. and non-U.S. equity and fixed-income strategies.

11.     State Street is incorporated in Massachusetts and maintains its principal place of business at One Lincoln Street, Boston, MA 02111.  State Street has a significant presence in this District in that it maintains at least six offices in this District including its executive offices.

---

[1]     For purposes of the Complaint a reference to the State Street common stock shall also encompass units of

12.     Summary Plan Descriptions ("SPDs"), which were provided annually to Participants, state that State Street was one of the Plan fiduciaries (along with the Benefits Committee and the Investment Committee identified below) and that State Street had "Plan Fiduciary Responsibility." The 2007 SPD stated that the Executive Committee of the Board of Directors of State Street may appoint and remove members of the Benefits Committee and the Investment Committee.  Under the governing Plan document, State Street was the "Plan Sponsor" (Plan, Section 2.35), and State Street designated the committee(s) which was or were to manage and administer the Plan on a day-to-day basis.  Plan, Section 2.10.  State Street also shared with the Benefits Committee, identified below, the power to select the investment options in which Participants could invest their retirement savings in the Plan.  Section 5.4 of the Plan states that Participant accounts "shall be invested . . . as the Participant . . . directs from among such investment options as the Committee or Plan Sponsor may make available from time to time." (Emphasis added).  Indeed, the SPDs which were made available to Participants on an annual basis specifically advised that "[t]he Company may add or delete funds or other investment alternatives at any time."  The SPD defines "the Company" as State Street and its subsidiaries and affiliates.  The Plan Administrator is also defined (in Section 2.34 of the Plan) as "State Street acting through the Committee(s)."  State Street is thus liable herein because of its own conduct and inaction as Plan Sponsor and because of its authority over Plan investment options, as well as under the doctrine of respondent superior (because the Benefits Committee, identified below, was made up of State Street employees), and also because State Street agreed to indemnify the members of the Benefits Committee, by virtue of Section 10.10 of the Plan or otherwise.

13.     At all times relevant to this Complaint, Defendant North America Regional Benefits Committee (the "Benefits Committee") managed and administered the Plan and the assets of the

---

the State Street Corporation ESOP Fund.

Plan on a day-to-day basis and acted as a fiduciary with respect to the Plan.  The Report of Independent Registered Public Accounting Firm (Ernst & Young LLP) included in the Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2007, which was filed with the SEC on or about June 27, 2008 (the "2008 11-K"), was addressed in part to "The North America Regional Benefits Committee."  The Benefits Committee is the Committee, identified in Section 2.10 of the governing Plan document, which has been designated by the Plan Sponsor (State Street) to manage and administer the Plan on a day-to-day basis.  Indeed, the Benefits Committee is described in the Plan documents as "the fiduciary identified to furnish the information to Participants and Beneficiaries described in the ERISA 404(c) regulations ...", (Plan, Section 5.4), and as the entity "responsible. . . for complying with the reporting and disclosure requirements of ERISA."  Plan, Section 10.8.  The Benefits Committee shared, with State Street, the authority to select the investment options to be made available to Plan Participants, since as noted above, Section 5.4 of the Plan states that Participants' accounts shall be invested as the Participants direct "from among such investment options as the Committee or Plan sponsor may make available from time to time."  The Benefits Committee had "full discretionary power and authority to administer the Plan in all of its details."  Plan, Section 10.2.  The March 27, 2008 Investment Policy Statement of the Plan similarly states that "State Street… gives the Benefits Committee all of the authority of the Company to manage the assets of the Plan."

14.     At all times relevant to this Complaint, Defendant Allison Quirk was a member of the Benefits Committee and was a fiduciary of the Plan.  Defendant Quirk was Chair of the Benefits Committee as of June 2008.

15.     At all times relevant to this Complaint, Defendant Pamela Gormley was a member of the Benefits Committee and was a fiduciary of the Plan.

16.     At all times relevant to this Complaint, Defendant Ross McLellan was a member of the Benefits Committee and was a fiduciary of the Plan.

17.     At all times relevant to this Complaint, Defendant David O'Leary was a member of the Benefits Committee and was a fiduciary of the Plan.  Defendant O'Leary, as State Street's Executive Vice President of Global Human Resources was a standing member of the Benefits Committee.

18.     At all times relevant to this Complaint, Defendant Skip Curtrell was a member of the Benefits Committee and was a fiduciary of the Plan.

19.     At all times relevant to this Complaint, Defendant Jayne Donahue was a member of the Benefits Committee and was a fiduciary of the Plan.

20.     At all times relevant to this Complaint, Defendant David Gutschenritter was a member of the Benefits Committee and was a fiduciary of the Plan.

21.     At all times relevant to this Complaint, Defendant James Malerba was a member of the Benefits Committee and was a fiduciary of the Plan.  At all relevant times, he was also Executive Vice President and Controller of State Street.

22.     At all times relevant to this Complaint, Defendant State Street Corporation Investment Committee (the "Investment Committee") assisted in the management and administration of the Plan and the assets of the Plan and acted as a fiduciary with respect to the Plan.

23.     John Does 1-30 were the individual members of the Investment Committee.  The identity of the members of the Investment Committee, and of any other committee(s) which was or were responsible for carrying out the provisions of the Plan, is currently not known.  Plaintiff has requested that a Plan representative provide the names of the Investment Committee members but the Plan representative has so far declined to provide such information.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on behalf of the Plan directly, and indirectly on his own behalf and as a class action pursuant to Rules 23(a), (b)(1)(B) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of State Street common stock (including in the form of units of the State Street Corporation ESOP Fund) at any time from August 28, 2007 to January 20, 2009 (the "Class").

25.     The members of the Class are so numerous that joinder of all members is impracticable.  According to State Street's 2008 11-K, the Plan was available to all State Street employees and employees of certain related companies.  At December 31, 2007, the Plan had assets of $1,465,758,975.  State Street's web page describes State Street as a company with "more than 27,500 talented and dedicated employees in our offices all over the world."  Thus, it can be fairly assumed that there are at least thousands of class members, clearly satisfying the numerosity requirement.

26.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants were fiduciaries;

(b)     Whether Defendants breached their fiduciary duties;

(c)     Whether it was prudent for Defendants to permit Plan Participants during the Class Period to continue to invest, or continue to maintain retirement funds, in State Street common stock or the State Street Stock Fund;

(d)     Whether Defendants, in their fiduciary capacity made materially false and

misleading statements and/or omitted material information in statements made to make the statements not misleading, and incorporated such statements into statements made or documents issued in their fiduciary capacity;

(e)      Whether the Plan and the Participants were injured by such breaches; and

(f)      Whether the Plan directly is entitled to the recovery of damages which would be distributed to the accounts of Class members in accordance with the losses or legally cognizable damages of such accounts; and

(g)      Whether injunctive or other equitable relief on behalf of the Plan are appropriate.

27.      Plaintiff's claims, brought directly on behalf of the Plan, and on his own behalf and for the other participants who are class members indirectly, are typical of the claims of the other members of the Class, as the Plaintiff, through his interest in the Plan and all other members of the Class, through their interests in the Plan, sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

28.      Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiff are coincident with and not antagonistic to the interests of the other class members.

29.      Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect

their interests.

30.     The claims herein are brought on behalf of the Plan under ERISA and related principles of federal common law and, cannot be asserted by the Plaintiff in derivative actions against the company or in class actions under the securities laws.

31.     Under and as required by ERISA, Defendants carry insurance for claims asserted herein that may not be available to the Defendants in any other actions.

## DESCRIPTION OF THE PLAN

32.     At all times relevant to this Complaint, the Plan was an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

33.     At all times relevant to this Complaint, the Plan was a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

34.     The purpose of the Plan was to enable and encourage Participants to save for their retirements.  As stated in the SPDs which were distributed annually to Participants, the Plan "helps you accumulate savings for retirement."  According to the 2007 SPD, the Plan "[l]ets you save for retirement or meet short-term needs."  The Plan document itself similarly states that "[t]he Plan is being maintained for the purpose of providing benefits to Participants upon retirement  . . ." Plan, Section 1.3, entitled "Purpose of Plan."  The March 27, 2008 Investment Policy Statement of the Plan concurs.  ("The primary purpose of the Plan is to provide a benefit to employees which encourages eligible participants to save for retirement. . .").

12

35.     At all times relevant to this Complaint, the Plan provided a number of different options for investment of the Plan's assets, including State Street common stock.

36.     At all times relevant to this Complaint, Participants were allowed to direct the Plan to purchase investments from among the investment options available under the Plan and allocate them to their individual accounts.  While the fiduciaries of the Plan did, in fact, offer State Street stock as a Plan investment option throughout the Class Period (albeit imposing a 25% cap), there was no requirement in the Plan or ERISA that the fiduciaries offer State Street stock.  Indeed, the governing Plan document, including at Sections 5.4 and 10.2(d), makes clear that both the Benefits Committee and State Street had complete discretion over what investment options would be made available to Participants.

37.     The 2008 11-K of the Plan states, among other things:

### 1.  Description of the Plan

The description of the State Street Salary Savings Program (the Plan) is provided for general information purposes only. Employees should refer to the Summary Plan Description and Plan document for more complete information.

### General

The Plan is a defined contribution plan.  All State Street employees and certain related companies (collectively, the Company) are immediately eligible to participate in the Plan except for the following categories of employees:

- •     Non-resident aliens with no U.S. source income
- •     Student interns and co-op employees
- •     Union employees
- •     Leased employees and independent contractors
- •     Employees of a non-participating affiliated company.

### Plan Amendments and Other Changes

During 2006, the following amendments and changes were made to the Plan:

Effective August 4, 2006 (close of business), the State Street Corporation Stock Fund (the non-ESOP Stock Fund) was discontinued. This non-ESOP stock fund had been used solely as a holding vehicle to receive new employee and employer contributions during a quarter before they were transferred to the ESOP Fund. Regulations changed and employee and company matching contributions could be posted directly into the ESOP Fund without first being posted to the non-ESOP fund.

Effective August 4, 2006 (close of business), the SSgA Conservative, Moderate, and Aggressive Asset Allocation Funds were discontinued as SSP investment options. Balances remaining in these funds as of the effective date were transferred automatically to the new Age-Based Fund associated with a participant's date of birth.

Effective August 7, 2006, nine SSgA Age-Based Funds were added to the SSP investment options. These nine funds are similar in composition to the Asset Allocation Funds and provide a single investment vehicle that provides diversification exposure across major global asset classes. The Age-Based Funds provide automatic rebalancing, moving from an aggressive mix to a conservative mix as retirement approaches.

Effective in 2007, the following changes were made to the Plan:

* * *

Restriction on ESOP Fund account balance to no more than 25% of participant's total account balance (existing ESOP balances grandfathered).

Investment in the ESOP Fund can be made only by means of a spot transfer from another core Plan fund or funds, subject to the 25% restriction; direct investment into ESOP Fund, by means of payroll contributions or rollovers, is no longer permitted.

* * *

**Contributions**

Active participants may elect to make tax-deferred contributions and/or Roth after-tax contributions to the Plan equal to 1% to 50% (25% prior to January 1, 2007) of their compensation, subject to certain limitations. Participants may also contribute amounts representing rollover distributions from other qualified defined benefit or defined contribution plans.

