UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS U. KENNEY, on Behalf of Himself and a Class of Persons Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) ) | NO. 09-10750-DJC |
| STATE STREET CORPORATION, et al., | ) ) ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## PLAINTIFF'S MOTION FOR LEAVE TO AMEND

May 18, 2011

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Thomas U. Kenney ("Kenney"), a former employee of State Street

Corporation ("State Street" or "Company"), has brought this putative class action on

behalf of himself, the State Street Salary Savings Program (the "Plan"), and a class of

current and former participants in the Plan whose accounts held shares of State Street

common stock at any time during the time period from August 28, 2007 to January 20,

2009 (the "Class Period").  The defendants include State Street, its North America

Regional Benefits Committee ("Benefits Committee"), its Investment Committee, and the

individual members of those Committees (collectively, "defendants").  Kenney claims

that during the Class Period, the defendants breached certain of the fiduciary duties owed

to the Plan and its participants under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA").

Kenney filed his original Class Action Complaint for Breach of Fiduciary Duty and Violation of ERISA Disclosure Requirements on May 7, 2009.  On July 20, 2009, before the defendants had answered, Kenney filed an Amended Complaint in which he asserted six statutory claims against the defendants under ERISA, including but not limited to, claims that the defendants breached their fiduciary duty of prudence by continuing to invest Plan funds in State Street stock, and that the defendants negligently misrepresented and failed to disclose critical aspects of State Street's financial condition, during the time period from January 3, 2008 to January 20, 2009.   The defendants moved to dismiss the Amended Complaint, and on March 15, 2010, the District Court issued a Memorandum and Order in which it dismissed all of the plaintiff's claims without prejudice except for his claim of negligent misrepresentation arising from an October 15, 2008 Form 8-K and press release that had been filed by State Street with the Securities and Exchange Commission ("SEC").  See Kenney v. State Street Corp., 694 F. Supp. 2d 67 (D. Mass. 2010) ("Kenney I").  Following the plaintiff's deposition, the defendants moved for summary judgment on the surviving claim, and on December 9, 2010, the District Court allowed the defendants' motion.  See Kenney v. State Street Corp., 754 F. Supp. 2d 288 (D. Mass. 2010) ("Kenney II").  Therefore, no claims currently are pending against the defendants in the litigation.

The matter is presently before the court on "Plaintiff Thomas U. Kenney's Motion for Leave to File a Second Amended Complaint" (Docket No. 92), by which Kenney is seeking to amend his complaint, pursuant to Fed. R. Civ. P. 15(a)(2), in order to revive his claims against the defendants for breaches of their fiduciary duties under ERISA during the longer class period of August 28, 2007 to January 20, 2009. Specifically, by his Proposed Second Amended Complaint ("SAC"), Kenney is seeking to assert new claims against all of the defendants for lack of prudence in permitting Plan participants to continue to invest in and/or maintain investments in State Street common stock (First Claim), negligent misrepresentation (Second Claim), material non-disclosure (Third Claim), and mismanagement of Plan assets (Fifth Claim). Additionally, Kenney is seeking to assert claims against the individual defendants for divided loyalty (Fourth Claim), and against State Street for failure to properly appoint, monitor and inform the Benefits and Investment Committees so as to ensure adequate management and administration of the Plan and its assets (Sixth Claim).

Kenney's principal claims continue to be his claim for lack of prudence and his claims for misrepresentation and non-disclosure. In support of those claims, Kenney alleges, in essence, that during the Class Period, the defendants mismanaged Plan assets and acted imprudently by continuing to invest Plan funds in State Street common stock despite the significant risk of loss that the Company was facing as a result of its sponsorship of four asset-backed commercial paper conduits and the likelihood that State Street would have to consolidate the conduits and their losses on its own financial statements.

-3-

He also claims that although State Street regularly issued statements about the conduit business in its SEC filings, those statements were materially false and misleading because they failed to disclose facts that would have revealed the extent of the financial risk to the Company that was created by its exposure to the conduits.  According to Kenney, it was not until January 2009, when State Street revealed that it was facing approximately $9 billion in potential losses from its investment securities and conduit business, and the price of State Street stock declined nearly 60% in a single trading session, that participants in the Plan were able to appreciate the level of risk associated with their investment in the Company's stock and to understand that such an investment was not prudent.

The defendants have opposed Kenney's motion to amend on the grounds that the SAC fails to state a plausible claim for relief, and that therefore, any such amendment would be futile.  They have also requested that Kenney's request for a jury trial, and his claims for equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), be stricken.  As detailed herein, in light of the First Circuit's admonition that the defendants' conduct must be evaluated considering the "totality of the circumstances" and that the test is not whether "[t]he odds of plaintiffs succeeding on their breach of fiduciary claims against the . . . defendants might be very long," this court concludes that the allegations set forth in Kenney's proposed SAC are adequate to state a claim for breach of the duty of prudence.  See Bunch v. W.R. Grace & Co., 555 F.3d 1, 7 (1st Cir. 2009); LaLonde v. Textron, Inc., 369 F.3d 1, 7 (1st Cir. 2004).  Nevertheless, this court also concludes that

the plaintiff has otherwise failed to make out a plausible claim for relief, that Kenney is not entitled to a jury trial under ERISA, and that Supreme Court precedent bars his claims for equitable relief. Accordingly, and for all the reasons described below, this court recommends to the District Judge to whom this case is assigned that the plaintiff's motion for leave to amend (Docket No. 92) be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that the motion be allowed with respect to the First Claim for relief but denied with respect to the remaining claims. This court also recommends that Kenney's demand for a jury trial and claims for equitable relief pursuant to § 502(a)(3) of ERISA be stricken.

## II.  STATEMENT OF FACTS

Where, as here, a motion to amend is opposed on grounds of futility, the "proposed amendment 'is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6).'" Transwitch Corp. v. Galazar Networks, Inc., 377 F. Supp. 2d 284, 290 (D. Mass. 2005) (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001)). Accordingly, the court must accept as true all well-pleaded facts set forth in the proposed amended complaint, and give the plaintiff the benefit of all reasonable inferences. See id.; Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999). In doing so, the court may consider documents attached to or expressly incorporated in the Proposed Amended Complaint, as well as "documents the authenticity of which are not disputed by the parties;" "official public records;" "documents central to

the plaintiff['s] claim;" and "documents sufficiently referred to in the complaint."[1] Alt. - Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (internal quotations omitted).  Applying this standard to the instant case, the relevant facts are as follows.

### The Plan

Defendant State Street is a financial holding company.  (SAC ¶ 10).  Through its subsidiaries, including its banking subsidiary, State Street Bank and Trust Company, the Company provides a range of products and services to institutional investors globally. (Id.).  Kenney was employed by State Street from 2000 to 2007, and again from March 2008 until December 4, 2008, when he was terminated in connection with the Company's job reduction plan.  (Id. ¶ 9).  Kenney alleges that during the Class Period, he was a participant in the Plan, which was designed as a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), and allowed participants to accumulate savings for retirement.  (Id. ¶¶ 9, 33-34).  He also alleges, and

---

[1] In addition to the SAC, which is attached as Exhibit A to the plaintiff's Motion for Leave to File a Second Amended Complaint (Docket No. 92), this court has considered the following documents to the extent they are consistent with the applicable standard: (1) the exhibits attached to the Affidavit of John J. Butts (Docket No. 103) ("Def. Ex. __"); (2) the exhibits attached to the Declaration of Mark Levine in Further Support of Plaintiff's Motion for Leave to File a Second Amended Complaint (Docket No. 106) ("Pl. Ex. __"); (3) the exhibits attached to the defendants' Opposition to Motion to File Second Amended Complaint (Docket No. 102) ("Def. Supp. Ex. __"); and (4) the exhibits attached to the Defendants' Sur-Reply in Opposition to Motion to File a Second Amended Complaint (Docket No. 117) ("Def. 2d Supp. Ex. __").

it is not disputed, that each of the defendants was a fiduciary of the Plan during the relevant time period.  (Id. ¶¶ 12-23).

According to Kenney, State Street and its Benefits Committee were responsible for selecting the investment options that were available under the Plan.  (Id. ¶¶ 12-13, 36). During the Class Period, participants in the Plan were allowed to choose from among a "wide range of investment choices."  (Id. ¶¶ 36-37; see also Def. Ex. A at 16-22 (describing options)).  One of the available choices consisted of an employee stock ownership plan ("ESOP"), which enabled Plan participants to invest up to 25% of their Plan account balances in State Street common stock.  (SAC ¶¶ 36-37; see also Def. Ex. A at 21-22).  As State Street's Summary Plan Description provided, "[t]he [ESOP] Fund provides participants the opportunity to become an owner in the Corporation and share directly in its financial performance."  (Def. Ex. A at last page).  However, it further noted that "[t]he value of the [ESOP] Fund will fluctuate depending on State Street's performance, stock market fluctuations and general economic conditions.  Because the Fund invests in the common stock of only one company, it is the most risky of the Funds offered through the [Plan]."  (Id.).

