# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| THOMAS U. KENNEY, on Behalf of Himself and a Class of Persons Similarly Situated, | : <br> : <br> : <br> : <br> : 1:09-cv-10750 (DJC) |
| Plaintiff, | : |
| v. | : |
| | : |
| STATE STREET CORPORATION; NORTH AMERICA REGIONAL BENEFITS COMMITTEE OF STATE STREET CORPORATION; ALISON QUIRK; PAMELA GORMLEY; ROSS MCLELLAN; DAVID O'LEARY; SKIP CURTRELL; JAYNE DONAHUE; DAVID GUTSCHENRITTER; JAMES MALERBA; STATE STREET CORPORATION INVESTMENT COMMITTEE; and JOHN DOES 1-10, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : |

---

### PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF HIS OBJECTION TO THE REPORT AND RECOMMENDATION

**TODD & WELD LLP**
Kevin T. Peters (BBO #550522)
28 State Street
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777

**STULL, STULL & BRODY**
Mark Levine
Patrick Slyne
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

**MAJOR KHAN, LLC**
1120 Avenue of the Americas
Suite 4100
New York, NY 10036
Tel: (646) 546-5664
Fax: (646) 546-5755

*Counsel for Plaintiff*

Thomas U. Kenney ("Plaintiff"), by his attorneys, submits this reply in further support of his objection to Report and Recommendation ("Recommendation") of Magistrate Judge Judith Dein with respect to Plaintiff's Motion for Leave to File a Second Amended Complaint ("SAC").

**PRELIMINARY STATEMENT**

In his objection, Plaintiff noted that the Recommendation suggested that he not be permitted to maintain his claim for negligent misrepresentation and omissions, as a result of the Court previously granting summary judgment based on Plaintiff's lack of reliance (that Plaintiff did not read certain Plan communications alleged to contain misleading statements) and that he could not maintain a plea for equitable relief, based on the Court's reading of *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) [Dkt.141 at 46-49] . However, Plaintiff has now demonstrated, based on the recent Supreme Court opinion in *Corporation v. Amara*, ___ U.S. ___, 131 S. Ct. 1866 (2011), that the Court's interpretation of *Great-West* is not correct and thus pleading of detrimental reliance in the context of an equitable claim, is not required. Faced with new and compelling authority that seriously undermines its position, Defendants disingenuously assert that Plaintiff cited mere *dicta* when, in fact, the language cited is integral to the Supreme Court's decision.  Nonetheless, even if the cited language was *dicta*, which it is not, Defendants flaunt First Circuit law in minimizing the authority of Supreme Court *dicta*.  In addition, Defendants mischaracterize Judge Dein's Recommendation, and State Street's disclosures to suggest, contrary to Judge Saris' Opinion, that none of its statements were materially misleading.  In sum, Plaintiff is entitled to pursue an equitable claim based on the Defendants' alleged misstatements.  Moreover Defendants' assertion that they were not made in a fiduciary capacity does not hold water.

### *CIGNA* MAKES CLEAR THAT PLAINTIFF MAY MAINTAIN AN EQUITABLE CLAIM WITH RESEPCT TO DEFENDANTS' MISSTATEMENTS WITHOUT PLEADING DETRIMENTAL RELIANCE

In CIGNA, plan participants challenged the conversion of their traditional defined benefit pension plan to a cash balance plan, arguing that 's misrepresentations with regard to the conversion adversely affected their pension benefits. *Id.* at 1870. The district court found that the misrepresentations violated duties as a fiduciary under ERISA and caused plaintiffs' "likely harm". 131 S. Ct. at 1870-71. Although the district court ordered the plan reformed and benefits paid under ERISA section 502(a)(1)(B), it declined to decide whether it could provide the same relief under section 502(a)(3). After the Second Circuit affirmed, the Supreme Court granted *certiorari* to decide "whether a showing of 'likely harm' is sufficient to entitle plaintiffs to recover benefits based on faulty disclosures." *Id*. at 1876. The Supreme Court found authority not based on section 502(a)(1)(B) but instead section 502(a)(3), the ERISA section which authorizes "appropriate equitable" relief. Similarly, Plaintiff Kenney seeks equitable relief under 502(a)(3) as the Supreme Court found appropriate in CIGNA.