Effective January 1, 2008, Matching Contributions to the Plan are made by the Company in amounts equal to 100% of the first 6% of the employee's tax-deferred contributions or Roth after-tax contributions. Prior to January 1, 2008, contributions to the Plan were made by the Company in amounts equal to 50% of the first 6% of the employee's contributions. Also, prior to January 1, 2008, all employees who had completed one year of employment during which they have worked at least 1,000 hours were eligible for corporate matching contributions and these contributions vested immediately.

All contributions to the Plan are paid to State Street Bank and Trust Company, as Plan Trustee. The Trustee holds contributions in trust exclusively for participants and their beneficiaries, invests the contributions as instructed by the participants, and makes benefit payments as they become due.

**Investment Options**

Participant contributions and matching contributions are allocated to investment funds at the participant's direction. A wide range of investment choices, including various common collective trust funds managed by State Street Bank and Trust Company, a company stock fund (ESOP) and a Self-Managed Brokerage Account (SMBA), are available to participants. Limitations and restrictions apply to direct contributions to the ESOP or the SMBA Funds.

In the event a participant does not make an investment election, and in the event of automatic enrollment, funds are invested in the Target Retirement Date Fund that corresponds to the participants assumed target retirement year based on the participant's date of birth.

* * *

**Participant Accounts**

Each participant's account is credited with the participant's contributions, Company contributions, and related earnings. The benefit to which a participant is entitled is the value of the participant's vested account balance, including earnings.

38.     The Plan's 2008 11-K represents that approximately $413,880,785 of the Plan's total

investments of $1,463,945,655, or approximately 28.2% of the assets of the Plan, were invested in

State Street common stock as of December 31, 2007.  According to the Plan's Form 11-K for the year ended December 31, 2008, which was signed by defendant Malerba on June 29, 2009 ("2009 11-K"), $194,949,882 of the Plan's total investments of $1,148,438,707, a reduction down to 17% of the assets of the Plan as of December 31, 2008, was invested in State Street common stock, despite the fact that the number of units of participation of State Street common stock had decreased only approximately 2% from 5,097,055 units to 4,956,774 units.  Thus, Plan participants who had invested in State Street stock saw a reduction in the value of those shares being held of about $200 million over the course of 2008.

39.     Throughout the Class Period, State Street common stock was not a prudent investment for the Participants' individual retirement accounts under the Plan.  Further, if Defendants had made full and timely disclosure to the Participants of State Street's true financial and operating condition, including all facts necessary for a reasonable investor to fully understand the structure of the conduits and State Street's relationship with the Conduits (as described below) and the financial risks to State Street associated with that relationship as described herein, the Participants would not have chosen State Street common stock as an investment option under the Plan or would not have chosen it to the extent that they did.  Indeed, had the full truth been disclosed to the Participants, State Street common stock would not have been chosen by many Participants as an investment option at all.

## ADMINISTRATION OF THE PLAN

40.     Defendants, as fiduciaries of the Plan, were required by ERISA to furnish certain information to Participants.  For example, ERISA Section 101 (29 U.S.C. § 1021) requires a plan's Administrator to furnish an SPD to Participants.  ERISA Section 102 (29 U.S.C. § 1022) provides that an SPD must apprise Participants of their rights and obligations under the Plan.  In addition,

every person who held State Street stock in a Plan account received annually a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of State Street.

41.     At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plan's assets allocated to their accounts.

42.     At all times relevant to this Complaint, Defendants had a duty to review the Plan's investment policies and the selection and the performance of investment alternatives offered under the Plan.  There was no requirement that any assets of the Plan be invested in Company stock or that Company stock be continued as an investment alternative.

43.     At all times relevant to this Complaint, all fiduciaries of the Plan had a duty to obtain from the Company information necessary for the proper administration of the Plan.  At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan.  Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

44.     During the Class Period, as a result of statements made by or on behalf of State Street, or by virtue of their failure to disclose material information, the Company was perceived by the market to be less vulnerable to market losses than broad-based commercial and investment banks, mainly because State Street did not make loans, offer credit cards, or engage in consumer banking but, instead, acted as a securities custodian.  However, this perception, which was fostered

by State Street, was incorrect.  In fact, during the Class Period: (1) State Street held or administered investments that resulted in a high level of financial and reputational risk to State Street; and (2) State Street was overexposed to the prospect of losses of billions of dollars of off-balance sheet high risk conduits.  As a result of such conduct, State Street stock performed significantly worse than available alternative prudent investments during the Class Period.

## DURING THE CLASS PERIOD STATE STREET STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN AND PLAN PARTICIPANTS

45.     Before and during the Class Period, State Street's business included managing or administering unconsolidated high-risk asset-backed commercial paper conduits (explained below), ignoring the devastating effects of the high risk associated with these conduits with respect to the Company's financial condition if there was a downturn in the economy, the stock market softened ,or if the conduit asset quality or pricing decreased.  These high-risk investments have caused substantial damage to State Street, in terms of unrealized losses, which were finally recognized on May 18, 2009, when State Street consolidated its conduits for accounting purposes, resulting in a loss for the quarter ended June 30, 2009 of $7.12 per share compared to reported earnings for the three months ended June 30, 2008 of $1.35 per share.  The losses reported at June 30, 2009 (Form 10-Q) included the "record[ing] [of] the conduits' aggregate assets and liabilities in [ ] [State Street's] consolidated balance sheet at their estimated fair values on the date of consolidation" resulting in a "pre-tax extraordinary loss of approximately $6.10 billion, or approximately $3.68 billion after-tax." in State Street's consolidated statement of income for the quarter ended June 30, 2009.

46.     Conduits, such as those administered by State Street,  are bankruptcy remote special purpose vehicles or entities, which means that they are separate business entities (in this case a business entity supposedly separate from State Street) and the conduit's assets are generally not

included in the sponsoring company's (in this case State Street) balance sheet.  This is done to free up the sponsor company's (State Street) balance sheet and improve its financial ratios to give the sponsor at least the appearance of better reported earnings and a healthier financial position.  Asset-backed commercial paper ("ABCP") is issued by one of these nominally capitalized, bankruptcy remote conduits.  The combination of a fee agreement and the credit enhancement with the conduit (as explained below) along with the liquidity guarantees meant that the sponsor, (in this case, State Street) had the benefits of ownership of assets, but with an even greater risk than normally associated with ownership because of the lack of capital support for the assets.  The enhanced risk would not have been apparent from State Street's SEC filings to the reasonable investor during the Class Period.  Because of the increased risk, an investment in State Street was not a prudent investment.

47.     Commercial paper ("CP"), an unsecured promissory note of relatively short duration, is a long established financial instrument.  But, like so many other things in the finance world, financial engineers have taken the traditional commercial paper market and used market participants' assumptions about its historical safety and liquidity to mask increasingly risky activities.   One result is ABCP.  These assets are typically held in a "conduit" or structured investment vehicle ("SIV") created for the purpose of holding the assets and issuing commercial paper to raise the money to purchase the assets.

48.     ABCP is like traditional CP in that it is issued with maturities of one year or less (typically less than 270 days).  CP is used as a short-term vehicle for investing cash.  The difference between ABCP and CP is that instead of being an unsecured promissory note representing an obligation of the issuing company, ABCP is backed by securities.  Therefore, the perceived quality of the ABCP depends on the quality of the underlying securities.

49.    A conduit is a bankruptcy remote special purpose vehicle (SIV) or entity, which means that it is ostensibly a separate business entity (in this case a business entity supposedly separate from State Street) and the conduit's assets and liabilities are generally not included in the sponsoring company's (in this case State Street) balance sheet.   The conduit pays various fees to State Street and any revenues remaining after payment of the conduit's expenses are "distributed" to State Street as well.

50.    The payment of fees from conduits but absence from the balance sheet is significant as State Street thus shows the benefit of the earnings on the conduit's assets without showing the assets and liabilities required to generate those earnings.   Since an important metric in the investment community's valuation of banks are the ratios of a) earnings divided by assets and b) earnings divided by equity, the effect of structuring the conduits in this way is to allow State Street to show higher earnings ratios than if the conduit's assets and liabilities were on State Street's balance sheet, in which case the denominators in the ratios explained above would be larger and the earnings ratios therefore lower.   The material risk inherent in using this conduit structure is that if the values of the assets of the conduits, or the associated revenues, fall enough below the value of the commercial paper debt which is tied to those assets by contract with the conduit, State Street becomes liable for the payment of the commercial paper debt.   So as long as the conduit operates as planned, State Street benefits from reporting higher earnings ratios and consequently a higher stock price, than it would without the conduits.   If the inherent but disguised risk of the conduits materializes, State Street's stock will lose this inflation component.

51.    State Street formed the conduits at issue here as "bankruptcy remote special purpose entities".  Another term used to describe these entities is "structured investment vehicles" or "SIVs".
 This terminology is used to allow State Street to qualify for the very beneficial accounting treatment

accorded these entities.  Note that these conduits were formed by State Street, not some unrelated party.  Ostensibly they were independent entities so that the assets and liabilities would not have to be included in State Street's balance sheets.  However, in order to sell the commercial paper, State Street provided a line of credit to back up the commercial paper as well as a "liquidity guarantee" to assure the commercial paper buyers there would be money available to repay them in the event that new commercial paper could not be sold to repay the already outstanding commercial paper.  For this "credit enhancement" State Street was paid a fee of $63 million in 2007, $59 million in 2008, and $19 million in 2009 (before consolidation of the conduits).

52.     As reported in paragraph 6.3 of Spinnaker Capital Pty Ltd.'s Information Memorandum, dated June 2008, and paragraph 6.3 of Schooner Capital Pty Limited's Information Memorandum, dated September 2007, State Street also receives fees for its role as trustee and administrator.

53.     The ownership interest of the conduits was placed in a charitable trust upon formation.  The charitable trust is administered by an affiliate of State Street.  Although this ostensibly separates the ownership from State Street to maintain the façade of independence, note that on the list of distributions of the revenues to the conduit, no distribution is provided to the "owner"—the charitable trust.  The remaining revenues, after expenses, which would normally be called "profit" is paid to the "Administrator"—State Street.  So State Street administers the business of the conduit, oversees the purchase of the assets, provides credit support for the liabilities, is exposed to the risk of loss, records the profits on earnings, but ostensibly does not "own" the conduit.  This structure could allow for the conduit to enter bankruptcy without involving State Street, although the operation of the conduit support agreements would, in fact, cause State Street to bear losses, perhaps significant ones.

54.     This supposed "protection" from risk is deceptive.  Because the assets are held in the conduits and not in the bank, there is no regulatory requirement for the minimum amount of equity capital that would be required if they were held by the bank.  So the conduit can issue almost as much debt as it buys in assets.  In State Street's conduits there appeared to be a nominal (extremely small) amount of capital, and $32 million of "first loss notes" at December 31, 2007, (increased to $52 million by June 30, 2008)[2], which presumably would absorb the first losses suffered by the assets, then the conduit would show a loss and a corresponding inability to repay fully the commercial paper.  Then given the obligations under State Street's liquidity and credit support agreements State Street would either loan the conduits money to repay the commercial paper, or purchase new commercial paper from the conduit, or buy assets from the conduit at a pre-agreed price (regardless of the actual market price).  Therefore, there was a very significantly smaller capital cushion under the conduit's assets than if they were recorded on State Street's own balance sheet.