Kenney alleges that during the Class Period, he maintained an investment in State Street common stock.  (See SAC ¶ 9).  He also alleges that between December 31, 2007 and December 31, 2008, "Plan participants who had invested in State Street stock saw a reduction in the value of those shares being held of about $200 million[.]"  (Id. ¶ 38). Kenney contends that throughout the Class Period, State Street common stock was not a

prudent investment for employees' individual retirement accounts due to the threat to State Street's financial stability posed by State Street's sponsorship of four asset-backed commercial paper conduits.  (See id. ¶¶ 1, 39).  He also contends that if the defendants had fully and timely disclosed State Street's true financial condition, including the financial risks associated with the Company's administration of the conduits, participants in the Plan would have understood that State Street common stock was not a prudent investment, and many of those participants would not have chosen that option.  (Id. ¶ 39).

### The Conduits

The conduits were first established in 1992, and were designed to satisfy demands from State Street's institutional investors, especially its mutual fund customers, for commercial paper.  (Def. Ex. G at 71).  The conduits consisted of independently owned, special-purpose, multi-seller asset-backed commercial paper programs that were structured as bankruptcy-remote, limited liability entities and were not recorded on State Street's consolidated financial statements.  (Id. at 71, 86; SAC ¶¶ 46, 59).  During the Class Period, the conduits invested in pools of medium and long-term financial instruments consisting mainly of asset-backed securities that were collateralized by mortgages, student loans, automobile loans, equipment loans and credit card receivables. (Def. Ex. G at 11, 71; see also SAC ¶ 56).  The investments were financed through the issuance of short-term commercial paper having maturities of one year or less.  (Def. Ex. G at 11, 71, 86; see also SAC ¶¶ 47-48).  Although the financial assets purchased by the

conduits were not originated by State Street, and State Street did not have any equity

ownership interest in the conduits, Kenney alleges that the Company remained exposed to

the risk of potentially significant losses from the conduits.  (See SAC ¶¶ 53, 63).

The conduits were designed not to trade their assets, but rather to hold those assets

to maturity.  (Def. Ex. G at 48).  The intent was to "maintain a positive margin between

the rate of return on their longer-term assets and the short-term cost of funding."  (Id. at

11).  In other words, as the defendants describe it,

> the conduits bought their debt security assets to obtain cash flow
> (principal and interest payments) from them until they matured.  This
> is because the conduits were designed with the objective that their
> two cash flow streams – one from the assets and the other to the
> holders of the commercial paper – would offset (except that the
> interest from the debt securities would exceed the interest paid on
> the commercial paper).

(Def. Opp. Mem. (Docket No. 102) at 4).  State Street received administrative fees and

other distributions out of the residual earnings of the conduits after payment of interest on

the outstanding commercial paper and other fees to third parties.  (See Def. Ex. R at 105;

SAC ¶ 49).  In its Form 10-K for the fiscal year ended December 31, 2008 ("2008 10-

K"), State Street reported that it had earned fee revenue from the conduits of

approximately $59 million for 2008, $63 million for 2007 and $62 million for 2006,

which it recorded in its consolidated statement of income.  (Def. Ex. R at 105).  Kenney

alleges that the structure of the conduit business enabled State Street to "show[] the

benefit of the earnings on the conduit's assets without showing the assets and liabilities

required to generate those earnings."  (SAC ¶ 50).  According to the plaintiff, this gave

State Street "at least the appearance of better reported earnings and a healthier financial position." (Id. ¶ 46). He claims that in reality, the conduits created enhanced financial risk for the Company and rendered State Street's stock an imprudent investment during the course of the Class Period. (Id.).

## Risks Associated with the Conduits[2]

Among the risks that State Street faced in connection with its sponsorship of the conduits was the risk that the Company would be required to provide liquidity to the conduits. In particular, the Company had "contractual obligations in the form of liquidity asset purchase agreements to support most or all of the liquidity of the conduits." (Def. Ex. G at 72; see also SAC ¶ 51). It also provided "credit enhancement" in the form of lines of credit in order to ensure that the conduits could meet their obligations to repay outstanding commercial paper. (Def. Ex. G at 72; SAC ¶ 51). As State Street explained in its Form 10-K for the fiscal year ended December 31, 2007 ("2007 10-K"),

> we provide back-up liquidity in the event that the conduits cannot meet their funding needs through the issuance of commercial paper. In the event that maturing commercial paper cannot be reissued into the market by the conduits' dealer group, we and the other institutions providing liquidity may be required to provide liquidity by purchasing portfolio assets from the conduits. State Street may also

---

[2] Kenney contends that the defendants made various misrepresentations and otherwise failed to adequately disclose risks associated with State Street's sponsorship of the conduits. As detailed below, this court declines to evaluate the specific representations at issue, since Kenney's lack of reliance on any of the representations precludes the maintenance of his challenge to their sufficiency. However, this court does note that State Street did make a great number of disclosures concerning the conduits, and, despite the plaintiff's challenges, State Street's public filings will be cited extensively in this decision.

> provide liquidity by purchasing commercial paper or providing other extensions of credit to the conduits.  As of December 31, 2007, State Streets' commitments under these liquidity asset purchase agreements and back-up lines of credit totaled approximately $28.37 billion, and our commitments under standby letters of credit totaled $1.04 billion.

(Def. Ex. G at 72).  During 2007, State Street held as much as $1.25 billion of the conduits' commercial paper on its consolidated balance sheet.  (Id.).

State Street's contractual obligations also subjected it to risks in the event that a conduit experienced a problem with an asset, such as a default or downgrade in the asset's credit rating.  (Def. Ex. G at 73).  As the Company disclosed to investors in its public filings, under such circumstances, State Street could be required to purchase the asset from the conduit.  (Id.).  Because State Street's asset purchase agreements required the Company to purchase conduit assets at agreed upon prices, there was a risk that the purchase price would exceed the fair market value of the asset.  (See id.; SAC ¶ 54, 82).  If that occurred, State Street would be required to recognize any loss that was not offset by funding from holders of first loss notes.  (Def. Ex. G at 73).  Kenney alleges that as of December 31, 2007, the aggregate amount of assets held by the conduits totaled $28.76 billion, but the first loss note holders, who would absorb any credit losses of the conduits prior to State Street, held only $32 million of such notes.  (SAC ¶¶ 63, 109-10).  He claims that if State Street had held the assets directly instead of through conduits, it would have been subject to regulations requiring it to maintain a much higher amount of equity capital.  (Id. ¶¶ 54, 63).  However, because the conduits were not subject to bank

regulatory requirements, there was "significantly less capital cushion under the conduit's assets than if they were recorded on State Street's own balance sheet" and a far greater risk of exposure to loss. (<u>Id.</u> ¶ 54).

In addition to the risks described above, State Street faced the possibility that it could be required under applicable accounting standards to consolidate some or all of the conduits on its consolidated balance sheet. (Def. Exs. G at 73 & P at 10). State Street warned investors that if that were to occur, the Company would have to consolidate the conduits' assets and liabilities on its balance sheet at fair value. (Def. Ex. G at 74). Thus, if the fair value of the conduits' liabilities exceeded the fair value of their assets, State Street would recognize a loss. (<u>Id.</u>). In its filings with the SEC, State Street repeatedly described the potential magnitude of any such losses. (<u>See</u>, <u>e.g.</u>, Def. Exs. G at 74, I at 35 & M at 38). For example but without limitation, State Street stated in its 2007 10-K as follows:

> for illustrative purposes only, assuming estimated fair values of the conduits' assets as of December 31, 2007, if all of the conduits' assets were purchased under the liquidity asset purchase agreements, or if the conduits' assets and liabilities were consolidated onto our consolidated balance sheet, we estimate that we would recognize an after-tax loss of approximately $530 million in our consolidated statement of income.

(Def. Ex. G at 74). According to Kenney, the decline in the market value of the conduits' assets over the course of the Class Period posed an increasing risk of loss to State Street, and ultimately led to dramatic declines in the Company's stock price. (<u>See</u> SAC ¶¶ 45, 56, 82, 86).

## **Growing Turbulence in the Credit Markets**

Kenney alleges that a growing financial crisis during the Class Period significantly increased State Street's exposure with respect to the conduit business.  (See id. ¶ 58).  He claims that the resulting risk of investing in the Company's stock was apparent from media coverage of State Street and other entities that sponsored off-balance sheet vehicles.  (See id. ¶¶ 58, 64-70).  For example, Kenney alleges that on August 28, 2007, the first day of the Class Period, an article in *Bloomberg* reported on the "growing recognition" of a "crisis in the commercial-paper market," and the concern that State Street would face losses in connection with the conduits.  (Id. ¶ 64).  The same article also noted that State Street shares had dropped 4.3% per share on August 28, 2007, and that two other banks which managed conduits had seen declines in their share prices as well.  (Id. ¶ 65).

On the same day, *The Times* of London allegedly published an article entitled "State Street Bank Has Highest Exposure to Conduits."  (Id. ¶ 66).  According to the plaintiff, the article provided:

> State Street, the American bank, has been identified as having $22 billion (£ 10.9 billion) of exposure to asset-backed commercial paper conduits, the off-balance sheet vehicles that have caused severe problems for rivals in recent weeks amid turmoil in credit markets.
>
> According to regulatory filings, the Boston-based bank has credit lines to at least six conduits, which account for 17 per cent of its total assets.  That proportion makes State Street the most highly exposed bank to conduits among its European and American peers.