Defendants strain to suggest that *CIGNA* is sufficiently distinguishable from the instant case such that when the Supreme Court stated that "there is no general principle that 'detrimental reliance' must be provided before a remedy is decreed" and that "[t]o the extent any such requirement arises, it is because the specific remedy being contemplated imposes such a requirement. *Id*. at 1881. But, as the Supreme Court stated, with respect to the law of equity, there is no general principle that 'detrimental reliance' must be proved before a remedy is decreed. *Id*.

*CIGNA* involved misrepresentations made to plan participants, and the participants who brought the action did not read those misrepresentations and did not act on those

misrepresentations.  Yet the Supreme Court found that such lack of detrimental reliance was not required to state a claim for equitable relief based on allegations of misrepresentation or omission.  131 S. Ct at 1181.   As the Supreme Court stated:

> Nor did equity courts insist upon a showing of detrimental reliance in cases where they ordered "surcharge." Rather, they simply ordered a trust or beneficiary made whole following a trustee's breach of trust. In such instances equity courts would "mold the relief to protect the rights of the beneficiary according to the situation involved." Bogert § 861, at 4. This flexible approach belies a strict requirement of "detrimental reliance."[1]

Nor is plaintiff attempting to evade the requirement of proving harm that the Supreme holds is still required even in the context of seeking equitable relief.  The inflation in the State Street stock that Plaintiff intends to prove will provide evidence of the harm.  Unlike a ***legal*** claim for negligent misrepresentation or omission that this Court previously held requires Plaintiff to have read statements alleged to be false, the Supreme Court's opinion makes plain that no such requirement exists in connection with his ***equitable*** claim under ERISA.  Just as it was acknowledged that the *CIGNA* plaintiff could state a valid claim for equitable relief notwithstanding having not read and relied on representations affecting his retirement plan value, it is just as possible to state an equitable claim even without pleading he read the document.

While Defendants suggest in a footnote that courts in "information related contexts" have "long demanded reliance to show causation of harm" [Dkt. 145 at 4, fn. 2], they ignore the fact that as the Supreme Court made abundantly clear in *CIGNA* that the rule may be different in the context of a plaintiff seeking equitable relief.  Surprisingly, Defendants cite *Brouda v. Dura*

---

[1] Considering the remedy of "surcharge", which is "compensatory", "make-whole" relief resulting from a trustee's breach of duty, *Id*. at 1880, the Supreme Court explained that while a fiduciary can be surcharged "only upon showing of actual harm . . . [which] may sometimes consist of detrimental reliance," the showing of actual harm might also come from the loss of a right protected by ERISA or its trust-law antecedents." *Id*.

3

*Pharmaceuticals, Inc.*, 544 U.S. 336, 343 (2006), for their support that direct reliance (i.e. the plaintiff reading the communication), is required even in the context of seeking equitable relief to continue the claim because *Brouda* was a case where direct reliance would not have been required because, like State Street, the stock in question traded in an efficient market so that investors would have been deceived whether or not they read particular statements. Ironically, the theme to Defendants' summary judgment motion was that direct reliance was required. *Poulos v. Caesars World, Inc.*, 379 F. 3d 654, 655 (9th Cir. 2004), is clearly *sui generis* as the court stated, "[d]ue to the unique nature of gambling transactions and the allegations underlying the class claims, this is not a case in which there is an obvious link between the alleged misconduct and harm." In *In re NM Holdings Co. LLC*, 622 F. 3d 613 (6th Cir. 2010), the court stated that it was obvious that an individual can not get harmed by a negligent audit unless that person relies on it. In contrast, here because the misstatements caused inflation in the price of State Street stock, they damaged plaintiff even if he did not read the statement and act based on it. *c.f.*, *In re Uniphase Corp. ERISA Litig*, 2005 U.S. Dist. LEXIS 17503 at *43 (N.D. Cal. July 14, 2005) (rejecting requirement to plead reliance on motion to dismiss in ERISA case).