55.     ABCP is issued by one of these nominally capitalized, bankruptcy remote conduits.  But the combination of the fee agreement and the credit enhancement along with the liquidity guarantees meant that the sponsor, (in this case, State Street) had the benefits of ownership of assets, but with an even greater risk than normally associated with ownership because of the lack of capital support for the assets.  The enhanced risk would not have been apparent from State Street's SEC filings to the reasonable investor during the Class Period.  Because of the increased risk, an investment in State Street was not a prudent investment.

56.     When the market value of the underlying assets of State Street's conduits declined in 2007 and 2008,  this decline introduced liquidity risk or the inability to raise money to repay the

---

[2] The conduits issued $20 million first-lost notes in the first quarter of 2008 and $15 million in the second quarter of

commercial paper which was coming due by selling new CP. There may be liquidity concerns in this market different from the traditional corporate CP market because the ABCP market is tied to the value of the underlying assets. The ABCP market goes the way of the underlying asset market. If market disruptions occur in the underlying market, this can have real negative effects in the ABCP market as it did in 2007 and 2008. For example, ABCP can be created from any type of asset-backed security, such as student loan asset-backed, credit card asset-backed or residential mortgage asset-backed (including prime and subprime) securities. If there are significant negative developments in any of the underlying markets, this will negatively affect the perceived quality and risk of ABCP. Because commercial paper investors may be risk averse, concerns about ABCP may cause them to seek other short-term, cash-equivalent investments (traditional CP, T-bills, etc.). This creates "liquidity risk' which means that the ABCP issuers, such as State Street's conduits, will not be able to roll over their ABCP, as they will have no investors to buy their new issuance.

57. This liquidity risk became important to State Street because under the credit support agreements State Street had to fund (through one of the mechanisms described above) the repayment of the conduit-issued commercial paper when it came due, when the conduits could not sell new commercial paper to pay off the old.

58. As early as August, 2007, if not earlier, Defendants should have recognized the enhanced risk of State Street's ABCP program and thus the lack of prudence of Defendants in permitting the continued investing and/or holding by Plan Participants in State Street common stock. Although State Street tried to temper concerns caused by increasing trouble in the marketplace and economy, even those without access to State Street's internal records would have seen signs by that time of increasing risk of investing in a company with significant exposure to conduits. On August

2008.

29, 2007, an article on *Boston.com*, an affiliate of *The Boston Globe*, by *Boston Globe* staff member Ross Kerber reported on a decline in State Street common stock the day before and a decline of 15% over the course of the month as a result of "growing concern these vehicles –known as 'conduits'— could expose State Street to the woes that have affected other financial institutions in the recent credit crunch." Touching on the sensitivity of the stock market to financial products affected by then current condition, the article reports that analyst Tom Finance at Loomis, Sayles stated that, "The market is very stressed about the smallest things that react to liquidity and funding."

59.     According to State Street's Form 10-K for the year ended December 31, 2007 ("2007 Form 10-K"), which was signed by, among others, then CEO Logue and Defendant Malerba on February 14, 2008, during the class period, State Street, in its role as a financial intermediary, administered four asset-backed commercial paper conduits that State Street portrayed as third party entities, which are structured as bankruptcy-remote, limited liability companies, and which were not included in State Street's consolidated financial statements.

60.     State Street's conduits are known as Clipper Receivables Company LLC ("Clipper"), which was developed by State Street in 1992, whose principal place of business cannot be determined on an internet search but whose address has been identified by Defendants as c/o J. H. Management Corp., One International Place, Boston, MA; Galleon Capital, LLC ("Galleon"), which was formed by State Street in 1994 and whose principal place of business cannot be determined on an internet search but whose address has been identified by Defendants as c/o J. H. Management Corp., One International Place, Boston, MA; Spinnaker Capital Pty Limited ("Spinnaker"), which was formed by State Street in 2000 and is located at Level 37, Aurora Place, 88 Philip Street, Sydney, Australia, the same exact location as that of State Street Bank and Trust Co. in Sydney; and Schooner Capital Pty Limited, ("Schooner"), which was launched by State Street in 1998, and is

located at Level 37, Aurora Place, 88 Philip Street, Sydney, Australia, the same exact location as that of State Street Bank and Trust Co. in Sydney.

61.     The 2007 Form 10-K stated that these conduits, which are administered by State Street, purchase a variety of financial assets from third-party financial institutions, and fund these purchases by issuing commercial paper.  The financial assets purchased by the conduits are not originated by State Street, and State Street purportedly did not hold any equity ownership interest in the conduits.

62.     According to the 2007 Form 10-K, which does not identify the conduits administered by State Street by name, State Street had, prior to the time of the filing of the 2007 Form 10-K made a determination that it was not required to include each or all of the conduits' assets and liabilities in its consolidated financial statements, based on its application of the provisions of FASB Interpretation No. 46(R), which State Street stated governs its accounting for the conduits.

63.     According to the 2007 Form 10-K,  the holders of the subordinated "first loss" notes held only $32 million of such notes, which going into 2008 was just over 1/10 of 1% of the assets of the conduits ($28.76 billion according to page 48 of the 2007  Form 10-K).  If the conduit's assets were on State Street's balance sheet, to meet regulatory requirements, State Street would have to have had a TCE ratio of 3% of the asset value of the conduits in equity (about $900 million) rather than the approximately 1/10 of !% (about $32 million) held by State Street.  Thus, the exposure of the conduits greatly increased  State Street's risk because of the highly leveraged situation.  In fact, in May 2009, when State Street did consolidate the conduits onto its balance sheet, it had to raise approximately $2.23 billion in equity by means of issuing common stock (resulting in dilution)  to recover to the required 3 percent TCE ratio.  This is illustrative of the true level of risk of State Street to the conduits and the lack of prudence in Defendants permitting continued investment or

maintenance of State Street stock in the Plan.

64.     As reported in an August 28, 2007 article via *Bloomberg*, "Barclays, State Street Fallon Concern About Loans," there was concern at the time that State Street would lose money on loans to funds that sell asset-backed commercial paper (conduits).  The article stated that "State Street has $27.9 billion in credit lines to the [asset-backed commercial paper] funds" and notes that Richard Bove, an analyst at Punk Ziegel & Co. in Lutz, Florida stated, "'There is a growing recognition that there is a crisis in the commercial-paper market'" despite the implicit denial by State Street's spokeswoman, Carolyn Cichon, who emailed a statement that "Holdings of State Street's asset-backed commercial paper funds have ratings of AAA and AA."  Furthermore, and as alleged *infra*, the reliability of the AAA and AA ratings given to holdings of State Street's asset-backed commercial paper conduits during the Class Period was highly suspect.

65.     The August 28, 2007 *Bloomberg* article also stated that State Street stock dropped 4.3% per share on that day, and two other banks which managed conduits, Bank of New York Mellon and Barclays, dropped 5.3% and 3.6%, respectively.

66.     Also on August 28, 2007, *The [London] Times* published the article, "State Street Bank Has Highest Exposure To Conduits."  *The Times* article stated:

> State Street, the American bank, has been identified as having $22 billion (£10.9 billion) of exposure to asset-backed commercial paper conduits, the off-balance sheet vehicles that have caused severe problems for rivals in recent weeks amid turmoil in credit markets.
>
> According to regulatory filings, the Boston-based bank has credit lines to at least six conduits, which account for 17 per cent of its total assets.  That proportion makes State Street the most highly exposed bank to conduits among its European and American peers.

67.     Analyst Richard Bove of Punk Ziegel recognized the risk of the conduits on August 29, 2007 when he wrote that, "Investors are concerned that State Street could suffer losses on either

the assets held in its portfolio or the assets held in the SIVs it operates.  These fears are not unfounded given the events in the financial markets of late related to asset-backed securities and commercial paper.  However, the bank insists that the quality of the paper is pristine.  The fact that no one knows what the reality of the situation is, I prefer to give the benefit of the doubt to the company, which I believe to be unusually effective in its business operations.  However, it is clear that the multiple on this stock will contract until there is more transparency as to what is truly happening with these portfolios."

68.     As reported in the article "SEC Is Examining Risks 'Conduits' May Pose to Securities Firms," by *Bloomberg* (also published in *The Wall Street Journal*) dated September 5, 2007,  "The U.S. Securities and Exchange Commission is scrutinizing the biggest Wall Street securities firms to find out whether they face losses from affiliated investment vehicles that sold short-term debt [i.e., conduits]."

69.     According to that same *Bloomberg* article, "The SEC, concerned about the collapse of the subprime mortgage market, is reviewing 'contingencies that might place additional strains on the balance sheets' of investment banks, said Erik Sirri, head of the agency's market regulation division, in prepared congressional testimony today. 'These include the potential unwinding of off-balance sheet funding structures, such as conduits.'"

70.     Also according to the September 5, 2007 *Bloomberg* article, "Banks set up conduits to sell tens of billions of dollars of commercial paper, which is debt due in 270 days or less. Citigroup Inc. the largest U.S. bank is one of several lenders that may suffer if they're forced to cover losses in conduits and other so-called Structured Investment Vehicles, *The Wall Street Journal* reported today.  Citigroup has about a quarter of the market for SIVs, representing almost $100 billion of assets under management, the Journal said."

71.     The collapse of securities insurers was also causing an upward spiraling of the risk to the conduits.  As reported on December 5, 2007 by *Bloomberg*:

> [Securities insurer] MBIA Inc. fell the most in more than 20 years in New York trading after Moody's Investors Service said the biggest bond insurer is "somewhat likely" to face a shortage of capital that threatens its AAA credit rating.
>
> A review of MBIA and six other AAA rated guarantors will be completed within two weeks, Moody's said in a statement today. Moody's revised its assessment from last month that MBIA was unlikely to need more capital after additional scrutiny of the Armonk, New York-based bond insurer's mortgage-backed securities portfolio.
>
> ***
>
> The loss of MBIA's top ranking would cast doubt over the ratings of $652 billion of state, municipal and structured finance bonds that the company guarantees. MBIA is among at least eight bond insurers seeking to ward off potential credit rating downgrades by Moody's, Fitch Ratings and Standard & Poor's. The insurers guarantee $2.4 trillion of debt and downgrades could cause losses of $200 billion, according to Bloomberg data.
>
> ***
>
> Ambac Financial Group Inc., the second-largest bond insurer, Financial Guaranty Insurance Co., the fourth-largest, and Security Capital Assurance Ltd. are also 'somewhat likely" to have a capital shortfall, Moody's said today. CIFG Guaranty, considered the most likely to fall below the benchmark, was bailed out by parents Groupe Banque Populaire and Groupe Caisse d'Epargne.
>
> ***
>
> Moody's, Fitch and S&P are examining the insurers, known as mono lines, on concern that a slide in the credit quality of some of the 80,000 securities they guarantee requires them to hold more capital to justify their AAA ratings.
>
> ***
>
> "The company has to address this, "Haines said. "They can't simply sit on their position right now. They've got to be cranking up reinsurance. They've got to be changing the risk profile of the new business they write. They've got to be considering some other soft

capital kind of arrangements."

*** 

"If any major monoline were to have a rating change it would have a real impact on all of the business of the mono lines," MBIA Chief Financial Officer Chuck Chaplin told a Bank of America conference in New York on Nov. 27.