(<u>Id.</u>).  One day later, on August 29, 2007, an on-line affiliate of *The Boston Globe*

allegedly reported that State Street stock had declined 15% over the course of the month

due to growing concern that the conduits "could expose State Street to the woes that have

affected other financial institutions in the recent credit crunch."  (<u>Id.</u> ¶ 58).

Kenney claims that other articles published in the Fall of 2007 echoed concerns

about the potential losses that State Street and other banks could face from their exposure

to conduits at a time of turmoil in the financial markets.  (<u>See</u> <u>id.</u> ¶¶ 67-70).  He contends

that "[a]s early as August, 2007, if not earlier, Defendants should have recognized the

enhanced risk of State Street's [conduit] program and thus the lack of prudence of

Defendants in permitting the continued investing and/or holding, by Plan Participants in

State Street common stock."  (<u>Id.</u> ¶ 58).

Kenney also contends that the collapse of certain monoline insurers during the

Class Period further enhanced the risk that State Street would suffer losses as a result of

its obligations to the conduits.  (<u>Id.</u> ¶ 71).  Specifically, he claims that a significant

percentage of the conduits' assets were insured for a portion of their face value by various

monoline insurers.  (<u>Id.</u> ¶ 72).  However, by late 2007, four of those insurers, which

together insured nearly 70% of the conduits' assets, allegedly were facing capital

shortfalls and possible downgrades in their credit ratings.  (<u>Id.</u> ¶¶ 71-72).  Kenney claims

that this development threatened the credit quality of the insured assets and caused "an

upward spiraling of the risk to the conduits."  (<u>Id.</u> ¶ 71).

The plaintiff alleges that the market disruptions adversely impacting the value of the conduits' assets persisted in 2008 and 2009.  For example, he claims that by March 31, 2008, 22% of the conduits' assets consisted of Australian residential mortgage backed securities, and that 97% of those assets were rated AA or better.  (Id. ¶ 76).  He alleges that by March 31, 2009, as a result of a growing crisis in Australia's "non-conforming" mortgage market and an associated drop in the credit ratings of the assets, only 67% of the Australian residential mortgage backed securities held by the conduits were rated AA or better.  (Id. ¶¶ 75-76).  According to Kenney, developments such as this one confirmed the fact that the defendants acted imprudently by permitting Plan participants to invest in and/or maintain their investments in State Street stock.  (Id. ¶ 76).

It is undisputed that as the troubled financial climate persisted throughout the Class Period, there were significant declines in the value of the conduit assets.  (Def. Opp. Mem. at 7).  State Street disclosed those declines each quarter throughout the Class Period in its financial statements filed with the SEC.  (See Def. Exs. D at 35, G at 74, I at 34, M at 38, O at 45, R at 11, and U at 20).  For example, but without limitation, the Company warned investors that if it had been required to consolidate the conduits' assets and liabilities onto its consolidated balance sheet, it would have recognized an after-tax loss of about $215 million as of September 30, 2007.  (Def. Ex. D at 35).  By December 31, 2008, the Company revealed that there were $3.56 billion in after-tax net unrealized losses associated with the assets held by State Street-sponsored conduits.  (Def. Ex. R at 11).

-15-

While State Street acknowledged the potential losses that would have occurred if it had been required to consolidate the conduits into its consolidated financial statements, it maintained that the quality of the conduit assets remained high.  (See SAC ¶¶ 64, 67, 128; Def. Ex. E at Ex. 99.2 at 1).  For example, in its Form 8-K dated October 16, 2007, the Company presented information showing that 77% of the assets held by State Street-sponsored conduits carried credit ratings of Aa/AA or higher.  (Def. Ex. E at Ex. 99.2 at 1).  However, Kenney alleges that the rating levels of the conduit assets continuously declined throughout the Class Period, and that by March 31, 2009, only 53% of the assets carried credit ratings of Aa/AA or higher.  (SAC ¶ 92).  He also alleges that the ratings were inflated by the ratings agencies, which placed their own profit motives above any interest in maintaining objectivity.  (See id. ¶¶ 96-97, 99-100).  According to the plaintiff, the ratings agencies sustained significant criticism as early as May 2007 in the wake of large losses in the value of investments that had been given the highest credit ratings from Moody's, and they continued to suffer criticism in connection with fallout from the ongoing financial crisis.  (See id. ¶¶ 98, 102).  Kenney contends that the defendants knew or should have known, as a result of the negative publicity, that it was unreasonable to rely on credit ratings to evaluate the quality of the conduit assets.  (Id. ¶ 98).

The plaintiff acknowledges that the conduits appeared to represent a relatively small element of State Street's financial profile because they were not part of the Company's traditional line of business.  (Id. ¶ 79).  He claims that they nevertheless were material to the health of State Street's business, as evidenced by their potential impact on

the Company's Tangible Common Equity ("TCE") ratio.  (<u>Id.</u>).  According to the plain-tiff, the TCE ratio is used as a measure of a company's capital strength and is calculated by dividing the company's tangible common equity by its tangible assets.  (<u>Id.</u>).  He alleges that regulators consider the minimum acceptable ratio for banks to be about 3%. (<u>Id.</u> ¶ 80).  He also alleges that on October 16, 2008, financial services firm Janney Montgomery Scott issued a report in which it stated that State Street had a TCE ratio of 4.8%, but that the TCE ratio would drop to 3% if all the conduits were consolidated onto the Company's balance sheet.  (<u>Id.</u> ¶ 81).  Kenney further claims that if State Street had consolidated the conduits as of March 31, 2008, and had not engaged in a $2.5 billion equity offering on June 3, 2008, its TCE ratio would have dropped to 1.6%.  (<u>Id.</u>).  Thus, Kenney contends, the significant impact that the conduits could have on State Street's overall financial health further illustrated the defendants' alleged lack of prudence in permitting Plan participants to continue or maintain investments in State Street stock. (<u>See</u> <u>id.</u> ¶ 63).

### Allegedly Misleading Statements

Kenney claims that in addition to their conduct in continuing to offer State Street stock despite the unreasonable risks posed to the Company by the conduits, the defen-dants issued Summary Plan Descriptions to Plan participants that referred to or incor-porated various SEC filings that were issued by State Street during the Class Period and contained materially false and misleading statements relating to the conduits. (<u>See</u> <u>id.</u> ¶¶ 132-35).  The SEC filings at issue include State Street's 2007 10-K, its Form 10-Qs for

the quarters ended March 31, 2008, June 30, 2008 and September 30, 2008, and its Form 8-K filed with the SEC on October 15, 2008.  (See id. ¶¶ 104-31).  Although the filings disclose the liquidity, credit and consolidation risks described above with respect to the conduits, Kenney nevertheless contends that a number of the statements contained therein were misleading because they did not fully disclose the level of risk inherent in the conduit business.  (Id. ¶¶ 106-30).  He alleges that the misrepresentations and omissions contained in State Street's SEC filings caused the Company's stock price to remain artificially inflated until the end of the Class Period, when the truth about the conduits was finally disclosed and the Company's stock price plunged, causing losses to the Plan and its participants' accounts.  (See id. ¶¶ 131, 135-36, 148, 150, 158-59).  However, Kenney does not allege that he read any of the challenged filings or that he otherwise relied on them in connection with his purchase of State Street stock.[3]

### Alleged Revelations Regarding State Street's True Financial Condition

The plaintiff alleges that the truth about State Street's exposure from the conduits was finally revealed on January 16, 2009, when State Street filed a Form 8-K with the SEC that included the Company's financial results for the quarter ended December 31, 2008.  (See id. ¶¶ 82-86; Def. Ex. S at 1).  Therein, State Street warned investors that it was facing potential investment losses of about $9 billion from its investment securities

---

[3]  Because this court finds that Kenney's failure to allege facts indicating that he detrimentally relied on the challenged SEC filings warrants the dismissal of his misrepresentation and non-disclosure claims as a matter of law, and due to the length of the challenged statements, this court has chosen not describe them herein.

and commercial paper conduit program, and that it was predicting a tougher 2009 than

had been disclosed previously.  (SAC ¶¶ 82-83).  With respect to the commercial paper

program, the Company revealed in relevant part as follows:

> Our asset-backed commercial paper conduit program experienced significantly reduced demand for its commercial paper financing beginning in the third quarter of 2007.  As the disruption in the credit markets continued through 2008, our liquidity management of the conduits resulted in our purchasing historically high levels of commercial paper from the conduits.  During 2008, the amount of commercial paper issued by the conduits on our consolidated balance sheet increased from approximately $2 million as of December 31, 2007 to approximately $292 million as of March 31, 2008, approximately $212 million as of June 30, 2008, and approximately $7.82 billion as of September 30, 2008 (including $1.6 billion under the AMLF program).  On December 31, 2008, we held $230 million of commercial paper issued by the conduits on our consolidated balance sheet (which does not include $5.7 billion issued by the conduits under the Federal Reserve's Commercial Paper Funding Facility as of December 31, 2008).  The highest total overnight position (including AMLF) in the conduits' commercial paper held by State Street during the three months ended December 31, 2008, was approximately $8.9 billion and during the fiscal year ended December 31, 2008, was approximately $8.9 billion.