## EVEN IF THE PLAINTIFF HAD ONLY CITED SUPREME COURT *DICTA*, THAT WOULD STILL BE BINDING ON THIS COURT

Plaintiff's citations to *CIGNA* clearly were not *dicta*.[2] Rather, the language of the Supreme Court opinion cited by Plaintiff was essential to its holding. Surely, the fact that the Supreme Court held that detrimental reliance is not needed to secure equitable relief in the

---

[2] According to *Black's Law Dictionary*, *obiter dictum* is a remark or observation made by a judge that, although included in the body of the court's opinion, does not form a necessary part of the court's decision.

context of that action was a substantial part of the reasoning why the Supreme Court vacated the dismissal and remanded the case back to the court below. In fact, in the opinion, the second item in the "Held" section states that, "Thus, to obtain relief by surcharge for violations of §§ 102(a) and 104(b), a plan participant or beneficiary must show that the violation caused injury, but need show only actual harm and causation, not detrimental reliance. Pp. 20-22." 131 S. Ct. at 1868.

Although Defendants attempt to downplay the significance of *CIGNA* by claiming that Plaintiff cites only *dicta*, it matters not because Defendants have withheld telling this Court that at least in the First Circuit, *dicta* by the Supreme Court has almost the same impact as any other statements it makes. As stated in *United States v. S. Union Co.*, 630 F.3d 17, 34 (1st Cir. 2010):

> We do not discount the Supreme Court's language merely because it was used in *dicta*. We 'are bound by the Supreme Court's considered *dicta* almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement.' *Rossiter v. Potter*, 357 F.3d 26, 31 n.3 (1st Cir. 2004) (alteration in original) (quoting *McCoy v. MIT*, 950 F.2d 13, 19 (1st Cir. 1991)) (internal quotation mark omitted).

Even Defendants do not argue that *CIGNA* is not of recent vintage or enfeebled by subsequent statement. That is particularly true in this case where *CIGNA* is less than two months old.

## PLAINTIFF DOES PLEAD ACTIONABLE MISREPRESENTATIONS AND OMISSIONS

The SAC alleges that Defendants' statements concerning the conduits were materially misleading and omitted to disclose information about the true extent and imminent financial risks to State Street. As Judge Saris held, while there were turgid disclosures in the SEC filings, they did not clearly explain the risks posed by "first loss" notes, "monoline insurance," the "financial models," or the "off balance sheet" assets. [Dkt. 56 at 25]. Specifically, Judge Saris held that State Street CEO Ronald Logue's October 15, 2008 statement (contained in a Form 8-K which was incorporated by reference in plan documents) that "the asset quality in both our investment

5

portfolio and conduit program remains high," was actionable since a Plan beneficiary could interpret Logue's statement as a pat-on-the-back assurance that no further significant conduit losses were foreseeable and there was no reason not to continue to invest in [State Street] stock."[3] [Dkt. 56 at 25]   Defendant Logue's statement, along with other State Street alleged misrepresentations pled in the SAC misled the market to believe that despite market turmoil and fluctuations in market prices of conduit assets, State Street's financial results and financial condition would not experience significant adverse impact from its conduit business.

Defendants' assertions that State Street's conduit disclosures were adequate are belied by the SAC, including the reference to Punk Ziegel analyst Richard Bove's August 29, 2007 report that while State Street "insists that the quality of its paper is pristine," "***no one knows what the reality of the situation is***" and that the multiple on State Street Stock will contract until there is "***more transparency as to what is truly happening in these portfolios.***," [Dkt.98 SAC ¶67].

Acknowledging the defect, defendants claim the lack of transparency was remedied by subsequent SEC Form 8-K filings that merely provided general categories of investment securities held by the conduits. [Dkt.124 at 40:12-41:21]   The SAC alleges that credit agency ratings on debt securities were unreliable [Dkt 98, SAC¶¶ 64, 96-112], but without disclosure of the identities of specific securities, the ratings on such specific securities, or whether there was an active market for any particular security, State Street's disclosures left Plan participants and analysts in the dark about true level of risks posed by the conduits.

---

[3] Although Defendants were subsequently granted summary judgment with respect to that statement based on lack of reliance, the grant of summary judgment in no way affected the question of whether or not that statement is still actionable, because of Judge Saris's previous ruling  Accordingly to the extent that the Court agrees with Plaintiff and finds that based on *CIGNA* proof of detrimental reliance is not required for equitable relief to be awarded, Plaintiff has established at least one actionable statement with respect to an equitable claim.