*** 

''It's Moody's firing a warning shot saying 'you have two weeks, so do something, '" said Paul Berliner, a trader at Schottenfeld Group, which manages $100 million in New York. ''The drama behind MBIA and Ambac should be the most important focus for the entire financial sector right now. Everyone should be on the edge of their seats wondering how this plays out. "

72.     The significance to State Street of the December 5, 2007 article by *Bloomberg* was that monoline insurers, such as MBIA and Ambac, insured a significant part of State Street's conduits.  The exposure for State Street (expressed as a percentage), per insurer, was as follows: MBIA, 26% AMBAC, 21% FGIC 18% FSA, 15% XL Capital, 12% CIFG, 4% AGC, 3% Radian, 1%.  The MBIA, AMBAC, FGIC and CIFG insurers (which insured nearly 70% of the insured assets) were considered troubled in the above article, and the dire financial conditions of the monoline insurers provide additional evidence of the lack of prudence by Defendants.

73.     The fact that the conduits' assets were insured for some percentage of their face or par value would normally cause an investor to assume a low level of risk of loss on that asset. However, the risks faced by the monoline insurer arose from their concentration in the financial sector—and particularly in financially engineered securities.  So the same conditions that caused liquidity risk or risk of loss to ABCP conduits also caused losses to the monoline insurers, which by definition, then could not spread their risks among other insurance products, lines of business or geographical areas, or otherwise diversify than its risk as a broader-based insurers normally do.

74.     Foreshadowing the gloom that would hit State Street, on December 13, 2007,

Citigroup consolidated $49 billion from 7 of its SIVs [i.e., conduits] onto its balance sheet after

Moody's and S&P said that it was preparing to cut the ratings of the SIVs.  State Street stock

dropped 2.0% on December 14, 2007, after the Citigroup consolidation was announced.

75.     Further risk was added by events going on in Australia.  According to the article,

"Australia's Mortgage-Backed Bond Losses May Rise, Moody's Says," by *Bloomberg,* on

December 21, 2007:

> Losses on bonds backed by Australian mortgages to borrowers who
> don't meet traditional criteria may grow because of higher lending
> rates, according to Moody's Investors Service.
>
> More late payments among financially weak homebuyers are likely
> because mortgage rates to so-called "non-conforming" borrowers
> have risen faster than official cash rates, the rating assessor said today
> in a report. The global credit-market turmoil is also making it
> difficult for these borrowers to refinance debt.
>
> Payments overdue for more than 90 days for non-conforming
> residential mortgage-backed securities averaged 6.27 percent in the
> third quarter, compared with 5.98 percent in the same period of 2006,
> according to Moody's.
>
> Non-conforming borrowers don't meet traditional bank lending
> criteria on credit certification or loan size and don't qualify for
> mortgage insurance. Subprime loans, made to people with weak
> credit or high debt, account for about 35 percent of the Australian
> non-conforming lending market, according to Moody's.

76.     The impact on State Street concerning the above December 21, 2007 *Bloomberg*

article was that on March 31, 2008, Australia (at 22%) represented the second largest country of

origin of State Street's conduit assets.  The United States (at 40%) was the largest.  On March 31,

2008, 97% of the conduit asset class represented by Australian Residential Mortgage Backed

Securities (RMBS) were rated AA or better.  By March 31, 2009, only 67% of the Australian RMBS

were rated AA or better.  On July 25, 2008, National Australia Bank stock dropped 10% after it

announced an increase in its loan loss provision based on mortgage-related loans on July 28, 2008,

the stock for Australia and New Zealand Banking Group declined after it tripled its provisions for delinquent loans.   Thus, the economic situation in Australia provides further evidence that Defendants acted imprudently in permitting Plan Participants to continue to invest in and/or maintain investments in State Street common stock.

77.     Clearly, by early in the Class Period concerns about the risks of off balance sheets assets such as conduits had caused waves at the highest levels of the financial world.  On February 29, 2008, *The Wall Street Journal* reported that the Financial Accounting Standards Board ("FASB"), which has been the designated organization in the private sector for establishing standards of financial accounting reports by for non-governmental entities, was re-examining how banks treat off-balance sheet vehicles.  According to the article, these vehicles played a big role in the credit crunch which had "contributed to more than $150 billion in losses that have hit financial institutions, but often came as a surprise to investors because banks didn't put them on their books."

  The article reported that, "The [accounting rules for off-balance sheet vehicles] were crafted in the wake of the implosion of the former Enron Corp. which used off-balance sheet vehicles to make its financial results.  The post-Enron rules were supposed to limit the use of such vehicles, but banks found ways to tailor structures that side stepped the new rules."

78.     *The Wall Street Journal* article reported that Senator Jack Reed, a member of the Senate Banking Committee who had written a letter to the FASB about his concern regarding off-balance sheet transactions, indicated in an interview with *The Wall Street Journal* that, "the risks hidden by off-balance sheet vehicles raises 'serious questions' about the quality of information investors receive and what bank books really show."  As Senator Read asked rhetorically, "Is it the items listed or items that are hidden away and could pop up at any moment?"  When Senator Reed was asked by the interviewer whether the assets should be on the banks' book, Senator Reed stated,

"The experience of the last few months suggests they should be on the balance sheet."

79.     On the surface, the conduits may have seemed to be a relatively small part of State Street's financial profile because they did not fall into a traditional line of business of State Street. However, the risk to State Street of administering of these conduits was clearly material. This is further demonstrated in part by examining State Street's TCE ratio. This is calculated by taking a Company's tangible common equity and dividing it by the company's tangible assets. This ratio is used a measure of a company's capital strength.

80.     The use of this ratio was prevalent during 2009 when the U.S. Federal Reserve began "stress-testing" the largest U.S. banks. A ratio of about 3% was considered a minimum acceptable standard for banks by U.S. regulators.

81.     A Janney Montgomery Scott report on October 16, 2008 (just after the Company reported third quarter 2008 earnings with higher unrealized losses in its investment portfolio) noted that State Street had a TCE ratio of 4.8%, but if all the conduits were consolidated, the TCE ratio would be 3.0%, the minimally acceptable level. Indeed State Street's TCE ratio, if the conduits were consolidated, would have been 1.6% at March 31, 2008, if not for a $2.5 billion equity offering by State Street on June 3, 2008.

82.     In January 2009, the inevitable happened as the level of unrealized losses exploded. After the markets closed on Friday, January 16, 2009, State Street filed a Form 8-K Current Report with the SEC containing a press release warning of about $9 billion in potential investment losses and projections for a tougher 2009 that had not previously been disclosed. The filing stated, among other things, that:

> As of December 31, 2008, there were $5.5 billion of after-tax net unrealized losses associated with our portfolio of investment securities available for sale and held to maturity. Generally, the fair value of such securities is based upon market values supplied by

third-party sources. Market values for the securities in our portfolio declined significantly during 2008 as liquidity and pricing generally in the capital markets was disrupted. When the fair value of a security declines, management must assess whether that decline is "other-than-temporary." See "—*We must apply significant judgment to assign fair values to our assets, and we may not be able to obtain these values, or any value, if these assets were sold*." When management reviews whether a decline in fair value is other-than-temporary, it considers numerous factors, many of which involve significant judgment. As 2008 progressed, rating agencies imposed an increasing number of downgrades and credit watches on the securities in our investment portfolio, which contributed to the decline in market values. Any continued increase in downgrades and credit watches may contribute to a further decline in market values. More generally, market conditions continue to be volatile, and we can provide no assurance that the amount of the unrealized losses will not increase.

\* \* \*

In connection with our administration of the asset-backed commercial paper conduits, we provide contractual back-up liquidity to the conduits.  If the conduits cannot issue sufficient commercial paper to meet their ongoing liquidity needs, we are required by contract to, among other things, provide liquidity to the conduits by purchasing portfolio assets from them. If required, these portfolio assets are purchased at prices determined in accordance with contractual terms of the applicable liquidity asset purchase agreement, which may exceed their fair value. We may also provide liquidity to the conduits by purchasing commercial paper from them or by providing other extensions of credit to the conduits. Our asset-backed commercial paper conduit program experienced significantly reduced demand for its commercial paper financing beginning in the third quarter of 2007.  As the disruption in the credit markets continued through 2008, our liquidity management of the conduits resulted in our purchasing historically high levels of commercial paper from the conduits.  During 2008, the amount of commercial paper issued by the conduits on our consolidated balance sheet increased from approximately $2 million as of December 31, 2007 to approximately $292 million as of March 31, 2008, approximately $212 million as of June 30, 2008, and approximately $7.82 billion as of September 30, 2008 (including $1.6 billion under the AMLF program).  On December 31, 2008, we held $230 million of commercial paper issued by the conduits on our consolidated balance sheet (which does not include $5.7 billion issued by the conduits under the Federal Reserve's Commercial Paper Funding Facility as of December 31,

2008).  The highest total overnight position (including AMLF) in the conduits' commercial paper held by State Street during the three months ended December 31, 2008, was approximately $8.9 billion and during the fiscal year ended December 31, 2008, was approximately $ 8.9 billion.  The average total overnight position (including AMLF) for the same periods was approximately $5.43 billion for the quarter ended December 31, 2008 and $2.3 billion for the fiscal year ended December 31, 2008.  As noted above, as of December 31, 2008, the conduits had utilized the Federal Reserve's Commercial Paper Funding Facility to issue $5.7 billion of commercial paper.  The Commercial Paper Funding Facility is currently scheduled to expire for new issuances on April 30, 2009. We may be required to provide additional back-up liquidity if the conduits are unable to place their commercial paper in the market after the Commercial Paper Funding Facility expires.  Our contractual arrangements with the conduits also require us to purchase conduit portfolio assets under other circumstances, such as a downgrade of the credit rating of securities held by the conduits. Purchase of the assets of the conduits pursuant to the contractual agreements described above could affect the size of our consolidated balance sheet and related funding requirements, our capital ratios, and, if the conduit assets include unrealized losses, could require us to recognize those losses. As of December 31, 2008, there were $3.6 billion of after-tax net unrealized losses associated with portfolio holdings of the conduits.  Because of our contractual agreements to purchase assets from the conduits under specified conditions, we are also exposed to the credit risks in the conduits' portfolios. [Emphasis in original]

83.    On January 21, 2009, commenting on the State Street Form 8-K filed days before,

*The Boston Globe* reported that:

> *Shares of State Street Corp. shed more than half their value yesterday,* as investors digested the company's warning about $9 billion in potential investment losses and projections for a tougher 2009.
>
> *The stock of the Boston financial services company plunged $21.46, or 59 percent, to $14.89, a level not seen since* 1996. Although State Street reported 28 percent increases in revenue and earnings for last year, it said fourth-quarter earnings fell 71 percent from the year-ago period. And its chief executive, Ronald E. Logue, said revenue and earnings growth would be flat this year.
>
> "State Street is a paradox right now," said Gerard Cassidy, a bank

analyst at RBC Capital Markets in Portland, Maine. "On the one hand, its daily operations, its day-to-day business, in this environment is respectable. *But the balance sheet, the unrealized losses in the investment portfolio are very, very substantial."*

State Street, which manages money for institutions and handles recordkeeping and accounting for large investment funds, revealed significant risks on the horizon in a regulatory filing after the markets closed Friday. In the filing, the company said it had $9.1 billion worth of troubled investments on its books, in investment securities and in its commercial paper program. The question is how many of those investments will recover in value; if they don't, the company will have to take losses on them. (emphasis added).