(Id. ¶ 82; Def. Ex. S at 9).  It further disclosed that

> [p]urchase of the assets of the conduits pursuant to the contractual agreements [with the conduits] could affect the size of our consolidated balance sheet and related funding requirements, our capital ratios, and, if the conduit assets include unrealized losses, could require us to recognize those losses.  As of December 31, 2008, there were $3.6 billion of after-tax net unrealized losses associated with portfolio holdings of the conduits.

(Id.).  According to the SAC, State Street's disclosure that its unrealized losses from the conduits had more than doubled in the fourth quarter shocked both analysts and investors. (SAC ¶ 85).

Between January 16, 2009 and January 20, 2009, the last day of the Class Period, State Street's stock price allegedly plunged nearly 60%, from $36.35 per share to $14.89 per share, as the market digested the news about State Street's business.  (Id. ¶¶ 83, 86). According to *The Boston Globe*, this was the lowest level that the stock had reached since 1996.  (Id. ¶ 83).  The plaintiff claims that the loss in value of State Street common stock resulted in diminished retirement savings for Plan participants who held such stock in their Plan accounts.  (Id. ¶ 86).

On January 21, 2009, the financial services firm of Keefe Bruyette & Woods issued a report in which it allegedly stated that if State Street consolidated its conduits, it would have had a TCE ratio of 1.05%.  (Id. ¶ 87).  The report further stated that without consolidation, State Street's TCE ratio would be 4.46%.  (Id.).  As described below, State Street ultimately determined that consolidation was necessary, but not until after the close of the Class Period.[4]

On February 10, 2009, *American Banker* allegedly reported that State Street's main ratings had been downgraded by all three of the major ratings agencies following the Company's announcement of its fourth quarter 2008 financial results.  (Id. ¶ 85).

---

[4]  Plaintiff does not allege that the timing of the consolidation was inappropriate under applicable accounting standards.

According to the article, State Street was saved from further downgrades due only to the prospect of a government bailout.  (Id.).

### Events Following the Close of the Class Period

On April 21, 2009, approximately three months after the close of the Class Period, State Street issued a Form 8-K and press release announcing its financial results for the first quarter of 2009.  (Id. ¶ 88; Def. Ex. V).  Therein, State Street announced earnings of $1.02 per share, a decline from the prior year's first quarter earnings of $1.35 per share.  (SAC ¶ 88; Def. Ex. V at Ex. 99.1 at 1).  It also announced revenue of $2.002 billion, which represented a decline of 22.3% from $2.577 billion reported in the first quarter of 2008.  (Id.).  Kenney claims that these results illustrated a deterioration in State Street's financial condition "which had its roots as early as 2007."  (SAC ¶ 88).

On May 18, 2009, State Street issued a Form 8-K in which it announced that it had elected to take action which resulted in the consolidation onto the Company's balance sheet of all the assets and liabilities of the conduits.  (Def. Ex. W at 26; see also SAC ¶ 89).  As State Street stated,

> [t]he consolidation of the conduits was completed pursuant to the provisions of Financial Accounting Standards Board Interpretation No. 46(R) following the voluntary redemption of the conduits' outstanding subordinated debt.  We consolidated the conduits only for accounting purposes and have not legally acquired the conduits' assets and liabilities.  The conduits remain separate and distinct legal entities, and their commercial paper programs continue to operate substantially in accordance with past practice.

(Def. Ex. W at 26).

On May 18, 2009, Janney Montgomery Scott reported that State Street's TCE ratio after consolidation was 2.2%.  (SAC ¶ 89).  Kenney alleges that following consolidation, State Street immediately announced a $2.2 billion equity offering, which increased its TCE ratio to 3.3%, just barely above the minimum acceptable standard.  (Id.).

Additional factual details relevant to this court's analysis are described below.

## III.  ANALYSIS

### A.    Motion to Amend Standard of Review

The decision whether to grant a motion for leave to amend falls within the trial court's discretion.  Sheehan v. City of Gloucester, 321 F.3d 21, 26 (1st Cir. 2003). "Leave to amend under Rule 15 'is freely given when justice so requires' absent an adequate basis to deny amendment such as futility, bad faith, undue delay or a dilatory motive."  Transwitch Corp. v. Galazar Networks, Inc., 377 F. Supp. 2d 284, 290 (D. Mass. 2005) (quotations and citation omitted), and cases cited.  The "futility" assessment is governed by the standard for motions to dismiss under Fed. R. Civ. P. 12(b)(6).  See id. Consequently, an amendment will not be deemed futile unless the well-pleaded facts, taken as true and viewed in favor of the plaintiff, fail to support a "'plausible entitlement to relief.'"  See Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief.  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st

Cir. 2009).  "'First, the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.'

Such conclusory statements are 'not entitled to the assumption of truth.'"  <u>Id.</u> (quoting

<u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)) (internal citations

omitted).  Second, the complaint must state "a plausible claim for relief[.]"  <u>Id.</u> (quoting

<u>Ashcroft</u>, 129 S. Ct. at 1950).  "This second principle recognizes that the court's

assessment of the pleadings is 'context specific,' requiring 'the reviewing court to draw

on its judicial experience and common sense.'  '[W]here the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged – but it has not show[n]' – 'that the pleader is entitled to relief.'"  <u>Id.</u> (quoting

<u>Ashcroft</u>, 129 S. Ct. at 1950) (internal citations omitted; alterations in original).

"Although evaluating the plausibility of a legal claim requires the reviewing court

to draw on its judicial experience and common sense, the court may not disregard

properly pled factual allegations, even if it strikes a savvy judge that actual proof of those

facts is improbable."  <u>Ocasio-Hernandez v. Fortuno-Burset</u>, – F.3d – , 2011 WL 1228768,

at *9 (1st Cir. Apr. 1, 2011) (internal quotations and citations omitted).  "Nor may a court

attempt to forecast a plaintiff's likelihood of success on the merits; a well-pleaded

complaint may proceed even if a recovery is very remote and unlikely."  <u>Id.</u> (quotations,

punctuation and citations omitted).  Thus, in evaluating whether a complaint states a

claim for relief, "[t]he relevant inquiry focuses on the reasonableness of the inference of

liability that the plaintiff is asking the court to draw from the facts alleged in the complaint."  Id.

### B.    First and Fifth Claims: Alleged Lack of Prudence and Failure to Diversify

By his proposed First Claim for relief, Kenney claims that the defendants breached a fiduciary duty of prudence owed to Plan participants under ERISA by continuing to offer and/or maintain State Street stock as an investment option under the Plan during the Class Period.  Similarly, by his Fifth Claim for relief, Kenney alleges that the defendants breached their fiduciary duty of prudence and mismanaged plan assets by permitting "an over allocation of assets into State Street common stock, thereby failing to diversify assets so as to minimize the risk of large losses" during the Class Period.  (SAC ¶ 172).  The defendants contend that both of these claims are futile.  For the reasons that follow, this court finds that Kenney's Fifth Claim is futile, but that the allegations set forth in supporting the First Claim of the proposed SAC are sufficient to support a claim.

### The Duty of Prudence

Under ERISA, fiduciaries are required to "use the 'care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'"  Bunch, 555 F.3d at 7 (quoting 29 U.S.C. § 1104(a)(1)(B)).  "In accordance with that duty, ERISA fiduciaries must 'diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the

circumstances it is clearly prudent not to do so.'" Kenney I, 694 F. Supp. 2d at 73

(quoting 29 U.S.C. § 1104(a)(1)(C)).  However, "an [ESOP] fiduciary's decision to

purchase or hold the employer's securities is exempt from the duty to diversify and the

related duty of prudence insofar as it concerns asset diversification." Kirschbaum v.

Reliant Energy, Inc., 526 F.3d 243, 248 (5th Cir. 2008) (citing 29 U.S.C. § 1104(a)(2)).

This is due to "the unique nature of ESOPs, which Congress intended to function as 'both

an employee retirement benefit plan and a technique of corporate finance that would

encourage employee ownership.'" Kenney I, 694 F. Supp. at 73 (quoting Martin v.

Feilen, 965 F.2d 660, 664 (8th Cir. 1992)) (internal quotations omitted).  Aside from the

exemption from diversification, fiduciaries of an ESOP otherwise "remain subject to

ERISA's strict fiduciary duties." Id.

This court finds that the exemption from diversification disposes of Kenney's Fifth

Claim for breach of fiduciary duties based on a failure to diversify assets. See

Kirschbaum, 526 F.3d at 249 ("ERISA exempts an [ESOP] from the duty to diversify

with regard to the purchase or holding of company stock").  Therefore, this court

recommends that the motion to amend be denied with respect to that claim.

In his First Claim, Kenney alleges that the defendants acted imprudently by failing

to remove the ESOP as an investment option during the Class Period.  The First Circuit

has noted that "prudence involves a balancing of competing interests under conditions of

uncertainty[,]" and that the question whether a defendant has exercised prudence in

selecting and retaining available investment options must be evaluated based on "the

totality of the circumstances[.]" <u>Bunch</u>, 555 F.3d at 7 (quotations and citations omitted). This includes, but is not limited to, an evaluation of such factors as "the plan structure and aims, the disclosures made to participants regarding the general and specific risks associated with investment in company stock, and the nature and extent of challenges facing the company that would have an effect on stock price and viability." <u>DiFelice v. U.S. Airways, Inc.</u>, 497 F.3d 410, 418 (4th Cir. 2007). It also includes consideration regarding "the market price of the [company's] stock." <u>Bunch</u>, 555 F.3d at 7. However, "'the test of prudence . . . is one of *conduct*, and not a test of the result of performance of the investment.'" <u>Id.</u> (quoting <u>Donovan v. Cunningham</u>, 716 F.2d 1455, 1467 (5th Cir. 1983)). Thus, "[t]he focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed." <u>Donovan</u>, 716 F.2d at 1467 (quotations and citation omitted). <u>See also</u> <u>LaLonde</u>, 369 F.3d at 7 ("It would subvert the purposes of ERISA to permit lawsuits against plan fiduciaries . . . every time a company's fortunes took a relatively unexceptional turn for the worse.").