Indeed, the financial models State Street used to estimate loss were a proverbial black box. Highly subjective assumptions used in the models to project conduit losses were not disclosed. The SAC alleges that credit agency ratings Defendants knew or should have known were unreliable were used by the model to estimate conduit losses.[4] [Dkt. 98, SAC¶¶ 64, 96-112]. The SAC also alleges that throughout the relevant period, Defendants represented that the "predominant risk" of loss associated with the conduits was credit risk, and that the so-called "first loss" notes, which totaled merely $32 and $52 million would absorb the majority of projected conduit losses going forward. [Dkt. 98, SAC¶¶ 63, 109, 119, 127, 136]. State Street represented that it estimated expected losses based on hundreds of thousands of probability-weighed loss scenarios.[5] [Dkt. 98, SAC¶¶ 112, 119, 127, 136]. Defendants' statements were materially misleading because, among other things, credit ratings used in the loss model were unreliable, despite reference to "hundreds of thousands" of loss scenarios, the model failed to project losses that would result from the conduit's sale of assets at market values less than book values, despite an abundance of news reflecting declines in similar assets held by competitor banks, State Street failed to similarly acknowledge the true extent of value declines in the assets of its own conduits. [Dkt. 98, SAC¶120]. In sum, the conduits exposed State Street to far greater and more imminent risk that State Street would be materially affected by its conduit business than Defendants' statements led Plan participants to believe. [Dkt.98, SAC¶¶ 82-91, 103].

---

[4] Plan participants, however, could not know whether credit ratings on conduits were inflated because State Street did not disclose sufficient information to determine any securities held,

[5] These are the same models that Judge Saris previous called "not well explained by SEC filings." [Dkt.56, opinion at 17].

7

On October 15, 2008, the same day as defendant Logue's sanguine assurance that asset quality "remains high," State Street held an analyst conference. The fact that State Street's public statements concerning the conduits were unclear is made plain by Goldman analyst Brian Foran's statement, "as I go through the [conference call] transcript here, *there has been about 10 questions on the conduit for every one question on the core business.*" [Dkt. 103, Ex.Q at 21]

Indeed, an important metric was the Tangible Common Equity (TCE) ratio which State Street recognized was problematic if it were below 3%.[6] [Dkt. 103, Ex. Q at 20]. If State Street were to consolidate the conduit assets onto its balance sheet, the TCE ratio would be adversely affected, and in order to maintain at least a 3% ratio, State Street would have needed to raise equity capital. It did so in June 2008 to prop up the TCE ration and it did it for a second time in less than a year almost simultaneously with the consolidation in May, 2009, diluting existing shareholder value. Thus, at the time State Street was reassuring the market in 2008 that the conduit assets would remain unconsolidated, it was issuing new equity to maintain a TCE ratio above the benchmark minimum 3%. [Dkt. 98, SAC¶ 117].

Finally, on January 16, 2009, State Street issued a press release that reported respectable results in its day to day operations but revealed $9 billion in potential losses in its investment portfolio and conduits that caused the market price of State Street common stock to *plunge*

---

[6] As Plaintiff has previously stated, an acceptable TCE ratio was so important to State Street and its investors that on February 5, 2009, just days after State Street stock dropped almost 60%, State Street stated in a press release, "In 2009, the plan to improve TCE includes reducing the Company's quarterly dividend on its common stock [from $.24 per share] to $0.01 per share, a more conservative reinvestment plan affecting assets paying down and maturing in its investment portfolio, actions intended to increase organic capital growth, and a reduction in the size of the company's balance sheet." Logue stated, "State Street has among the highest regulatory capital ratios in the industry; however, **we are implementing a plan to alleviate investor concerns about our pro forma TCE ratio, if we were to consolidate the asset-backed commercial paper conduits that we administer . . .**" (emphasis added). [Dkt.146, Ex. A].