84.    Similarly, *American Banker* reported on January 21, 2009, in an article entitled "State St. CEO: No Need for Fresh Capital" that some "analysts were [] skeptical, saying that *State Street may face customer claims, financial losses, reputational damage, and regulatory scrutiny."* (emphasis added).

85.    On February 10, 2009, in an article entitled "State Street Preferred Ratings Trimmed," *American Banker* recognized the serious deterioration of State Street's financial position, saved from further downgrade only by the likelihood of a government bailout, reporting that:

Fitch Inc. reduced State Street Corp.'s preferred stock rating but affirmed other key ratings, citing the "extremely high probability" the federal government would bail out the asset manager and securities custodian if necessary.

State Street last month shocked analysts and investors by disclosing that unrealized losses had more than doubled in the fourth quarter, raising questions about its capital levels and ability to raise money if need be.

All three major ratings agencies, including Fitch, downgraded the company's main ratings in response to the fourth-quarter results.

On Monday, Fitch cut its rating on the preferred stock by two notches, to BBB, or two steps above junk grade, on the "somewhat higher risk" that dividends could be deferred or that "other undesirable outcomes" were possible.

86.    All told, State Street's stock price dropped precipitously from January 16, 2009

($36.35) to January 20, 2009 ($14.89), as the market digested the shocking news about the depth of State Street's business, particularly the unrealized losses suffered by the Company, and questions about its future.  The enormous decline in the market price of State Street's common stock from January 16, 2009 to January 20, 2009 and, indeed, throughout the Class Period, corresponds directly with diminished retirement savings of Participants who held State Street stock in the Plan accounts.

87.    After State Street reported its fourth quarter 2008 earnings (with significant additional unrealized losses), a Keefe Bruyette & Woods report on January 21, 2009 stated that State Street's TCE ratio, assuming full consolidation of its conduits, was a dangerously low 1.05%, compared with the reported 4.46% without consolidation.  Largely as a result of the increase in unrealized losses when fourth quarter earnings were announced, the price of State Street stock dropped approximately 60% in one day.

88.    On April 21, 2009, State Street issued a Form 8-K which contained a press release providing and discussing State Street's financial results for the quarter ended March 31, 2009.  The press release contained in the Form 8-K confirmed the deterioration of State Street financial condition which had been discussed by State Street in January 2009 but which had its roots as early as 2007.  The April 21, 2009 press release indicated that State Street's first quarter 2009 earnings per share had declined to $1.02 per share from $1.35 per share for the quarter ended March 31, 2008.  Moreover, the revenue reported for the first quarter of 2009 of $2.002 billion was a decline of 22.5% from revenue of $2.577 billion reported for the first quarter ended March 31, 2008.

89.    Finally, State Street effected the consolidation of the conduits on May 18, 2009.  A Janney Montgomery Scott report on May 18, 2009 put State Street's TCE ratio at 2.2% after consolidation (and below the standard 3% level).  However, State Street almost simultaneously announced a $2.2 billion equity offering which increased the TCE ratio to 3.3%, just barely more

than the minimum acceptable standard.[3]

90.     On July 21, 2009, *The Boston Globe* reported that following the announcement of $9 billion in potential losses and a plunge of 59% in market price in January, "Nancy Bush, a banking analyst and founder of NAB Research during the [conference] call [with State Street CEO Logue] took Logue to task for not having disclosed sooner that earnings were likely to be flat this year."

91.     In summary, throughout the Class Period the conduits made State Street's financial condition much worse than would have been apparent from reading its financial statements, despite State Street's denials regarding the need to consolidate the conduits.

92.     As shown by the following chart, the quality of the conduit assets was deteriorating during the Class Period:

---

[3].   In addition, this report reveals that the Company had revised its earnings guidance lower as a result of the consolidation of the conduits.  Interestingly, the analyst also used a tangible book value metric to value the shares instead of a P/E ratio.  The change in valuation method was brought about as a result of the increasing previously unrealized losses by State Street's conduits.

| Rating | Percent as of September 30, 2007 | Percent as of December 31, 2007 | Percent as of March 31, 2008 | Percent as of June 30, 2008 | Percent as of September 30, 2008 | Percent as of December 31, 2008 | Percent as of March 31, 2009 |
|---|---|---|---|---|---|---|---|
| AAA/Aaa | 62% | 61% | 56% | 53% | 53% | 51% | 40% |
| AA/Aa | 15% | 16% | 16% | 19% | 17% | 18% | 13% |
| A/A | 8% | 8% | 10% | 10% | 10% | 9% | 12% |
| BBB/Baa | 5% | 5% | 7% | 7% | 7% | 9% | 10% |
| BB/Ba | - | - | - | 1% | 1% | - | 4% |
| B/B | - | - | - | - | 1% | 1% | 3% |
| CCC/Caa | - | - | - | - | - | 2% | 4% |
| CC/Ca | - | - | - | - | - | - | 3% |
| Not Rated[4] | 10% | 10% | 11% | 10% | 11 | 10% | 11% |
| TOTAL | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

93.    Clearly, the decline in rating levels of the conduit assets is one indication of the increased risk of an investment in State Street which continued to administer or manage the conduits as the period progressed and demonstrates how permitting Plan Participants to invest and/or maintain their investments in State Street stock became more and more imprudent.

94.    But for the denials by State Street's management of asset quality problems, the stock price would have declined sooner based on analysts' earlier statements and/or other bank declines. Moreover, disclosure of the true quality of State Street's conduit asset quality would have led to earlier and greater stock decline.  It was imprudent of Defendants to permit Plan Participants to continue to purchase and/or maintained investments in State Street stock when the risk of significant stock decline was evident from stock price declines of comparable banks which announced losses (unrealized or upon consolidation) on similar structures (conduits / SIVs) with similar asset backing.

95.    The Company's reputational harm already suffered will likely further cause the

---

[4].    According to the article "CDO Boom Masks Subprime Losses, Abetted by S&P, Moody's, Fitch ," by Richard Tomlinson and David Evans via *Bloomberg*, on May 31, 2007, regarding the ratings of CDOs (a collection of securities backed by bonds, mortgages and other loans):  "[t]he lowest portions, the toxic waste, which offer the highest potential return and biggest risk for investors, go unrated."

Company to lose customers and management and consulting fees, thereby decreasing its future income and cash flows.  On April 20, 2010, *CNN Money.com* listed State Street as one of its "20 Biggest Money Losers."  The article said the following about State Street:

> The banking company that acts as a custodian and focuses on wealthy and institutional clients expanded its business during the boom years and paid the price. After losses in some of its fixed-income funds, litigation led it to reimburse hundreds of millions to investors.
>
> But the main hit to profits stemmed from a $3.86 billion loss tied to off-balance-sheet vehicles called "conduits" through which State Street raised money from short-term investors and invested in long-term assets. The company broke the venerable rule, "Don't borrow short and lend long."

96.     In addition to the risks alleged above, the asset-quality ratings of State Street's conduits were, at a minimum, immensely suspect for being inflated during the Class Period.  Credit-rating agencies like Moody's were criticized during the 2007 and 2008 time frame for giving unrealistically high ratings to the complex investments backed by risky mortgages and other assets.

97.     Until the early 1970s, bond credit ratings agencies were paid for their work by investors who wanted impartial information on the credit worthiness of securities issuers and their particular offerings.  Starting in the early 1970s, the "Big Three" ratings agencies (S&P, Moody's, and Fitch) began to receive payment for their work by the securities issuers for whom they issue those ratings, which has led to charges that these ratings agencies can no longer always be impartial when issuing ratings for those securities issuers.  Securities issuers have been accused of "shopping" for the best ratings from these three ratings agencies, in order to attract investors, until at least one of the agencies delivers favorable ratings.  This arrangement has been cited as one of the primary causes of the subprime mortgage crisis (which began in 2007), when some securities, particularly mortgage backed securities (MBSs) and collateralized debt obligations (CDOs) rated highly by the credit ratings agencies, and thus heavily invested in by many organizations and individuals, were

rapidly and vastly devalued due to defaults, and fear of defaults, on some of the individual components of those securities, such as home loans and credit card accounts.

98.     Credit rating agencies, including Moody's, had been criticized and have been subject to even greater criticism in the wake of the large losses in the asset backed security ("ABS") collateralized CDO market that occurred despite being assigned top ratings by the CRAs.  As reported in the article "CDO Boom Masks Subprime Losses, Abetted by S&P, Moody's, Fitch," by Richard Tomlinson and David Evans via *Bloomberg*, on May 31, 2007, losses on $340.7 million worth of ABS collateralized debt obligations (CDO) issued by Credit Suisse Group added up to about $125 million, despite being given the highest rating, AAA or Aaa, by Moody's.  Thus, as early as May 2007, Defendants knew or should have known that reliance on credit agency ratings was not reasonable.  Moreover, Defendants knew or should have known that rating agencies' ratings, even if initially given objectively, and particularly changes in such ratings such as downgrades, are subject to a time lag.  This would likely be even more so the case during the latter part of 2007 and through 2008 when the world's markets were in turmoil.

99.     As explained in the *McClatchy Newspapers* article "How Moody's sold its ratings - and sold out investors," published October 18, 2009:

> As the housing market collapsed in late 2007, Moody's Investors Service, whose investment ratings were widely trusted, responded by purging analysts and executives who warned of trouble and promoting those who helped Wall Street plunge the country into its worst financial crisis since the Great Depression.

100.    The October 18, 2009 *McClatchy Newspapers* article goes on to report:

> A McClatchy investigation has found that Moody's punished executives who questioned why the company was risking its reputation by putting its profits ahead of providing trustworthy ratings for investment offerings.

> Instead, Moody's promoted executives who headed its "structured

finance" division, which assisted Wall Street in packaging loans into securities for sale to investors. It also stacked its compliance department with the people who awarded the highest ratings to pools of mortgages that soon were downgraded to junk. Such products have another name now: "toxic assets."

As Congress tackles the broadest proposed overhaul of financial regulation since the 1930s, however, lawmakers still aren't fully aware of what went wrong at the bond rating agencies, and so they may fail to address misaligned incentives such as granting stock options to mid-level employees, which can be an incentive to issue positive ratings rather than honest ones.

The Securities and Exchange Commission issued a blistering report on how profit motives had undermined the integrity of ratings at Moody's and its main competitors.

101.    On April 21, 2010, the Financial Crisis Inquiry Commission ("FCIC") issued a media advisory for immediate release that was titled: "Financial Crisis Inquiry Commission Issues Subpoena to Moody's Corporation."  The advisory states that "Chairman Phil Angelides and Vice Chairman Bill Thomas announce that the Financial Crisis Inquiry Commission (FCIC) has issued a subpoena to Moody's Corporation for failing to comply with a request for documents in a timely manner."  The one-page advisory goes on to state that the FCIC:

was created by Congress and is charged with examining the causes of the financial meltdown. It is also examining causes of the collapse of major financial institutions that failed or would likely have failed had they not received exceptional government assistance. As part of its inquiry, the Commission will hold a series of public hearings throughout the year including, but not limited to, the following topics: avoiding future catastrophe, complex financial derivatives, credit rating agencies, excess risk and financial speculation, government-sponsored enterprises, the shadow banking system, subprime lending practices and securitization, and too big to fail.