The First Circuit, acknowledging that ERISA breach of fiduciary duty claims implicate an "important and complex area of law" that "is neither mature nor uniform," has expressed reluctance to lay down any "hard-and-fast rule" with respect to such claims. <u>LaLonde</u>, 369 F.3d at 6. It also has emphasized the importance of developing the factual record in such cases. <u>See</u> <u>id.</u> In light of the fact-based nature of the prudence analysis, the First Circuit's emphasis on factual development, and the liberal pleading standard applicable to ERISA breach of fiduciary duty claims, this court recommends that

-26-

Kenney be given an opportunity to develop the record as to whether the defendants acted

imprudently by continuing to offer State Street stock under the circumstances alleged to

have existed during the Class Period.

### The Presumption of Prudence

A threshold issue raised by the defendants' opposition to the motion to amend is

whether, in evaluating Kenney's claim for breach of the duty of prudence, the court

should adopt the presumption of prudence that was first applied to such claims by the

Third Circuit in <u>Moench v. Robertson</u>, 62 F.3d 553 (3d Cir. 1995).  Therein, the court

held that "an ESOP fiduciary who invests the assets in employer stock is entitled to a

presumption that it acted consistently with ERISA by virtue of that decision."  <u>Id.</u>, 62

F.3d at 571.  Courts applying the presumption articulated in <u>Moench</u> have determined

that in order to overcome the presumption, "plaintiffs must . . . make allegations that

'clearly implicate[] the company's viability as an ongoing concern' or show 'a

precipitous decline in the employer's stock . . . combined with evidence that the company

is on the brink of collapse or is undergoing serious mismanagement.'"  <u>Quan v. Computer</u>

<u>Sciences Corp.</u>, 623 F.3d 870, 882 (9th Cir. 2010) (quoting <u>Wright v. Oregon</u>

<u>Metallurgical Corp.</u>, 360 F.3d 1090, 1099 n.5 (9th Cir. 2004)), and cases cited.

Accordingly, the <u>Moench</u> presumption establishes a standard that is very difficult for

plaintiffs to rebut.  <u>Id.</u> at 883.

The Fifth, Sixth and Ninth Circuits have followed the Third Circuit in adopting the

<u>Moench</u> presumption.  <u>See id.</u> at 874 ("We also join the United States Courts of Appeals

for the Third, Fifth, and Sixth Circuits by adopting the rebuttable 'Moench presumption' that fiduciaries acted consistently with ERISA in their decisions to invest plan assets in employer stock."). However, "the First Circuit has expressly declined to do so." Kenney I, 694 F. Supp. 2d at 74 (describing First Circuit's unwillingness to apply presumption in LaLonde and Bunch). Additionally, the First Circuit has expressed particular concern about applying such a presumption at the pleading stage, and has continued to emphasize "the value of 'further record development' as 'essential to a reasoned elaboration of that which constitutes a breach of fiduciary duty in this context.'" Id. (quoting LaLonde, 369 F.3d at 6).

It is true, as the defendants argue, that the First Circuit has not completely fore-closed the possibility of applying the Moench presumption to ERISA fiduciary duty claims filed in this Circuit. See LaLonde, 369 F.3d at 6 (emphasizing, in declining to follow Moench, that the ERISA "law implicated by plaintiffs' [breach of fiduciary duty] claims is neither mature nor uniform," and that there are only a "few discordant judicial decisions" addressing the question whether the presumption of prudence should apply). Nevertheless, this court declines to apply it here. As an initial matter, there is still disagreement, even among courts that have adopted the Moench presumption, about the appropriateness of doing so at the pleadings stage. See Kenney I, 694 F. Supp. 2d at 75 n.6 ("Those courts that have adopted Moench have disagreed as to the propriety of applying it at the pleadings stage"); In re Morgan Stanley ERISA Litig., 696 F. Supp. 2d 345, 359 (S.D.N.Y. 2009) ("district courts in the Second Circuit and elsewhere have

viewed the presumption of prudence inappropriate for resolution on a motion to

dismiss").  Even <u>Moench</u> itself arose in the context of a motion for summary judgment.

<u>Moench</u>, 62 F. 3d at 556.  Furthermore, as recently as 2009, the First Circuit reiterated its

resistence to the application of "hard-and-fast rule[s]" in ERISA fiduciary duty cases.

<u>Bunch</u>, 555 F.3d at 10.  Accordingly, this court concludes that the <u>Moench</u> presumption

should not be applied to Kenney's proposed SAC.

The defendants argue that even disregarding <u>Moench</u>, "a plaintiff must allege facts

plausibly showing that the stock was so extraordinarily risky that 'no Plan assets – *not*

*one cent* – should have been invested in it.'"  (Def. Opp. Mem. at 23 (quoting <u>Morrison v.</u>

<u>MoneyGram Int'l, Inc.</u>, 607 F. Supp. 2d 1033, 1051 (D. Minn. 2009)) (emphasis added).

Plaintiff argues that such an extreme finding is not the law.  (Pl. Reply Mem. (Docket No.

108) at 19-20).  This court notes that, despite this quoted language, <u>Morrison</u> did not

address whether the situation could arise where it was deemed prudent to hold onto some

company stock, but imprudent to continue to buy company stock.  A fair reading of

Kenney's SAC is that he is leaving open the potential for such a claim in the instant case.

Moreover, the quoted language from <u>Morrison</u> was made in the context of that court's

conclusion that the <u>Moench</u> presumption should apply to an eligible individual account

plan ("EIAP"), as well as to an ESOP, since in both situations the fiduciaries are exempt

from the duty to diversify.  <u>See Morrison</u>, 607 F. Supp. 2d at 1050-51.  The First Circuit,

however, has rejected the rigid application of <u>Moench</u> despite the statutory exemption

from the duty to diversify.  <u>See Lalonde</u>, 369 F.3d at 6, 8.  Thus, this court's analysis will

be based on the generally accepted prudence standard, and will not require a showing, at least at the pleading stage, that the company stock was so "extraordinarily risky" that "not one cent" of company stock should be held as Plan assets.

### Sufficiency of the Allegations

In support of the defendants' argument that Kenney's claim of imprudence is futile, regardless of the standard applied, the defendants point to the fact that the plaintiff's allegations focus on one part of State Street's business while ignoring the fact that the Company as a whole was remarkably successful.  (Def. Opp. Mem. at 24-25; Def. Sur-Reply (Docket No. 117) at 18).  For example, but without limitation, they point out that in its 2007 Form 10-K, State Street reported that its net income had increased from $1.106 billion in 2006 to $1.261 billion in 2007, and that its revenue had increased from $6.311 billion to $8.336 billion over the same period.  (Def. Ex. G at 77).  Additionally, in its 2008 Form 10-K,  State Street reported net income of $1.811 billion, revenue of $10.693 billion, and assets exceeding $173.6 billion.  (Def. Ex. R at 31).  Moreover, the defendants assert that the Company reportedly paid shareholders a substantial dividend, and qualified as well capitalized regardless of whether the conduits were consolidated. (Def. Sur-Reply at 18).

The plaintiff acknowledges the fact that the conduits represented only a portion of State Street's business.  (See SAC ¶ 66 (citing article stating that State Street had credit lines to conduits representing 17% of its total assets)).  Nevertheless, he alleges that the conduits were material to the Company's overall financial stability, as evidenced by the

drop in State Street's TCE ratio that would have occurred if the conduits had been consolidated on State Street's balance sheet.  (See id. ¶¶ 79-81).  Although the defendants attempt to minimize the alleged significance of the TCE ratio by arguing that it was not required under GAAP or bank regulations, (Def. Sur-Reply at 9), it is undisputed that the TCE ratio was "a metric used by [State Street's] management to evaluate the adequacy of State Street's capital levels." (Def. Ex. Y at p. 9).  Moreover, the record shows that the Company deemed it significant enough to disclose to investors in various Form 8-K filings how consolidation of the conduits would have affected State Street's TCE ratio during the Class Period.  (Def. Sur-Reply at 9-10 (citing disclosures)).  Those disclosures reveal that the TCE ratio would have fallen below 3% had consolidation occurred in certain quarters during the Class Period.  (Id. at 10).  Accordingly, the question whether the conduit business posed an extraordinary risk to the financial health of the entire operation can only be resolved after further development of the factual record.