8

***$21.46, or 59 percent, to $14.89, a level not seen since 1996***.  [Dkt. 98, SAC¶ 82]. When in May 2009, State Street effected the consolidation of the conduits onto its balance sheet and recognized a financial loss due to the decline in market value of the conduit assets,  State Street simultaneously announced a $2.2 billion equity offering which increased its TCE ratio of 2.2% to 3.3%, just barely more than the minimum benchmark.  [Dkt. 98, SAC¶ 89].  When State Street consolidated the conduit assets onto its balance sheet during the second quarter 2009, State Street *recognized* a pre-tax extraordinary loss of $6.10 billion, for a loss of $7.12 per share, compared to a $1.35 per share profit in the same period in the prior year. [Dkt. 98, SAC¶ 88]. Defendants present a number of bullet points which they assert as examples of Judge Dein not overlooking State Street's disclosures [Docket Entry 145, Defs. Reply Br. at 8], when in fact, Judge Dein never ruled that State Street's disclosures were adequate.  Although Defendants list quite a few bullet points, a closer look shows most of them presented out of context.  For example, Defendants quote from the Recommendation [Docket Entry 145 at 4] as follows: "State Street regularly issued statements about the conduit business in its SEC filings."  The Recommendation states, "[Plaintiff] also claims that although State Street regularly issued statements about the conduit business in its SEC filings, those statements were materially false and misleading because they failed to disclose facts that would have revealed the extent of the financial risk to the Company that was created by the conduits." [Dkt.141 at 4].

Defendants second bullet states, "State Street did make a great number of disclosures concerning the conduits, and, despite the plaintiff's challenges, State Street's public filings will be cited extensively in this decision." [Dkt.141 at 10, n. 2].  But Defendants omit: "Kenney contends that the defendants made various misrepresentations and otherwise failed to adequately disclose risks associated with State Street's sponsorship of the conduits.  As detailed below, this

9

court declines to evaluate the specific representations at issue, since Kenney's lack of reliance on any of the representations precludes the maintenance of his challenge to their sufficiency." *Id*.

In the last bullet point, defendants quote the Recommendation [Dkt.141 at 16], stating that "State Street 'acknowledged the potential losses that would have occurred if it had been required to consolidate the conduits into its consolidated financial statements.'" But what Defendants failed to do is include the first word in the sentence which was "While" and to finish up the sentence it was quoting from Judge Dein which stated, "it maintained the quality of the conduit assets remained high." It was misleading not just because leaving out part of the sentence put the entire sentence out of context, but the part the sentence that Defendants omitted was the very same statement that Judge Saris previously found actionable. [Dkt.56 at 23-24].

### DEFENDANTS ARE LIABILE FOR REFERENCED STATEMENTS

Although the Recommendation does not address the issue, Defendants suggest that the accuracy of the statements alleged to be materially false and misleading is irrelevant because the statements were not made in a fiduciary capacity because they were not contained in the four corners of the plan documents. [Dkt.145 at 4-5]. However, whether a misrepresentation and omissions was made within the four corners of the plan document is irrelevant if the documents containing the actionable statements were incorporated by reference in the plan or Summary Plan Document.  See, *Krohn v. Huron Mem'l Hosp.*, 173 F. 3d 542, 548 (6th Cir. 1999); *Banks. v. Healthways, Inc.*, 2009 U.S. Dist. LEXIS 6105, at * 9-10 (M.D. Tenn. Jan. 28, 2009); *In re AEP ERISA Litigation*, 327 F. Supp. 2d 812, 832 (S.D. Ohio 2004); *In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003); *In re Elec. Data Sys. Corp. ERISA Litig.*, 305 F. Supp. 2d 658, 665-73 (E. D. Tex. 2004); *In re JDS Uniphase Corp. ERISA Litig.*, 2005 U.S. Dist. LEXIS 17503 (N.D. Cal. July 13, 2005).

## CONCLUSION

For the foregoing reasons, and for the reasons and the reasons stated in all of Plaintiff's memoranda of law in connection with the motion to file a second amended complaint and memoranda related to the Report and Recommendation, Plaintiff respectfully requests the Court grant Plaintiff leave to file the proposed SAC.

Dated:  July 8, 2011

Respectfully Submitted:

**TODD & WELD LLP**
Kevin T. Peters (BBO #550522)
28 State Street
Boston, MA 02109
Telephone: (617) 720-2626
Facsimile:  (617) 227-5777

**STULL, STULL & BRODY**

By: /s/ Mark Levine
Mark Levine
Patrick Slyne
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile:  (212) 490-2022

**MAJOR KHAN, LLC**
1120 Avenue of the Americas
Suite 4100
New York, NY 10036
Tel: (646) 546-5664
Fax: (646) 546-5755

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Mark Levine, hereby certify that a copy of the foregoing document, filed through the ECF system on July 8, 2011, was sent electronically on that date to the registered participants as identified in the Notice of Electronic Filing.

Dated July 8, 2011

/s/ Mark Levine