102.    According to an April 21, 2010 articled, "Fiscal Panel Subpoenas Documents of Moody's," in *The New York Times*, the subpoena issued to Moody's constituted "the first such subpoena issued by the [FCIC]."  The article goes on to point out the following:

The rating agencies have also come under new scrutiny as a result of the fallout over the civil fraud suit against Goldman Sachs filed by the Securities and Exchange Commission last Friday. The suit contends that the investment bank wrongly permitted the hedge fund manager John A. Paulson to heavily influence which mortgage securities were included in an investment portfolio that was marketed and sold to investors even though it was designed to lose value.

Mr. Paulson's hedge fund has noted that securities created under the portfolio were subsequently given a AAA rating by S. & P. and Moody's.

"Why is it Moody's isn't just as much in the focus here?" Representative Darrell Issa of California, the top Republican on the House Committee on Oversight and Government Reform, asked on CNBC on Wednesday.

"How could John Paulson know that these were actually bad mortgages and Moody's couldn't know?"

## DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSONS OF MATERIAL FACT DURING THE CLASS PERIOD

103.    In administering a conduit portfolio the size that State Street did during the Class Period the Defendants knew or should have known, among other things, that: (i) throughout the Class Period the Company was more exposed to financial market fluctuations than it disclosed; and (ii) the Company's Class Period public and financial statements, which were incorporated by reference in statements made by Defendants in a fiduciary capacity, were materially false and misleading and/or omitted material facts due to their failure to inform the market of the ticking time bomb in the Company's investment securities portfolio due to the risk and deterioration of conduit assets which caused massive losses to State Street and created risk far beyond that which was disclosed by Defendants in statements made in a fiduciary capacity, and, (iii) the structure of the conduits, with the minimal obligations for First Loss Note holders dramatically increased the risk to State Street of being required to consolidate the conduits and in State Street's TCE ratio falling

below the minimal ratio required of financial institutions..

104.    State Street's 2007 Form 10-K, was signed by, among others, CEO Logue and Defendant Malerba on February 14, 2008.

105.    In its 2007 Form 10-K, State Street provided a complex and opaque explanation of its process for estimating expected losses attributed to the conduits.  The 2007 Form 10-K stated that State Street uses "a financial model calculated by comparing projected possible cash flows, which are probability-weighted, with expected cash flows for the risk(s) the entity was designed to create and distribute; they represent the variability in potential cash flows of the entity's designated risks."

106.    What the above sentence from the 2007 Form 10-K paragraph appears to really say if it was written in plainer English is that the State Street would compare the expectations at any point in time based on their best estimates of the probability of receiving the cash flows in the future, and compare the value of those estimates against the value that it initially obtained when it created the entity.  Simply, if the expected cash flows at the new valuation date are higher than those that existed previously, the value of the entity would go up; conversely if the new expected future cash flows were lower than the earlier ones, the value of the entity would go down.  Of course, in this case, throughout 2007 and certainly by 2008, the expected cash flows from holding mortgage-backed securities were perceived as declining over time compared with such expectations from for example before 2007.  Therefore, one would expect declining values for investments in this area.  It omits to disclose the results of its model's calculations and the level of the expected future cash flows so that a Plan Participant would be able to understand the degree to which losses were anticipated on conduits assets which means that Defendants omitted to disclose information from which the risk in investing in State Street stock could be determined.

107.    The difficult to decipher code of the 2007 Form 10-K continues with a statement

43

that State Street believed:

> that credit risk is the predominant risk that is designed to be created and distributed by these entities.  There is also a modest amount of basis risk within each conduit.  Basis risk arises when commercial paper funding costs move at a different rate than the comparable floating-rate asset benchmark rates (generally LIBOR).  This risk is mitigated through the use of derivative instruments, principally basis swaps, which remove this variability from each conduit. Accordingly, basis risk is not a significant assumption in the financial model.

108.    The above statement was materially misleading and omitted to disclose material facts needed to make it not misleading because it fails to disclose the liquidity risk of there not being new investors to purchase the commercial paper in order to repay the old therefore calling in to play State Street's liquidity guarantee.

109.    The 2007 Form 10-K contains discussion about the absorption of credit risks with respect to the conduits:

> Any credit losses of the conduits would be absorbed by (1) investors in the subordinated debt, commonly referred to as "first-loss notes," issued by the conduits; (2) State Street; and (3) the holders of the conduits' commercial paper, in order of priority. The investors in the first-loss notes, which are independent third parties, would absorb the first dollar of any credit loss on the conduits' assets. If credit losses exceeded the first-loss notes, we would absorb credit losses through our credit facilities provided to the conduits. The commercial paper holders would absorb credit losses after the first-loss notes and State Street's credit facilities have been exhausted. We have developed a financial model to estimate and allocate each conduit's expected losses. Our model has determined that, as of December 31, 2007, the amount of first-loss notes of each conduit held by the third-party investors causes them to absorb a majority of each conduit's expected losses, as defined by FIN 46(R), and, accordingly, the investors in the first-loss notes are considered to be the primary beneficiary of the conduits. The aggregate amount of first-loss notes issued by the conduits totaled approximately $32 million as of December 31, 2007.

110.    An explanation of this paragraph in plain English is that the aggregate amount of assets held by the conduits totaled $28.76 billion at December 31, 2007.  The aggregate amount of

first loss notes outstanding at that time was approximately $32 million.  Since there was virtually no capital in the conduit entities, that means that there was approximately 0.11% (that is, 11/100 of 1%) of first loss notes available to absorb losses in the value of the assets of the conduits before State Street would be required to make good on further losses to repay the commercial paper issued by the conduits.  Compare this rate of 0.11% with the minimum required capital holdings if the assets and liabilities of the conduits had been directly on State Street's balance sheet, of 3% of assets, the minimum regulatory requirement.  Therefore, the conduits had only about 1/30th of the capital that would have been required if the assets were owned directly by State Street, which also supports the proposition that State Street was not a prudent investment because of the riskiness caused by State Streets administration of the conduits.  In fact, in May 2009, when State Street finally did consolidate the conduits onto its balance sheet, it had to raise approximately $2.23 billion in equity by means of issuing common stock (resulting in dilution)  to recover to the required 3 percent level of tangible capital to assets.

111.    The above statement from State Street's 2007 Form 10-K, was materially misleading and failed to disclose material facts needed to make it not misleading because it omits to disclose the then current levels of expected losses, default probabilities and loss severities, thereby making it difficult for a Plan Participant to understand the risk involved in investing in State Street common stock.  Thus, the above statement fails to disclose facts from which the true risk to State Street can be clearly understood.

112.    The 2007 Form 10-K discusses the process purportedly used by State Street to estimate expected losses as required by FIN 46(R):

> We estimate possible defaults of the conduits' assets. These expected
> losses are allocated to the conduits' variable interest holders based on
> the order in which actual losses would be absorbed, as described
> above. We use the model to estimate expected losses based on

hundreds of thousands of probability-weighted loss scenarios. These simulations incorporate published rating agency data to estimate expected losses due to credit risk. Primary assumptions incorporated into the financial model relative to credit risk variability, such as default probabilities and loss severities, are directly linked to the conduit's underlying assets. These default probabilities and loss severity assumptions vary by asset class and ratings of individual conduit assets. Accordingly, the model's calculation of expected losses is significantly affected by the credit ratings and asset mix of each conduit's assets. These statistics are reviewed by management regularly and more formally on an annual basis. If downgrades and asset mix change significantly, or if defaults occur on the conduits' underlying assets, we may conclude that the current level of first-loss notes is insufficient to absorb a majority of the conduits' expected losses.

113.    The above statement was materially misleading and omitted to disclose material facts needed to make it not misleading because it fails to disclose that there was only a capital cushion in the form of first loss notes equal to 0.11% of the asset values and as such a decline in value had certainly already occurred by January 17, 2008 based on market reports and actions taken by similar banks to recognize losses in their conduits holding a similar type of assets.

114.    The 2007 Form 10-K described State Street's stress tests and sensitivity analyses with respect to each conduit individually in order to model potential scenarios that could cause the amount of first-loss notes to be insufficient to absorb the majority of the conduits' expected losses. The 2007 Form 10-K goes on to state:

As part of these analyses, we have identified certain conduit assets that could be more susceptible to credit downgrade because of their underlying credit characteristics. Our scenario testing specifically addresses asset classes that have experienced significant price erosion and/or have little observed market activity. Examples of scenarios that are designed to measure the sensitivity of the sufficiency of the first-loss notes include performing a downgrade of all assets which have underlying monoline insurance provider support, and a downgrade scenario on certain other conduit securities where our analysis of the timing and amount of expected cash flows for selected security default expectations does not re-affirm the security's current external credit rating. These simulations do not include a scenario

whereby all positions are simultaneously downgraded, the possibility of which we consider remote. In addition, a scenario could arise where one or more defaults could be so severe that the associated losses would exhaust the conduits' total first-loss notes currently outstanding.

115. The above statements are materially misleading and omitted to disclose material facts needed to make it not misleading because it fails to disclose that under the obligations to the conduits, based on conditions already existing at that time, if any declines in the asset values began to occur it would result in a downward spiraling credit situation with the conduit which would require State Street to execute upon its liquidity and credit support agreements and begin either lending money to the conduits, buying the conduit's commercial paper, or directly buying assets from the conduits. In any of these circumstances, State Street would begin taking the asset and/or liabilities on its balance sheet, which would result in recognizing losses on the assets but having to pay the commercial paper in full.

116. The 2007 Form 10-K stated that State Street believed that, "the current level of first-loss notes of approximately $32 million as of December 31, 2007 is sufficient to support default scenarios that we believe are more likely, including the stress tests previously described. However, in the future, if the determination and allocation of conduit expected losses by the financial model indicates that the current level of first-loss notes is insufficient to absorb a majority of the conduits' expected losses, we would be required to either (1) issue additional first-loss notes to third parties; (2) change the composition of conduit assets; or (3) take other actions in order to avoid being determined to be the primary beneficiary of the conduits. If we were unable to accomplish any of the above, we would be determined to be the primary beneficiary of the conduits, and would be required to consolidate the conduits' assets and liabilities. "

117. The above statement was materially misleading and omitted to disclose material facts

needed to make it not misleading because, although the conduits are technically structured as

bankruptcy remote entities and "third party owned", in fact State Street recorded the income from

such conduits on its income statements and was substantially exposed to risk of loss from the

conduits due to their structure and the presence of only 0.11% of assets in the form of first loss notes

available to absorb losses before State Street needed to consolidate the conduits on to its own

balance sheet and report the corresponding losses on its income statement.  It did not disclose that it

did not have the capital to support the consolidation without raising additional capital such as with a

stock offering as it did.

118.    State Street filed its Form 10-Q for the quarter ended March 31, 2008 ("First Quarter

2008 Form 10-Q") on May 9, 2008.  Its signatories included Defendant Malerba.

119.    The First Quarter 2008 Form 10-Q addressed the issue of absorption of credit losses

and assumptions in estimating losses and defaults:

> Any credit losses of the conduits would be absorbed by (1) investors
> in the subordinated debt, commonly referred to as "first-loss notes,"
> issued by the conduits; (2) State Street, pursuant to our contractual
> obligations; and (3) the holders of the conduits' commercial paper.
> The investors in the first-loss notes, which are independent third
> parties, would absorb the first dollar of any credit loss on the
> conduits' assets. If credit losses exceeded the amount of first-loss
> notes, we would absorb credit losses through credit facilities provided
> to the conduits, which are discussed later in this section. The
> commercial paper holders would absorb credit losses after the first-
> loss notes and State Street's credit facilities have been exhausted. We
> have developed the financial model referenced above to estimate and
> allocate each conduit's expected losses.
>
> In order to estimate expected losses as required by FIN 46(R), we
> estimate possible defaults of the conduits' assets and allocate the
> expected losses to the conduits' variable interest holders based on the
> order in which actual losses would be absorbed, as described above.
> We use the financial model to estimate expected losses based on
> hundreds of thousands of probability-weighted loss scenarios. These
> simulations incorporate published rating agency data to estimate
> expected losses due to credit risk. Primary assumptions incorporated

into the financial model relative to credit risk variability, such as default probabilities and loss severities, are directly linked to the conduit's underlying assets.