The defendants also argue that Kenney's allegations regarding the risks associated with the conduits cannot support an imprudence claim because State Street's sponsorship of the conduits was a business strategy that had been part of the Company's ongoing operation for years.  (Def. Opp. Mem. at 25).  They contend that Kenney cannot "shift to State Street (and its current investors) any losses incurred in a period he selected in hindsight which encompassed the full span of the global credit crisis[.]"  (Id. at 26).  Courts have held that "[a] company's decision to adopt a riskier business model is not itself a fiduciary decision governed by ERISA, nor does that decision automatically

trigger a duty to divest."  In re Constellation Energy Group, Inc., 738 F. Supp. 2d 602,

611 (D. Md. 2010) (citing cases).  Here, however, the question is not whether State

Street's sponsorship of the conduits in general was imprudent, but whether the defendants

acted imprudently by failing to cease investments in the Company's stock at a time when

they knew or should have known that a crisis in the credit markets had significantly

enhanced the risk that State Street would suffer severe losses from its exposure to the

conduit business.  See In re Am. Int'l Group, Inc. ERISA Litig. II, No. 08 Civ. 5722

(LTS)(KNF), 2011 WL 1226459, at *7 (S.D.N.Y. Mar. 31, 2011) (slip op.) (finding that

plaintiffs stated imprudence claim where they alleged numerous factual circumstances

warranting further inquiry into employer's financial health, including but not limited to,

facts showing that company saw mounting evidence of increasing risk in the residential

housing market, faced increased calls for collateral, had an increasingly leveraged

financial position, and was the subject of a criminal investigation).  Accordingly, it is not

simply State Street's involvement in risky business practices that Kenney attacks, but the

alleged failure to act at a time when the Company was facing the prospect of significant

losses and declining stock prices from the financial pressures on that business.

      This court also is unpersuaded by the defendants' argument that Kenney's theory

is implausible because he wrongfully alleges that State Street should have consolidated

the conduits on its balance sheet earlier, and because his allegations regarding the price

drop that occurred following the Company's issuance of its Form 8-K on January 16,

2009 "does not suffice as a factual basis for imprudence."  (Def. Opp. Mem. at 26-27;

Def. Sur-Reply at 20).  As an initial matter, this court does not understand the SAC to allege that State Street should have consolidated the conduit losses on its balance sheet sooner than it did.  Rather, Kenney alleges that because State Street was exposed to such potentially huge losses in the event consolidation became necessary, the defendants knew or should have known that it was no longer prudent for the Plan to invest in the Company's common stock.  (See SAC ¶¶ 45, 56-58, 82).

This court also disagrees that Kenney's claim is based solely on the plunge in the price of State Street stock that occurred at the end of the Class Period.  Rather, as alleged in the SAC, Kenney is claiming that beginning in August 2007 and continuing throughout the Class Period, the adverse impact on the conduits caused by the turmoil in the financial markets was so significant that it threatened to derail State Street's financial stability and its stock price.  He further claims that under those circumstances, the defendants knew or should have known that State Street stock was an imprudent investment.  Thus, while the drop in the stock price is relevant to the analysis, it is only "one factor" bearing on whether the stock was an imprudent investment.  See Bunch, 555 F.3d at 7.

This court does agree with the defendant's assertion that in considering the "totality of the circumstances" as the First Circuit instructs, the court should consider the absence of similar price declines following larger increases in unrealized losses in earlier periods, as well as evidence regarding how State Street stock performed as compared to its peers and the S&P 500 index given all of the circumstances occurring in the market

during the course of the Class Period.[5]  (See Def. Sur-Reply at 20).  However, these are

factors that should be considered as part of a fuller analysis of the relevant facts, after the

parties have had an opportunity to engage in discovery.  See Bunch, 555 F.3d at 10

(recognizing "the importance of record development of the facts" in ERISA fiduciary

duty cases).

### Existence of Red Flags

In urging the court to deny Kenney's motion to amend, the defendants also assert

that Kenney's claim for breach of the duty of prudence is inadequate because the plaintiff

has alleged no facts plausibly suggesting that the defendants knew or should have known

that investing in State Street stock was imprudent.  "ERISA imposes no duty on plan

fiduciaries to continuously audit operational affairs.  Rather, courts have held that a duty

to investigate only arises when there is some reason to suspect that investing may be

---

[5]  The defendants argue, without citing to the record, that the court should consider the
fact that State Street's stock price rose 278% in the four months following the close of the Class
Period.  (Def. Opp. Mem. at 26).  Hindsight is not an appropriate lens through which to view a
fiduciary's actions under ERISA.  Bunch, 555 F.3d at 10; DiFelice, 497 F.3d at 424 ("whether a
fiduciary's actions are prudent cannot be measured in hindsight, whether this hindsight would
accrue to the fiduciary's detriment or benefit").  Nevertheless, if the defendants' argument
regarding the recovery of State Street's stock price subsequent to the close of the Class Period is
correct, it suggests that the defendants could have been exposed to a claim for breach of the duty
of prudence had they divested the Plan's holdings in the ESOP during the Class Period.  This
illustrates one of the reasons why some courts have concluded that fiduciaries of an employer
stock plan must be given a presumption of prudence.  See Kirschbaum, 526 F. 3d at 256
(concluding that "[l]ess than rigorous application of the Moench presumption threatens its
essential purpose.  A fiduciary cannot be placed in the untenable position of having to predict the
future of the company's stock performance.  In such a case, he could be sued for not selling if he
adhered to the plan, but also sued for deviating from the plan if the stock rebounded.").  As
detailed above, however, that is not yet the law of this Circuit.

imprudent – that is, there must be something akin to a 'red flag'" indicating that the company's stock was no longer an appropriate investment. Pugh v. Tribune Co., 521 F. 3d 686, 700 (7th Cir. 2008). Kenney does not dispute this requirement, but argues that he "has shown there were red flags as early as August 2007." (Pl. Reply Mem. at 17). This court agrees that under the liberal pleading standard applicable to ERISA claims, Kenney has adequately alleged facts showing the defendants had reason to know that continued investment in State Street stock was no longer prudent.

Kenney claims that the risk of investing in State Street stock had become apparent by August 28, 2007. At that time, according to the plaintiff, it was widely reported that there was growing recognition of a "crisis in the commercial-paper market" and concern about State Street's exposure to the conduits, which amounted to $22 billion and accounted for 17% of the Company's total assets. (SAC ¶¶ 64, 66). It was also reported that State Street had the most exposure to conduits among its European and American peers, that the "turmoil in credit markets" had caused "severe problems" for other sponsors of commercial paper conduits, and that State Street stock had been adversely impacted due to concerns about its sponsorship of the conduits. (Id. ¶¶ 58, 66). While "general news information [about the market] is not the type courts have found to be sufficient to trigger the duty to investigate[,]" this court finds that reports specifically relating to State Street, combined with the Company's own public disclosures regarding the increasing liquidity risk and growth in unrealized losses from the conduits during a time of turmoil in the commercial paper market, are sufficient to show that the defendants

knew or should have known about the risk that the conduit business was posing to the Company's financial condition and to the value of its stock. Compare In re Huntington Bancshares Inc. ERISA Litig., 620 F. Supp. 2d 842, 852 (S.D. Ohio 2009) (finding that general news reports about declines in the housing market and foreclosures on subprime mortgages were insufficient to place defendants on notice of the need to liquidate employer stock fund).

The defendants argue that Kenney's reliance on news articles and analyst reports in which commentators expressed concern about the conduits were not "red flags" because the analysts quoted therein did not express an opinion that the stock should be sold. (Def. Opp. Mem. at 30-31). While the defendants' argument raises factual issues as to whether the information available to the defendants should have triggered a duty to question the prudence of continued investment in State Street stock, it does not warrant the denial of Kenney's motion to amend with respect to his First Claim for relief.

This court also finds that the plaintiff is not required to plead facts showing that each individual defendant was, or should have been, aware of a red flag. (See Def. Opp. Mem. at 29). Fed. R. Civ. P. 8 "does not require Plaintiff[] to identify each Defendant by name when the Complaint makes an allegation that applies equally to all." In re Morgan Stanley ERISA Litig., 696 F. Supp. 2d 345, 365 (S.D.N.Y. 2009), and cases cited. The plaintiff's allegation that by August 2007, the "Defendants should have recognized . . . the lack of prudence . . . in permitting the continued investing and/or holding, by Plan Participants in State Street common stock[,]" (SAC ¶ 58), is "sufficient under Rule 8 to

appraise (sic) the Defendants of the grounds on which the claims are being brought and to allow them to prepare their defense." Id.

The defendants contend that even if Kenney is not required to offer individualized allegations regarding each defendant's knowledge, his claim still fails because no one could have predicted the extent of market forces on the conduit assets over the course of 2007 and 2008, the growth in unrealized losses, or the market's adverse reaction to the increase in unrealized losses in the fourth quarter of 2008.  (Def. Opp. Mem. at 29-30). However, this is not a case in which the plaintiff claims that the defendants breached their fiduciary duties simply because the "[C]ompany's fortunes took a relatively unexceptional turn for the worse." LaLonde, 369 F.3d at 7.  Rather, as Kenney explains it, he claims "that because the market was in such turmoil, and ominous signs had appeared as early as August 2007, a prudent fiduciary would not take the risk of investing a participant's retirement fund in State Street stock that was so exposed to the market turmoil."  (Pl. Reply Mem. at 19).  Although Kenney's ability to prove his case may turn out to be impossible, given the fact-based nature of the inquiry, and the First Circuit's emphasis on record development, he should have an opportunity to establish that under the circumstances presented at the time, the defendants knew or should have known that State Street stock was no longer a suitable investment.