These default probabilities and loss severity assumptions vary by asset class and ratings of individual conduit assets. Accordingly, the model's calculation of expected losses is significantly affected by the credit ratings and asset mix of each conduit's assets. These statistics are reviewed by management regularly and more formally on an annual basis. If downgrades and asset mix change significantly, or if defaults occur on the conduits' underlying assets, we may conclude that the current level of first-loss notes is insufficient to absorb a majority of the conduits' expected losses.

We perform stress tests and sensitivity analyses, with respect to each conduit individually, in order to model potential scenarios that could cause the amount of first-loss notes to be insufficient to absorb the majority of the conduits' expected losses. As part of these analyses, we have identified certain conduit assets that could be more susceptible to credit downgrade because of their underlying credit characteristics. Our scenario testing specifically addresses asset classes that have experienced significant price erosion and/or have little observed market activity. Examples of scenarios that are designed to measure the sensitivity of the sufficiency of the first-loss notes include assuming a downgrade of all assets which have underlying monoline insurance support, and assuming a downgrade scenario concerning certain other conduit securities where our analysis of the timing and amount of expected cash flows for selected security default expectations does not re-affirm the security's current external credit rating. These simulations do not include a scenario whereby all positions are simultaneously downgraded, the possibility of which we consider remote. In addition, a scenario could arise where one or more defaults could be so severe that the associated losses would exhaust a conduit's total first-loss notes currently outstanding.

120.     The above statements are materially misleading and omitted to disclose material facts

needed to make it not misleading because they fail to disclose that State Street had only a capital

cushion in the form of first loss notes equal to 0.11% of the asset values and that such decline in

value had already occurred by January 17, 2008 based on market reports and action taken by similar

banks to recognize losses in their conduits holding substantially similar types of assets.

121.    The First Quarter 2008 Form 10-Q also discussed the contractual obligations of State

Street under liquidity asset purchase agreements with the conduits:

> Since the conduits were first organized, we have entered into
> contractual obligations, usually in the form of liquidity asset purchase
> agreements, to support most or all of the conduits' liquidity, by
> agreeing to purchase assets from the conduits at their book value
> upon the occurrence of certain events. We also provide credit
> enhancement to the conduits in the form of standby letters of credit.
> Other institutions can and do provide contractual liquidity to the
> conduits. As required by these agreements, we provide back-up
> liquidity in the event that the conduits cannot meet their funding
> needs through the issuance of commercial paper. In the event that
> maturing commercial paper cannot be reissued into the market by the
> conduits' dealer group, we and the other institutions providing
> liquidity may be required to purchase portfolio assets from the
> conduits. State Street may also provide liquidity by purchasing
> commercial paper or providing other extensions of credit to the
> conduits. In addition, we may be required to purchase assets from the
> conduits in connection with certain events related to those assets. As
> of March 31, 2008, our commitments under these liquidity asset
> purchase agreements and back-up lines of credit totaled
> approximately $27.89 billion, and our commitments under standby
> letters of credit totaled $1.06 billion.

122.    The above statement was materially misleading and omitted to disclose material facts

needed to make it not misleading because it fails to disclose that under State Street's obligations to

the conduits, based on conditions already existing in the market at that time as well as on an ongoing

basis, if any declines in the asset values began to occur, it would result in a downward spiraling

credit situation with the conduit, which would require State Street to execute upon its liquidity and

credit support agreements and begin either lending money to the conduits, buying the conduit's

commercial paper, or directly buying assets from the conduits.  In any of these circumstances, State

Street would begin taking the assets and/or liabilities on to its balance sheet, which would result in

recognizing losses on the assets but having to pay the commercial paper in full.  This in fact is what

happened and could reasonably have been anticipated to occur due to the structure of the conduits

and the liquidity and support agreements.   That is, once the asset values begin declining, as discussed previously, the liquidity for the commercial paper would begin to dry up such as there would be few or no new buyers for paper backed by assets with declining values.   Accordingly, the sterile language of the statement in the First Quarter 2008 Form 10-Q omits to disclose totally foreseeable effect of such events occurring.   These had already begun to occur by the date of the Form 10-Q as evidenced by Bank of New York Mellon Corp.'s consolidation of its conduits.

123.   The First Quarter 2008 Form 10-Q also addressed the exercise of State Street's obligation to purchase conduit assets.

> There were no draw-downs on the standby letters of credit during the first quarter of 2008. However, pursuant to the contractual terms of our liquidity asset purchase agreement with the conduits, we were required to purchase $850 million of conduit assets during the quarter. The purchase was the result of various factors, including the continued illiquidity in the commercial paper markets. The securities were purchased at prices determined in accordance with existing contractual terms in the liquidity asset purchase agreement, and which exceeded their fair value. Accordingly, the securities were written down to fair value through a $12 million reduction of processing fees and other revenue in our consolidated statement of income. The securities are carried at fair value in securities available for sale in our consolidated statement of condition.
>
> The conduits generally sell commercial paper to third-party investors; however, we sometimes purchase commercial paper from the conduits. As of March 31, 2008, we held on our consolidated balance sheet an aggregate of approximately $292 million of commercial paper issued by the conduits, compared to $2 million as of December 31, 2007 and $730 million as of September 30, 2007. The paper we hold is purchased at current market prices, and is carried at fair value in trading account assets in our consolidated statement of condition. These holdings have been higher than the levels of commercial paper we have historically held, which is reflective of the continued illiquidity in the asset-backed commercial paper markets and our desire to provide short-term stability to the conduits' funding costs. As of April 30, 2008, we held approximately $1.18 billion of the conduits' commercial paper.

124.   The above statements were materially misleading and omitted to disclose material

facts needed to make them not misleading because the statements fail to disclose the trend and likely continued effect of a continuation of that trend on State Street's balance sheet and on its obligation to consolidate the conduits. That is, considering the continued decline in the quality of the mortgage-backed securities market, and the continuing illiquidity of the conduits' commercial paper, it appeared very highly likely at April 30, 2008 that State Street was going to have to continue to purchase commercial paper from the conduits, thereby subjecting itself to the declining asset values of the conduits and requiring it to recognize increasing losses and consolidate the assets and liabilities on to its balance sheet.

125.   The First Quarter 2008 Form 10-Q also discussed issues regarding consolidation of the conduits.

> If we were required to consolidate the conduits' assets and liabilities, our regulatory capital ratios would be negatively impacted for a period of time. With respect to regulatory capital, the consolidation of the conduits' assets and liabilities would cause a reduction of our tier 1 and total risk-based capital ratios. The impact of consolidation on our tier 1 leverage ratio would be more significant, but the degree of impact would depend on how and when consolidation occurred, since this ratio is a function of our consolidated total average assets over an entire quarter. If consolidation of the conduits was anticipated to occur, management expects that it would take appropriate action to maintain the tier 1 leverage ratio above 5%.

126.   The above statement was materially misleading and omitted to disclose material facts needed to make it not misleading because it failed to disclose that the "appropriate action" would likely include the need to sell additional equity which would dilute the interests of current stockholders.

127.   On August 1, 2008, State Street filed its Form 10-Q for the quarter ended June 30, 2008 ("Second Quarter 2008 Form 10-Q"). Its signatories included that of defendant Materba who signed it on August 1, 2008. The statements relevant to this Complaint contained in the Second Quarter 2008 Form 10-Q are substantially similar to those as in the First Quarter 2008 Form 10-Q

with the primary difference being the particular numerical figures particular to the Second Quarter of

2008.  They were materially false and misleading and omitted to state material facts for the reason

stated above with respect to the First Quarter 2008 Form 10-Q.

128.    State Street's overly optimistic statements to the public generally and to the

Participants in this case continued.  On October 15, 2008, the Company issued a Form 8-K which

contained a press announcing State Street's results of operations and related financial information

for the second quarter of 2008 ended September 30, 2008:  It stated as follows:

> Ronald E. Logue, State Street's chairman and chief executive officer,
> said, *"We are pleased to be one of the nine financial institutions key
> to the infrastructure of the global financial markets,* selected by the
> U.S. Treasury to initiate the TARP Capital Purchase Program, a
> program aimed at addressing the financial turmoil and restoring
> confidence in the markets. Our selection demonstrates the important
> role that State Street plays for its customers and in the global markets
> and reflects our core financial strengths. Although we have always
> been and remain well capitalized, the program adds additional capital
> and affords us additional flexibility to continue our leadership role in
> meeting the challenges and opportunities in current markets. It's my
> belief that the companies that will emerge from this turmoil are those,
> like State Street, with the right mix of businesses, a focus on
> customer service, and a prudent plan for this environment. As part of
> this program, State Street will issue $2 billion of senior preferred
> shares to the U.S. Treasury along with warrants to purchase common
> stock with a total market price equal to about $300 million at the time
> of issuance, which we anticipate will be minimally dilutive to our
> shareholders."
>
> He continued, "In the third quarter, the volatility of both the equity
> and fixed-income markets resulted in increased business for State
> Street as customers sought us out because of our reputation for
> stability and safety. Market events drove growth in our balance sheet
> from $146 billion at June 30, 2008, to $286 billion at quarter end.
> Our normalized balance sheet has grown to $155 billion, excluding a
> temporary balance of $77 billion due to the AMLF and $54 billion in
> excess balances held at central banks, which we believe reflect
> current market conditions. We bear no risk or any capital assessment
> relative to the AMLF balances. We are pleased to be a significant
> participant and one of the first banks to be fully operational in the
> AMLF program of the Federal Reserve. We are also pleased to have

been appointed by the U.S. Treasury to manage a portion of the assets for its mortgage-backed securities portfolio."

Logue noted, "Due to the unprecedented market illiquidity in the third quarter, the unrealized after-tax mark-to-market losses at quarter end on State Street's investment portfolio have increased to $3.3 billion and in the asset-backed commercial paper conduits to $2.1 billion. *However, as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high."*

Addressing the future outlook, Logue concluded, "Due to our strong performance in the first nine months of 2008, *we continue to confirm our earlier statements regarding our performance to our financial goals for 2008.* We continue to expect our growth in operating earnings per share to be approaching the high end of the 10 to 15 percent range; growth in operating revenue to be above the high end of the 14 to 17 percent range and our operating return on equity to approach the high end of the 14 to 17 percent range." (emphasis added).