## C.    Second and Third Claims: Negligent Misrepresentation and Failure to Disclose

In his Second and Third claims for relief, Kenney claims that the defendants breached their fiduciary duties by making material misrepresentations and failing to disclose material information in State Street's SEC filings, including in its 2007 Form 10-K, its Form 10-Q for the quarters ended March 31, 2008, June 30, 2008 and November 11, 2008, and in a Form 8-K issued on October 15, 2008.  The defendants argue that Kenney has failed to state a claim because he has not alleged that he detrimentally relied on the challenged filings, the SEC filings were not fiduciary communications, Kenney has failed to identify any false or misleading statements, and State Street had no duty under ERISA to disclose conduit-related information.  This court finds that Kenney's failure to allege facts showing that he relied on any of the challenged statements in connection with his purchase of State Street stock is fatal to his misrepresentation and non-disclosure claims.  Therefore this court recommends that his Second and Third Claims for relief be dismissed.

"In order to establish that State Street breached its fiduciary duties under ERISA by negligently misrepresenting information about the plan, the plaintiff must prove 'significant or reasonable reliance' on these misrepresentations."  Kenney II, 754 F. Supp. 2d at 291, and cases cited.  Although his lack of reliance was an issue in connection with the challenges to his First Amended Complaint, in his proposed SAC, Kenney has not alleged any facts indicating that he relied on the challenged statements.  Instead, he alleges that reliance on material misrepresentations and non-disclosures is presumed.

(SAC ¶¶ 149, 157).  For the reasons that follow, this court finds that Kenney is entitled to no such presumption in this case.

Kenney argues that because he is seeking plan-wide relief and has brought his claim as a class action, he is not obligated to allege individual reliance.  (Pl. Reply Mem. at 29).  These same arguments were raised in connection with the defendants' prior summary judgment motion, and rejected by the District Judge in Kenney II.  See Kenney II, 754 F. Supp. 2d at 291-92 (finding that participants in a defined contribution plan must show individual reliance on misrepresentations, even if claim is made on behalf of the entire plan, and that "[n]amed plaintiffs in a class action must be able to make out an individual claim").  There is nothing in Kenney's proposed SAC or in his brief that warrants a different outcome here.

Kenney also argues that he is entitled to a presumption of reliance under the Supreme Court case of Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972).  (Pl. Reply Mem. at 29-30).  This court finds that the presumption of reliance established by Affiliated Ute in the securities context does not apply to Kenney's proposed claims in this action.

Again, this argument was raised in connection with the defendants' motion for summary judgment on Kenney's prior claim that the defendants had negligently misrepresented aspects of State Street's financial condition in the Company's October 15, 2008 Form 8-K and press release.  As the District Judge stated in Kenney II,

Plaintiff also attempts to circumvent the requirement to prove detrimental reliance by recasting his claim as one for nondisclosure. In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972), a securities case brought against the United States under Rule 10b-5, the Supreme Court held that "[in cases] involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to discovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of the decision.  *Id.*  More recently, the Supreme Court expounded further on this rule and held that "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance."  *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008) (describing the *Affiliated Ute* presumption as a "rebuttable presumption of reliance); *cf.  Basic Inc. v. Levinson*, 485 U.S. 224, 248, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (describing how a presumption of reliance based on a "fraud-on-the-market" theory in securities law is rebutted by "any showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff....").

754 F. Supp. 2d at 292.  The District Judge further stated that it was "unclear whether this holding extends to the ERISA context," but she concluded that it was unnecessary to resolve that issue because the remaining claim was "concerned primarily with an affirmative misrepresentation on which the plaintiff must prove he relied" and because evidence of Kenney's failure to read the communication at issue rebutted any presumption of reliance regarding State Street's non-disclosures.  Id. at 292-93.

This court finds that Kenney's claims for misrepresentation and non-disclosure in the SAC must fail as well.  Admittedly, Kenney has attempted to recast his claims as ones

for non-disclosures.[6]  Even assuming, arguendo, that the complaint involves "primarily a

failure to disclose," however, the undisputed facts establish that any presumption of

reliance on the SEC filings at all has been rebutted.  See, e.g., Stoneridge Inv. Partners,

128 S. Ct. at 769 (Affiliated Ute establishes a rebuttable presumption of reliance).  The

rebuttable presumption exists because "[r]equiring a plaintiff to show a speculative state

of facts, i.e. how he would have behaved if omitted material information had been

disclosed, places an unrealistic evidentiary burden on the . . . plaintiff."  Joseph v. Q.T.

Wiles, 223 F.3d 1155, 1162 (10th Cir. 2000).  Here, however, Kenney has affirmatively

admitted that he did not read State Street's October 15, 2008 Form 8-K and press release

(the subject of the earlier motion for summary judgment),[7] and he has not challenged the

defendants' repeated assertions that he did not read any of the SEC filings at issue in the

SAC.[8]  Since Kenney did not read any of the filings, the court need not speculate about

---

[6]  In attempting to establish that his complaint is about omissions, Kenney quotes at length
from State Street's SEC filings, and then asserts that other information was not provided, without
attempting to explain why such information would logically be disclosed at that point in the filing.
(See, e.g., SAC ¶¶ 107-108, which objects to information being omitted from pages 46-47 of the
2007 Form 10-K which was, in fact, disclosed on page 72).  In addition, Kenney ignores all the
disclosures of risk made throughout State Street's SEC filings.  Some courts distinguish between
cases involving "half-truths" and "distortions" from situations where "the complaint is grounded
primarily in allegations that the defendant has failed to disclose any information whatsoever
relating to material facts[,]" and apply Affiliated Ute only to the latter.  See, e.g., In re Enron
Corp. Sec., Derivative & ERISA Litig., 610 F. Supp. 2d 600, 631 n.33 (S.D. Tex. 2009).  While
the issue is not free from doubt, for present purposes, this court will assume that the SAC
primarily involves claims of complete omissions.

[7]  See Kenney II, 754 F. Supp. 2d at 290.

[8]  It is also logical to conclude that Kenney did not read any of the challenged filings since
his last stock purchase was in 2007 and all of the challenged filings were dated after that time.

his response to the filings.  Kenney was as unaware of any alleged omissions as he was of any alleged affirmative misrepresentations.  Because Kenney "did not in fact rely upon [the defendants'] own deceptive conduct," his claims of misrepresentation and non-disclosure must fail.  See Stoneridge Inv. Partners, 128 S. Ct. at 770.

Finally, this court is not convinced that it is appropriate to apply the presumption recognized by Affiliated Ute and Stoneridge to an ERISA case like this one.  At least two Circuit Courts of Appeals have ruled that detrimental reliance is an element of an ERISA claim for breach of fiduciary duty based on material omissions.  See Bell v. Pfizer, Inc., 626 F.3d 66, 75 (2d Cir. 2010) (ruling that "where a plaintiff asserts a breach of fiduciary [duty] claim based on a material misrepresentation or omission, the plaintiff must establish detrimental reliance"); Leuthner v. Blue Cross & Blue Shield of Ne. PA, 454 F.3d 120, 123, 127-28 (3d Cir. 2006) (finding that detrimental reliance is an element of plaintiffs' ERISA claims for breach of fiduciary duty based on "material misrepresenta-tions and omissions about Plan benefits and amendments").  The plaintiff has cited to an unpublished district court case, In re Tyco Int'l, Ltd. Multidistrict Litig., No. MD-02-1335-PB, 2006 WL 2349338 (D.N.H. Aug. 15, 2006), in which the court found, in connection with a motion for class certification, that "the logic of *Affiliated Ute* lends itself equally well to a claim like plaintiff's misrepresentation count because it would be practically impossible for plaintiffs to prove that they relied on information that was

---

(See Docket No. 81, Ex. A at 61-62; Docket No. 90 at Resp. Nos. 4 & 7; SAC ¶¶ 104, 118, 127, 128, 130).

never provided to them." Tyco, 2006 WL 2349338, at *6 (quotations and citation

omitted). See also Nauman v. Abbott Lab., N. 04 C 7199, 2007 WL 1052478, at *2

(N.D. Ill. Apr. 3, 2007) (court, without discussion, applied Affiliated Ute in an ERISA

breach of fiduciary duty case in evaluating whether the plaintiffs had satisfied the

commonality requirement for class certification).  However, it is "a big leap" for the court

"to transfer the principles of securities law to ERISA cases and presume reliance from

materiality."  In re Merck & Co., Inc. Sec. Derivative & "ERISA" Litig., MDL No. 1658

(SRC), Civil Action Nos. 05-1151 (SRC), 05-2369 (SRC), 2009 WL 331426, at *5

(D.N.J. Feb. 10, 2009).  As the Merck court concluded, "[i]n the absence of any

controlling authority this Court is not persuaded that principles of securities law apply in

ERISA cases."  Moreover, unlike the situation described in Tyco, where it "would be

practically impossible" to prove reliance, here Kenney could show that he relied on the

allegedly misleading statements described in detail in his SAC.  Accordingly, this court

recommends that Kenney's negligent misrepresentation and non-disclosure claims be

dismissed.