129.    Although in the October 15, 2008 Form 8-K, State Street referenced some of the

adverse effects of the credit markets at the time, the only efforts it makes to tie these events to State

Street with respect to the conduits is a series of statements which are nothing but a series of "ifs"

when in fact, market conditions had already deteriorated to a point where the "ifs" were no longer

"ifs" but rather facts that Defendants knew or should have known would have made any positive

statement concerning the near term for State Street false and misleading for failing to disclose the

extent to which market conditions were already negatively impacting State Street including its off

balance sheet assets (conduits) and thus the asset quality of its conduits assets had not remained high

as stated, and was in fact in the midst of a steady spiral downward.  Moreover, the forecast set forth

in the above statements failed to disclose as Defendants knew or should have known, that even if

State Street reported earnings per share and return on equity as forecasted, the continued downward

decline of State Street's conduits and their quality and the likelihood that they would soon need to be

consolidated would have an extremely negative impact on State Street's true financial condition such

that the reported earnings and return on equity would not present the true picture of State Street's financial conditions.

130.    On November 11, 2008, State Street filed its Form 10-Q for the quarter ended September 30, 2008 ("Third Quarter 2008 Form 10-Q").  Its signatories included that of defendant Materba who signed it on November 1, 2008.  The statements relevant to this Complaint contained in the Third Quarter 2008 Form 10-Q are substantially similar to those as in the First Quarter 2008 Form 10-Q with the primary difference being the particular numerical figures particular to the Third Quarter of 2008.  They were materially false and misleading and omitted to state material facts for the reason stated above with respect to the First Quarter 2008 Form 10-Q.

131.    The material information that was omitted from the above statements made by State Street in the above enumerated SEC filings caused the price of State Street stock to be inflated above the price it would have been had State Street made full disclosure of the material facts.  The price of State Street stock declined in response to disclosures of material information that had been withheld.

## BREACHES OF FIDUCIARY DUTY

132.    As required by ERISA, Defendants issued one or more SPDs, each of which either referred to or incorporated by reference the documents filed by State Street with the SEC under the federal securities laws.  For example, State Street published an SPD for the Plan on September 21, 2007 for the program in effect on January 1, 2007.  It includes a Plan Prospectus, dated March 13, 2007.  In a section of the 2007 SPD entitled "Incorporation of Certain Documents by Reference", the SPD states:

> . . . The information incorporated by reference is considered to be part of this Prospectus, and the information that the Company will file later with the SEC will automatically update and supersede this information. On July 11, 2006, the Company filed a registration statement in accordance with SEC Form S-8, Part II with respect to shares of Company stock deliverable under the Plan, which

incorporated certain n documents by reference. The Company incorporates those documents by reference in this Prospectus as well. In addition, all documents filed by us under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this Prospectus and prior to the end of this offering are deemed incorporated in this Prospectus from the date of their filing.

The SPD published by State Street on June 10, 2008 for the program in effect on January 1, 2008 contains substantially similar language.

133.    These incorporated filings, however, contained numerous material misrepresentations and omitted to state material facts which were necessary to make the statements which were made in them or the documents incorporated by reference, not misleading.

134.    Defendants were not obligated by ERISA or by the Plans to discharge their duty to provide information to Participants through the mechanism of incorporation of SEC filings. Defendants could have fulfilled this duty by setting forth sufficient and accurate information in the SPDs themselves, and updating such information as appropriate.  Defendants chose, however, to adopt the mechanism of incorporation of SEC filings into the SPDs, and the SEC filings contained materially false and misleading information which caused loss to the Plans and its Participants as set forth above.

135.    At all relevant times, Defendants should have known of the material misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs.

136.    State Street stock traded at $85.37 on January 3, 2008.  As a result of the above, State Street stock closed at $14.89 per share on January 20, 2009, a decrease of over 80%, thereby greatly diminishing the retirement benefits of Plaintiff and the Participants.  State Street stock declined significantly more than available alternative prudent investments during the Class Period.  State Street's highly speculative investments and conduits, its inability to properly the value same, and its

attempts to conceal the truth about the severity of its problems from the investing public, regulators, securities analysts and the Participants have resulted in significant Plan and Participant losses.

## MISMANAGEMENT OF PLAN ASSETS

137.   Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

138.   Defendants breached their fiduciary duties in that they should have known the facts alleged above and should have known that the Plan should not have invested in State Street common stock during the Class Period.

### FIRST CLAIM: LACK OF PRUDENCE IN PERMITTING PLAN PARTICIPANTS TO CONTINUE TO INVEST IN AND/OR MAINTAIN INVESTMENTS IN STATE STREET COMMON STOCK (AGAINST ALL DEFENDANTS)

139.   Plaintiff realleges and incorporates herein by reference the allegations set forth above.

140.   Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

141.   Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.  Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties.  By their

continuing to offer State Street common stock as an investment under the Plan, and/or permitting past investments to be maintained when in State Street's true adverse financial and operating condition was being concealed or when State Street common stock was not a prudent investment, Defendants breached each of these fiduciary duties and was not acting as prudent fiduciaries.

142.    As a consequence of Defendants' breaches, the Plan was damaged in that investments in the Plan with respect to State Street stock suffered inferior returns compared to returns that would have been available if the same funds had been prudently invested.

143.    Defendants are individually liable to make good to the Plan any damages to the Plan resulting from such breach.

144.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution to the Plan.

**SECOND CLAIM:  NEGLIGENT MISREPRESENTATION
(AGAINST ALL DEFENDANTS)**

145.    Plaintiff realleges and incorporates herein by reference the allegations set forth above except for those alleged in the First Claim.

146.    Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

147.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

148.    Defendants breached these fiduciary duties in that they made material misrepresentations, identified above, which boosted and artificially inflated the market price of State

Street stock and caused participants to pay more than they would have paid and more than they should have had to pay for State Street stock had the truth been told.

149.    Even if the Participants had not read each or any statements alleged to be materially false and misleading, the Participants are presumed to have relied upon Defendants' material misrepresentations to their detriment.

150.    As a consequence of Defendants' material misrepresentations, the Plan suffered damages recognized by law which upon payment to the Plan should be distributed to Participants who are class members in accordance with their legally cognizable losses.

151.    Defendants are individually liable to make good to the Plan any losses or damages to the Plan resulting from each breach to the Plan.

152.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution to the Plan.

### THIRD CLAIM:  MATERIAL NONDISCLOSURE
### (AGAINST ALL DEFENDANTS)

153.    Plaintiff realleges and incorporates herein by reference the allegations set forth except for those alleged in the Second Claim and any allegations of material misrepresentation, that do not involve a failure to disclose material fact.

154.    Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

155.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

156.    Defendants breached these fiduciaries in that they concealed and failed to disclose material information about State Street's conduits, including the associated risks, trends, results of model calculation and all other material information identified above.

157.    Actual reliance on particular statements on the part of the Plaintiff and of the other Class Members is either not a required element of the claim or to the extent that it may be required, reliance is presumed on behalf of all Class Members and there is no necessity that Plaintiff or any other Class Member actually read any particular statement alleged to have omitted any material facts needed to make such statement not misleading.

158.    Due to the material omissions of fact as alleged above, the price of State Street common stock was higher than it would have been had all material facts about or relating to the conduits administered by State Street and their risks and the results of the model calculation and all other material information identified as having not been disclosed.  As the stock market learned more of the material information that had been omitted, the price of State Street common stock declined.

159.    As a consequence of Defendants' materially misleading omissions, the Plan was damaged such damages to be awarded to the Plan and the amounts to be allocated to the accounts of Plan Participants who are class members in accordance with their legally cognizable losses..

160.    Defendants are individually liable to make good to the Plan any losses or damages to the Plan resulting from each breach.

161.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution to the Plan.

### FOURTH CLAIM: DIVIDED LOYALTY
### (AGAINST THE INDIVIDUAL DEFENDANTS ONLY)

162.    Plaintiff realleges and incorporates herein by reference the allegations set forth above

except those in the Second and Third Claim.

163.    Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

164.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

165.    Defendants breached their fiduciary obligations when they acted in their own interests or in their employer's (State Street's) interests rather than solely in the interests of the Participants and Beneficiaries.

166.    As a consequence of these breaches, the Plan was damaged.

167.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

168.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution to the Plan.

## FIFTH CLAIM:  MISMANAGEMENT OF PLAN ASSETS
### (AGAINST ALL DEFENDANTS)

169.    Plaintiff realleges and incorporates herein by reference the allegations set forth above except those in the Second and Third Claim.

170.    Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

171.     Pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), the Defendants were required to discharge their duties with respect to the Plan solely in the interests of the Participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

172.     Defendants breached these duties in that the Plan invested in State Street common stock despite the fact that State Street had made materially misleading statements and/or omitted material information, and the Plan permitted an over allocation of assets into State Street common stock, thereby failing to diversify assets so as to minimize the risk of large losses.

173.      As a consequence of these breaches, the Plan suffered losses and damages as recognized by law in that the value of the portfolio invested in State Street stock underperformed an investment of the same initial value prudently invested.

174.     Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach and for all legally recognized damages such amount to be distributed to the accounts of Plan Participants who are class members in accordance with their legally cognizable losses.

175.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution to the Plan.

**SIXTH CLAIM:  BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR
AND INFORM THE COMMITTEE AND MEMBERS OF THE COMMITTEE
(AGAINST STATE STREET ONLY)**

176.     Plaintiff realleges and incorporates herein by reference the allegations set forth above except those in the Second and Third Claim.

177.     State Street had the duty and responsibility to properly appoint, monitor and inform the members of the Benefits and Investment Committees and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and their assets.

178.     State Street failed to properly appoint, monitor and inform such persons in that the State Street failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the State Street did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by State Street during the Class Period identified herein) but nonetheless continued to allow such persons to offer State Street common stock as an investment option and/or maintain State Street common stock in Plan accounts even though State Street common stock was not a prudent investment for Participants' retirement accounts under the Plan.

179.     As a consequence of these breaches, the Plan suffered losses and damages recognized by law in that the value of the portfolio invested in State Street stock underperformed an investment of the same value prudently invested.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.     Judgment against defendants, jointly and severally, for actual damages to be paid to the Plan in the amount the difference between the value of the plan if it had been prudently invested during the class period and the actual value of the plan, with such damages to be allocated among the Participants' individual accounts in proportion to the accounts' losses, as well as damages calculated on an individual account basis;

B.     Appropriate equitable relief, including in the form of restitution to the Plan based on whatever formula the Court may deem appropriate or based on whatever further ;

C.      Costs and expenses, including expert's fees, pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

D.      Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and,

E.      Such other relief as the Court may deem equitable and just.

### **JURY TRIAL DEMAND**

Plaintiff demands trial by jury of all issues so triable.

Dated:  July ___, 2010

> Respectfully submitted
> **TODD & WELD LLP**
> Kevin T. Peters
> 28 State Street
> Boston, MA 02109
> Telephone: (617) 720-2626
> Facsimile:  (617) 227-5777
>
> **STULL, STULL & BRODY**
>
>
> **By:**_____
> Edwin J. Mills
> Mark Levine
> James Henry Glavin IV
> Michael J. Klein
> 6 East 45th Street
> New York, NY 10017
> Telephone: (212) 687-7230
> Facsimile:  (212) 490-2022
>
> **MAJOR KHAN, LLC**
> Major Khan
> 1120 Avenue of the Americas
> Suite 4100
> New York, NY 10036
> Telephone: (646) 546-5664
> Facsimile: (646) 546-5755
>
> *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Mark Levine, hereby certify that a copy of the foregoing document, filed through the

ECF system on July 30, 2010, was sent electronically on that date to the registered participants as

identified in the Notice of Electronic Filing.

Dated July 30, 2010

/s/ Mark Levine_____