### D.    Remaining Claims

The remaining claims consist of a claim against the individual defendants for

divided loyalty (Fourth Claim) and a claim against State Street for breach of the duty to

appoint, monitor and inform members of the Benefits and Investment Committees about

the true financial and operating condition of the Company (Sixth Claim).  Kenney has not

disputed the defendants' argument that those claims are futile.  For the reasons that

follow, this court recommends that the motion to amend be denied with respect to both claims.

"To state a claim for breach of the duty of loyalty based on conflicts of interest, plaintiffs must allege a specific conflict and harm resulting from the conflict." In re ING Groep, N.V. ERISA Litig., 749 F. Supp. 2d at 1351. It is not enough to allege, as Kenney has done in the instant case, that the individual defendants "breached their fiduciary obligations when they acted in their own interests or in their employer's (State Street's) interests rather than solely in the interests of the [Plan] Participants and Beneficiaries." (SAC ¶ 165). Rather, Kenney must allege facts showing that the individual plaintiffs had "an identifiable conflict that either benefitted the [individual] defendants or caused an identifiable harm to the Plan." In re Dynegy, Inc. ERISA Litig., 309 F. Supp. 2d 861, 897-98 (S.D. Tex. 2004). Kenney has not identified any such conflict. Therefore, his Fourth Claim for relief is not actionable.[9]

In support of his claim for breach of the duty to properly appoint, monitor and inform, Kenney alleges that the Company

> failed to adequately inform [members of the Benefits and Investment Committees] about the true financial and operating condition of the Company or, alternatively, ... State Street did adequately inform such

---

[9] To the extent Kenney is relying on the fact that two of the individual defendants were officers of State Street as well as fiduciaries under the Plan, (see SAC ¶¶ 17, 21), this is insufficient to support a claim for divided loyalty. See In re ING Groep, N.V. ERISA Litig., 749 F. Supp. 2d 1338, 1351 (N.D. Ga. 2010) ("It is well established that such dual roles [as corporate officers and plan fiduciaries] do not alone create an actionable conflict of interest under ERISA").

> persons of the true financial and operating condition of the Company
> (including the financial and operating problems being experienced
> by State Street during the Class Period identified herein) but
> nonetheless continued to allow such persons to offer State Street
> common stock as an investment option and/or maintain State Street
> common stock in Plan accounts even though State Street common
> stock was not a prudent investment for Participants' retirement
> accounts under the Plan.

(SAC ¶ 178).  There is nothing in the SAC to suggest that the members of the Benefits

and Investment Committees were not properly appointed.  Furthermore, with respect to

the duty to inform, Kenney has not alleged any facts, as opposed to conclusory allega-

tions, to show that State Street failed to provide the members of those Committees with

information about the Company's true operating and financial conditions.  To the extent

Kenney is suggesting that State Street breached its duty to monitor by allowing the

Committee members to continue to offer State Street stock although it was imprudent,

this is not sufficient to state a claim.  "A duty to monitor is pleaded sufficiently . . . when

a complaint alleges that the fiduciaries responsible for appointing other fiduciaries utterly

'failed to establish a procedure for monitoring [the appointed fiduciaries] and [failed] to

review those fiduciaries' performance.'"  In re Am. Int'l Group, Inc. ERISA Litig. II,

No. 08 Civ. 5722 (LTS) (KNF), 2011 WL 1226459, at *10 (S.D.N.Y. Mar. 31, 2011)

(slip op.) (quoting In re Pfizer Inc. ERISA Litig., 04 Civ. 10071, 2009 WL 749545, at *9

(S.D.N.Y. Mar. 20, 2009)) (alterations in original).  The SAC contains no allegations of

fact showing that State Street failed to establish any such procedures or to review the

performance of the other Plan fiduciaries.  Therefore, this court finds that Kenney has failed to allege a plausible claim for relief.

### E.    Demand for Jury Trial and Claims for Equitable Relief

The defendants have requested that Kenney's demand for a jury trial, as well as his claims for equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), be stricken.  This court agrees that Kenney is not entitled to a jury trial, and that he has failed to state a claim for relief under § 502(a)(3).

"[E]very Circuit Court to have considered the issue has concluded that ERISA does not confer a jury trial right."  Gammell v. Prudential Ins. Co. of Am., 502 F. Supp. 2d 167, 172 (D. Mass. 2007).  See also Hampers v. W.R. Grace & Co., 202 F. 3d 44, 54 (1st Cir. 2000) (affirming district court's denial of plaintiff's jury demand where plaintiff's claim was preempted by ERISA); Pepicelli v. Fall River Shirt Co., Inc., Civil Action No. 07-11770-RWZ, 2010 WL 3749453, at *3 (D. Mass. Sept. 21, 2010) (ruling, in case involving claims for breach of fiduciary duty under ERISA, that "[t]here is no right to a jury trial on an ERISA claim").  Kenney does not cite to any cases that hold otherwise. Instead, he argues that the Supreme Court's decision in LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S 248, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) implies that a jury trial may be appropriate in ERISA cases because it upholds a claim for monetary relief under ERISA § 502(a)(2).[10]  (Pl. Reply Mem. at 32-33).  This court disagrees.  In LaRue,

---

[10]   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes suits by participants for relief under section 1109.  Section 1109 provides in relevant part that "[a]ny person who is a fiduciary

the Supreme Court held that "although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." 552 U.S. at 256, 128 S. Ct. 1026. The Supreme Court said nothing to indicate that claims under § 502(a)(2) are legal rather than equitable, and it did not suggest that jury trials may be available in cases arising under ERISA § 502(a)(2). Moreover, the Supreme Court has long recognized that claims for breach of fiduciary duty under ERISA subject fiduciaries to liability for monetary relief, but it has not concluded that such relief is legal rather than equitable or that plaintiffs seeking relief for breaches of fiduciary duty are entitled to a jury trial. See Mertens v. Hewitt Assocs., 508 U.S. 248, 262, 113 S. Ct. 2063, 2071, 124 L. Ed. 2d 161 (1993) (noting that monetary damages are available under ERISA § 409(a), 29 U.S.C. § 1109(a), for breaches of fiduciary duty). "[T]he overwhelming weight of authority in the federal courts holds that actions under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), by participant - beneficiaries and fiduciaries to remedy . . . alleged violations of ERISA § 409(a), 29 U.S.C. § 1109(a), are equitable in nature for purposes of the Seventh Amendment jury trial right."[11] Spano v. Boeing Co., N. 06-cv-

---

with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a).

[11] Nothing in Evans v. Akers, 534 F.3d 65 (1st Cir. 2008) alters this court's conclusion that a jury trial is not available for claims arising under ERISA § 502(a)(2). In that case, the First

743-DRH, 2007 WL 1149192, at *8 (S.D. Ill. Apr. 18, 2007) (collecting cases).

Therefore, this court recommends that Kenney's demand for a jury trial be stricken.

This court recommends that Kenney's claims for equitable relief pursuant to § 502(a)(3) of ERISA be stricken as well. Section 502(a)(3) authorizes civil actions

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of a plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....

29 U.S.C. § 1132(a)(3). By his claims under § 502(a)(3), Kenney is seeking "appropriate equitable relief, including in the form of restitution to the Plan." (See, e.g., SAC ¶ 144). However, in Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002), the Supreme Court limited claims for restitution under § 502(a)(3) to cases in which the plaintiff seeks "to restore to the plaintiff particular funds or property in the defendant's possession." 534 U.S. at 214, 122 S. Ct. at 714-15 (footnote omitted). Thus, as the Court explained, relief under § 502(a)(3) is only

---

Circuit held that "former employees who allege that fiduciary breaches reduced their lump-sum distribution from a defined benefit contribution plan have standing to sue as 'participants' under the ERISA statute." Evans, 534 F.3d at 67. In its analysis, the First Circuit rejected the defendants' argument that the plaintiffs were not "participants" under ERISA because their claims under § 502(a)(2) sought relief in the form of "damages" rather than "benefits." Id. at 70. In particular, the court refused to accept the defendants' "strained distinction between suits for benefits and those for money damages[,]" noting that "any claim for breach of fiduciary duty is to some extent a claim for damages arising from the breach." Id. at 73 (internal quotations omitted). Nevertheless, the court cautioned that "[t]he appropriate distinction is not between 'benefits' and 'damages,' but rather between relief to which a participant is entitled under ERISA and relief which is not authorized by that Act." Id. As detailed above, the overwhelming weight of authority holds that relief under § 502(a)(2) for monetary damages is nevertheless equitable, and that plaintiffs asserting claims thereunder are not entitled to a jury trial.

available where "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." Id. at 213, 122 S. Ct. at 714.  This is not what Kenney alleges in the instant case where the losses at issue occurred as a result of a plunge in the price of State Street stock.  Therefore, he cannot seek equitable relief under ERISA § 502(a)(3), and such claims should be stricken.

## IV.  CONCLUSION

For all the reasons detailed herein, "Plaintiff Thomas U. Kenney's Motion for Leave to File a Second Amended Complaint" (Docket No. 92) is ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that the motion be allowed with respect to the First Claim for relief but denied with respect to the remaining claims.  This court also recommends that Kenney's demand for a jury trial and claims for equitable relief pursuant to § 502(a)(3) of ERISA be stricken.[12]

---

[12]   The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).

　　　/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge